EXHIBIT 4

1               UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                       --oOo--

4

5   ASHLYN PETIT, as successor-in
    interest to JERMAINE PETIT, deceased,

6
            Plaintiff,

7
    v.                            Case No.
8                                 2:23-cv-00789-CJC (PVCx)

9   CITY OF LOS ANGELES, a municipal
    entity; OFFICER DARYL GLOVER, JR.;
10  SERGEANT BRETT HAYHOE;
    and DOES 1 through 10, inclusive,

11
            Defendants.
12  _____/

13

14

                STENOGRAPHIC REPORTER'S TRANSCRIPT OF
15
             REMOTE VIDEO DEPOSITION OF DARYL GLOVER, JR.
16
                   WEDNESDAY, JULY 30, 2025
17
                   **UNSEALED PORTION**
18

19  Reported Stenographically by:

20  KIMBERLY D'URSO, CSR 11372, RPR

21  Job No.  18705

22

23

24

25

```
 1                     APPEARANCES  (Remote)

 2   FOR THE PLAINTIFFS:

 3             LAW OFFICES OF DALE K. GALIPO
               BY:  DALE K. GALIPO, ESQ.
 4                  RENEE MASONGSONG, ESQ.
               21800 Burbank Boulevard, Suite 310
 5             Woodland Hills, California 91367
               818.347.3333
 6             dalekgalipo@yahoo.com
               rvalentine@galipolaw.com
 7
               IVIE MCNEILL WYATT PURCELL & DIGGS
 8             BY:  RODNEY S. DIGGS, ESQ.
               444 S. Flower Street, Suite 3200
 9             Los Angeles, CA 90071
               213.489.0028
10             rdiggs@imwlaw.com

11

12   FOR THE DEFENDANTS BRETT HAYHOE and DARYL GLOVER, JR.

13             CARPENTER ROTHANS & DUMONT, LLP
               BY:  KIMBERLY SARMIENTO, ESQ.
14             500 S. Grand Avenue, 19th Floor
               Los Angeles, CA 90071
15             213.228.0400
               ksarmiento@crdlaw.com

16   FOR THE DEFENDANT CITY OF LOS ANGELES:

17             OFFICE OF THE CITY ATTORNEY OF LOS ANGELES
               BY:  CHRISTIAN R. BOJORQUEZ, ESQ.
18             200 N. Main Street, 6th Floor, City Hall East
               Los Angeles, CA 90012
19             christian.bojorquez@lacity.org

20   ALSO PRESENT:  Dennis Saelee, Videographer

21                  Danie Williams, paralegal

22                  Olivia Burnett, law clerk

23                     --oOo--

24

25
```

Dahlia Petit Jr.

```
 1        Q.    Prior to the date of the shooting, had you ever
 2   been present for an officer-involved shooting before?
 3        A.    No.
 4        Q.    Had you ever seen a suspect with a firearm in
 5   their hand before the date of the shooting?
 6        A.    Yes.
 7        Q.    On how many occasions, approximately?
 8        A.    Approximately, 20 to 25.
 9        Q.    Were you trained that you can shoot someone
10   merely for seeing a firearm in their hand?
11              MS. SARMIENTO:   Objection.   Incomplete
12   hypothetical.
13   BY MR. GALIPO:
14        Q.    You may answer.
15        A.    No -- I'm -- I'm sorry.   Can you repeat the
16   question?
17        Q.    Sure.   Were you trained that you can shoot
18   someone merely for seeing a gun in their hand, that fact
19   alone?
20              MS. SARMIENTO:   Same objections.
21              Go ahead.
22              THE WITNESS:   I would need more to it.   Are
23   they pointing it at us, or are they just merely holding a
24   gun?
25   BY MR. GALIPO:
```

David Petit Jr.

```
 1        Q.    Just holding it.
 2        A.    No.
 3        Q.    The 20 to 25 individuals you saw with guns in
 4   their hand, did you shoot any of those individuals?
 5        A.    No.
 6        Q.    Have you seen suspects with other weapons in
 7   their hands, like knives and other objects?
 8        A.    Yes.
 9        Q.    And has that been on multiple occasions?
10        A.    Yes.
11        Q.    Is one of the commands that you're trained to
12   give if you see a weapon in someone's hand, to "Drop
13   it," if you have time to give that command?
14        A.    Yes.
15        Q.    Other than your firearm, did you have any less
16   lethal tools with you that day, such as a Taser, pepper
17   spray, or a police baton?
18        A.    Yes, sir.
19        Q.    What did you have with you, other than your
20   firearm?
21        A.    A baton, a Taser, and pepper spray.
22        Q.    Do you know what type of baton?  Was it
23   expandable?
24        A.    No, I had the -- the side-handle baton.
25        Q.    Do you know what type of Taser you had?  Was it
```

Daniel Petit Jr.

```
 1    an X2 or something else?

 2         A.   I don't recall, sir.

 3         Q.   Do you recall if it had two cartridges in it?

 4         A.   Yes, sir.  I believe it did.

 5         Q.   And was it essentially OC spray that you had?

 6         A.   Yes, sir.

 7         Q.   Prior to the date of the shooting incident, had

 8    you ever used your Taser in the field?

 9         A.   Yes, sir.

10         Q.   On how many occasions, approximate?

11         A.   Once.

12         Q.   Was that in the probe mode?

13         A.   Yes, sir.

14         Q.   Or the -- and how about your OC spray?  Had you

15    ever used that in the field before?

16         A.   No.

17         Q.   And how about your baton as an impact weapon;

18    had you ever used that before?

19         A.   No, simply for crowd control.

20         Q.   You told me earlier you were partnered up with

21    Officer Martinez on the date of the incident; is that

22    correct?

23         A.   Yes, sir.

24         Q.   Were you assigned to the same patrol vehicle?

25         A.   Yes, sir.
```

Petit v. City of Los Angeles, et al.
Focus Litigation Solutions

Page: 18

Daniel Estrada Jr.

