EXHIBIT 5

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                      --oOo--

4

5    ASHLYN PETIT, as successor-in
     interest to JERMAINE PETIT, deceased,
6
             Plaintiff,
7
     v.                           Case No.
8                                 2:23-cv-00789-CJC (PVCx)

9    CITY OF LOS ANGELES, a municipal
     entity; OFFICER DARYL GLOVER, JR.;
10   SERGEANT BRETT HAYHOE;
     and DOES 1 through 10, inclusive,
11
             Defendants.
12   _____/

13

14

                 STENOGRAPHIC REPORTER'S TRANSCRIPT OF
15
             REMOTE VIDEO DEPOSITION OF BRETT HAYHOE
16
                   THURSDAY, AUGUST 28, 2025
17
                    **UNSEALED PORTION**
18

19   Reported Stenographically by:

20   KIMBERLY D'URSO, CSR 11372, RPR

21   Job No.  19685

22

23

24

25

```
 1                    APPEARANCES (Remote)

 2   FOR THE PLAINTIFFS:

 3            LAW OFFICES OF DALE K. GALIPO
              BY:  DALE K. GALIPO, ESQ.
 4                 RENEE MASONGSONG, ESQ.
              21800 Burbank Boulevard, Suite 310
 5            Woodland Hills, California 91367
              818.347.3333
 6            dalekgalipo@yahoo.com
              rvalentine@galipolaw.com
 7
              IVIE MCNEILL WYATT PURCELL & DIGGS
 8            BY:  RODNEY S. DIGGS, ESQ.
              444 S. Flower Street, Suite 3200
 9            Los Angeles, CA 90071
              213.489.0028
10            rdiggs@imwlaw.com

11
     FOR THE DEFENDANTS BRETT HAYHOE and DARYL GLOVER, JR.
12
              CARPENTER ROTHANS & DUMONT, LLP
13            BY:  KIMBERLY SARMIENTO, ESQ.
              500 S. Grand Avenue, 19th Floor
14            Los Angeles, CA 90071
              213.228.0400
15            ksarmiento@crdlaw.com

16   FOR THE DEFENDANT CITY OF LOS ANGELES:

17            OFFICE OF THE CITY ATTORNEY OF LOS ANGELES
              BY:  CHRISTIAN R. BOJORQUEZ, ESQ.
18            200 N. Main Street, 6th Floor, City Hall East
              Los Angeles, CA 90012
19            christian.bojorquez@lacity.org

20   ALSO PRESENT:  Karen Torres-Corona, Videographer

21                  Danie Williams, Paralegal

22                  Aria Beizi, Law Clerk

23
                         --oOo--
24

25
```

1    before?

2          A.    Yes.

3          Q.    Do you have an estimate as to how many times,

4    approximately, you had seen suspects with guns in their

5    hands?

6          A.    I'd say dozens.

7          Q.    Were you trained as an officer that you can

8    shoot someone merely for seeing a gun in their hand?

9                MS. SARMIENTO:    Objection.    Incomplete

10   hypothetical.

11               You can answer.

12               THE WITNESS:    Simply based on that statement

13   alone, sir, just somebody standing with a gun or just

14   holding a gun, I would not be -- I would not be

15   authorized to use -- to use my weapon in that regard.

16               I'd need more facts, is what I'm trying to say,

17   to answer that question.

18   BY MR. GALIPO:

19         Q.    Okay.  Had you been involved in any other

20   shootings as a shooter, other than this case?

21         A.    No, sir.

22         Q.    You had been present for any officer-involved

23   shootings where you actually were on scene when the

24   shooting took place, other than this case?

25         A.    No.  I have responded to numerous shootings

1    things on fire and carrying a stick.

2         Q.   Any other information you recall having, other

3    than what you've told me so far?

4         A.   That the individual threatened the PR with a --

5    with a handgun, and then the general description of the

6    last seen location of where the suspect was.

7         Q.   Did you have the individual's name?

8         A.   No.

9         Q.   Any information of any prior criminal history

10   before that day?

11        A.   No.  No, sir.

12        Q.   Any information that the individual had

13   physically injured anyone?

14        A.   No, sir.

15        Q.   Where was the individual when you first saw the

16   individual?

17        A.   When I first saw the individual, I was driving

18   in my black-and-white vehicle, as I saw him walking on

19   foot as I was driving eastbound, on Martin Luther King

20   Boulevard, passing the residential street that he was

21   walking on.

22             And he was walking southbound on the east

23   sidewalk of Dayton and -- I belive it's Degnan Avenue,

24   and it's spelled D-E-G-N-A-N.  And he was walking south

25   on the east sidewalk, and I was travel eastbound on

Petit v. City of Los Angeles, et al.
Focus Litigation Solutions

Page: 15

1    talking 90 to 120 feet?

