EXHIBIT 8

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    --oOo--

4

5    ASHLYN PETIT, as successor-in
     interest to JERMAINE PETIT, deceased,

6

           Plaintiff,

7

     v.                              Case No.

8                                    2:23-cv-00789-CJC (PVCx)

9    CITY OF LOS ANGELES, a municipal
     entity; OFFICER DARYL GLOVER, JR.;

10   SERGEANT BRETT HAYHOE;
     and DOES 1 through 10, inclusive,

11

           Defendants.

12   _____/

13

14

           STENOGRAPHIC REPORTER'S TRANSCRIPT OF

15          REMOTE DEPOSITION OF PHILLIP SANCHEZ

16              MONDAY, OCTOBER 13, 2025

17

18   Reported Stenographically by:

19   KIMBERLY D'URSO, CSR 11372, RPR

20   Job No.  20753

21

22

23

24

25

```
 1                    APPEARANCES (Remote)

 2    FOR THE PLAINTIFFS:

 3              LAW OFFICES OF DALE K. GALIPO
                BY:  DALE K. GALIPO, ESQ.
 4                    RENEE MASONGSONG, ESQ.
                21800 Burbank Boulevard, Suite 310
 5              Woodland Hills, California 91367
                818.347.3333
 6              dalekgalipo@yahoo.com
                rvalentine@galipolaw.com
 7
                IVIE MCNEILL WYATT PURCELL & DIGGS
 8              BY:  RODNEY S. DIGGS, ESQ.
                444 S. Flower Street, Suite 3200
 9              Los Angeles, CA 90071
                213.489.0028
10              rdiggs@imwlaw.com

11
      FOR THE DEFENDANTS BRETT HAYHOE and DARYL GLOVER, JR.
12
                CARPENTER ROTHANS & DUMONT, LLP
13              BY:  STEVEN J. ROTHANS, ESQ.
                500 S. Grand Avenue, 19th Floor
14              Los Angeles, CA 90071
                213.228.0400
15              srothans@crdlaw.com

16    FOR THE DEFENDANT CITY OF LOS ANGELES:

17              OFFICE OF THE CITY ATTORNEY OF LOS ANGELES
                BY:  CHRISTIAN R. BOJORQUEZ, ESQ.
18              200 N. Main Street, 6th Floor, City Hall East
                Los Angeles, CA 90012
19              christian.bojorquez@lacity.org

20

21                        --oOo--

22

23

24

25
```

1    observations the officers made at the time?

2         A.    Yes.

3         Q.    When you wrote your initial report, did you

4    include the documents you had reviewed up to that point

5    in time?

6         A.    Yes, sir.

7         Q.    I want to just ask you some general questions

8    about tactics, if that's okay.   One of the concepts

9    trained to police officers is de-escalation when

10   feasible; is that fair?

11        A.    When safe and feasible, yes, sir.

12        Q.    And are officers trained to give commands in a

13   clear voice, when feasible?

14        A.    When safe to do so, based on the totality of

15   the circumstances, yes.

16        Q.    And are officers trained to give the individual

17   an opportunity to comply with the commands, again, when

18   it's safe to do so?

19        A.    Yes, sir; to evaluate the entire environment

20   and action or reaction of the individual.

21        Q.    If there's a foot pursuit or potential foot

22   pursuit, do officers have training with respect to

23   setting up containments or perimeters when they can?

24        A.    Yes.

25        Q.    Depending on the circumstances, are officers

1    trained to have less-lethal options available, if that's

2    feasible in circumstances?

3        A.    Generally, yes.    There are some accoutrements

4    that officers carry on their person, such as a baton,

5    Taser, OC spray.    In my opinion, the more effective

6    less-lethal devices are typically in the radio car and

7    not always accessible by the officer.

8        Q.    Would that be like 40-millimeters and bean bag

9    rounds?

10       A.    Yes, sir.

11       Q.    Based on your review of the materials, are you

12   aware that two of the officers were outside of their

13   patrol vehicle at some point when they made contact --

14   or tried to make contact with Mr. Petit?

15       A.    That's my understanding.

16       Q.    And which officers do you understand tried to

17   make contact with him?

18       A.    Yes, sir.    I believe it was Officer Glover,

19   G-L-O-V-E-R, and Martinez, common spelling.

20       Q.    From your review of the materials, do you know

21   if Officer Glover had a baton, Taser, or OC spray on his

22   person?

23       A.    I do not know those specific accoutrements.    I

24   do know he was in a marked police vehicle, wearing a

25   traditional police uniform.

1    Q.   And same question for Martinez; do you know

2    whether he had a baton, Taser, or OC spray on his

3    person?

4    A.   Similar response.  I didn't see any -- there

5    was body-worn camera video of both officers, one from a

6    view of Glover to Martinez and from Martinez to Glover;

7    but I don't recall the accoutrements that they had on

8    their person.

9    Q.   Did you have an understanding as to whether or

10   not their vehicle had either a 40-millimeter or bean bag

11   shotgun somewhere in it or in the trunk?

12   A.   I believe that they were in an SUV, so it would

13   have been the cargo area versus an actual trunk.  And I

14   did not see any material suggesting that there were

15   those launchers that were in the vehicle at the time of

16   the event.

17   Q.   And did you understand there was also a

18   sergeant who was involved in part of the shooting?

19   A.   Yes, sir.  Sergeant Hayhoe, H-A-Y-H-O-E.

20        MR. GALIPO:  And thank you for your spellings,

21   by the way.  On behalf of the court reporter, we

22   appreciate that.

