# EXHIBIT A

Ashlyn Petit

Jermaine Petit, et al. vs.
City of Los Angeles, et al.

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3

4   JERMAINE PETIT, an incompetent   )
     person, by and through his Guardian  )
5   Ad Litem, CHARLOTTE BLACKWELL,   )
                           )
6           Plaintiff,       )
                           )
7     vs.                 ) Case No.: 2:23-cv-00789-ODW(PVCx)
                           )
8   CITY OF LOS ANGELES, a municipal   )
     entity; OFFICER DARYL GLOVER, JR.;  )
9   SERGEANT BRETT HAYHOE; and DOES 1   )
     through 10, inclusive,        )
10                           )
             Defendants.       )
11   _____)

12

13

14

15

16         VIDEO-RECORDED DEPOSITION OF

17              ASHLYN PETIT

18    REMOTELY HELD VIA VIDEOCONFERENCE TECHNOLOGY

19            JUNE 9, 2025

20

21

22   REPORTED BY:
     LYNETTE MARIE NELSON,
     CA CSR No. 11585, OR CSR No. 250121,
23   TN LCR No. 896, RPR, CRR, CCRR, CRG,
     REALTIME SYSTEMS ADMIN.

24

25   JOB NO. 10165041

Ashlyn Petit

Jermaine Petit, et al. vs.
City of Los Angeles, et al.

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3

4  JERMAINE PETIT, an incompetent      )
   person, by and through his Guardian )
5  Ad Litem, CHARLOTTE BLACKWELL,      )
                                       )
6          Plaintiff,                  )
                                       )
7     vs.                              ) Case No.: 2:23-cv-00789-ODW(PVCx)
                                       )
8  CITY OF LOS ANGELES, a municipal    )
   entity; OFFICER DARYL GLOVER, JR.;  )
9  SERGEANT BRETT HAYHOE; and DOES 1   )
   through 10, inclusive,              )
10                                     )
           Defendants.                 )
11 _____)

12

13

14

15

16

17          DEPOSITION OF ASHLYN PETIT,

18  taken by the Defendants, commencing at the hour of

19  9:34 a.m. on Monday, June 9, 2025, held remotely via

20  videoconference, before Lynette Marie Nelson,

21  Certified Shorthand Reporter in and for the State of

22  California, Oregon, and Tennessee.

23

24

25

Ashlyn Petit

Jermaine Petit, et al. vs.
City of Los Angeles, et al.

```
 1    APPEARANCES:

 2

          For the Plaintiff:
 3            IVIE McNEILL WYATT PURCELL & DIGGS
              BY:  RODNEY S. DIGGS, ESQ.
 4            444 South Flower Street, Suite 1800
              Los Angeles, California  90071
 5            rdiggs@imwlaw.com

 6        For the Defendants, Sergeant Brett Hayhoe and
          Officer Daryl Glover, Jr., public employees:
 7            CARPENTER, ROTHANS & DUMONT, LLP
              BY:  KIMBERLY SARMIENTO, ESQ.
 8            500 S. Grance Avenue, 19th Floor
              Los Angeles, California  90071
 9            (213)228-0400
              kmorosi@crdlaw.com
10

          For the Defendant City of Los Angeles,
11        a public entity:

12            HYDEE ROSE FELDSTEIN SOTO
              BY:  CHRISTIAN BOJORQUEZ, ESQ.
13            LOS ANGELES CITY ATTORNEYS OFFICE
              City Hall East Police Litigation
14            200 N. Main Street, 6th Floor
              Los Angeles, California  90012
15            hydee.feldsteinsoto@lacity.org

16

17        Also present:  Olivia Burnett, law clerk

18                           Spencer Benveniste, videographer

19

20

21

22

23

24

25
```

Page 3

Jermaine Petit, et al. vs.
City of Los Angeles, et al.

1    of why.

2            And as human beings, I believe that we have

3    some type of intuition when it comes to the close

4    people in our life, especially parents, or if you

5    have children.  I believe that we have some type of

6    intuition about when something's wrong with one or

7    the other.  And my intuition was telling me, and

8    the -- if you believe in spiritual things, that

9    there were signs in my heart that I knew that it got

10   to a point where I knew in my heart that he had

11   passed away.

12       **Q.   Did you think to call 911 or some local law**

13   **enforcement agency to Palmdale to check on your dad?**

14       A.   My grandmother told me that she -- I have

15   not seen transcripts or physical evidence of this

16   happening.  This is through word of her mouth --

17   that there was -- she did have the Lancaster Police

18   Department do a welfare check to the house.  But

19   they did not have a warrant to be able to go inside

20   the house, and they did not suspect that anybody had

21   passed away because there was no suspicious smells

22   outside of the house.