1      Q.    Any other information you recall having related

2      to the call, before seeing the potential suspect?

3      A.    That's all I recall right now, sir.

4      Q.    Did you have any information, for example, on

5      the name of the person?

6      A.    No, sir.

7      Q.    Did you know whether or not the person had a

8      criminal history?

9      A.    No, sir.

10     Q.    Did you have any information as to whether the

11     person was under the influence of drugs or alcohol?

12     A.    No, sir.

13     Q.    Did you have any information that the person

14     specifically, had injured anyone?

15     A.    No, sir.

16     Q.    As a law enforcement officer, is part of your

17     job, as you understand it, to respond to calls and

18     information and do some type of assessment or

19     investigation when you can?

20     A.    Yes, sir, when I can.

21     Q.    Sometimes, has it been your experience that

22     information that comes in from callers is accurate, and

23     sometimes it may be inaccurate?

24     A.    Yes, sir.

25     Q.    Where was the individual that ended up getting

1          A.    Yes.

2          Q.    Let's start with the left hand.  Did he have

3     anything in his left hand?

4          A.    I don't recall if it was the left or the right.

5          Q.    Did you ever see a water bottle in either one

6     of his hands?

7          A.    I don't recall a water bottle.

8          Q.    Okay.  The object that you did see that you're

9     not sure which hand it was in, what did the object --

10    what color was it?

11         A.    It was black.

12         Q.    Was it -- was it solid black, from your

13    perspective?

14         A.    Yes, sir.

15         Q.    Were you -- strike that.

16               How far, approximately, was the individual from

17    Bronson, when you saw this object in his hand?

18         A.    Approximately, 20 yards.

19         Q.    And did the person ever turn towards you when

20    he had this object in the his hand?

21         A.    Yes, sir.

22         Q.    And where was Martinez, if you know, when the

23    person -- the suspect turned towards you with this

24    object in his hand?

25         A.    I believe Martinez was directly behind him.

1      Q.    Were you trained that if you see what you
2    believe to be a gun in a suspect's hand, one thing you
3    can do is yell out "Gun" to alert your partner.
4            MS. SARMIENTO:  Incomplete hypothetical.
5            You can answer.
6            THE WITNESS:  That is something that we
7    normally do.  Yes, sir.
8    BY MR. GALIPO:
9        Q.    And what's the purpose of that, based on your
10    training?  Just to let your partner know what you're
11    observing?
12            MS. SARMIENTO:  May call for speculation.
13            Go ahead.
14            THE WITNESS:  The purpose -- I'm sorry, sir.
15    Can you repeat it?
16    BY MR. GALIPO:
17        Q.    Not -- not a problem.  Based on your training,
18    what's your understanding of why you should yell out
19    "Gun" if you see a gun in a suspect's hand or on their
20    person?
21        A.    For officer safety.
22        Q.    And did you in this case ever yell out "Gun"
23    when you saw this object in his hand?
24        A.    I -- I told my partner, I was like, "Oh" --
25    like, "Oh, crap.  Do you see that?"

1       Q.   Okay.   I'm just wondering if you yelled out
2    "Gun"?   That was my question right now.
3       A.   No, I did not yell out "Gun."   No.
4       Q.   Okay.   You said something like, "Oh, did you
5    see that?", or words to that effect?
6       A.   Yes.
7       Q.   And did your partner say anything in response?
8       A.   Yes.
9       Q.   What did your partner say?
10      A.   My partner said, "It's not a gun" or "I don't
11   think it's a gun."
12      Q.   Okay.   How far was your partner from the
13   suspect when you heard your partner say, "It's not a
14   gun," or words to that effect?
15      A.   My partner was still directly behind him, but
16   approximately 7 feet -- 5, 7 feet.
17      Q.   And if you know, had your partner been out of
18   the car with the suspect for a few seconds before you
19   got out of the car?
20      A.   Yes.
21      Q.   When your partner said, "It's not a gun," did
22   you respond or say anything back to your partner?
23      A.   Yes.
24      Q.   What did you say?
25      A.   "What do you mean it's not at gun?   What is

1    it?"

2          I was under the impression that that was a --

3    that it was a firearm.  But when he made that statement,

4    it kind of took me back a little bit.

5       Q.   Generally, do you trust everything that your

6    partner says when you're out working with your partner?

7          MS. SARMIENTO:  Vague.  Incomplete

8    hypothetical.

9          Go ahead.

10          THE WITNESS:  That was my first -- generally,

11   yes.  But that was my first day ever working with Officer

12   Martinez, and Officer Martinez had just finished his

13   probation not too long prior to this incident.

14   BY MR. GALIPO:

15       Q.   And at least from your perspective, you

16   would -- you would not say, "It's not a gun," unless you

17   were sure.  Is that a fair statement?

18       A.   Absolutely.  Yes, sir.

19       Q.   In your training, were you trained that

20   sometimes you have to rely on what your partner says?

21          MS. SARMIENTO:  Vague.  Incomplete

22   hypothetical.

23          Go ahead.

24          THE WITNESS:  Can you repeat it one more time,

25   sir?

```
 1    BY MR. GALIPO:

 2         Q.   Sure.  In your training as a police officer,

 3    are you trained that sometimes you need to rely on what

 4    your partner's telling you?

 5              MS. SARMIENTO:  Same objections.

 6              THE WITNESS:  Yes.

 7    BY MR. GALIPO:

 8         Q.   When you saw this object in the suspect's hand,

 9    are you saying you're not sure which hand it was in?

10         A.   I believe -- I believe it was in the right

11    hand, but I'm not a hundred percent sure at this moment.

12         Q.   And how long -- for how long a period of time

13    did you continuously see this object in his right hand?

14         A.   I don't know how long, sir.

15         Q.   In other words, do you know if it was more or

16    less than three seconds, or more or less than five

17    seconds?

18              MS. SARMIENTO:  Don't guess.

19              THE WITNESS:  I don't know, sir.

20    BY MR. GALIPO:

21         Q.   Okay.  Do you have any estimate, or you're not

22    sure?

23         A.   I wouldn't even feel comfortable giving an

24    estimate, because I really don't know.

25         Q.   Okay.  Did you ever shoot the individual at
```

Dante Pettit Jr.