2        A.    Yes, sir.  That's about right.

3        Q.    And then when you saw him again after going out

4    of your view for approximately a minute, was he on the

5    sidewalk or somewhere else?

6        A.    I believe he was on the sidewalk.

7        Q.    And was he stationary or walking?

8        A.    He was walking.

9        Q.    Do you know what direction he was walking on

10   the sidewalk?

11       A.    He had just emerged onto Martin Luther King, so

12   as he came out of view -- came into view, he would have

13   been walking -- he would have been walking south, on the

14   east sidewalk still, but he -- once observing the

15   officers, he quickly -- I mean, it was simultaneously

16   transitioning into a eastbound -- sorry -- a westbound

17   walk, across the street on Degnan.

18       Q.    Did it look to you like he was trying to avoid

19   contact with the officers at that point?

20            MS. SARMIENTO:  Objection.  Calls for

21   speculation.  Lacks foundation.

22            You can answer.

23            THE WITNESS:  Yes.  It did appear -- it did

24   appear so at that time.

25   BY MR. GALIPO:

1    that it was behind me.

2        Q.    Okay.  You had passed the patrol vehicle at

3    that point?

4        A.    Yes, sir.

5        Q.    So before you passed the patrol vehicle, did

6    you see any interaction between the other officers and

7    the suspect?

8        A.    Yes.

9        Q.    Can you describe to me, please, what you

10   observed before you passed the patrol vehicle?

11       A.    Before I passed the patrol vehicle, I observed

12   the initial encounter between the two officers and the

13   individual on the sidewalk.

14           Go ahead.

15       Q.    Yeah.  What did you observe, in that regard?

16       A.    I observed the individual looking in the --in

17   the direction of the officers.  And it appeared to me

18   that he was deliberately attempting to evaded them.

19           And when it became evident that -- once I heard

20   verbal commands being given to him and the individual

21   continued to ignore the officers, I believed at that

22   point, or it appeared to me that this individual was

23   intentionally attempting to evaded them, and that the

24   situation was going to possibly escalate further.

25       Q.    Could you hear what the commands were at that

Petit v. City of Los Angeles, et al.
Focus Litigation Solutions

Page: 25

1    BY MR. GALIPO:

2         Q.   Are you saying that you made your decision to

3    pass the patrol car before you could verify whether he

4    had anything in his hands?

5         A.   Yes.

6              MS. SARMIENTO:   Same objections.

7              Go ahead.

8              THE WITNESS:   That's correct, sir.   I did -- I

9    did pull my vehicle forward, even though I could not see

10   what was in his hands.

11   BY MR. GALIPO:

12        Q.   Okay.  And then at some point after you passed

13   the patrol car, did you get in a position where you

14   could better see his hands?

15        A.   Yes.

16        Q.   And was that what we were talking about

17   earlier, when you were like 20 or 25 feet away from him?

18        A.   That's correct, sir.

19        Q.   Okay.  And at that point, would he have still

20   been westbound on the sidewalk?

21        A.   Yes, sir.

22        Q.   And you would have been westbound in the curb

23   lane?

24        A.   In the closest lane to the curb.  Yes, sir.

25        Q.   And were you essentially looking out your open

1    passenger window?

2        A.   Yes, sir.

3        Q.   At that point, were you more or less

4    paralleling him?

5        A.   Yes.

6        Q.   And did you see anything in his left hand at

7    that point?

8        A.   No.

9        Q.   Could you see his left hand at that point?

10        A.   I could not see either one of his hands at that

11    point.  I couldn't -- I don't recall anything in his

12    hand at that point.

13        Q.   I guess what I'm wondering, were you trying to

14    look at his hands at that point?

15        A.   Yes, I was.

16        Q.   And could you see his hands, where they were?

17        A.   I saw where they were, yes.

18        Q.   Okay.  Where were they?

19        A.   They were -- his hands were in -- in the area

20    of his midsection, near his waistband area.

21        Q.   How far was he from Bronson at this point?

22        A.   He was approximately a half a block, so I would

23    say approximately maybe 20 yards, 25 yards away.

24        Q.   How long were you paralleling him for where you

25    were this 20- to 25-foot distance from him?

1      Q.   And you're estimating maybe a few feet from

2   Bronson?

3      A.   Yes.

4      Q.   Prior to him getting a few feet from Bronson,

5   did you see him, at any time, point a weapon at any of

6   the two patrol officers that you had passed?

7      A.   No, I could not see that.

8      Q.   Over your police radio, did you hear any of the

9   officers yell out that he had a gun?