23        THE CERTIFIED STENOGRAPHER:  Yes.

24        THE WITNESS:  I'm a terrible speller, Mr.

25   Galipo.

```
 1              THE CERTIFIED STENOGRAPHER:  Thank you very
 2    much.
 3              MR. GALIPO:  Well, I've had several court
 4    reporters tell me you're a pleasure to take down, so
 5    whatever you're doing, keep it going.
 6              THE WITNESS:  Thank you.
 7    BY MR. GALIPO:
 8         Q.   And do you know if Sergeant Hayhoe had either a
 9    40-millimeter or a bean bag shotgun in his car?
10         A.   I did not see any material or indicating those
11    launchers in his vehicle.
12         Q.   If you know, do officers have some training on
13    trying to distinguish firearms from other objects in a
14    person's hand?
15         A.   Generally speaking, that training is covered
16    either in the academy or when law enforcement officials
17    discover some non-traditional firearm, and they make
18    that information known on a statewide basis.
19         Q.   So, for example, if someone has a wallet versus
20    a firearm, or keys versus a firearm, is there some
21    general training on that, if you know?
22         A.   I think, Mr. Galipo, the general training is
23    covered either in the academy or AOT, advanced officer
24    training.  And in that training, experts or the
25    instructors typically talk about a traditional --
```

Petit v. City of Los Angeles, et al.
Focus Litigation Solutions

Page: 12

1    recognizing a traditional firearm, and then trying to

2    recognize objects as they appear or perceive to be

3    firearms.  And then, of course, there are homemade or

4    non-traditional firearms that also present a threat to

5    law enforcement or the public.

6        Q.    Officers also have training on the concepts of

7    cover and concealment?

8        A.    Yes.

9        Q.    Are officers trained that one option for them

10   is to take cover, if they can, if they believe someone

11   is armed with a firearm?

12       A.    Cover or concealment, depending on the

13   totality.

14       Q.    Is communication generally an important concept

15   in tactics, both with a suspect and even in between

16   officers?

17       A.    Yes.

18       Q.    And the methods of communications between

19   officers, I take it, one might be the police radio, and

20   another would be simply verbalizing to each other on

21   scene?

22       A.    Those are examples.  There are also nonverbal

23   communications between partners that exist as well.

24       Q.    Can you give me just a few examples of that?

25       A.    Of nonverbal?

Petit v. City of Los Angeles, et al.
Focus Litigation Solutions

Page: 13

1      Q.   Yes.

2      A.   Yes.  In field tactics, generally, a nonverbal

3   tactic or nonverbal communication to your partner that

4   you've identified an individual, officers will typically

5   hold their fingers in a high-five pattern.

6        My fingers -- for the record, my fingers are

7   pointed upward, and my thumb is extended out to my left

8   shoulder.  Kind of a "high-five," for lack of better

9   terms.  The term is actually used "five," that denotes a

10  suspect or subject, followed by the officer pointing in

11  the direction, has been my experience.

12       Another nonverbal simply is pointing in the

13  direction of the suspect, fingers closed in a bladed in

14  one format, and one officer is pointing to the next.

15      Q.   Okay.  Thank you for that.

16       Let me talk to you just for a moment about some

17  of the standards that apply to the use of deadly force.

18  I take it deadly force is the highest level of force an

19  officer is authorized to use?  Is that a fair statement?

20      A.   Yes.

21      Q.   And based on the training, is the expectation

22  that if an officer shoots someone center mass, it's

23  likely to cause serious injury or death?

24      A.   Yes.

25      Q.   Do officers, for that reason, often have

1    ballistics vests on during their work?

2         A.    Yes.

3         Q.    And are officers generally trained that deadly

4    force is appropriate if there's an immediate or imminent

5    threat of death or serious bodily injury to themselves

6    or others?

7         A.    Yes.

8         Q.    And is the general training if there's not an

9    imminent or immediate threat of death or serious bodily

10   injury, they should not use deadly force?

11        A.    Yes.

12        Q.    And are you familiar -- I think you mentioned

13   it in your report -- but the training or the standards

14   on the suspect having the "ability, opportunity, and

15   apparent intent to immediately cause death or serious

16   bodily injury," are you familiar with that language,

17   either in the Penal Code Section or the POST standards?

18        A.    Yes.

19        Q.    And that applies to the use of deadly force;

20   correct?

21        A.    Yes.

22        Q.    And so part of the analysis is whether or not

23   it reasonably appeared that the suspect had those three

24   components:   the opportunity, ability, and apparent

25   intent to immediately cause death or serious bodily

1    injury?  Is that your understanding?

2        A.   Yes.  Not necessarily in that order, but the

3    components are there.

4        Q.   Okay.  I wasn't suggesting that had to be the

5    order.  I was just trying to remember what the three

6    were.

7             And am I correct that it's in the conjunctive,

8    meaning there's "and"; there has to be all three, as

9    opposed to just one of them?

10       A.   It's a descriptor that helps the officers

11   evaluate the event as it's rapidly evolving, as to

12   whether or not the subject has AOI:  the ability, the

13   opportunity, and the perceived intent.

14       Q.   And is that the acronym that's often used for

15   that?

16       A.   Yes.

17       Q.   Is part of the consideration, when looking at a

18   scenario where deadly force is used, whether there were

19   other reasonable options?

20       A.   Yes, depending on the totality.

21       Q.   And is part of the consideration, again,

22   depending on the totality, is whether a verbal warning

23   was given and whether it was feasible to give a verbal

24   warning?

25       A.   Yes.

Petit v. City of Los Angeles, et al.
Focus Litigation Solutions

Page: 16

1      Q.    Is there training for officers, with respect to

2   controlling their fear?  I realize fear is a very

3   natural thing for anyone to have, but are they trained

4   to try to control it to the extent they can?

5      A.    Yes.  I would think that that's a fair

6   statement, based on my experience.  Again, it's based on

7   the totality of the circumstances.