23            So from my knowledge, what I was told from

24   my grandmother was that had happened.  And so no one

25   was able to get inside the house at that point.

**Page 42**

1    about what you mean?

2    BY MS. SARMIENTO:

3         Q.    Sure.  Did you know whether or not your

4    father suffered from any health conditions, any

5    diagnoses that he had that you were concerned about

6    in that period of time that you hadn't heard from

7    him?

8         A.    My father was deemed in 2015 100 percent

9    mentally disabled, and he was diagnosed with PTSD

10   from his time in the Air Force.

11          So I had concerns about him -- his PTSD and

12   his, you know, being mentally disabled, 100 percent

13   disabled, that I -- I was just concerned in general

14   when you have a parent who suffers with PTSD.

15        Q.    Did you have any concerns in light of your

16   dad's mental health diagnoses that he was living by

17   himself at that house in Palmdale?

18        A.    No.

19        Q.    Why not?

20        A.    Because he was mentally disabled, but when

21   he was still able to function, like he wasn't

22   like -- he could still go do normal things.  It

23   wasn't to the point where he was like restricted

24   from being able to like go to the store, go to the

25   bathroom, take care of himself, or anything like

Ashlyn Petit

Jermaine Petit, et al. vs.
City of Los Angeles, et al.

1    see him, both my mother and I, in that state.

2            And I don't know what other.

3        Q.    Why don't we do this:  Do you know how long

4    your dad was in the hospital for after the shooting

5    that occurred in July of 2022?

6        A.    I don't know the exact time period.

7        Q.    Okay.  So you arrived after his release

8    from the hospital; correct?

9        A.    Yes.

10       Q.    Did you ever have any contact with any of

11   his doctors following his release about his

12   prognosis?

13       A.    No.

14       Q.    Okay.  Why not?

15       A.    Because from what I remember, my

16   grandmother was -- who I was receiving that

17   communication from.  At that point, I was only 17

18   years old.  I was a minor.  And so the adults at

19   that time relayed that information to me.

20       Q.    Okay.  And what information did your

21   grandmother, Charlotte Blackwell, relay to you in

22   terms of what your dad's prognosis was according to

23   the doctors when he was released from the hospital?

24       A.    I don't recall.

25       Q.    Okay.  When you saw him, you talked about

**Ashlyn Petit**

**Jermaine Petit, et al. vs.
City of Los Angeles, et al.**

1  severe injuries.  Can you describe for me what

2  injuries you observed when you visited with your dad

3  in August of 2022?

4      A.   He was very fragile.  You could tell that

5  he was recovering from injuries.  And I know that

6  from his injuries, he had a shattered jaw bone,

7  which made him -- it extremely hard for him to be

8  able to talk comfortably, which made it extremely

9  hard for us to be able to fully understand what he

10  was saying at times because of the pain that he was

11  in.

12          And I think emotionally, having those types

13  of injuries would take a toll on anybody.

14      Q.   When your father was released from the

15  hospital, where did he stay?

16      A.   I don't recall.  I do not know exactly

17  where he stayed.

18      Q.   When you visited with him in August of

19  2022, where did you see him?

20      A.   My grandmother, Charlotte Blackwell's,

21  home.

22      Q.   And during that trip with your mom in

23  August of 2022, how long did you stay out in

24  Los Angeles?

25      A.   About a week.

Ashlyn Petit

Jermaine Petit, et al. vs.
City of Los Angeles, et al.

1      Q.    And during that week that you were out here

2   in Los Angeles, how many times did you visit with

3   your father?

4      A.    Once.

5      Q.    Okay.  And how long was that visit that you

6   had with him?

7      A.    Throughout the day.  I do not know exactly

8   how many hours.  But multiple.

9      Q.    Okay.  And was that the last time that you

10  saw your father?

11     A.    Yes.

12     Q.    Okay.  Who else was with you when you

13  visited your father other than your mom and your

14  grandmother?

15     A.    My great grandma Ernestine.  She lives --

16  lived with my grandma.  And my great aunt, Gail, and

17  my uncle Jermell Petit.  The four of them all lived

18  in the house together.

19     Q.    Okay.  And when you saw your dad during

20  that visit in August of 2022, was he able to walk

21  around?