1    that time?

2        A.    At that time, no.

3        Q.    And that was during a time that he was turned

4    towards you, with this object, you believe, in his right

5    hand?

6        A.    Yes, sir.

7        Q.    Did you ever give the individual verbal warning

8    you were going to shoot him?

9        A.    No, sir.

10       Q.    Did you tell your partner you thought it was a

11   gun?

12       A.    At that time, I -- I don't think I did.    I

13   insinuated.

14       Q.    You had your police radio on you; correct?

15       A.    Yes, sir.

16       Q.    And you were aware your sergeant was close by?

17       A.    Yes, sir.

18       Q.    He would have been in the patrol car going west

19   on King?

20       A.    Yes, sir.

21       Q.    Did you ever dispatch over the police radio

22   that you observed a gun or thought the individual had a

23   gun?

24       A.    No, sir.    We were dealing with the situation at

25   hand.

1        Q.    If you thought the person had a gun or you saw

2   a gun, do you think that would have been information

3   important to communicate to the sergeant?

4        A.    Yes, sir.   We also had to take into

5   consideration that we have, like, tactics, and it would

6   be unfeasible for me to pick up a radio and dispatch

7   in -- you know, additional information while also trying

8   to apprehend a guy that, you know, at this point -- at

9   the point you're asking, I'm kind of going back and

10  forth with my partner about if it is or is not a gun to

11  begin with.  So I'm still trying to figure everything

12  out and process everything.

13       Q.    Okay.  Have you been in prior situations where

14  a fellow partner communicated to you that they saw a gun

15  on a suspect's person or hand?

16       A.    Yes, sir.

17       Q.    Did you generally believe them when they said

18  that?

19       A.    Yes, sir.

20       Q.    Had you been in prior situations where a

21  partner officer told you that the object was not a gun?

22       A.    No, sir.

23       Q.    This is the first time you can remember hearing

24  a partner officer say that?

25       A.    Yes, sir.

Dale Petit Jr.

1        Q.    At some point, the individual continues to walk

2    away from you?

3        A.    Yes, sir.

4        Q.    And he would have been going westbound on the

5    sidewalk?

6        A.    Yes, sir.

7        Q.    Could you make out any words the individual was

8    saying?

9        A.    I couldn't.

10       Q.    Did you say anything additional to him, other

11   than what you told me so far, before he started walking

12   away from you?

13       A.    I don't believe so.

14       Q.    And then you continued to walk or pursue him on

15   foot?

16       A.    Yes, sir.

17       Q.    And to your knowledge, was Martinez also

18   pursuing on foot?

19       A.    Yes, sir.

20       Q.    You would have been going westbound, generally,

21   in the area of the sidewalk?

22       A.    Yes, sir.

23       Q.    And was Martinez generally to your right?

24       A.    Yes, sir.

25       Q.    At some point, did you notice the sergeant's

Dario Ortiz, Jr.

```
 1    in fact, was a gun.

 2              That he had shot at that patrol vehicle.  That

 3    person returned fire, and then at that point, I shot to

 4    stop the threat.

 5    BY MR. GALIPO:

 6         Q.   Okay.

 7         A.   So I didn't -- go ahead, sir.

 8         Q.   No, that's okay.

 9              Were you done with your answer?  I didn't want

10    to cut you off?

11         A.   Yes, sir.  That's it.

12         Q.   When you fired your shot, it would be after you

13    heard two shots?

14         A.   Yes, sir.

15         Q.   And when you fired your shot, how far were you

16    from the suspect?

17         A.   Approximately, 5 to 10 yards.

18         Q.   And football season is coming up, so is that

19    like 15 to 30 feet?

20         A.   Give or take, sir.

21         Q.   And when you shot the suspect, was he still

22    upright on his feet?

23         A.   Yes, sir.  As everything was happening, yes,

24    sir.

25         Q.   When you shot at him, you fired one shot; is
```

Dahl Ott, Jr.

1    that right?

2       A.   Yes, sir.

3       Q.   So from your perspective, would you generally

4    have been -- center mass would have been his back, from

5    your perspective?

6       A.   Center -- I don't recall.

7       Q.   Didn't he have his --

8       A.   He bladed his body.  And -- I mean, yeah, it

9    was kind of like the ribs, I guess.

10      Q.   Well, was his back generally to you when you

11   fired?

12      A.   Yes.

13      Q.   And were you aiming center mass?

14      A.   Yes.

15      Q.   And you're saying he was upright on his feet

16   when you fired; is that correct?

17      A.   Yes, sir.

18      Q.   And then, did you have the impression as to

19   whether your shot struck him or not?

20      A.   Unknown.

21      Q.   Did he go down --

22      A.   At that time, I don't know.  He -- he had fell.

23      Q.   Okay.  But did he fall down after you fired

24   your shot?

25      A.   Yes, sir.

1       Q.    And then, why did you only fire one shot?

2       A.    Because at that time, I no longer deemed him to

3   be a threat completely.  He was down as -- I want to say

4   I observed the firearm just, like, out of his hands at

5   that point.

6       Q.    So once he was down on the ground, based on

7   your training, you did not think it would be appropriate

8   to shoot him; is that what you're saying?

9       A.    Correct.

10      Q.    So just going back, I know your partner said,

11  "It's not a gun, bro," or words to that effect.  And it

12  sounds like there was a period of time where you saw

13  this object in his right hand, before he was walking

14  away from you; is that correct?

15      A.    Yes, sir.

16      Q.    And you didn't shoot him at that point; is that

17  correct?