10     A.   No.   No, sir.

11     Q.   And did you hear that -- aside from the radio,

12  did you hear them yell that out at the scene, that he

13  had a gun?

14     A.   I don't recall that.

15     Q.   In listening to the body-worn camera footage,

16  are you aware now that one of the officers said

17  something to the effect, "It's not a gun, bro"?

18     A.   Yes, sir, after the fact.   Yes, sir.

19     Q.   But you're saying you did not hear that -- you

20  did not hear that at the time?

21     A.   That's correct.

22     Q.   Are officers trained that if they see what they

23  believe to be a gun, to yell out, "Gun," if they can, to

24  alert fellow officers?

25              MS. SARMIENTO:  Objection.  Incomplete

```
 1   hypothetical.  Lacks foundation.
 2            You can answer.
 3            THE WITNESS:  I'm sorry, sir.  The question is,
 4   is it -- am I trained to alert?
 5   BY MR. GALIPO:
 6       Q.   Yeah.  Is part of the training, if an officer
 7    sees what they believe to be a gun on a suspect, and
 8    they're able to advise other officers by yelling out,
 9    "Gun," or words to that effect, is that part of the
10    training?
11            MS. SARMIENTO:  Same objections.
12            You can answer.
13            THE WITNESS:  I think it depends on the
14   situation, sir, and how the -- the circumstances of the
15   incident.  But I would need more facts to be able to
16   answer that, as far as a description of the item or -- or
17   what the officer sees at the time.
18            It just depends on the perception of the
19   officer giving the -- giving that indication to the
20   fellow officers.
21   BY MR. GALIPO:
22       Q.   Well, what if the officer perceives it to be a
23   gun?  In other words, the officer sees the object and he
24   thinks it's a gun.  Is that part of the training that
25   one thing he could do, if he has time, alert fellow
```

Petit v. City of Los Angeles, et al.
Focus Litigation Solutions

Page: 37

1    officers as to his perception or observation?

2         A.   Yes.

3         Q.   And is the purpose of that just for officer

4    safety reasons?

5         A.   Yes, sir.  Yep.

6         Q.   And if it's the opposite?  What if an officer

7    sees an object and can tell it's not a gun?  Are

8    officers allowed to verbalize that to their partners?

9              MS. SARMIENTO:  Incomplete hypothetical.

10             You can answer.

11             THE WITNESS:  I think it depends, again, the

12   situation at hand.  But if there is some information that

13   would dispute facts surrounding whether something is a

14   weapon or not, then that would pertinent information for

15   other officers to know.

16   BY MR. GALIPO:

17        Q.   Was there any communication between you and the

18   other officers about how to -- how to handle this

19   situation, tactically?

20             MS. SARMIENTO:  Vague as to time.

21             MR. GALIPO:  Before the shooting.

22             Sorry.  Thank you.

23             MS. SARMIENTO:  You can answer.

24             THE WITNESS:  So the question, I believe, is

25   was there some sort of dialogue or plan between myself

1   residential neighborhood to the north.  It's a busy

2   street.  Martin Luther King Boulevard is a very busy

3   street.  And there's also a school that's on the

4   opposite side of the street, within feet of where

5   incident took place.  And there's a mall, Crenshaw Mall,

6   which is only two blocks away.

7          So not only did I engage the -- did I interject

8   myself into the situation because of the officers'

9   personal safety, I did so in -- in regards to public

10  safety, as well.

11      Q.   Okay.  Let me just ask you a few more questions

12  and then we can take our first break.

13      A.   Okay.

14      Q.   You had your gun pointed out the window for

15  some period of time before you shot; is that correct?

16      A.   Yes, sir.

17      Q.   For how long, approximately, did you have your

18  gun pointed out the window of your car before you shot?

19      A.   So I would have had my -- my -- I unholstered

20  my gun and trained my weapon on the individual

21  immediately upon encountering him at the mid-block area

22  where we discussed, where I was 25 to 30 feet away.

23      Q.   So would you have had your gun pointed out your

24  window for approximately nine seconds?

25      A.   Yes, sir -- or less than ten seconds.  In -- in

1    that range.  However long it took from me not seeing his

2    hands, from the point to where I recognized the item I

3    believed to be a firearm.

4         Q.   And this object that you saw, which hand was it

5    in, of his?

6         A.   I don't recall.

7         Q.   How much time passed from you seeing the object

8    to you firing your first shot?

9         A.   I'm sorry.  Repeat one more time?

10        Q.   How much time passed from you seeing the object

11   in his hand to you firing the first shot?

12        A.   It just happened so quickly, simultaneously.

13   Probably, one to two seconds.  No more than that, once I

14   recognized the item, what I believed to be a handgun

15   pointed in my direction, so...