8            Many things dictate fear:  experience,

9   religious beliefs, the amount of sleep the officer's

10  had, their training, expertise, knowledge, past

11  experiences, whether they've been inoculated with the

12  appropriate training and understanding of the

13  physiological effects of stress and lethal environments.

14  Many, many components.

15           But in general, officers are -- are -- are

16  taught to try to control their fear to the best of their

17  ability.

18      Q.    And along those lines, is there also training

19  with respect to not "panicking," if you will, in a

20  high-stress situation?

21      A.    Again, based on experience, their inoculation

22  with past events.  "Panic" is a strong word.  I think

23  the previous question captured it a little bit better,

24  in that officers are expected to try to control their

25  fear to the best of their ability.

1    Q.   And is the basis or reason for part of that

2    training, if you know, to not overreact, if that can be

3    avoided?

4    A.   Yes.

5    Q.   I take it at least one consideration in using

6    deadly force would be backdrop or background?

7    A.   Yes.  That's a consideration for the officer.

8    Q.   Have you heard of the term "contagious fire" or

9    "sympathetic fire"?

10   A.   Yes.

11   Q.   What do you understand that to mean, based on

12   the training?

13   A.   My understanding of sympathetic fire is more

14   reactionary fire, that the -- each individual who is

15   actually pulling the trigger may not see or perceive a

16   real threat, but because there's other gunfire, then

17   feels compelled or justified to engage in the use of --

18   of gunfire, as well.

19   Q.   Going back to -- I know you were with the City

20   of Pasadena for some time; is that correct?

21   A.   Yes, sir.

22   Q.   What time period were you there?

23   A.   July of 2010 to April of 2018.

24   Q.   And at some point you served as their chief of

25   police?

```
 1        A.    Yes; for those full eight years.

 2        Q.    And where were you -- I don't know why I can't

 3   remember right now, but where were you before that?

 4        A.    You mean where was I employed before the --

 5        Q.    Yeah; where were you employed?  I'm sorry.

 6        A.    Yes, sir.  With the City of Santa Monica.

 7        Q.    That's right.

 8              In your work as a law enforcement officer, had

 9   you had occasions to see suspects with guns in their

10   hand before?

11        A.    Yes, many times.

12        Q.    Do you have an estimate as to how many times,

13   or can you give me any range?

14        A.    I would say between 50 and 100 times.  A lot of

15   my career as a younger officer, I served on task force

16   and anticrime teams, so we dealt with a lot of predators

17   in the public.

18        Q.    Were you trained as an officer you can shoot

19   someone merely for seeing a gun in their hand, or does

20   there have to be more?

21        A.    Has to be more.

22        Q.    During your career, had you been present before

23   for officer-involved shootings?

24        A.    Yes.

25        Q.    On how many occasions had you been present
```

Petit v. City of Los Angeles, et al.
Focus Litigation Solutions

Page: 19

1    [sic].  And the second caller was Hannah Mark, M-A-R-K.

2          Both described Mr. Petit as an African American

3    adult, provided a clothing description, physical

4    description, and both indicated that they believed they

5    saw a firearm, a gun.

6          Q.   Did the officers have any information that any

7    shots were fired before arriving on scene?

8          A.   Not to my knowledge.

9          Q.   Any information that anyone specifically had

10   been injured?

11         A.   Not to my knowledge.

12         Q.   At some point, the officers, one or more of

13   them, observed Mr. Petit?

14         A.   Yes.

15         Q.   And do you have an understanding as to who was

16   the first officer who made contact with him?

17         A.   Yes.

18         Q.   What's your understanding?

19         A.   My understanding is it was Officer Glover and

20   Martinez, assigned to a single radio car, who made the

21   initial contact with Mr. Petit.

22         Q.   And by the way, this is not a complete memory

23   test, Phil, so if you need to look at your notes or

24   report at some point, that's totally fine.  Just let me

25   know what you're looking at, so we can all follow along.

1    A.    My understanding, based on Officer Martinez's

2    statement at his sworn deposition and his initial

3    statement to FID, Force Investigation Detail, of the

4    Los Angeles Police Department, that he was about 6 to 10

5    feet away from Mr. Petit.

6    Q.    Was it light outside at the time?

7    A.    Yes.

8    Q.    And I think you indicated earlier you did

9    review the body-worn camera footage available in this

10    case?

11    A.    Yes.

12    Q.    And according to Martinez, did Mr. Petit have

13    anything in his hands at that point?

14    A.    During the initial contact, I believe that

15    Martinez testified that he saw a dark-colored object in

16    Petit's hand.

17    Q.    Do you recall which hand; or did he recall?

18    A.    I believe he testified at his deposition, his

19    right hand.

20    Q.    And if you know, did Officer Martinez ever

21    identify that object as a firearm?

22    A.    I believe that he verbalized to his partner,

23    Glover, who was out of the vehicle at this time, that it

24    was not -- the object Petit was holding was not a

25    firearm.   That was a response based on Officer Glover's

Petit v. City of Los Angeles, et al.
Focus Litigation Solutions

Page: 26

1    observation, that Petit had a gun.

2        Q.    Did either of the officers yell out, "Gun" at

3    any time that you heard?

4        A.    Not that I heard on body-worn camera.  Glover

5    later told FID investigators that he perceived Petit was

6    armed with a homemade gun.  And when Martinez indicated

7    it was not a firearm -- of course Martinez had a

8    different perspective and a different view -- Petit --

9    I'm sorry -- Glover questioned that.

10       Q.    Based on your review of the materials, did

11   Glover hear that comment by Officer Martinez that it was

12   not a firearm?