22     A.    Yes, but with difficulty.

23     Q.    When you say "with difficulty," was he

24  walking with any walking aids?

25     A.    I don't recall.

Ashlyn Petit

1    Q.    Okay.   When you say "difficulty," can you

2    describe for me what made you believe he was having

3    difficulty walking?

4    A.    You cut out for a second.   Can you repeat

5    that question?

6    Q.    Sure.   You're saying that he had, to your

7    knowledge, difficulty walking when you visited with

8    him in August of 2022.   What was it in what you

9    observed that made you think he was having

10   difficulty walking during that time?

11   A.    Because after the severity of the injuries

12   that he went through, you could tell he was still in

13   pain.   He had not been -- it had been a short time

14   since he had been released from the hospital.   He

15   was still recovering from his injuries.

16   Q.    Okay.   And to your recollection, you don't

17   remember seeing a walker or a cane or anything like

18   that; correct?

19   A.    Correct.

20   Q.    Okay.   Did you have any understanding of

21   whether or not he was going to continue with any

22   outpatient care after his release from the hospital?

23   A.    I don't recall.   I don't.

24   Q.    Okay.   After that visit with your father in

25   August of 2022, had you ever spoken to him on the

Ashlyn Petit

1    phone after that?

2         A.    Yes.

3         Q.    How many times?

4         A.    I don't know.

5         Q.    During those occasions where you spoke to

6    your father on the phone after that visit in August

7    of 2022, did it appear to you from, you know,

8    talking to him on the phone that he was having any

9    improvement in his ability to speak?

10        A.    Eventually.  I don't know how long.  Few

11   months.  Don't know.

12        Q.    Okay.  So at some point, he started to

13   sound more like himself during those phone calls; is

14   that right?

15        A.    Yes.

16        Q.    Okay.  Did you ever FaceTime your dad after

17   that visit in August of 2022?

18        A.    No.

19        Q.    Okay.  Did you ever speak to your

20   grandmother, Charlotte Blackwell, about your dad's

21   recovery after that visit in August of 2022?

22        A.    Yes.

23        Q.    Okay.  And what discussions did you have

24   with your grandmother in terms of your father's

25   recovery?

Ashlyn Petit

Jermaine Petit, et al. vs.
City of Los Angeles, et al.

1      A.    I don't remember the specifics.

2      Q.    Okay.  Did you ever inquire as to whether

3   he seemed to be getting better?

4      A.    Yeah, I asked her.

5      Q.    Okay.  And what did she tell you?

6      A.    Can you give me more specifics on this time

7   line?  Because it's going to be different from if

8   you are talking about immediately after, year after,

9   two years after.

10      Q.    Sure.  Why don't we first start with six

11   months after your visit in August of 2022, and we

12   can go from there.

13      A.    I don't remember.

14      Q.    Okay.  Beyond the six months from August of

15   2022, let's stay a year out to August of 2023,

16   anything that you can recall from your discussions

17   with your grandmother about your father's recovery?

18      A.    Do you mean physical recovery?

19      Q.    Physical and mental.

20      A.    Physically, as time goes on, injuries begin

21   to get better.

22          Emotionally, that's something that sticks

23   with you for longer, in my opinion.

24      Q.    Okay.  Was there anything that your

25   grandmother had shared with you about her

Ashlyn Petit

Jermaine Petit, et al. vs.
City of Los Angeles, et al.

1    observations of your father's mental health state

2    after the incident that made you think he was

3    getting worse, getting better, staying the same?

4        A.   I don't think anybody would get better

5    after an incident like that.

6        Q.   So the question was:  What did your

7    grandmother share with you in terms of her

8    observations about your father's mental health?

9        A.   She shared with me what I remember that,

10   like her and everyone else in my family who was

11   close to him, we still remained concerned about the

12   effects of the incident.

13       Q.   Do you know when your father eventually

14   went back to his house in Palmdale?

15       A.   I don't know.

16       Q.   Okay.  During the time that you hadn't

17   heard from your father in 2024, were you still under

18   the impression that he was living with your

19   grandmother?

20       A.   No.

21       Q.   Okay.  So when did you become aware that he

22   had relocated out of your grandmother's home?

23       A.   I do not know the exact date or month of

24   when that was.

25       Q.   Okay.  Was it in 2023 or 2024?

Jermaine Petit, et al. vs.
City of Los Angeles, et al.