18      A.    Yes, sir.

19      Q.    Based on your training, did you think it would

20  be appropriate to shoot him at that point, before he

21  started walking away from you?

22      A.    Based on my training, yes.  But based off of

23  what my partner's statement was, I -- it kind of threw

24  me back a little bit.  And at that point, it -- it -- I

25  had to -- I wanted to re-assess.

Case 2:23-cv-00789-ODW-PVC   Document 87-5   Filed 11/21/25   Page 19 of 45   Page
Dahl et al.
ID #:865 Jr.

1    Q.   Okay.

2    A.   Because the last thing I ever want to do is

3  shoot someone that's not armed.

4    Q.   Correct.

5    A.   So based on what he stated, I reassessed the

6  situation.

7    Q.   Right.  Because your partner's telling you it's

8  not a gun, basically?

9    A.   Yes.  But I also know that my partner did not

10  modify the weapon that was in his hand or have any

11  previous contact with him prior to even make a statement

12  like that.  So that kind of threw me when he --

13    Q.   Okay.  But it sounds like you took that

14  statement into consideration, at least in not firing,

15  initially?

16    A.   Yes, sir.

17    Q.   And then when the person was walking away from

18  you, did you think it was appropriate to shoot him at

19  that point?

20    A.    I did not think it was appropriate to shoot him

21  until I seen him blade that weapon towards the officer's

22  vehicle and fire, what I believed to be at that moment,

23  a round at the police vehicle, which, in fact, allowed

24  me to know that it was, in fact, a firearm.

25    Q.   Okay.  I take it if you would have known it was

Dahud, Jr.

```
 1    not at firearm, you wouldn't have shot; is that fair?

 2         A.    Absolutely.

 3         Q.    I mean, obviously, you don't want to shoot

 4    someone who's unarmed.  Is that generally a fair

 5    statement?

 6         A.    Yes, sir.

 7         Q.    Did you see any muzzle flash coming from that

 8    item -- object he had?

 9         A.    No, sir.

10         Q.    And you heard two shots; correct?

11         A.    Yes, sir.

12         Q.    And your impression was one of the shots came

13    from the police vehicle?

14         A.    Yes, sir.

15         Q.    What gave you that impression?

16         A.    It was I guess what his body did after the

17    second shot.  After I heard the second shot, his body

18    appeared to be like going down.  It was all so quick.

19              But the way I processed it during that

20    encounter was -- was that the second round had struck

21    him.  And then I -- then, like I said, believed that he

22    was shot.

23         Q.    Okay.  So you believe he was shot and going

24    down before you fired your shot?

25              MS. SARMIENTO:  May misstate the witness's
```

```
1    testimony.

2             Go ahead.

3             THE WITNESS:  No, sir.  I believe -- I'm sorry.

4    Can you repeat it?

5    BY MR. GALIPO:

6        Q.   Sure.  You told me that you believed the second

7     shot had struck him and he was going down.  Did I

8     understand you correctly?

9        A.   No.

10            MS. SARMIENTO:  Same objections.

11            Go ahead.

12            THE WITNESS:  I believed that the second round

13   hit him, not that he was going down and out of the fight.

14   BY MR. GALIPO:

15       Q.   Okay.

16       A.   I just believed that the second round hit him.

17       Q.   Okay.  So you believed the second shot hit him,

18   just based on his body's response?

19       A.   Yes.

20       Q.   But he did not go down.  You're saying he was

21    still upright?

22       A.   Yes, sir.

23       Q.   And then when you fired your shot, he was still

24    upright?

25       A.   Yes.  And then at that point, he fell.
```

Dale Petit Jr.

1        Q.    And so when you first got out of your patrol

2    vehicle, are you saying there was a time when he was

3    turned towards you in the street?

4        A.    Yes.  There was a time where -- yes.

5        Q.    And is that when you saw the object in his

6    hand?

7        A.    Yes.

8        Q.    And how long after seeing the object did you

9    hear your partner say, "It's not a gun, bro"?

10       A.    Almost simultaneously.

11       Q.    How far was your partner from you,

12   approximately, when he said, "It's not a gun, bro"?

13       A.    From me?

14       Q.    Yes, from you.

15       A.    3 feet, maybe.  3 to 5 feet.

16       Q.    Obviously, that's something you could hear?

17       A.    Yes, sir.

18       Q.    And for how long a period of time was the

19   person -- Mr. Petit facing in your direction towards the

20   street during that time frame?

21       A.    Approximately, two seconds.

22       Q.    And while he was facing towards you, you could

23   see this object in his hand?

24       A.    Yes, sir.

25       Q.    Did you ever with 100 percent certainty,

1    identify it as a gun while he was turned towards you?

2              MS. SARMIENTO:   Vague.

3              You can answer.

4              THE WITNESS:   I -- while I was processing it,

5    like, when I was visualizing, I was under the impression

6    that it was a firearm.   But like I mentioned, when my

7    partner made the comment, it threw me back a little bit.

8    BY MR. GALIPO:

9         Q.   You weren't sure at that point?

10        A.   So I was not sure.

11        Q.   At some point after turning in your direction,

12   Mr. Petit would have continued walking westbound on the

13   sidewalk?

14        A.   Yes, sir.

15        Q.   So he would have turned away from you again at

16   some point?

17        A.   Yes, sir.

18        Q.   And when he was turned away from you and

19   walking westbound on the sidewalk, he would be

20   approaching Bronson Street?

21        A.   Yes, sir.

22        Q.   And when he was turned away from you and

23   walking on the sidewalk, approaching Bronson Street,

24   where were you, approximately?  Do you recall if you

25   were in the street, in a driveway, or somewhere else?

Daniel Petit, Jr.

1    A.    When I seen the object in his hand, that was

2    the direction he was facing, sir.

3    Q.    Okay.  And how much time do you think passed

4    from you getting out of your vehicle to seeing the

5    object?