16        Q.   Was the upper body of Mr. Petit facing

17   westbound when you fired your first shot?

18        A.   I don't recall whether he was bladed or facing

19   west.

20        Q.   How about the second shot?  Do you recall if it

21   was bladed or facing due west?

22        A.   Yeah, I don't recall the exact second or half a

23   millisecond.  I don't recall.

24        Q.   Did you give any verbal warning you were going

25   to shoot?

```
 1        A.    No.   I did not say those particular words.

 2        Q.    Did he appear to wince after the first shot?

 3        A.    I'm sorry, "wince"?

 4        Q.    Wince or pull or jerk?

 5        A.    Oh.   No, I don't -- I don't recall if he winced

 6   or not.

 7        Q.    Do you know where this object was when you

 8   fired the second shot?

 9        A.    Do I know where the object was?

10        Q.    Yeah.   Could you see it at the time you

11   actually fired the second shot?

12        A.    I did -- I did see the object.   It was still in

13   his hands.

14        Q.    And your vehicle would have been moving as you

15   were shooting out the window?

16        A.    Yes, sir.

17             MR. GALIPO:   Okay.   We've been going for quite

18   a while.

19             THE WITNESS:   Okay.

20             MR. GALIPO:   Is this a good time to take a

21   ten-minute break?

22             THE WITNESS:   Sure.

23             MR. GALIPO:   It might help you stretch a little

24   bit or whatever you need to do, so...

25             THE WITNESS:   Sure.   No problem.   Thank you.
```

```
 1            MR. GALIPO:  Okay.  Ms. Videographer, we'll
 2    take a ten-minute break and you can take us off the
 3    record, please.
 4            THE VIDEOGRAPHER:  We're off the record at 3:00
 5    p.m.
 6            MR. GALIPO:  Okay.  We'll see you all in ten
 7    minutes.  Thank you.
 8            (Break taken.)
 9            THE VIDEOGRAPHER:  We're back on the record at
10    3:15 p.m.
11            MR. GALIPO:  Okay.  Thank you.
12    BY MR. GALIPO:
13        Q.   So it sounds like there was a period of time
14    that you were watching or observing Mr. Petit before you
15    passed the officers.  Is that right?
16        A.   Yes.
17        Q.   And were you trying, to the best of your
18    ability, to maintain a visual on him, to see what he was
19    doing?
20        A.   Yes.
21        Q.   At any point in time before you passed the
22    officers, did you see Mr. Petit point any object at
23    either of the officers?
24        A.   No, sir.
25        Q.   As you were passing the officers and getting
```

1   closer to Mr. Petit, were you trying to maintain a

2   visual on him?

3        A.    Yes.

4        Q.    And during that time frame, did you see him

5   pointing any objects at anybody?

6        A.    No.

7        Q.    And then this distance that you were observing

8   him, let's say up to 10 feet before Bronson -- so

9   everything up to 10 feet -- because I realize that when

10  it got close to Bronson is when you saw the object.  Is

11  that right?

12       A.    Yes.

13       Q.    So before that, like 10 feet before he got to

14  Bronson, during that time frame, you were paralleling

15  him before he got 10 feet away, did you see any object

16  in either one of his hands?

17       A.    I'm sorry.  Repeat the question one more time,

18  sir.

19       Q.    Okay.  Sure.

20            So if we were to draw a line 10 feet in front

21  of Bronson, on the sidewalk -- so this would be 10 feet

22  back from east of Bronson.  If we were to draw a line on

23  the sidewalk that was 10 feet away from Bronson, as

24  you're going westbound on the sidewalk, I'm wondering,

25  before you got to that line -- or he got to that line,

```
 1    did you see any object in either one of his hands?

 2        A.   No.

 3        Q.   And is one of the reasons that you felt

 4    comfortable moving forward and paralleling him at the

 5    time is because you didn't see any object in his hands?

 6        A.   Yes.   That's -- that's accurate.

 7        Q.   I mean, I take it if you would have seen

 8    something that looked like a gun in his hands, you might

 9    have tactically done something differently?

10        A.   Yes, sir.   That's possible.   That's a

11    possibility.

12        Q.   You might have not exposed yourself as much,

13    for example?

14             MS. SARMIENTO:   Objection.   Vague as to

15    "exposed."   Calls for speculation.

16             You can answer.

17             THE WITNESS:   Yes, sir.   Cover would have been

18    an option at that point.   Yes, sir.

19    BY MR. GALIPO:

20        Q.   It sounds like one of the reasons you

21    tactically moved your vehicle forward as you did is

22    because you didn't see anything in his hands.   Is that a

23    fair statement?

24        A.   Yes.

25        Q.   Obviously, if you would have seen something
```

1    that looked like a gun in his hands, you know, well

2    before he got to Bronson, you might have taken a

3    different tactical approach?