13       A.    Yes.

14       Q.    And I take it officers, under certain

15   circumstances, are trained if they see what they believe

16   to be a gun or a firearm, one thing they can do is yell

17   out, "Gun, gun," or words to that effect, to let fellow

18   officers know of their observations?

19       A.    That is an option, if it's safe to do so, and

20   alerts, of course, other officers in the area.

21       Q.    And what's the benefit of that, generally?

22       A.    The benefit, I think, is to avoid sympathetic

23   fire if it comes to use of lethal force.  I think the

24   other benefit is to allow your partner officer to at

25   least comprehend or try to understand your perspective

1    A.   No.

2    Q.   And is Mr. Petit, based on your review, does he

3  ever turn towards them in the initial contact?

4    A.   According to Officer Martinez's deposition,

5  yes.  Petit not only turned towards Martinez, but

6  started to raise the object and -- that was in his

7  hands.  And Martinez felt that it was pointed at least

8  towards him.

9    Q.   And were any shots fired at that point by

10  either officer?

11    A.   No.

12    Q.   And what do you understand the distance to be

13  at that point between Mr. Petit and Officer Martinez?

14  About the same we talked about before?

15    A.   Yes, sir.  Between 6 and 10 feet, according to

16  Officer Martinez's deposition testimony.

17    Q.   And how about Officer Glover?  Did you have an

18  understanding where he was at the time that Mr. Petit

19  had this object, raised it, and maybe pointed it?

20    A.   Yes.

21    Q.   What's your understanding?

22    A.   Based on his deposition testimony, Officer

23  Glover said that he had exited the vehicle, moved to the

24  front of the patrol unit, beyond the bumper, and was

25  about 20 to 25 feet -- I guess it would be north of

1    where Mr. Petit was standing.

2         Q.   And if you know, did either Martinez or Glover

3    have their firearm out at that time?

4         A.   At least Officer Glover did.  I can't recall if

5    Officer Martinez had unholstered his pistol.

6         Q.   Were there additional commands given -- and

7    again, this is when it's fine to look at your notes if

8    you want.  But were there additional commands given, if

9    you know, after the initial commands by Martinez?

10        A.   Yes.

11        Q.   And what were those, if you recall?

12        A.   For clarity, Mr. Galipo, I don't have any

13   notes.  I just have the reports.

14        Q.   Okay.  I was just saying that in a general

15   sense.

16        A.   Thank you for the clarity.  I appreciate that,

17   for allowing me to say that.

18        Q.   You're welcome.

19        A.   Yes.  Officer Glover, when he stepped from the

20   vehicle, gave Petit orders, "Drop it.  Don't move."

21   Similar commentary to the orders that were issued by

22   Martinez.

23        Q.   Do you think it would have been appropriate for

24   Officer Martinez to shoot Mr. Petit in that initial

25   contact?

1      A.   No.

2      Q.   And why not?

3      A.   I don't believe that Mr. Petit, although

4   perceived to be armed, did not present -- did not

5   present a situation that created an imminent threat of

6   death or serious bodily injury.

7      Q.   Do you think it would have been appropriate for

8   Officer Glover to shoot him in that initial contact?

9      A.   No.

10      Q.   For the same reason?

11      A.   Yes.   I would add that Officer Glover had

12   indicated in his deposition that he saw the black

13   object, believed it was a homemade firearm.   Petit was

14   holding the object at chest level, but the, quote,

15   "barrel," the long end of the device or object, was

16   pointed towards the ground.

17      Q.   Okay.   And if it was pointed down, that would

18   at least play into the analysis on the intent and the

19   immediacy of the threat?

20      A.   Yes, sir.

21      Q.   And at some point, is it your understanding

22   that Mr. Petit is walking away or moving away from the

23   officers as he's going down the sidewalk?

24      A.   Yes, sir.   Based on my review, he was

25   noncompliant with orders from Martinez or Glover.   He

1   presented the firearm.  He presented the object that the

2   officers believed -- at least Glover believed -- was a

3   firearm, and then started to walk away quickly from

4   Martinez and Glover.

5       Q.   At that point, when he was walking away and not

6   obeying verbal commands, do you think it would have been

7   appropriate for either Martinez or Glover to shoot him

8   as he was walking away?

9       A.   No.

10      Q.   And why not?

11      A.   Well, I think the baseline premise is that

12  Glover [sic] is armed, perceived to be armed.  He's at

13  least in violation, potentially of 148, crime in

14  progress, resisting, interfering, or delaying an

15  officer's investigation.

16          But most importantly, he's not presenting an

17  imminent threat.  The gun is not -- the object is not

18  pointed at the officers.  Therefore, the imminency is --

19  is -- is not present.

20      Q.   Okay.  In your response, you said "Glover," but

21  I think you meant Petit?

22      A.   Thank you.  Thank you, Mr. Galipo.

23      Q.   Okay.  Now, at some point, your understanding,

24  the sergeant was in his patrol vehicle?

25      A.   Yes.

Petit v. City of Los Angeles, et al.
Focus Litigation Solutions

Page: 32

1    Q.   And you reviewed the sergeant's statement as

2  part of the documents you reviewed in this case?

3    A.   Yes.

4    Q.   And also, eventually, you received his

5  deposition?

6    A.   Yes.

7    Q.   Did you note in your review of the officer's

8  statement that one of the reasons he said that he moved

9  forward to the position that he did with his patrol car

10  is because, based at least on his observations, he could

11  see that Mr. Petit had nothing in his hands?  Do you

12  recall that, generally, in his statement?

13    A.   Yes.

14    Q.   And would that be important, tactically, from

15  your perspective, the sergeant not seeing anything in

16  his hands at the time he's moving forward?