Ashlyn Petit

1    A.    2023.

2    Q.    Okay.  In light of what you just expressed

3    to me about your concerns of this having continuous

4    impacts on his mental health, were you concerned

5    that your dad had relocated out of your

6    grandmother's home?

7    A.    No.

8    Q.    Okay.  Was it still your belief during that

9    time that your dad was still able to function enough

10   to take care of his physical well-being?

11   A.    I don't know.

12   Q.    Okay.  Did you ever relay your concern to

13   any family member about the fact that your dad was

14   no longer staying with other relatives or with his

15   mother?

16   A.    No.

17   Q.    Okay.  Why not?

18   A.    Because my dad had a house in Lancaster

19   that he was proud to have.  And if he felt it was

20   best for him to move back into his house, then it

21   was his decision to make.

22   Q.    Okay.  To your knowledge, did your mother

23   keep track of your father's recovery both physically

24   and mentally after the shooting?

25   A.    I don't know.

Ashlyn Petit

Jermaine Petit, et al. vs.
City of Los Angeles, et al.

1    Q.    Okay.  Did you ever have plans to come back

2   and visit your father after that visit in August of

3   2022?

4    A.    Can you repeat the question, please.

5    Q.    Sure.  When you visited in August of 2022,

6   did you have any plans, like did you say, "Hey, dad,

7   I'm going to come back next year around this time?"

8   Or "I'm going to come back in six months and see

9   you"?

10    Any -- any future plans that you had

11   concrete plans to come see him again in Los Angeles?

12    A.    No, I did not have any concrete plans.

13    Q.    Okay.  So when your father could not attend

14   your high school graduation, did you have a

15   discussion with him about the difficulties that he

16   was having that you said prevented him from coming

17   to your graduation?

18    A.    No.

19    Q.    Okay.  Did -- so did he ever say anything

20   to you like, I can't go because I'm still having a

21   hard time with this?

22    A.    No, he did not say those exact words to me.

23    Q.    What did he say to you?

24    A.    I believe we mutually understood that that

25   this was something that he wasn't ready to do.

1    A.    I -- I'm sure that I asked my mom about it,

2    but she never gave me specifics because, again, I

3    was a child, and I don't think she wanted me to

4    worry about those things.

5    Q.    And was it your mother who informed you

6    that your dad had been arrested?

7    A.    Yes.

8    Q.    Did it surprise you to learn that your

9    father had been arrested on those occasions?

10    A.    No.

11    Q.    Why not?

12    A.    Well, I don't know how many times or what

13    he has been -- was arrested for.  But I know

14    previously that he had spoken to him before while he

15    was in jail.  So I know that he -- it wasn't -- he

16    had been there before.  And that for people who look

17    like him, who are black men, that statistically,

18    those are the people that the police usually keep an

19    extra eye on.

20    Q.    Did you have any belief that your father's

21    mental health diagnoses played a role in his arrest?

22    A.    Yes.

23    Q.    Why?

24    A.    Because in our society, I think that

25    people, especially police officers, have a hard time

1    dealing with people who have mental illness and

2    don't know how to regulate the situation without

3    escalating it.

4        Q.    Okay.  Are you aware of any other mental

5    health diagnoses that your dad had other than PTSD?

6        A.    I believe he was diagnosed with

7    schizophrenia.

8        Q.    Do you know when he was diagnosed with

9    schizophrenia?

10       A.    Did you say "when"?

11       Q.    Yes.

12       A.    No, I don't know when.

13       Q.    Had you ever observed your father when he

14   was experiencing a mental health episode?

15       A.    No.

16       Q.    Okay.  Had you ever spoken to your

17   grandmother about your dad's schizophrenia?

18       A.    I knew it was something that he struggled

19   with, but I didn't ask for specifics.  And, again,

20   was shielded from knowing too many details about

21   things because that's not something that a child

22   should have to worry about.

23       Q.    Were you ever informed that there was an

24   incident where your father tried to set fire to your

25   mother's home -- or your grandmother's home?

1    A.    No.

2         MR. DIGGS:  Objection.  Assumes facts not

3    in evidence, lacks foundation, calls for speculation

4    and conjecture as to this witness.

5    BY MS. SARMIENTO:

6    Q.    Sorry.  You said "no"?

7    A.    No, I wasn't -- no.

8    Q.    Were you ever informed that there was an

9    incident where your father brandished a knife at

10   your uncle Jermell?

11   A.    No.

12        MR. DIGGS:  Same objection.

13   BY MS. SARMIENTO:

14   Q.    Do you still have the letters that you

15   received from your father while he was incarcerated?