6    A.    I'm not sure, sir.

7    Q.    How much time passed from seeing the object

8    from hearing your partner say, "It's not a gun, bro"?

9    A.    Approximately, two seconds.

10    Q.    And how much time passed after your partner

11    said, "It's not a gun, bro," that Mr. Petit started

12    walking away from you?

13    A.    Almost instantaneous.

14    Q.    Okay.  And then once he started walking away

15    from you, he would have been going, as you explained,

16    westbound on the sidewalk, towards Bronson?

17    A.    Yes, sir.

18    Q.    And at some point, you made it to the sidewalk?

19    A.    Yes, sir.

20    Q.    And were you more on the, I guess, south side

21    of the sidewalk and your partner more to your right on

22    the north side?

23    A.    Yes, sir.

24    Q.    And as -- as Mr. Petit was walking away from

25    you, towards Bronson, could you see his right hand?

Dana Gorman Jr.

1      Q.    Okay.

2      A.    He's walking but he kind of bladed his body.

3  So I see, yes, his back.  I see his left shoulder.  I

4  see, you know, his legs as he's walking.  But that's my

5  image.

6      Q.    All right.  So --

7      A.    An image like that, everything from that angle.

8      Q.    So, again, like if we thought -- think about

9  the hands of a clock.  If -- if he's walking -- I guess

10  we can do it towards 12:00 o'clock or 9:00 o'clock,

11  whatever you're comfortable.  But if he's walking

12  towards 12:00 o'clock, you're saying his upper body's

13  turned to the left?

14      A.    Yes, sir.  So looking at a clock, his upper

15  body would be towards 11.

16      Q.    Towards 11:00 o'clock?

17      A.    Yeah.  So, 11.

18      Q.    Now, when you hear these two shots, you told me

19  you could not see muzzle flash; correct?

20      A.    Yes, sir.

21      Q.    Could you see the object when you actually hear

22  the shots?

23      A.    No, just because he was bladed.

24      Q.    So the last time you saw the object prior to

25  hearing the shots would be when he was facing towards

1    you earlier, towards the street, before he walked away?

2         A.    Yes.

3         Q.    Did you hear anyone give a verbal warning they

4    were going to shoot?

5         A.    No.

6         Q.    Did you, yourself, give any verbal warning you

7    were going to shoot?

8         A.    No, sir.  It wasn't feasible at the time.

9         Q.    Did you say anything to Mr. Petit after he

10   started walking away from you but before you fired your

11   shots?

12        A.    I don't recall.

13        Q.    So when you actually fired your shot, was he

14   still standing up, bladed to the left or towards 11:00

15   o'clock?

16        A.    Yes.  As I shot, yes.

17        Q.    And so you would have been looking at his back

18   left side, from your perspective?

19        A.    Yes, sir.

20        Q.    Was he directly west of you or slightly offset?

21        A.    From my recollection, he was directly west of

22   me.

23        Q.    And do you know where Martinez was in relation

24   to you?

25        A.    He was to the right of me, so just north.

1    Q.   At some point, did you use profanity with

2    Mr. Petit?

3    A.   Yes, sir.

4    Q.   And was it essentially the F-word in relation

5    to putting your hands up?

6    A.   Yes, sir.

7    Q.   Did you see him go to the ground before you

8    fired your shot?

9    A.   No.  No, sir.

10    Q.   Now, you reference that -- well, let me ask

11    you, after you shot him, did he go chest down?

12    A.   I believe so.

13    Q.   So you would have heard the two shots, he was

14    bladed to his left, as you described, turned to his

15    left, slightly.  Then you fired your shot, then he went

16    to the ground, chest down.

17         Do I have the order correct?

18         MR. BOJORQUEZ:  Just one second real quick.

19         Objection.  I think it misstates the witness's

20    testimony as to some of the actions of how he was --

21    you're using a term "bladed and turned."  I don't

22    think -- I think he's saying "he's bladed," and I think

23    you're misrepresenting what that is.

24         MR. GALIPO:  Okay.  Let me be more specific.

25    BY MR. GALIPO:

Dahir, et al. Jr.

1      Q.   We were using the hands on the clock, and you

2    said if he was going towards 12:00 o'clock, he would

3    have been turned towards 11:00 o'clock when you heard

4    the shots.  Is that fair?

5      A.   Yes, sir.

6      Q.   And when you fired, you're saying he was still

7    turned towards 11:00 o'clock?

8      A.   Yes, sir.

9      Q.   And then after -- after you fired, you're

10   saying he went down to the ground?

11     A.   Yes, sir.

12     Q.   Did you see him go down to the ground?

13     A.   Yes, sir.

14     Q.   Did you have the impression that because he

15   went down to the ground immediately after you fired,

16   your shot may have struck him?

17     A.   Yes, sir.

18     Q.   And when he went down to the ground, he went

19   chest down, you're saying?

20     A.   Yes, sir.

21     Q.   And then at some point, did you see the object

22   again on the ground near him?

23     A.   Yes, sir.  Near him.

24     Q.   And where did you see the object again near

25   him, after he went to the ground?

1    A.    I believe it was by his head.

2    Q.    And were you able to see that from some

3    distance away?

4    A.    I was able to see it once we -- I'd say maybe 5

5    yards away, once we were about 5 yards away, when I saw

6    the other police vehicle.

7    Q.    Once you got within 15 feet, approximately, you

8    could see the object near his head?

9    A.    Yes, sir.

10   Q.    And did that appear to be the same object to

11   you that he had in his hand earlier?

12   A.    Yes, sir.

13   Q.    And was this object, based on your

14   observations, black in color?

15   A.    Yes, sir.

16         MR. BOJORQUEZ:  Objection.  Vague and ambiguous

17   as to time.

18   BY MR. GALIPO:

19   Q.    Well, when you saw it in his hand, what color

20   was it?