4        A.    Yes.

5        Q.    Did you have a sense as you were getting closer

6    to Bronson, where the other two patrol officers were?

7        A.    I did.  Yes, sir.

8        Q.    What was your sense, based on your

9    observations?

10       A.    My sense was that they were trailing a short

11   distance behind.  That they were still on foot, but they

12   were still trailing the individual, westbound on the

13   sidewalk or in the sidewalk curb area, behind him, as --

14   as we were continuing westbound on Martin Luther King.

15       Q.    Do you know -- or did you know at the time

16   whether they had their guns in their hands?

17       A.    I don't recall.

18       Q.    Did you have a sense as to how far behind him

19   they were?

20       A.    I -- I don't recall the distance.

21       Q.    I take it, foot pursuits sometimes happen in

22   your line of work?

23       A.    Yes, sir.

24       Q.    And one of the things you were considering as a

25   possibility when you saw the individual walking away

Petit v. City of Los Angeles, et al.
Focus Litigation Solutions

Page: 47

1    from the officers, you thought it could end up in a foot

2    pursuit.  Is that a fair statement?

3        A.    Yes.  Yes.

4        Q.    And are officers trained certain tactics with

5    respect to foot pursuits?

6              MS. SARMIENTO:  Vague.

7              You can answer.

8    BY MR. GALIPO:

9        Q.    For example, I mean, sometimes you could set up

10   containment or a perimeter or use the police radio to

11   communicate where the person's going?

12       A.    Yes, sir.  Those are options.

13       Q.    As Mr. Petit was nearing Bronson -- so now I

14   want to talk about this last 10 feet as he was getting

15   close to Bronson -- did you actually see his hand go

16   inside his waistband?

17             MS. SARMIENTO:  Misstates the witness's

18   testimony.

19             You can answer.

20             THE WITNESS:  I don't recall them actually

21   being inside the waistband area.

22   BY MR. GALIPO:

23       Q.    Did you see either one of his hands go in any

24   pockets?

25       A.    No.

1        Q.   Did you ever hear him verbally threaten to harm

2   anyone?

3            MS. SARMIENTO:   Vague as to "verbally threat."

4            You can answer.

5            THE WITNESS:   No.

6   BY MR. GALIPO:

7        Q.   Did you hear him say anything?

8        A.   No.

9        Q.   Do you know specifically where this object that

10  you saw came from?

11           MS. SARMIENTO:   Calls for speculation.

12           THE WITNESS:   No, I do not.

13  BY MR. GALIPO:

14       Q.   And you're saying you saw it about a second

15  before you fired?

16       A.   Possibly, one to two seconds.

17       Q.   When you fired your first shot, was Mr. Petit

18  on the sidewalk, or had he already walked into the

19  street?

20       A.   I believe he had already walked into the

21  street.

22       Q.   When he was in the street, was his upper body

23  turned towards you?

24       A.   He was back and forth turning -- intermittently

25  turn towards me in a bladed fashion, and also running.

1    So he wasn't facing me or running consistently,

2    position-wise, the entire time.

3         Q.   Okay.  I'm just -- I guess what I'm wondering

4    about, it seems like he was in the street for a

5    relatively short period of time before you fired.  Is

6    that accurate?

7         A.   Yes.

8         Q.   When he was in the street, just before you

9    fired, did he turn his upper body towards you?

10        A.   I -- I don't recall.

11        Q.   Was there anything in his left hand when you

12   fired?

13        A.   I -- I don't recall whether the item was in his

14   right or left hand at this point.  I don't -- I don't

15   remember.

16        Q.   Did he have one item in his hand or more than

17   one, if you know?

18        A.   I don't know.

19        Q.   How much of the item could you see before you

20   fired?

21        A.   I saw what I believed or what appeared to me as

22   the barrel of a handgun.

23        Q.   How many inches of the item were you able to

24   observe before you fired?

25        A.   A few inches.

1    in the street at that point.

2         Q.    Did you make any -- did you give him any

3    commands after you saw a few inches of the object, but

4    before the shooting?

5         A.    No.

6         Q.    It sounds like the commands you gave were

7    before you saw the object.    Is that correct?

8         A.    Yes.

9         Q.    Did you have any information that the

10   individual in this case, Mr. Petit, had seriously

11   injured or killed anyone before you saw him?

12        A.    No, sir.

13        Q.    Did you recognize him from any prior contacts?

14        A.    No, sir.

15        Q.    Did you have an impression as to whether he was

16   possibly homeless or transient?