17    A.   Yes.

18    Q.   And why so?

19    A.   I think that the Sergeant Hayhoe would -- in my

20  opinion, might have selected different tactics if he had

21  seen Petit holding a dark object in his hands at the

22  time he was driving west on MLK, Martin Luther King

23  Boulevard.

24    Q.   If you know, did either Glover or Martinez

25  communicate over their police radio that they saw a gun

1    in Mr. Petit's hand?

2         A.    No.

3         Q.    And what other potential tactical choices would

4    the sergeant have had, if he would have seen a dark

5    object in Mr. Petit's hands before approaching the

6    intersection?

7         A.    In my estimation and experience, if Sergeant

8    Hayhoe had seen an object in Petit's hand that he

9    believed, in fact, was the gun, he could have maintained

10   his distance.    He could have communicated on the radio

11   that he saw a gun.

12         He could have offered a mobile cover for Glover

13   and Martinez, who were at least trailing behind him at

14   some point.

15         The only radio communication that I recall from

16   Sergeant Hayhoe to the communications center is that he

17   indicated the officers were, quote, "Code 6," C-O-D-E,

18   "Code 6," which is LAPD's term for "on scene and about

19   to make contact with an individual."

20         Q.    Have you heard the expression in training

21   before that "Cover plus distance equals time"?

22         A.    Yes.    It referred to time, tactics, and tack --

23   or talk, yes.

24         Q.    Now, at some point, according to the sergeant,

25   he does see a dark object in Mr. Petit's hand.    Is that

1    A.   At that time, Sergeant Hayhoe gave verbal

2    orders, "Drop it."  "Don't do it."  Something along

3    those lines.   Perceived that there was an imminent

4    threat, based on the position of the black object, and

5    Petit's body movements and position, and fired one of

6    two rounds, in fear of death or serious bodily injury.

7         Q.   Let me give you a hypothetical, if I can, and

8    the same facts we have in this case.   I don't want to go

9    through all of them, but everything the same as you

10    understand it, up to the time that the sergeant sees the

11    object in Mr. Petit's hand.

12         And let's assume he sees the object, but like

13    earlier on, Mr. Petit doesn't raise it, point it, or

14    turn towards the sergeant.   I'm just going to add that

15    in my hypothetical.   I realize that is inconsistent, to

16    some extent, with what the sergeant says.   But do you at

17    least understand my hypothetical?

18         A.   Yes, sir.

19         Q.   If, hypothetically, Mr. Petit did not turn

20    towards the sergeant, did not raise the object or point

21    it at the sergeant, then do you have an opinion as to

22    whether that shot would have been appropriate or not?

23         A.   Based on the facts of your hypothetical, which

24    of course I could always use more information -- but

25    based on the facts that you have presented, I don't

Petit v. City of Los Angeles, et al.
Focus Litigation Solutions

Page: 36

1    believe it would have been appropriate for

2    Sergeant Hayhoe, because the imminent threat of death or

3    bodily injury isn't present.

4           In other words, Petit doesn't -- doesn't

5    possess AOI at that point:  ability, aim, opportunity,

6    and intent to create the perception of an imminent death

7    or serious bodily injury.

8      Q.   So under my hypothetical, walking away, seeing

9    the object, not obeying commands, you would need more

10   than that for the use of deadly force?  Is that fair?

11     A.   Yes.

12          MR. GALIPO:  And just so you know, Phil, there

13   was a very slight glitch where you paused for a second

14   or two or froze up, but your words, I think, kept going.

15   I just want to make sure our court reporter got

16   everything down.

17          She's nodding her head yes.

18          THE CERTIFIED STENOGRAPHER:  Yes.  Thank you,

19   Mr. Galipo.

20          MR. GALIPO:  Thank you.

21   BY MR. GALIPO:

22     Q.   And would the same be true of the second shot,

23   if the item was not -- if he had not directed the item

24   at the sergeant, that the shooting, in your opinion,

25   would be inappropriate?

Philip Sanchez

1    A.   Yes.

2    Q.   In the video footage that you have watched,

3    from any of the videos, do you ever see the object

4    pointed at the sergeant?

5    A.   I see the object by Mr. Petit raising up

6    towards where I believe the radio car -- Sergeant

7    Hayhoe's radio car is positioned.

8    Q.   And could you actually see the object?

9    A.   I believe there was an LAPD critical incident

10   review, and they -- they circled or highlighted where

11   the object was, yes.

12   Q.   In watching the video, have you watched it in

13   slow motion before?

14   A.   Yes, sir.

15   Q.   And have you watched it frame by frame?

16   A.   No.  I've watched it in slow motion.

17   Q.   Which way, as you understand it -- I think you

18   told me this earlier -- was Mr. Petit walking?  Would

19   that be west?

20   A.   Yes, sir.  My understanding, he was walking

21   west on Martin Luther King Boulevard.

22   Q.   And which way do you believe the front of his

23   body was facing, Mr. Petit's body, at the time of the

24   first shot?

25   A.   I believe it was bladed, based at least on

1    body-worn camera video, and testimony by the shooting

2    officers and sergeant, Sergeant Hayhoe and Officer

3    Glover, that Mr. Petit's shoulders had turned or were

4    turning to his left -- I think that would be the

5    north -- towards Sergeant Hayhoe's patrol vehicle.

6         Q.    And then is it your understanding that after

7    Sergeant Hayhoe's two shots -- oh, did you have an

8    understanding from Sergeant Hayhoe's statement or

9    testimony whether he thought his first shot struck

10    Mr. Petit?

11         A.    I think he told FID investigators, and then

12    later in deposition, that Mr. Petit shuddered, shook,

13    but did not fall, and that Sergeant Hayhoe perceived

14    that the threat was still active and present and fired a

15    second round.