16   A.    No.

17   Q.    Do you know if your father was ever

18   hospitalized overnight in a psychiatric hospital?

19   A.    Yes.

20   Q.    How many times was your dad hospitalized

21   for his psychiatric conditions?

22   A.    I don't know the number of times.

23   Q.    Okay.  How did you find out that your dad

24   was hospitalized for his psychiatric conditions?

25   A.    My mother.

**Page 69**

Jermaine Petit, et al. vs.
                                                                City of Los Angeles, et al.

1      Q.    And do you know what led to him being

2   hospitalized?

3      A.    I'm assuming because of his mental -- his

4   PTSD and his schizophrenia.

5      Q.    Do you know which hospital he was sent to?

6      A.    No.

7      Q.    Do you have any information as to how long

8   he was hospitalized for?

9      A.    No.

10      Q.    Did you have any contact with your father

11   when he was staying in a psychiatric hospital?

12      A.    Yes, he would send me letters, pictures.

13   He would call me.

14      Q.    Do you still have any of those letters or

15   pictures?

16      A.    No.

17      Q.    What sort of pictures would your father

18   send you when he would stay in the psychiatric

19   hospital?

20      A.    Just like basic drawings, like nature, like

21   flowers, sun, just like doodle drawings.

22      Q.    Did you ever have any discussions about

23   your -- with your father about the treatment he was

24   receiving?

25      A.    I'm sorry.  You cut out.  Could you please

**Ashlyn Petit**

1    repeat that.

2        Q.    Sure.  When your father was staying in the

3    psychiatric hospitals, did you have any discussions

4    with you about what sort of treatment he was

5    receiving?  For example, did he ever tell you that

6    he was seeing a therapist or a psychiatrist?

7        A.    No, we did not talk about specifics.

8        Q.    Outside of this stay in the psychiatric

9    hospital, has your father had any discussions with

10   you about his psychiatric care?

11       A.    No.

12       Q.    Do you know if your father ever took any

13   drugs?

14       A.    Yes.

15       Q.    What drugs are you aware of that your

16   father took?

17       A.    I know he smoked marijuana.  I know that he

18   took harder drugs, but I was not made aware of which

19   ones.  Because, again, I was a child, and my family

20   did not -- it wasn't necessary for me to know those

21   type of specifics.

22       Q.    How did you become aware of his drug usage?

23       A.    My mother.

24       Q.    Was there anything else that your mother

25   told you?

1    prescribed medications to assist with his physical

2    injuries following the incident that happened in

3    July of 2022?

4         A.    No.

5         Q.    Have you ever heard anything from any

6    family members about whether your dad was taking any

7    psych meds consistently?

8         A.    No.

9         Q.    Other than his mental health issues, do you

10   know of any health conditions that your dad was

11   dealing with prior to his passing?

12        A.    No.

13        Q.    Do you know why your dad left the military?

14        A.    He left the military in December 2005.  I

15   was born in January.  So his four-year deployment

16   was up.

17        Q.    We talked about some concerns that you had

18   for your dad's mental health state.  Did you ever

19   look into any programs that provided mental health

20   services for little to no cost depending on need?

21        A.    No.

22        Q.    Did you ever ask your mom to look for any

23   programs for your father?

24        A.    No.

25        Q.    Was there ever an occasion where your dad

Ashlyn Petit

Jermaine Petit, et al. vs.
City of Los Angeles, et al.

1              REPORTER'S CERTIFICATE

2

3              I, Lynette Marie Nelson,
Certified Shorthand Reporter, in and for the State
4  of California, Certificate No. 11585, do hereby
certify:

5

            That the witness in the
6  foregoing  deposition was by me first duly sworn to
testify to the truth, the whole truth, and nothing
7  but the truth in the foregoing cause; that the
deposition was then reported by me in shorthand and
8  transcribed, through computer-aided transcription,
under my direction; and that the above and foregoing
9  transcript, is a true record of the testimony
elicited and proceedings had at said deposition.

10

            I do further certify that I am a
11  disinterested person and am in no way interested in
the outcome of this action or connection with or
12  related to any of the parties in this action or to
their respective counsel.

13

14             In witness whereof, I have
hereunto set my hand this 24 day of June 2025.

15

16

17  _____

18  Lynette Marie Nelson, CA CSR No. 11585,
OR CSR No. 250121, TN LCR No. 896, RPR
19  CRR, CCRR, CRG, REALTIME SYSTEMS ADMIN

20

21

22

23

24

25