21   A.    Black.

22   Q.    And when you saw it on the ground after the

23   shooting, what color was it?

24   A.    Black.

25   Q.    Did you ever see either one of his hands in his

1    pockets or waistband?

2        A.    I don't recall.

3        Q.    Did you ever try to create distance from him

4    after you saw the object in his hand?

5        A.    No.

6        Q.    Did you ever try to take cover after you saw

7    the object in his hand?

8        A.    At that point, I was too far out in the --

9    like, there was no objects for me to seek cover but

10   still keep my eyes on him due to the fact that our

11   patrol vehicle was further away than, you know, we'd

12   like, and we had a busy street, just south of us.

13            So it was pretty difficult for us to find cover

14   from that position and where we were.

15       Q.    Based on your training with respect to the use

16   of deadly force, did you think it was appropriate to

17   shoot him after he went to the ground?

18            MS. SARMIENTO:  Vague.

19            MR. BOJORQUEZ:  Objection.  The question is

20   vague and ambiguous.  Assumes a fact not in evidence.  It

21   also calls for a legal conclusion as phrased.

22            MS. SARMIENTO:  Lacks foundation.

23            MR. GALIPO:  You may answer.  You may answer.

24            THE WITNESS:  I don't think -- I didn't shoot

25   him after he was on the ground.

Dale Porter Jr.

```
1    BY MR. GALIPO:
2         Q.    Right.    I'm asking a little separate question.
3    Based on your training, did you think it would have been
4    appropriate to shoot him once he was on the ground?
5         A.    No.
6              MR. BOJORQUEZ:    My apologies.    Lacks
7    foundation.    Calls for speculation.    It assumes facts not
8    in evidence.    I think it's an incomplete and improper
9    hypothetical.
10             MS. SARMIENTO:    I'll join the objection.
11             MR. GALIPO:    You may answer.
12             THE WITNESS:    I would say no if the gun was no
13   longer in his hand or we deemed the threat to no longer
14   be a threat.
15   BY MR. GALIPO:
16        Q.    Well, it sounds like you did not shoot him when
17    he was on the ground; is that correct?
18        A.    Yes, sir.
19        Q.    And why not?
20        A.    Because at that moment, I no longer deemed him
21    to be a threat because the firearm was no longer in his
22    hand.
23        Q.    You're aware now that it's not an actual
24    firearm; is that fair?
25        A.    Yes, sir.
```

```
 1   STATE OF CALIFORNIA)
                        ) ss:
 2   COUNTY OF BUTTE    )

 3
              I, KIMBERLY E. D'URSO, do hereby certify:
 4

 5            That the witness named in the foregoing

 6   deposition was present remotely and duly sworn to testify

 7   to the truth in the within-entitled action on the day and

 8   date and at the time and place therein specified;

 9            That the testimony of said witness was reported

10   by me in shorthand and was thereafter transcribed through

11   computer-aided transcription;

12            That the foregoing constitutes a full, true and

13   correct transcript of said deposition and of the

14   proceedings which took place;

15            Further, that if the foregoing pertains to the

16   original transcript of a deposition in a federal case,

17   before completion of the proceedings, review of the

18   transcript [ ] was [ ] was not requested.

19            That I am a certified stenographic reporter and

20   a disinterested person to the said action;

21            IN WITNESS WHEREOF, I have hereunder subscribed

22   my hand this 13th day of August, 2025.

23   _____

24   KIMBERLY D'URSO, CSR NO. 11372, RPR

25
```

Dale Petit Jr.

```
 1          Q.   Does it appear that Mr. Petit at this time is
 2    in the street?
 3          A.   Yes, sir.
 4          Q.   Okay.  Do you believe this is the general
 5    position he was in when the shots started?
 6          A.   Possibly, yes.
 7          Q.   And you already told me, but you could not see
 8    his right hand or any object at this point.  Is that
 9    correct?
10          A.   Yes, sir.
11          Q.   You did -- you were aware that the patrol
12    vehicle was there; correct?
13          A.   Yes, sir.
14          Q.   And your impression was, at least one of the
15    shots came from the patrol vehicle?
16          A.   Yes, sir.
17               MR. GALIPO:  Okay.  Let's go a little bit
18    forward.
19    BY MR. GALIPO:
20          Q.   Do you believe you fired your shot yet?
21          A.   No, sir.
22               MR. GALIPO:  Okay.  We might be able to see
23    your arms come up at some point, but let's just go
24    forward a little bit and stop.
25               (Video being played.)
```

Dahl et al. Jr.

1   slow-mo, and maybe -- I don't know if we can do frame by

2   frame, but that would be helpful.

3            MS. MASONGSONG:  Yes.  Do you want me to play

4   it in slow motion, or do you want me to do frame by

5   frame?

6            MR. GALIPO:  Yes.  Play it in slow motion, and

7   when we get close to the shooting, see if you can go

8   frame by frame.

9            (Video being played.)

10           MR. GALIPO:  Okay.  Now, let's try the frame by

11  frame from about, I guess, 2:15.  Those would be -- okay.

12           (Video being played.)

13           MS. MASONGSONG:  Okay.  Starting at 2:15, we're

14  doing a frame by frame now.

15           MR. GALIPO:  Okay.  So let's look.

16           (Video being played.)

17           MR. GALIPO:  Stop it right there.

18  BY MR. GALIPO:

19      Q.   Do you see your gun there?

20      A.   Yes, sir.

21      Q.   You see your hands?

22      A.   Yes, sir.

23      Q.   You see Mr. Petit on the ground?

24      A.   Yes, sir.

25      Q.   And right to the right of your gun, do you see

1     your casing being ejected?

2          A.    Yes, sir.

3               MR. GALIPO:  And we stopped it at 2:17.

4               Go forward a little bit more, Renee.

5               (Video being played.)