17        A.    I'm sorry.    Did I have any information that he

18   had --

19        Q.    Impression -- just either information or

20   impression, from observing him?

21        A.    I did have an initial -- my initial observation

22   when I passed him, my first observation upon seeing him,

23   which was very, very quick, a second, a couple seconds'

24   worth of observation was that he was possibly a

25   transient.

```
 1        Q.   Have you had some experience in your law

 2   enforcement career dealing with transients or homeless

 3   people?

 4        A.   Yes, sir.   Absolutely.

 5        Q.   Have you found in your experience that some of

 6   them have mental health issues?

 7             MS. SARMIENTO:   Lacks foundation.   Calls for

 8   speculation.

 9             You can answer.

10             THE WITNESS:   Yes, sir.   I'm aware.

11   BY MR. GALIPO:

12        Q.   So I think you told me after you fired --

13   strike that.

14             Did you see his body jerk after you fired your

15   first shot?

16        A.   Very, very slightly.   And I want to say when we

17   go back to your initial description of wincing, I think

18   maybe that's a little bit more accurate.   So, it was

19   very -- it was very slight.

20        Q.   And where were you aiming on his body, from

21   your perspective, when you were firing out your window?

22        A.   I was aiming towards center mass.

23        Q.   Was that his left side from where you were at?

24        A.   No.   Center mass would have been his front

25   center -- center of his body, towards his -- from his
```

1     abdomen to his shoulder region.  That's what I would

2     refer to as center mass.

3          Q.    Were you further west of him when you fired?

4          A.    Slightly.

5          Q.    So --

6          A.    Maybe.

7          Q.    Go ahead.  I'm sorry.

8          A.    Yeah, I was, but very slightly.  Maybe 1 to 2

9     feet.  Just offset of parallel.

10         Q.    Which direction, compass direction, were you

11    firing your shots?

12         A.    North.

13         Q.    Slightly northeast?

14         A.    Very, very slightly northeast.

15         Q.    And then could you tell if your second shot

16    struck him?

17         A.    I believe my second shot struck the individual.

18         Q.    Is that when he went down?

19         A.    Yeah, he -- yes, sir.  He went down after I

20    believe I fired my second shot.

21         Q.    And then at some point, you heard an additional

22    shot?

23         A.    Correct.

24         Q.    And do you recall how he came to rest on the

25    roadway after he went down?  Whether it was chest down

1    or some other fashion?

2         A.   I observed him, sir, when he went down to the

3    ground, he appeared to fall forward onto the ground, and

4    initially be on his stomach.

5         Q.   And did you see the object anywhere on the

6    ground, after he initially went down?

7         A.   No, sir.  I could not see it.  I could not

8    immediately see it.

9         Q.   At some point was he rolled over, or did he

10   turn himself on his back?

11        A.   Yes.

12        Q.   And could -- when he turned himself on his

13   back, did you see any object on the ground that looked

14   like a gun to you?

15        A.   I don't recall his position when I actually --

16   I don't -- I don't remember seeing the gun right away --

17   or the -- I'm sorry -- the item right away.

18        Q.   Did you -- do you recall saying something like,

19   "Does anyone see the gun?", after the shooting, when he

20   was lying there?

21        A.   Yes, I did say that.

22        Q.   Who were you saying that to?

23        A.   I was -- I verbally said that to the group of

24   officers that were there at scene, that were part of our

25   tactical plan in approaching the individual.

1    street and started walking away from them?

2         A.   Yes.

3              MR. GALIPO:  Can we go to page 13 of the

4    transcript, please, at the bottom portion of the

5    response.

6    BY MR. GALIPO:

7         Q.   Are you able, first of all, to see that on your

8    screen?

9         A.   Yes.  Yes, sir.

10        Q.   Are you able to read it?

11        A.   Yes.

12        Q.   Okay.  So you see on the left-hand side there's

13   line numbers?

14        A.   Yep.

15        Q.   So starting at page about line 20, you're

16   talking about the individual is unresponsive, was not

17   stopping, was not slowing.

18             Do you see that?

19        A.   Yes, I do.

20        Q.   And then you say, starting on line 22:  "Again,

21   but did not have anything in his hands at this point."

22             Do you see that?

23        A.   Yes.

24        Q.   Would that be when you were initially observing

25   him?

1       A.   Yes.   Wait a minute here.   Hold on a sec.   So

2   let me -- I want to answer it accurately here.

3            As the officers are trying to make contact with

4   him, I do not remember seeing anything in his hands.

5       Q.   Okay.   And is that why in your interview here

6   you said:   "Again, but did not have anything in his

7   hands at this point"?