16         Q.    Okay.  Do you recall if Sergeant Hayhoe had an

17    impression, one way or the other, whether his first shot

18    struck him; or he wasn't sure?

19         A.    He was unclear.

20         Q.    And then the second shot, did Sergeant Hayhoe

21    have an understanding or belief as to whether that shot

22    struck him, based on your review of the materials?

23         A.    Based on my review, I recall that

24    Sergeant Hayhoe had indicated that Mr. Petit fell at

25    that time.  Whether or not -- I don't recall any remarks

1    that he had actually, quote-unquote, "hit him."

2        Q.   And your understanding is Officer Glover also

3    fired a shot?

4        A.   Yes.

5        Q.   Based on your review of the materials, was

6    Mr. Petit already in the process of falling to the

7    ground at the time of Glover's shot?

8        A.   In reality, he may have been.  I think that

9    Officer Glover's testimony, however, is that he -- he

10   saw Petit facing west.  His feet were facing west.  His

11   body was -- shoulders and body had either turned or was

12   turning towards Sergeant Glover's patrol vehicle.  That

13   there was simultaneous gunfire.

14           Glover perceived and testified that he believed

15   that Petit and Hayhoe had exchanged gunfire, and then

16   fired one round in fear of death or imminent -- in fear

17   of imminent death or serious bodily injury,

18   particularly -- predominantly for Sergeant Hayhoe, who

19   was in the vehicle.

20       Q.   So your understanding is that Glover thought

21   that one of the shots came from Sergeant Hayhoe?

22       A.   Simultaneous gunfire exchanged between Hayhoe

23   and Petit.

24       Q.   And when you say "simultaneous," was there

25   audio to any of the body-worn camera footage that you

1  listened to?

2      A.   Not that I recall.

3      Q.   Was it ultimately discovered that, in fact, the

4  object was not a firearm?

5      A.   Yes.

6      Q.   Do you know whether or not the tactics in this

7  case were found to be within policy or not by the

8  department?

9      A.   I did not review any material of an internal

10 investigation, that I recall.  My observations of the

11 tactics, in my opinion, were appropriate, based on the

12 totality of the circumstances, in a rapidly-evolving

13 situation.

14     Q.   Right.  But it sounds like you're saying if the

15 sergeant has seen the dark object, he, at least

16 tactically, might have not pulled forward in the manner

17 he did?  Is that fair?

18     A.   Yes.  Initially, when he saw Mr. Petit, I think

19 he testified in deposition and his statement to the

20 investigators that he did not initially see anything in

21 his hands.

22          I would note, Mr. Galipo, that all three

23 individuals, Martinez, the non-shooting officer, Glover,

24 and Hayhoe, all indicated at one point or another that

25 Mr. Petit was making -- consistently making furtive

1    Q.   And then going to page 15, that's where opinion

2    2 starts?

3    A.   Yes, sir.

4    Q.   And that opinion, generally, is that the

5    officers had probable cause to contact and arrest

6    Mr. Petit; is that correct?

7    A.   Yes.

8    Q.   Can you please turn to page 17 of your report?

9    A.   Yes, sir.  I'm there.

10   Q.   So the top paragraph, I just want to ask you a

11   few questions about that.  And I think you told me this,

12   but going two lines down -- two and three lines down

13   from the top is the reference of the "standing about 6

14   feet away from Mr. Petit."  Do you see that?

15   A.   Yes.

16   Q.   And you also indicate, and I think you talked

17   about this earlier, that Mr. Petit had produced a black

18   object.  You put in parentheses:  "simulating a firearm

19   and pointing it at Martinez, in his right hand, as he

20   walked away from Officer Martinez."  Do you see that?

21   A.   Yes.

22   Q.   Did you get that from the statements, the depo,

23   the video, or maybe a combination?

24   A.   Combination.  Particularly the video.  And that

25   was Officer Martinez's deposition testimony.

1      Q.   And you told me earlier that it would have been

2  inappropriate to use deadly force at that point;

3  correct?

4      A.   Yes.

5      Q.   Now, going three paragraphs down, on page 17,

6  there's a paragraph that starts:  "Officer Glover stated

7  he moved away."  Do you see that paragraph?

8      A.   Yes.

9      Q.   It's a short paragraph.  It's about four lines,

10  I think.  Do you see the one I'm referring to?

11      A.   Yes, sir.

12      Q.   Okay.  And the last two lines, you're talking

13  about the observation that he saw:  "Petit holding a

14  black object, and believed it was a gun."  Do you see

15  that sentence?

16      A.   Yes.

17      Q.   And then it says:  "Glover stated that Petit

18  turned towards him while holding the black object in his

19  hand."  Do you see that?

20      A.   Yes.

21      Q.   And again, you previously told me you felt it

22  would be inappropriate to use deadly force at that

23  point?

24      A.   Yes.

25      Q.   And then the next paragraph, we talked about

1  this before, where -- the last sentence, Officer

2  Martinez responded, quote:  "It's not a gun," end quote.

3  Do you see that?

4      A.   Yes.

5      Q.   So going to page 18, at the top, "Opinion 3,"

6  that's essentially your opinion that the use of deadly

7  force was objectively reasonable?

8      A.   Yes, based on the totality of the

9  circumstances.

10     Q.   And I gave you a few hypotheticals before.  I'm

11 sure someone can come up with many more.  But would you

12 generally agree, in any case, whether the use of force

13 -- deadly force specifically is appropriate or not

14 depends upon the facts?

15     A.   Yes, either the -- the -- the practical or

16 actual facts, or at least the perception of what is

17 occurring at the time.

18     Q.   And do you generally understand in some of the

19 cases you've been working on so far as an expert, that

20 sometimes the facts are disputed by both sides?