6               MR. GALIPO:  Okay.  We can stop it now.

7               Thank you.  We can take that down.

8     BY MR. GALIPO:

9          Q.    Do you recall in your interviews -- at some

10    points in your interviews that you gave to FID, saying

11    that you fired your shot after he went to the ground?

12         A.    I don't recall saying that, sir.

13         Q.    Do you recall at some point saying --

14    clarifying, "No, I shot him, and then he went to the

15    ground"?

16         A.    Yes, sir.

17               MR. GALIPO:  Renee, are we able to put up some

18    selected pages of his statement?

19               MS. MASONGSONG:  Yes, I have it ready.

20               MR. GALIPO:  Okay.  Let's start with the -- I

21    guess, the first portion of it.

22    BY MR. GALIPO:

23         Q.    I think you gave one statement, and then there

24    was a short break, and then you did a follow-up

25    statement.  Do you recall that?

1    but I see him go down"?

2         A.    Yes.  That was --

3         Q.    And then if you continue, you say -- and this

4    is on line 13:  "I shooted [sic] him to put him down,

5    like, to stop his actions.  And at that point, I shot

6    once because he immediately dropped after that."

7              Do you see that?

8         A.    Yes.

9         Q.    You recall in your statement referring to the

10   object as a "funky gun"?

11        A.    Yes, sir.

12        Q.    You've been trained on the concept of

13   de-escalation; correct?

14        A.    Yes, sir.

15        Q.    With respect to commands, are you trained to

16   give commands in a loud, clear voice, if you can?

17        A.    Yes, sir.

18        Q.    And to give the individual an opportunity to

19   comply with the commands, if you can safely do so?

20        A.    Yes, sir.

21        Q.    And then going to page 40 -- actually, page 50.

22   So at the bottom of 49, the detective is asking you his

23   position when you shot, and you said, on lines 2 and 3

24   of page 50:  "He was in an upward position."

25              And then the detective says:  "When did you see

```
 1    the suspect fall to the ground?"
 2             You say:  "After I shot."
 3             The detective says:  "After you shot?"
 4             You say:  "Yes."
 5             Do you see those questions and answers?
 6    A.    Yes, sir.
 7    Q.    And that's generally what you told me today,
 8    correct, that you fired --
 9    A.    Yes, sir.
10    Q.    -- and then he went to the ground after you
11    fired?
12    A.    Yes, sir.
13    Q.    Now, there is another portion of the
14    transcription that we received.  Going to page 8 of that
15    portion, line 17, that's again when you reference your
16    partner's statement:  "It's not a gun."
17             Do you see that?
18    A.    Yes, sir.
19    Q.    And on page 10, lines 19 through 21, you say
20    that you're:  "not going to make a life-altering
21    decision like that, unless I have a hundred percent I'm
22    sure that that's what it is."
23             Do you see that?
24    A.    I do.
25    Q.    And then you proceed to say:  "At that moment
```

1    when I -- I seen it, I was still a little unsure because

2    I -- it -- it was handmade.  It was -- it wasn't what

3    we're used to seeing a gun looking like."

4              Do you see that?

5         A.   Yes, sir.

6         Q.   So initially, between its appearance and your

7    office -- your partner's statement:  "It's not a gun,"

8    you were unsure whether it was a gun or not.  Is that

9    fair?

10        A.   Yes, sir.

11        Q.   And then when you say you're:  "not going to

12   make a life-altering decision like that, unless I have a

13   hundred percent I'm sure that that's what it is," are

14   you referring to a hundred percent sure that it's a gun?

15        A.   Yes, sir.

16        Q.   And when you say:  "life-altering decision,"

17   you mean shooting someone?

18        A.   Yes, sir.

19        Q.   Okay.  Now, on page 11, lines 12 and 13, you

20   say:  "I trust everything that my partner statements

21   [sic]."

22              Do you see that?

23        A.   Yes, sir.

24        Q.   And we talked about this earlier.  You

25   generally do trust the statements of your partners?

1    A.    Generally, I do.  Yes, sir.

2    Q.    And then on page 12, you're talking about, on

3    line 18 -- 17, 18, your partner's statement.  You say:

4    "It kind of pushed me back a little bit."

5          Do you see that?

6    A.    Yes, sir.

7    Q.    And we talked about that a little bit; correct?

8    A.    Yes, sir.

9    Q.    And then on lines 20 through 22, you say:

10   "Like, you know, where action could have been taken

11   without someone possibly getting shot at or whatever the

12   case was."

13         Do you see that?

14   A.    I see it.  Yes, sir.

15   Q.    Now, toward the end of this statement, most of

16   the questions were asked by Detective Arteaga.

17         One moment, please.

18         (Pause.)

19         MR. GALIPO:  I can't seem to find what I'm

20   looking for, so why don't we just take our last break,

21   and then I'll come back and I'll finish this up, if

22   that's okay with everybody.