8       A.   Yes.

9            MR. GALIPO:   And then if we can go to page 14,

10  please, towards the bottom.

11  BY MR. GALIPO:

12      Q.   You say, on line 23:   "So at this point, I did

13  not see anything in his hands, and I knew we were coming

14  up on a residential street."

15           Do you see that?

16      A.   Yes.

17      Q.   And it starts on line 20:   "As he got closer

18  and closer to Bronson, he started to pick up his pace a

19  little bit from the officers to -- in my opinion, he was

20  trying to elude the officers."

21           Do you see where I'm reading from?

22      A.   Yes.

23      Q.   So is that when he was walking away from the

24  officers?

25      A.   At this point in time, he's in a -- in a slight

1    jog.

2            (Simultaneous speakers.)

3    BY MR. GALIPO:

4        Q.    Okay.   And then you say on line 23:   "So at

5    this point, I did not see anything in his hands."

6            Do you see that?

7        A.    Yes, sir.

8            MR. GALIPO:   And then going to page 15, please,

9    the next page.

10   BY MR. GALIPO:

11       Q.    On line 7, you say:   "I didn't say anything in

12   his hands at this point.  I didn't believe that he was

13   armed at this point."

14           Do you see those sentences?

15       A.    Yes, sir.

16       Q.    And then you say:   "The last" point of -- and

17   this is on line 9:   "The last information that was given

18   over the radio of this potential suspect, that he was

19   armed with a stick, possibly armed with a stick."

20           Do you see that?

21       A.    Yes.

22       Q.    Was that some information that came over the

23   radio that he might be armed with a stick?

24       A.    Yes.

25       Q.    Going to page 16, line 20, towards the bottom,

1    you say:  "Again, I didn't feel like the need to stay

2    back at this point.  I thought it was safe to do so with

3    the cover of my vehicle and not seeing anything in his

4    hands at that point."

5         Do you see that?

6    A.    Yes.

7    Q.    Are you referencing the time frame when you

8    pulled -- decided to pull forward?

9    A.    Yes.

10   Q.    Going to page 17, on the bottom, lines 21 and

11   22, you say:  "In my process of accelerating towards

12   him, his hands were free."

13        Do you see that?

14   A.    Yes.

15   Q.    And then you go on to say:  "He had nothing in

16   his hands.  He didn't have a stick.  He didn't have a

17   gun.  He had nothing in his hands."

18        Do you see that part of your interview?

19   A.    Yes.

20   Q.    And in you're interview, obviously, you're

21   describing what your observation were at various points

22   in time.  Is that fair?

23   A.    Yes.

24   Q.    And then going to page 18, on line 15, you say:

25   "I couldn't see anything in his hands at that point."

1    But then you go on to say:  "But he was manipulating in

2    a process of -- it appeared that he was trying to

3    retrieve something from his front section, here."

4            Do you see where I'm reading from?

5        A.   Yes.

6        Q.   "I just -- I could not see what was in his

7    hands.  I couldn't see where they were going.  It wasn't

8    deep in a pocket.  It was just inside his clothes area,

9    near his front waistband area."

10           Do you see that?

11       A.   Yes, sir.

12       Q.   Did you see him at some point skipping or

13   side-stepping as he was going down the sidewalk?

14       A.   Yes.

15       Q.   And you unholstered your weapon, I think you

16   told us before, and pointed it at him before you saw any

17   object in his hands.  Is that fair?

18       A.   Yes, sir.

19       Q.   Going to the bottom of page 21.  And I think we

20   kind of talked about this earlier, this is about the

21   time of your first shot, on line 21.  If you look above,

22   you're talking about when you fired your first round, on

23   line 19.

24           And then you say:  "The suspect" didn't --

25   "winced and he didn't immediately go down.  His body kind

Petit v. City of Los Angeles, et al.
Focus Litigation Solutions

Page: 66

1          Do you see that on line 10?

2     A.    Yes.

3     Q.    And then the next sentence says:  "He's facing

4  me the entire time.  He's looking at me."

5          Do you see that?

6     A.    Yes.

7     Q.    So were you distinguishing the movement of the

8  upper body from the face?

9     A.    Yes.  And not just his face, but from his upper

10 shoulders and his upper body portion, as well.

11    Q.    Right.  That's where I was a little confused.

12 When you said:  "He doesn't turn his body at any point,"

13 what did you mean by that?

14    A.    I meant that when he was looking at me, he was

15 facing me.

16    Q.    And obviously, you fired your shots through the

17 open passenger window?

18    A.    Yes.

19    Q.    Is there a policy, if you know, against

20 shooting at or from moving vehicles or highly

21 disfavoring it?