21     A.   Yes.  And facts are determined, of course, by

22 the judge or the jury.

23     Q.   Have you seen cases where even a video is

24 subject to different interpretations by different

25 people?

Petit v. City of Los Angeles, et al.
Focus Litigation Solutions

Page: 48

1      A.   Yes.

2      Q.   And your understanding, ultimately, the jury

3    would decide whether the use of deadly force was

4    excessive or not or appropriate or not?   Is that your

5    understanding?

6      A.   Yes.

7      Q.   Going to page 19 of your report, please.

8      A.   Yes, sir.

9      Q.   So the first full paragraph that starts:

10   "Sergeant Hayhoe," do you see that paragraph at the top?

11     A.   Yes.

12     Q.   And I think we talked about this, but they said

13   they were "Code 6."  And you put:  "We're about to

14   contact possible suspect."  Do you see that?

15     A.   Yes.

16     Q.   And your last sentence of the next paragraph,

17   ends with:  "Petit was deliberately trying to evade the

18   officers."  Do you see that?

19     A.   Yes.

20     Q.   And was that your impression from watching the

21   video and the other materials, that he was walking or

22   moving away from the officers?

23     A.   Yes.  From the initial point of contact with

24   Martinez to the ultimate area that -- that shots were

25   fired at Mr. Petit, he obviously covered some distance,

1    A.   Yes, sir.

2    Q.   And we've covered that to some extent.   Would

3    you agree?

4    A.   Yes.

5    Q.   And you indicate that Officer Glover considered

6    Officer Martinez's statement that it was not a gun.   Is

7    that your understanding?

8    A.   Yes, based on his deposition testimony.

9    Q.   On page 24, you have Opinion 5.   And the last

10   two paragraphs or the last paragraph, you're referencing

11   "Learning Domain 37."   Do you see that on the last line

12   of page 24?

13   A.   Yes.

14   Q.   And that Learning Domain, in part, covers

15   dealing with people with disabilities?

16   A.   Yes, sir.

17   Q.   Page 25, I think we've talked about this a bit

18   before; but this is where you highlight in the middle of

19   the page, the ability, opportunity, and perceived

20   intent?

21   A.   Yes.

22   Q.   On page 26, Opinion 6, you're talking about the

23   LAPD's policies?

24   A.   Yes.

25   Q.   Do you know if they have a policy with respect

1    to shooting at or from moving vehicles?

2        A.    Yes.

3        Q.    What is your understanding of that policy?

4        A.    Generally prohibited, indicating that it's --

5    it's not something that the department wants to see

6    every day.  They would want to evaluate the totality of

7    circumstances, the tactics of the officer, pre --

8    pre-shooting actions, and determine whether or not it

9    was appropriate, given that situation.

10       Q.    And Opinion 7, it seems somewhat repetitive.

11   But when you say:  "Standard of care," what do you have

12   in mind?

13       A.    That -- that the officers involved in this

14   case, Mr. Galipo, that they were -- that they performed

15   their duties to the best of their ability, within the

16   law, the Constitution, policies and procedures of the

17   Los Angeles Police Department.  That they were not

18   deliberately malicious or took -- treated Mr. Petit

19   unreasonable.

20             That the level of force that they used was

21   objectively reasonable and was based on probable cause.

22   I didn't want to tease those things out, necessarily,

23   because it permeates the report.

24       Q.    Your understanding, when you're looking to

25   evaluate whether the use of force, including deadly

Petit v. City of Los Angeles, et al.
Focus Litigation Solutions

Page: 56

 1    force was appropriate or not, you're not necessarily

 2    looking at the motives or intent of the officers; you're

 3    looking at it objectively.  Is that fair?

 4         A.   Yes.  Against the -- balanced against the

 5    standard of law, objectively reasonable force, given the

 6    totality of the circumstances.

 7         Q.   And if you know, are officers taught that,

 8    under the Fourth Amendment, suspects or individuals have

 9    a right to be free from excessive force?

10         A.   Yes.

11         Q.   So at some point you wrote a rebuttal report;

12    is that correct?

13         A.   Yes, sir.

14         Q.   And do you have that handy, as well?

15         A.   I do.

16         Q.   Are the first 12 pages the same, if you know?

17         A.   I didn't -- excuse me, Counselor, yeah.  Just

18    the cover page is generally the same, and then I go

19    right into my opinions on the rebuttal on page 2.

20         Q.   Oh, okay.  I'm sorry.  I think I have -- I'm

21    looking at two copies of your initial report.

22         A.   I wouldn't make you read that again, sir.

23         Q.   Oh, okay.  Thank you.  I've got plenty of

24    reading to do.  That's for sure.

25              What was the purpose of your rebuttal report,

Petit v. City of Los Angeles, et al.
Focus Litigation Solutions

Page: 57

1   back, to some extent?

2       A.   I would agree, to at least consider another

3   option, whatever that might be.

4       Q.   I guess one advantage of having cover or being

5   in a tactically sound position is you have more time to

6   assess?  Is that one of the principles?

7       A.   Yes.  And I believe the interior of Sergeant

8   Hayhoe's vehicle provided him or the exterior shielded

9   him from -- from some cover -- or provided him some

10  cover.

11      Q.   The vehicle itself?

12      A.   Yes, sir.

13      Q.   Do you know if either officer ever gave a

14  verbal warning they were going to shoot?

15      A.   I believe that Sergeant Hayhoe had said to

16  Petit, "Drop it.  Don't do it."  Something -- words to

17  that effect.  I don't believe that Glover ever did.

18           MR. GALIPO:  Okay.  If it's okay, I'm going to

19  go off the record for just one minute to see if I can

20  grab -- but we're going to finish by 12.  And if we

21  finish a little short, of course I'll pay you the full

22  two hours.  But I'll be back in just one minute, if

23  that's okay?