23         MS. SARMIENTO:  Ten minutes?

24         MR. GALIPO:  Yes, that'll be fine.

25         MS. SARMIENTO:  Thank you.

 1          Q.   Was the fact that the your partner said, "It's
 2    not a gun, bro," did that have anything to do with you
 3    not trying to communicate that you thought it was a gun
 4    to the other officers?
 5          MS. SARMIENTO:   Vague.
 6          THE WITNESS:   No, sir.
 7    BY MR. GALIPO:
 8          Q.   Were you expecting the shots at the moment they
 9    happened?
10          A.   No.
11          Q.   So I want to just show you two other videos
12    very briefly and then ask you some last group of
13    questions, and I'll be done.
14          MR. GALIPO:   Can we mark Officer Martinez's
15    body-worn camera footage as Exhibit 2, please?
16          (Exhibit Number 2 was marked.)
17          MR. GALIPO:   And, Renee, if you can play a
18    portion of that and I'll try to note for the record the
19    time.
20          MS. MASONGSONG:   Okay.   I'm getting it open.
21          Do we start at the beginning, or should I do my
22    best to start --
23          MR. GALIPO:   Do your best to start it once he
24    gets out of the car, or getting out, if we can.
25          MS. MASONGSONG:   Okay.   I'm going to start the

```
 1              MR. GALIPO:  Are you able to help with that,
 2    Renee?  Here we go.  Okay.  So the timer is --
 3              MS. MASONGSONG:  It's at 1 second.  And I can
 4    just start at the beginning for simplicity.
 5              MR. GALIPO:  Okay.  That's fine.
 6              (Video being played.)
 7              MR. GALIPO:  Stop there.
 8              We stopped it at like 2:27.
 9    BY MR. GALIPO:
10         Q.   Did you hear the voice of the sergeant saying
11    that he can't see the gun and asking the other officers
12    whether they had any visual of the gun?
13         A.   Yes.
14         Q.   And you hear the other officers say, "No"?
15         A.   Yes.
16         Q.   And this would be, obviously, after the
17    shooting; correct?
18         A.   Yes, sir.
19         Q.   Where the object was on the ground, near
20    Mr. Petit's head?
21         A.   Yes, sir.
22         Q.   All right.
23              MR. GALIPO:  Please continue.
24              (Video being played.)
25              MR. GALIPO:  Let's stop it, if we can.  I think
```

Petit v. City of Los Angeles, et al.
Focus Litigation Solutions

Page: 85

1    the camera.  I looked back.  I seen he was good.  I

2    didn't see -- I just assumed he had missed.  But we had

3    talked about it after.

4        Q.   Okay.

5        A.   I was just like, "Hey, are you good?"  Like,

6    you know, we checked on each other like that.

7        Q.   I got it.

8             But you know now, at least, that Mr. Petit had

9    not fired either of the two shots.  They were both fired

10   by the sergeant?

11       A.   Now I do.  Yes, sir.

12       Q.   Okay.  Thank you for that.

13            MR. GALIPO:  We can take that down.

14   BY MR. GALIPO:

15       Q.   So I just have some last questions about your

16   training on deadly force.  I'm assuming you received

17   training on deadly force at the academy and then during

18   your tenure as a police officer?

19       A.   Yes, sir.

20       Q.   In general, is deadly force the highest level

21   of force an officer can use?

22       A.   Yes, sir.

23       Q.   And by training, is the expectation if you

24   shoot someone center mass, you're likely to cause death

25   or serious bodily injury?

CONFIDENTIAL
Dale Gibson Jr.

```
 1                    MS. SARMIENTO:    Incomplete hypothetical.
 2                    Go ahead.
 3                    THE WITNESS:   Yes, sir.
 4        BY MR. GALIPO:
 5              Q.    Were you trained that deadly force should only
 6        be used if there's an imminent or immediate threat of
 7        death or serious bodily injury?
 8              A.    Yes, sir.
 9              Q.    And were you trained that in order for there to
10        be an imminent threat of death or serious bodily injury,
11        the individual has to have the ability, opportunity, and
12        apparent intent to immediately cause death or serious
13        bodily injury?
14              A.    Yes, sir.
15                    MR. BOJORQUEZ:  Objection.  Calls for a legal
16        conclusion.  Lacks foundation.  Calls for speculation.  I
17        think it misstates what the law actually says.
18        BY MR. GALIPO:
19              Q.    That's part of your training; correct, Officer?
20              A.    Yes, sir.
21                    MR. BOJORQUEZ:  Again, I think it lacks
22        foundation.  Calls for speculation.  Again, I think it
23        assume facts not in evidence, and it calls for a legal
24        conclusion.
25        BY MR. GALIPO:
```

1        Q.   And part of that -- are you aware, Officer,

2   that part of that verbiage I just gave you is included

3   in the revised Penal Code section?

4              MR. BOJORQUEZ:  Again, objection.  I think

5   calls for a legal conclusion.  Lacks foundation.  Vague

6   and ambiguous as to time versus time of incident.

7              MS. SARMIENTO:  Join.

8              MR. GALIPO:  You may answers, if you know.

9              THE WITNESS:  Yes, sir.

10  BY MR. GALIPO:

11       Q.   And are you aware that that's been in the POST

12   Learning Domain for some time now, that language?

13             MR. BOJORQUEZ:  Objection.  Vague and ambiguous

14  as to "some time now."  I also think it lacks foundation.

15  Calls for speculation.

16             MS. SARMIENTO:  I'll join the objection.

17             You can answer.

18             MR. GALIPO:  You may answer.

19             THE WITNESS:  Yes, sir.

20  BY MR. GALIPO:

21       Q.   Okay.  Were you trained that a verbal warning

22   should be given, when feasible, before using deadly

23   force?

24       A.   When feasible, yes, sir.

25       Q.   What was your backdrop or background when you

```
 1    STATE OF CALIFORNIA)
                         ) ss:
 2    COUNTY OF BUTTE    )

 3
                I, KIMBERLY E. D'URSO, do hereby certify:
 4

 5              That the witness named in the foregoing

 6    deposition was present remotely and duly sworn to testify

 7    to the truth in the within-entitled action on the day and

 8    date and at the time and place therein specified;

 9              That the testimony of said witness was reported

10    by me in shorthand and was thereafter transcribed through

11    computer-aided transcription;

12              That the foregoing constitutes a full, true and

13    correct transcript of said deposition and of the

14    proceedings which took place;

15              Further, that if the foregoing pertains to the

16    original transcript of a deposition in a federal case,

17    before completion of the proceedings, review of the

18    transcript [ ] was [ ] was not requested.

19              That I am a certified stenographic reporter and

20    a disinterested person to the said action;

21              IN WITNESS WHEREOF, I have hereunder subscribed

22    my hand this 13th day of August, 2025.

23    _____

24    KIMBERLY D'URSO, CSR NO. 11372, RPR

25
```

Petit v. City of Los Angeles, et al.
Focus Litigation Solutions

Page: 99