22    A.    Yes.

23    Q.    Do you know whether or not your actions in this

24 case of shooting from a moving vehicle was deemed to be

25 outside of policy?

```
 1        Q.   Was this -- how long had you been a sergeant
 2   when this happened, approximately?
 3        A.   Probably, sir, maybe seven -- seven to eight
 4   months, possibly.
 5        Q.   Okay.  Was this the first time that you were a
 6   sergeant at an officer-involved shooting incident?
 7        A.   Yes, I believe so.
 8        Q.   Okay.
 9             MR. GALIPO:  Okay.  Thank you, Renee.
10   BY MR. GALIPO:
11        Q.   Okay.  Just lastly, regarding your training
12   with respect to the use of deadly force, I'm assuming
13   thank your general training is that to use deadly force,
14   there has to be an immediate or imminent threat of death
15   or serious bodily injury.  Is that fair?
16        A.   Yes.
17        Q.   And do you have training that the person --
18   that there has to be the opportunity, ability, and
19   apparent intent to immediately cause death or serious
20   bodily injury?
21        A.   I think it's based on the reasonableness of the
22   officer, perceptions of the officer at the time, and the
23   fact that are known at the time.
24        Q.   Okay.  I think that's right.
25             But do you know as part of your training, have
```

1    you heard the terms, "the ability, opportunity, and

2    apparent intent"?  Have you heard that at all in the

3    training that you've had?

4         A.   Yes.

5         Q.   Okay.  Do you know if that's part of the

6    analysis?

7         A.   Yes.

8         Q.   And were you trained to give a verbal warning

9    before using deadly force, when feasible?

10        A.   When feasible, yes, sir.

11        Q.   What was your background or backdrop when you

12   fired?

13        A.   So at the time I did -- I fired my first round,

14   my -- my background was a nearby unoccupied vehicle in

15   the driveway of the adjacent residence, which would have

16   been located on the northeast corner of Martin Luther

17   King Boulevard and Bronson.  It was an unoccupied silver

18   vehicle in the driveway.

19        Q.   And how about your second round?  Was it same

20   background or slightly different?

21        A.   I would say same background.

22        Q.   Were you trained that deadly force should only

23   be used when no other reasonable options are available?

24        A.   Yes.

25        Q.   Were you trained on the acronym "IDLE" at some

1    point, "immediate defense of life"?

2        A.    Yes.

3        Q.    Were you trained that deadly force should only

4    be a last resort?

5        A.    Yes.

6            MR. GALIPO:  All right.  I think -- I don't

7    have any further questions, but I'm not sure about

8    counsel, either for the City or your counsel.  So I'm

9    going to turn it over to them to see if they have any

10   follow-up questions.

11           MS. SARMIENTO:  None from my end.

12           MR. BOJORQUEZ:  And the City has no questions

13   at this time, as well.

14           MR. GALIPO:  So, Kimberly, do you have any

15   questions, or do you want to do a read off?

16           THE CERTIFIED STENOGRAPHER:  Ms. Sarmiento, are

17   you ordering a copy?

18           MS. SARMIENTO:  Yes, Madam Court Reporter.

19           THE CERTIFIED STENOGRAPHER:  Thank you.

20           And, Mr. Bojorquez, are you ordering a copy?

21           MR. BOJORQUEZ:  The City will, as well.  And

22   then as I mentioned, just making sure that we get

23   communications and contact with Carolyn Castillo, which I

24   put in the chat.  Thank you.

25           THE CERTIFIED STENOGRAPHER:  Thank you.  One

1    moment.

2              THE VIDEOGRAPHER:  We're off the record at 4:43

3    p.m.

4              (4:43 p.m., deposition concluded.)

5                        --oOo--

1    STATE OF CALIFORNIA)
                       ) ss:
2    COUNTY OF BUTTE    )

3
              I, KIMBERLY E. D'URSO, do hereby certify:
4

5             That the witness named in the foregoing

6    deposition was present remotely and duly sworn to testify

7    to the truth in the within-entitled action on the day and

8    date and at the time and place therein specified;

9             That the testimony of said witness was reported

10   by me in shorthand and was thereafter transcribed through

11   computer-aided transcription;

12            That the foregoing constitutes a full, true and

13   correct transcript of said deposition and of the

14   proceedings which took place;

15            Further, that if the foregoing pertains to the

16   original transcript of a deposition in a federal case,

17   before completion of the proceedings, review of the

18   transcript [ ] was [ ] was not requested.

19            That I am a certified stenographic reporter and

20   a disinterested person to the said action;

21            IN WITNESS WHEREOF, I have hereunder subscribed

22   my hand this 2nd day of September, 2025.

23   _____

24   KIMBERLY D'URSO, CSR NO. 11372, RPR

25