24           THE WITNESS:  Yes, sir.

25           (Off the record.)

1      MR. GALIPO:  Of course I asked Renee if she had

2    given it to me, and she said she had; so I realized it

3    was in front of me somewhere, so I have it now.

4    BY MR. GALIPO:

5        Q.    Okay.   So starting on page 2, you reference

6    Bryce's Opinion 1, that:   "Mr. Petit complied with the

7    request to show what was in his hands."   Do you see

8    that?

9        A.    Yes, sir.

10       Q.    And at some point, we do at least see Mr. Petit

11   turning towards the officer and shows his hands and the

12   object, initially; is that true?

13       A.    Yes.

14       Q.    Going to page 3, this is the disagreement with

15   respect to whether someone would have realized it was

16   not a firearm?

17       A.    Yes.

18       Q.    We can probably talk about that all day, but

19   would it at least be fair that, at the time, Martinez

20   said it was not a gun and, initially, Glover wasn't

21   sure?

22       A.    I think that's a little bit of a

23   misrepresentation from Glover.   Glover believed it was a

24   homemade firearm.   He said as much to FID investigators

25   and later in his deposition.

1    But as I understand the circumstances, Glover

2    saw the object.  He believed, in fact, it was a homemade

3    gun.  He testified as much.  He said that Petit was

4    turning towards him or had turned towards him, but I

5    didn't see anything that said he pointed or raised the

6    object beyond his chest.  It was at chest height when

7    Glover made the initial contact.

8         Q.   Okay.  And then going to page 4, this is your

9    disagreement with Bryce's opinion that it may have been

10   a reactionary shot or contagious fire?

11        A.   Yes.

12        Q.   And he also said that the shot happened after

13   Mr. Petit had fallen to the ground.  Did you do anything

14   to try to figure out if he had fallen or was falling at

15   the time of that shot?

16        A.   Other than evaluate the material that was

17   provided to me, including the body-worn camera video,

18   no.

19        Q.   Do you disagree that Mr. Petit was falling to

20   the ground or had fallen to the ground at the time of

21   that shot?

22        A.   I don't know that I necessarily disagree with

23   Mr. Bryce's opinion in that regard; however, I think the

24   focal point, Mr. Galipo, is that -- what was in the

25   state of mind of Officer Glover when he fired?

1   to look at it from Glover's perspective.  And, moreover,

2   what would a reasonable officer perceive at the time

3   that the gun -- the sound of gunfire occurred, based on

4   the circumstances where the position of the vehicle --

5   police vehicle was, Petit's position, in quote, and

6   "shooting stance," and the sound of gunfire.

7   BY MR. GALIPO:

8        Q.   Okay.  Thank you.

9             And based on your review, did Officer Glover

10   see either muzzle flash or smoke coming from Mr. Petit

11   or his -- that object?

12        A.   I don't -- I don't believe he testified that he

13   saw it.  He testified that he heard what he described as

14   simultaneous gunfire, and a belief or perception that

15   Mr. Petit, and the officer we know is Sergeant Glover,

16   had exchanged gunfire.

17        Q.   Would it be uncommon, in your opinion, if an

18   officer saw something he believed to be an imminent

19   threat, to fire more than one shot?

20        A.   Not necessarily.  Officers are trained, as you

21   well know, to fire until the threat has -- has ceased or

22   has been eliminated.  What I mean by "eliminated," that

23   the threat no longer exists.

24             In this case, Petit had fallen or was falling,

25   which necessitated Officer Glover's use of deadly force,

Philip Bojorquez

```
1    This is the type of relationship we have.

2              THE CERTIFIED STENOGRAPHER:  And Mr. Bojorquez,

3    are you ordering a copy?

4              MR. BOJORQUEZ:  Yeah, we'll request a copy.

5    And then if you look, also, Ms. D'Urso, I put Caroline's

6    contact information in the chat.

7              THE CERTIFIED STENOGRAPHER:  Thank you very

8    much.

9              (11:58 a.m., deposition concluded.)

10                        --oOo--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   STATE OF CALIFORNIA)
                        ) ss:
 2   COUNTY OF BUTTE    )

 3
              I, KIMBERLY E. D'URSO, do hereby certify:
 4

 5            That the witness named in the foregoing

 6   deposition was present remotely and duly sworn to testify

 7   to the truth in the within-entitled action on the day and

 8   date and at the time and place therein specified;

 9            That the testimony of said witness was reported

10   by me in shorthand and was thereafter transcribed through

11   computer-aided transcription;

12            That the foregoing constitutes a full, true and

13   correct transcript of said deposition and of the

14   proceedings which took place;

15            Further, that if the foregoing pertains to the

16   original transcript of a deposition in a federal case,

17   before completion of the proceedings, review of the

18   transcript [ ] was [ ] was not requested.

19            That I am a certified stenographic reporter and

20   a disinterested person to the said action;

21            IN WITNESS WHEREOF, I have hereunder subscribed

22   my hand this 26th day of October, 2025.

23   _____

24   KIMBERLY D'URSO, CSR NO. 11372, RPR

25
```

1

ERRATA SHEET

2

PAGE/LINE                    CHANGE                    REASON



3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          DECLARATION OF DEPONENT

2

3          I, Phillip L. Sanchez, say I have read the

4   foregoing deposition and declare under penalty of perjury

5   under the laws of the State of California and all federal

6   laws that my answers as indicated are true and correct.

7

8          Dated this 04 day of November , 2025, at

9   Dana Point , California.

10

11                                        _____

12                              PHILLIP SANCHEZ

13

14

15

16

17

18

19

20

21

22

23

24

25