# EXHIBIT F



# Bennet Omalu
PATHOLOGY

| | | |
|---|---|---|
| Phone: 279-345-1300<br>Fax: 866-402-6875<br>bennetomalu@bennetomalu.com | **Autopsy and Anatomic Pathology**<br>**Clinical Pathology and Toxicology**<br>**Forensic Pathology** | Neuropathology<br>Epidemiology<br>Medico-Legal Consultations |

Dale K. Galipo, Esq  
Law Offices of Dale K. Galipo  
21800 Burbank Blvd., Suite 310  
Woodland Hills, CA 91367

September 18, 2025

Dear Mr. Galipo,

    Re:    **Jermaine Clodor Petit, Deceased**  
             **Medico-Legal Report**

**Summary of Education, Training and Experience**

I completed medical school in 1990 at the University of Nigeria, Enugu, Nigeria. Upon graduating from medical school, I completed a one-year clinical housemanship at the University of Nigeria Teaching Hospital in the fields of Pediatrics, Internal Medicine, General Surgery, Obstetrics, and Gynecology. After housemanship, I worked as an emergency room physician at a university hospital in Nigeria for approximately three years. I sat for and passed my United States Medical Licensing Examinations [USMLE] while I worked as an emergency room physician. I came to the United States in 1994 through a World Health Organization scholarship to become a visiting research scholar for eight months at the Department of Epidemiology, Graduate School of Public Health, University of Washington, Seattle, Washington.

In 1995, I proceeded to the College of Physicians and Surgeons of Columbia University, New York, at Harlem Hospital Center, to complete residency training in Anatomic Pathology and Clinical Pathology. In 1999 I proceeded to the University of Pittsburgh, Pittsburgh, Pennsylvania to complete residency training in Forensic Pathology and Neuropathology. I hold four board-certifications in Anatomic Pathology, Clinical Pathology, Forensic Pathology and Neuropathology. I also hold a Masters in Public Health [MPH] degree in Epidemiology from the Graduate School of Public Health, University of Pittsburgh, Pittsburgh, Pennsylvania. I also hold a Masters in Business Administration [MBA] degree from the Tepper School of Business, Carnegie Mellon University, Pittsburgh, Pennsylvania, one of the leading business schools in the world. I am a Certified Physician Executive and an Honorary Fellow of the American Association of Physician Leadership [AAPL]. I also hold a fifth board-certification in Medical Management from the AAPL. I am currently licensed to practice Medicine and Surgery in the State of California.

I am currently the President and Medical Director of Bennet Omalu Pathology [BOP], a California medico-legal consulting firm, and a Clinical Professor at the Department of Medical Pathology and Laboratory Medicine, University of California, Davis. In my capacity as the Medical Director of BOP, I am a consulting Forensic Pathologist and Neuropathologist to many hospitals in central California and to several counties in northern California. There are less than a few dozen practicing Forensic Pathologists-Neuropathologists in the United States who are board-certified in both Forensic Pathology and Neuropathology.

For over twenty-five years, I have been involved in over fifteen thousand death and injury investigations in my career as a Forensic Pathologist and Neuropathologist, which began in 1999. I have personally conducted and performed over thirteen thousand autopsies and death investigations and examined over fifteen thousand brain tissue specimens. I also perform trauma pattern analysis in both living patients and deceased patients to determine causes and mechanisms of sustenance of injuries and death. I am also involved in the evaluation of living victims of all types of injuries and trauma, including but not limited to victims of assault, traumatic falls, industrial and accidental injuries, medical complications and misadventures, rape, child abuse and sports-related injuries.

I have performed autopsies, examined the medical records, occupational histories, exposure histories, autopsy tissues and biopsy tissues of hundreds of living and deceased patients who had been occupationally exposed to asbestos, solvents and other types of toxic agents, performed differential diagnosis, made disease diagnosis and determined medical causation of diseases involving all types of occupational exposures, including asbestos related diseases and malignancies like malignant mesothelioma.

I have been consulted and retained as an expert witness in two to three thousand cases involving all types of medico-legal cases across all jurisdictions in the United States including federal, state, county and municipal courts and arbitration panels; in both civil and criminal cases, for the plaintiff, defense, district attorneys and public defenders. I have been involved as an expert witness in complex class action and industrial lawsuits involving thousands of individuals and major corporations.

My areas of interest and focus include brain patho-physiology, brain injuries and brain trauma, in both living and deceased patients. I identified Chronic Traumatic Encephalopathy [CTE] in a retired football player when I performed an autopsy and examined the brain of Mike Webster in 2002. Subsequently, I identified CTE in other high-impact, high-contact sports athletes and in military veterans suffering from Post-Traumatic Stress Disorder [PTSD]. Since 2002 CTE has received international attention from the sports industry, sports medicine, and neuroscience. My work has been featured extensively in all media platforms across the world. My work and life were featured in a major Hollywood film, "Concussion" released in December 2015 by Sony Motion Pictures, in which the renowned actor, Will Smith, played me as Dr. Omalu. Several New York Times best-selling books have also been published on my life and work including "The League of Denial" and "Concussion." I have published several books including my memoir, "Truth Doesn't Have a Side," which was published in August 2017. My latest book, "Brain Damage in Contact Sports" was published in February 2018. I have published extensively in the medical and scientific literature, authoring many scientific papers and book chapters.

I have received three honorary PhD degrees from two universities in the United States, and from the Royal College of Surgeons of Ireland in recognition of my work and expertise. I have also received numerous awards from across the world in recognition for my work and expertise in



both living and deceased patients. I have received the "Distinguished Service Award" from the American Medical Association [AMA], which is the most prestigious award of the AMA. I have been honored by the United States Congress, and I have appeared on multiple occasions before committees of the United States Congress and committees of State Legislatures across the Unites States advising them on matters relating to trauma. In 2019 and 2020 I was appointed to the Traumatic Brain Injury Board of the State of California to advise the state on matters relating to traumatic brain injuries.

Since 1999 I have testified as an expert witness in matters relating to all types of injuries and deaths in over 800 court proceedings across the United States. I have attached a copy of my curriculum vitae, which enumerates my body of work and experience in greater detail. The cases I have testified in, beginning in 2009, are enumerated at the end of my curriculum vitae.

Pursuant upon your request, I have reviewed the following materials sent to me on the case of Jermaine Clodor Petit, Deceased:
1. Records from Cedars Sinai Medical Center
2. Investigation Report by the Los Angeles County Sheriff's Department
3. BWC Video, Sgt. Brett Hayhoe
4. BWC Video, Officer Nelson Martinez
5. BWC Video, Officer Daryl Glover
6. Death Certificate
7. Autopsy Report
8. Autopsy Pictures

In order to perform and apply a valid differential diagnosis method including but not limited to causation criteria analysis[1], Central Limit Theorem analysis and Clinico-Pathologic Correlation analysis, on this case, I had to review, document, and analyze the materials sent to me on this case in considerable depth and detail. Such differential diagnosis and review would form the foundation for my case-specific and general causation opinions in this case.

**Brief Summary of Prevailing Forensic Scenario[1,]**

**Summary**

In July 2022, Jermaine Petit was the victim of an officer-involved shooting (OIS) that led to a several-week hospitalization and worsened his pre-existing PTSD and schizophrenia. According to his autopsy report and death certificate, the cause and manner of his death were undetermined.

**Synopsis**

**Records from Cedars Sinai Medical Center**
Jermaine Petit arrived at the emergency department (ED) with a complaint of trauma at 19:53 on July 18, 2022. He was received by Registered Nurse (RN) Karen Klos, who paged Dr. James Scott Fishkin and Dr. Batbold Boldbaatar. RN Matthew Jarvis reported that Jermaine Petit had

---

[1] This section of the report should not be used to establish the facts in this case and is not intended to be used to establish the facts in this case.



prehospital interventions, which included an intravenous peripheral site and a needle thoracostomy. His heart rate was 123 bpm, while his blood pressure, temperature, respiration, and oxygen saturation were unobtainable.

RN Klos noted at 20:03 that Jermaine Petit's Glasgow Coma Score (GCS) was 4/15. At 20:04, Jermaine Petit had an intraosseous line placed by the emergency medical services (EMS). A primary survey revealed his airway was partially obstructed by blood, and his breathing was abnormal with a reduced level of consciousness. He had an open wound on his back at the left scapula, possibly a gunshot wound.

Dr. Fishkin ordered an Etomidate injection, which was administered at 20:07, and Rocuronium, administered at 20:08. At 20:09, Jermaine Petit's heart rate was still elevated at 142 bpm, and his respirations were 18 cpm. Dr. Matthew Bloom arrived at the ED and placed a cuffed endotracheal tube at 20:14; the procedure was well-tolerated with no immediate complications. Jermaine Petit was transfused two units of whole blood, and Dr. James Fishkin was assigned as Attending at 20:14 on July 18, 2022. Jermaine Petit was placed on mechanical ventilation at 20:25.

During Dr. James Scott Fishkin's review of Jermaine Petit in the emergency department on July 18, 2022, at 20:19, he noted a chief complaint of a gunshot wound. Jermaine Petit had been shot in the left scapula, exhibiting decreased breath sounds, hypotension, and a needle thoracostomy on the left. He also had a gunshot wound to the jaw with lingual trauma. He was moaning and unable to provide any history. His GCS was 10/15 [motor 5- purposeful, verbal 2- moaning, eye 3- opening to painful stimuli]. He was agitated and erratic.

Jermaine Petit's past medical, family, and social history were unknown at this time. Dr. Fishkin was unable to perform a review of his systems due to Jermaine Petit's altered mental status. His vital signs at that time included a pulse of 123 bpm, respiration of 18 cpm, and unrecordable blood pressure.

He had a gunshot wound to the mouth with lingual laceration and blood in the oropharynx and decreased breath sounds on the left chest. His Glasgow Coma Score was 10/15.

Dr. Fishkin reported that a blood transfusion was initiated for Jermaine Petit, and fluids were started. Jermaine Petit was also sent for a Pan scan of the head, neck, chest, abdomen, and pelvis, and was then transferred to the intensive care unit (ICU). He also received a tetanus injection.

Dr. Matthew Bloom reported that at 20:00 on July 18, 2022, he responded to a trauma activation request from Dr. Fishkin to assess Jermaine Petit, who had sustained a gunshot wound to the left back and left jaw. Upon arrival at the ED, Dr. Bloom noted Jermaine Petit's GCS was 6-7/15. A left chest needle thoracostomy and a right lower extremity intraosseous line were in place. Jermaine Petit had active bleeding from the oropharynx and was intubated. At the ED, Jermaine Petit was hypotensive, with systolic blood pressure in the 80s, and tachycardic, with a heart rate in the 120s-130s.

Dr. Bloom further noted that a left chest tube was placed for Jermaine Petit, autotransfusion was activated, and he was transfused with 1 unit of packed red blood cells. Dr. Bloom was unable to perform a review of systems due to Jermaine Petit's altered mental status, injuries, and intubation. He reported vital signs of blood pressure 128/86 mmHg and pulse 131 bpm.



A Focused Assessment with Sonography in Trauma (FAST) revealed no significant fluid in the pericardium, peri-hepatic space, or pelvis. A Chest X-ray showed fractures of the left scapula and left second rib. A Computed Tomography (CT) scan of the brain showed no intracranial bleed.

A CT maxillofacial bones revealed a comminuted left mandibular fracture, right submandibular and retropharyngeal hematoma, a ballistic fragment embedded in the right submandibular region, and a nondisplaced left frontal maxilla process fracture. A CT cervical spine showed no acute fracture.

A Computed Tomography Angiogram (CTA) of the neck indicated active extravasation of contrast in the right submandibular space from an external carotid branch. There was normal carotid and vertebral enhancement bilaterally, though the right jugular was not fully visualized, likely due to hematoma compression.

A CT of the chest, abdomen, and pelvis showed ballistic fragments lodged within the left-sided paravertebral tissues at the T2 level, along with a comminuted fracture of the left second rib, adjacent hematoma, and significant left-sided supraclavicular and chest wall subcutaneous gas. There was a marked comminuted fracture of the left scapula with a small left hemothorax and a small apical left pneumothorax with a chest tube in place. Apical ground glass opacities were compatible with pulmonary hemorrhage. A fluid-filled, patulous esophagus and a markedly dilated, fluid-distended stomach with an enteric tube in place raised concerns for a high aspiration risk. There was no evidence of traumatic injury to the abdomen and pelvis.

Dr. Bloom diagnosed Jermaine Petit with left hemothorax, left pulmonary hemorrhage, left scapular fracture, left second rib fracture, left mandibular fracture, right submandibular/retropharyngeal hematoma, left frontal process of maxilla fracture, and right external carotid branch with active extravasation following gunshot wounds to the left back and jaw.

Dr. Bloom planned to admit Jermaine Petit to the surgical ICU (SICU) for mechanical ventilation, blood product transfusions, and hemodynamic monitoring. He also requested oral-maxillofacial surgery and orthopedic consultations for facial and scapular fractures, respectively.

At 20:59 on July 18, 2022, Dr. David Chernobylsky had an initial surgical ICU consultation with Jermaine Petit and reported that the left chest tube had initially drained 300cc of blood.

Jermaine Petit became hypotensive, and a massive transfusion protocol was started. He received 2 units of packed red blood cells, 1 unit of platelet concentrates, 1 unit of autotransfusion, and 1 unit of crystalloid. Dr. Chernobylsky planned to continue monitoring and treatment at the SICU for potential imminent or life-threatening deterioration.
At 23:37 on July 18, 2022, with the supervision of Dr. Geoffery Scott Marecek, Dr. Christian Bough had an orthopedic consultation for Jermaine Petit and planned for nonoperative treatment of his ballistic scapula.

Jermaine Petit's clean-catch midstream urine culture yielded no growth but was positive for cocaine metabolites (380 ng/mL) and amphetamine. A nasopharyngeal swab Rapid Polymerase Chain Reaction (PCR) showed no detectable SARS-CoV-2.



A CT Brain without contrast was performed on Jermaine Petit and reported by Dr. Ravi Prasad on July 19, 2022, at 11:25 a.m. as follows:
- No evidence of intracranial hemorrhage, territorial infarct or mass effect.
- Nasal trauma with nondisplaced fracture of the left nasal bone, leftward displacement of the nasal septum with associated fracture of the vomer/nasal bone.
- Suspected left mandibular fracture with extensive posttraumatic changes of the oral cavity.

A CT maxillofacial bone without contrast was performed on Jermaine Petit and reported by Dr. Ravi Prasad on July 19, 2022, at 12:21 p.m. as follows:
Osseous Structures: Leftward deviation of the nasal septum with associated nondisplaced longitudinal fracture of the vomer plate. Nondisplaced hairline fracture of the left nasal bone. Comminuted fracture of the mandible with an inferiorly displaced 5 cm fragment of the left body of the mandible. There was a complete fracture through the medial portion of the fragment. A piece of jaw overlying the inferiorly displaced fragment was missing along with multiple left lower teeth. The pterygoid plates were intact. Orbital floor was intact. No dislocation of the mandibular condyles was seen. The fracture of the mandible did involve the mandibular canal.
Paranasal Sinuses: There was blood within the ethmoid air cells. The frontal sinus, sphenoid sinus, and mastoid air cells were clear.
Orbits: Normal
Soft Tissues: Subcutaneous emphysematous changes were identified within the right and left parotid space extending into the right masticator space. There was extensive amount of soft tissue edema noted regional to the mandible as well as in the submandibular soft tissues. Thickening of the platysma was noted. The tongue and oral cavity were deviated towards the left. No discrete fluid collection was identified. Ballistic fragments were identified just below the angle of the mandible on the right. Multiple fragments were identified in the oral cavity with comminuted bone fragments. There was an underlying hematoma noted in the left floor of mouth and in the region of the anterior tongue. Partially visualized endotracheal tube within the airway. Partially visualized orogastric tube within the esophagus.
Visualized Intracranial Structures: No abnormality demonstrated.
Impression:
- Facial trauma with fractures of the left nasal bone, nasal septum and vomer plate, and comminuted fracture of the left body of the mandible with a missing osseous component. There was diffuse surrounding edema, hematoma and subcutaneous emphysema.

A CT Angiogram of the neck with contrast was performed on Jermaine Petit and reported by Dr. Ravi Prasad on July 19, 2022, at 5:38 p.m. as follows:
Aortic Arch: Aortic arch was normal in appearance.
Left Carotid Artery: The left common carotid artery, carotid bifurcation and cervical/petrous internal carotid artery were normal in appearance.
Right Carotid Artery: The right common carotid artery and carotid bifurcation was normal in appearance. There was mild mass effect noted at the mid cervical right internal carotid artery from hematoma noted within the peri-mandibular soft tissues. No dissection of the right internal carotid artery was seen. The cervical and petrous right internal carotid artery were otherwise normal in appearance. There was however an active extravasation identified just anterior to the bullet fragment and measured 22 x 17.5 mm. There might be a second foci of extravasation noted slightly more anteriorly and medially and measured 13.3 x 10.9 mm.
Right Vertebral: No abnormality demonstrated.
Left Vertebral: No abnormality demonstrated.
Osseous Structures: There was redemonstration of comminuted fracture of the anterior left mandibular body and mandibular symphysis. Additional fractures of the left lateral aspect of the



T1 vertebral body as well as the transverse process of T2/costovertebral junction of T2 was noted. Bullet fragments were seen involving the left second rib. Comminuted fracture of the left scapula was identified.

Soft Tissues of the Neck: Left pneumothorax was noted along with contusion in the left lung. There was a chest tube in place on the left. Nasogastric tube was identified. Dilated fluid-filled esophagus was seen extending towards the right parasagittal location. Extensive subcutaneous emphysema in the lower left neck was identified as well as areas of emphysematous changes within the periventricular soft tissues, right mandibular angle, as well as in the floor the mouth. There was a hematoma involving the anterior floor of the mouth and tongue. There was compression of the right jugular vein.

Impression:
1. Jermaine Petit was status post gunshot wounds to the face and upper chest with comminuted facial fractures, floor of mouth hematoma, and subcutaneous emphysema.
2. Active extravasation identified within the right submandibular region just ventral to the bullet fragment.
3. Left pneumothorax with contusion.
4. Multiple left costovertebral junction fractures as well as fracture of the T1 vertebral body.

A CT chest, abdomen and pelvis with contrast was performed on Jermaine Petit and reported by Dr. Jason B. Aaronson on July 18, 2022, at 9:57 p.m. as follows:
- The tip of an endotracheal tube was seen above the carina.
- Foley catheter was seen within the urinary bladder lumen
- Enteric tube was identified with the tip in the very proximal stomach.
- Two left chest tubes were identified.
- Small left hemopneumothorax.
- Extensive soft tissue emphysema identified in the left axillary and sub-clavicular regions of the chest.
- Fracture of the left second rib and left scapula.
- Extensive pulmonary contusions/hemorrhage/laceration were seen in the left upper lobe.
- Very patulous fluid-filled esophagus.
- Distended stomach.

A CT reconstruction cervical spine was performed on Jermaine Petit and reported by Dr. Ravi Prasad on July 19, 2022, at 11:32 a.m. as follows:
Bullet embedded in posterior aspect of left second rib/apex of chest with associated fracture of the rib and the adjacent transverse process. No other rib fractures were identified. There were adjacent punctate shrapnel, hemorrhage/consolidation of the adjacent lung parenchyma, small left pneumothorax, and chest tube in place.

There were comminuted fractures of the superior aspect of scapular blade located medial to suprascapular notch. The glenoid and coracoid process was intact. There was comminuted fracture of acromion spine. Superior aspect of acromion and acromioclavicular joint were out of field-of-view. There was subacute to old appearing fracture deformity at the inferomedial most aspect of the scapula with callus formation present. The glenohumeral joint was normal and the visualized humerus was intact. There was a presence of gas along the muscle planes of the shoulder and chest wall. Muscle bulk was normal.

Impression:
1. Status post gunshot wound with: Embedded bullet in the left posterior second rib/apex of chest, associated left rib fracture and fracture of adjacent transverse process. Adjacent



hemorrhage/consolidation of left apical lung. Small left apical pneumothorax. Chest tube in place.
2. Acute comminuted fracture at the superior aspect of scapular blade located medial to the suprascapular notch.
3. Acute comminuted fracture of spine.
4. No fracture extension into glenoid articular surface.
5. Subacute to old appearing fracture deformity at the inferomedial most aspect of scapula with callus formation present.

On July 19, 2022, Jermaine Petit had a serial chest X-ray performed on him to assess for interval changes. It was reported by Dr. Tal Rencus as follows:
12:22 a.m.:
There was a large, fragmented bullet in the left lung apex. There was subcutaneous edema in the supraclavicular region. Left-sided chest tube in place. There was an enteric tube with a tortuous course relating to distention of the patient's esophagus which terminated in the stomach with tip and side-port in the upper body and fundus of the stomach. The ETT appears to be in satisfactory position approximately 6 cm above the carina. The right lung was grossly clear. The mid and left lower lung zone were within normal limits. The heart borders were unremarkable.

6:07 a.m.:
Left upper lobe hazy opacity could relate to pulmonary contusion. There appeared to be some fractures of the left second rib just lateral to the extensive ballistic material embedded in the left lung apex. No significant pneumothorax seen. No pleural effusion appreciated

11:20 a.m.:
Small left apical pneumothorax was visible. Other findings were unchanged.
Impression:
1. Ballistic injury to the left lung apex with fracture of the left second rib and small left apical pneumothorax.
2. Lines and tubes were in satisfactory position.
3. Tortuous course of the esophagus and the nasogastric (NG) tube relating to esophageal distention.

Other medications received included Cefazolin, Acetaminophen, Calcium gluconate, Cefepime, Ceftriaxone, Cisatracurium, Dexmedetomidine, Docusate sodium, Enoxaparin, Fentanyl, Furosemide, Gabapentin, Glucagon, Glucose chewable tablet, Haloperidol, Insulin glargine, regular Insulin, Lorazepam, Magnesium sulfate, Methocarbamol, Epinephrine, Norepinephrine, Oxycodone, Pantoprazole, Piperacillin-tazobactam, Quetiapine, Valproic acid and Vancomycin.

**Medico-Legal Questions**

1. **What were the characteristics and trajectories of the bullets of the gunshot wounds Jermaine Petit sustained?**
    a. **What was Mr. Petit's body positioning while he was being shot?**
    b. **What was the trajectory of the shots that entered Mr. Petit's body?**
    c. **What injuries or damages were caused to Mr. Petit by the gunshots?**

Medicine is a life science, which is evidence based. The practice of medicine is guided by established standards and generally accepted principles, which certified physicians must adhere to. The specialties and the categories of physicians who are most proficiently trained,



specialized, and competent in the accurate determination of the cause, mechanism and manner of death and the mechanisms of sustenance of serious bodily injury and possibly lethal trauma are the forensic pathologists. Jermaine Petit suffered serious bodily injuries.

It is a generally accepted principle and common knowledge in medicine and forensic pathology, that specific traumatic events generate predictable, reproducible, and specific patterns of traumas and injuries. Applying the clinico-pathologic method of differential diagnosis, a specific documented pattern of trauma can be evaluated, translated, and applied to the determination of the mechanisms of generation, causation, and sustenance of the specified trauma pattern, with a reasonable degree of medical and scientific certainty; based on the differential diagnosis of the established common knowledge and generally accepted principles of trauma patterns and their mechanisms of generation, causation, and sustenance. The documentation and translation of patterns of trauma can be done by a variety of methods including but not limited to radiological methods, autopsy methods, clinical physical examination methods, and applied clinico-pathologic methods.

The patterns of injuries generated by gunshots, firearms and ballistics weapons, and the mechanisms of generation, causation, and sustenance of these patterns of injuries are very well-established in the medical literature and are common knowledge. Based on the prevailing forensic scenario, and on the generally accepted principles and common knowledge of medicine and science, and based on the global constellation, configurations and anatomic conformations of the gunshot wounds sustained by Jermaine Petit, the mechanisms of generation, causation and sustenance of his injuries can be determined with a reasonable degree of medical certainty.

Based on the physical characteristics and physics of ballistics, partially burnt and hot residues of gunpowder and soot travel behind the bullet when it exits the muzzle, and due to gravitational forces and the differential densities of the bullet, soot, and residues of gunpowder in the gravitational field, the bullet can travel longest, followed by the partially burnt gunpowder residues, which travel longer than soot. Soot will travel for about 1 foot, before it is pulled down by gravitational forces, and the partially burnt gunpowder residue will travel for about 2-3 feet before it is pulled down by gravitational forces. Therefore, if the muzzle of the gun were closer to the skin by less than 1 foot, you would expect to find marginal soot deposits around the gunshot wound of entrance [close range shot]. If the muzzle of the gun were closer to the skin by less than 2-3 feet, you would expect to find powder stippling around the gunshot wound of entrance [intermediate range shot]. If the muzzle of the gun were located greater than 2-3 feet away from the skin ad infinitum, you would expect to find only marginal abrasions around the wound without soot deposits or powder stippling [distant range shot]. If there is an eccentric accentuation of the width of the marginal abrasion, it may suggest that the muzzle of the gun was not located perpendicularly to the skin when it was fired but rather located in the direction of the eccentric accentuation of the marginal abrasion.

The direction of travel of a bullet inside the body can be determined in the three planes of nature with the body disposed in the universal anatomic position, by the systematic tracking and description of the anatomic pathway of the bullet, tissue disruptions, damages and injuries, correlated with the anatomic topographic locations of the gunshot wound of entrance, gunshot wound of exit and recovery of the bullet, or where the bullet settled.

Based on these common knowledge and generally accepted principles of medicine and science, Jermaine Petit sustained a total of two gunshot wounds as have been summarized above. Jermaine Petit sustained a gunshot wound of his face and a gunshot wound of his back. The



Jermaine Clodor Petit, Deceased
Medico-Legal Report

Page 10 of 18

gunshot wound of entrance on his face was located in the left mandibular face/ jaw. The gunshot wound of entrance on his back was located in the left scapular back. The bullet of the gunshot wound of the face settled in the right submandibular space/region/ triangle. The bullet of the gunshot wound of the back settled in the left paravertebral soft tissues at the T2 level, along the left posterior second rib.

The bullet of the gunshot wound of the face perforated, contused and lacerated the skin and soft tissues of the left jaw and face, perforated and fractured the left mandible and facial skeleton, perforated, contused and lacerated the floor of the mouth, the tongue and soft tissues of the oral cavity and oropharynx, and right submandibular triangle, perforated, contused and lacerated the right external carotid and jugular vessels before it came to settle below the mandibular in the right submandibular space.

The bullet of the gunshot wound of the back perforated, contused and lacerated the skin and soft tissues of the left scapular back, perforated and fractured the left scapula, perforated and fractured the left posterior 2nd rib, penetrated and fractured the T2 vertebra before it came to settle in the left paravertebral soft tissues along the left posterior 2nd rib and T2 vertebra.

The two gunshot wounds exhibited tissue disruptions, damages and injuries along the anatomic pathways including but not limited to soft tissue hemorrhages, oropharyngeal hemorrhages, left pulmonary hemorrhages, contusions and lacerations, and left hemopneumothorax. The two gunshot wounds were potentially fatal, but were not immediately fatal and were survivable with definitive medical and surgical treatments and interventions. The definitive medical and surgical treatments Jermaine Petit received at the hospital salvaged him, and he survived his injuries.

None of the gunshot wounds of entrance was documented as exhibiting any marginal soot deposits or powder stippling. As the video documentation of the shooting confirms, this means that the gunshot wounds sustained by Jermaine Petit were distant range gunshot wounds. The officer(s) who shot Jermaine Petit were not located in close range or intermediate range of Jermaine Petit. The muzzles of the gun(s) that fired the bullets were not located in close range or intermediate range of Jermaine Petit. The officer(s) and the muzzle(s) of the guns that fired the bullets were located greater than 2-3 feet, ad infinitum, away from Jermaine Petit when the gun(s) was fired. Jermaine Petit was shot at a distance by the police officer(s), and the gun(s) that fired the bullets were located at a distance from Jermaine Petit. Jermaine Petit was not within close range or intermediate range of the muzzles of the gun(s) or of the officer(s) when he was shot.

The bullet that caused the gunshot wound of the face traveled in a backward, downward and rightward trajectory with the body in the universal anatomic position. The officer who fired the bullet that caused the gunshot wound of the face was located at a distance from Jermaine Petit, on his left side. The configurations and locations of the mandibular fractures and the gunshot injuries indicate that when he was shot, Jermaine Petit was more likely than not turning his face on his neck to the left side, and was leaning forward or beginning to fall down. He was not standing fully erect on his feet when he was shot. He was not facing the officers, was not attacking or charging at the officers who shot him, as has been confirmed by videographic captures of the shooting.

The bullet that caused the gunshot wound of the back traveled in a forward, upward and rightward trajectory with the body in the universal anatomic position. The officer who fired the



bullet that caused the gunshot wound to the back was located at a distance from Jermaine Petit, in his back, and to the left side of his back. The configurations and locations of the scapular, costal and vertebral fractures and the gunshot injuries indicate that when he was shot, Jermaine Petit, more likely than not, had his back facing the officer, and the officer who shot him in the back was seeing and looking at his back when he was shot. He was not facing the officer who shot him in the back, and he was not attacking or charging at the officer when he was shot. The acutely inclined anatomic direction of travel and trajectory of the bullet that caused the gunshot wound of the back indicate that Jermaine Petit was leaning forward and was falling down or on the ground when he was shot in the back, as has been confirmed by videographic captures of the shooting. When he was shot in the back, Jermaine Petit was not standing fully erect on his feet.

2.  **Did Jermaine Petit experience pain and suffering when he was shot on July 2022 and after he was shot, and for how long?**

It is a generally accepted principle and common knowledge in medicine and forensic pathology, that specific traumatic events generate predictable, reproducible, and specific patterns of traumas and injuries. The patterns of traumas/injuries generated by blunt force impacts, gunshots, firearms and ballistics weapons, and the mechanisms of sustenance of these patterns of traumas/injuries are very well established in the medical literature and have become common knowledge.

**Patho-physiology of conscious pain and suffering**
Conscious pain and suffering is initiated by widespread free nerve endings situated in the skin, soft tissues, and organs. Pain can be elicited by multiple types of stimuli classified into three broad categories: mechanical, thermal, and chemical pain stimuli. Nerve endings for pain sensations generate electrical action potentials following contact of any part of the body with an impacting surface and following all types of mechanical tissue damage caused by kinetic energy and blunt force trauma. Similarly, nerve endings for pain and heat sensations generate electrical action potentials following contact of any part of the body with flames and heat and following all types of tissue damage caused by flames and heat. The fundamental mechanism of injury sustenance for gunshots is kinetic energy transference, which causes mechanical destruction of tissues. Action potentials are the sub-cellular physiologic basis for noxious conscious sensations and originate from voltage gated sodium and potassium electrolyte membrane pumps in the cell membranes of nerve cells, fibers, and synapses.

It takes a few 10,000$^{ths}$ of a second to generate action potentials. Action potentials are transmitted through nerve fibers to the brain. They are transmitted in peripheral nerves in the Aδ and C fibers for fast and slow pain respectively at impulse rates of 5-30 meters per second and 0.5-2 meters per second, respectively. There is therefore a double pain sensation, a fast-sharp pain, and a slow pain. The sharp pain apprises the person rapidly of imminent danger and prompts the person to react immediately and remove himself from the painful stimulus or imminent danger. The slow pain becomes greater as time passes resulting in continued intolerable pain and suffering prompting the person to continue to try to relieve the cause of the pain and flee from imminent danger.

As an adult male, Jermaine Petit felt all types of gunshot induced pain within milliseconds of contact of the bullet with his skin, and within milliseconds of direct blunt force impact and contact of his body with any unyielding surface. One millisecond is one second divided into 1000 parts.



For the slowest nervous mechanisms of pain sensation and consciousness, a man like Jermaine Petit felt pain within 100 milliseconds.

Nerve pathways transmitting pain, terminate in the spinal cord. Secondary pathways transmit the pain from the spinal cord to the brainstem and thalamus, especially to the reticular activating system of the brainstem. From the thalamus, tertiary pathways transmit pain to other basal ganglia, limbic cortex, and neocortex of the brain. Pain stimuli are transmitted to the reticular nuclei of the midbrain, pons, and medulla; to the tectal midbrain and the periaqueductal gray matter. These lower regions of the brain, i.e., brainstem, are vital for the appreciation of the suffering types of pain.

Animals with their brains sectioned above the midbrain, to block any impulse reaching the neocortex and cerebral hemispheres, still experience suffering from pain caused by all types of trauma. Complete removal of the somatosensory regions of the cerebral hemispheres does not preclude an animal's ability to perceive and experience pain.

The sensation of pain induces conscious suffering since pain is a noxious sensation, which stimulates the neocortex, limbic cortex, and forebrain to cause mental pain and suffering. All these neural processes occur in $1000^{ths}$ of a second [milliseconds]. Pain impulses entering the spinal cord, brainstem and lower centers of the human brain can cause conscious perception of pain. Pain perception is principally a function of the lower centers of the brain; however, the upper centers and cerebral hemispheres are responsible for the interpretation of the quality of pain and other cognitive aspects of pain, which are not needed to experience pain. Perception of pain is a primitive vegetative reflex similar to thirst and hunger.

The cranial or spinal reflex is the foundational basis for pain and suffering. As long as the spinal cord is intact, the human being will experience pain and suffering. This is buttressed by the fact that patients with high cervical spinal cord injuries and transections, and quadriplegia still experience pain and suffering in the body distal to the level of the spinal cord injury. Even with the traumatic absence of any connectivity with the upper central nervous system, the cerebral hemispheres and brainstem, a patient will continue to experience pain and suffering driven by the spinal reflex. This is in part why patients who are quadriplegic experience pain and suffering in their bodies below the levels of the spinal cord injury based upon a variety of established pathophysiological mechanisms[2-12]. Therefore, in the absence of catastrophic spinal cord and cranial injuries, a traumatized patient would experience pain and suffering.

One of the factors we consider in the determination of general and case-specific causation is analogy. Is there another disease or trauma entity that is analogous to the case in question? And in this case an analogy is that of spinal cord injuries and quadriplegia. The quadriplegic patient can still experience pain and suffering below the level of the injury, which may include but are not limited to[6]:
1. Nociceptive pain
    a. Musculoskeletal pain
    b. Visceral pain
    c. Other nociceptive pain
2. Neuropathic pain
    a. At-level spinal cord injury pain
    b. Below-level spinal cord injury pain
3. Other pain
4. Unknown pain



Jermaine Clodor Petit, Deceased
Medico-Legal Report

Page 13 of 18

Mechanical pain from tissue damage by blunt force trauma and by bullets elicit both the fast and slow pain types. Fast pain is felt within milliseconds while slow pain is felt within about one second. Following mechanical tissue damages, biochemical tissue reactants like bradykinin, serotonin, histamine, prostaglandins, leukotrienes, potassium ions, substance P, acetylcholine, acute phase reactants and proteolytic enzymes are expressed to elicit sustained secondary biochemical pain in addition to the primary fast pain directly caused by mechanical tissue damages. The biochemical pain elicited by these chemical reactants is a slow type of suffering pain. The intensity of pain is closely correlated with the rate of tissue damage from kinetic energy.

The brain is responsible for and sustains consciousness in human beings. The region of the brain responsible for consciousness is the brainstem. The center in the brainstem, which is responsible for consciousness, is the reticular activating system, which is deeply located in the central regions of the brainstem. As long as the reticular activating system remains anatomically and electrochemically intact, an individual like Jermaine Petit will remain conscious and will feel pain and experience suffering.

The primary mechanisms of serious bodily injury, permanent injury and possibly death for the types of gunshot wounds Jermaine Petit suffered, as have been described above involved tension pneumothorax and acute cardio-respiratory arrest, hypovolemia, systemic hypotension, cerebral hypoperfusion and eventual global, diffuse hypoxic-ischemic cerebral injury. The human brain is a post-mitotic organ and can only survive on oxygen and glucose, which are supplied by blood that come from the heart, primarily in the internal carotid arteries and the vertebral arteries. While the brain is only about 2-3% of the body weight, it receives approximately 15% of the cardiac output at a rate of 750-900 ml/min of blood. The normal range of perfusion of the brain is about 50 to 65 ml/100 g/min [80-100 ml/100g/min for the gray matter and 20—25 ml/100g/min for the white matter, at a rate of oxygen consumption of 3.5 ml/100 g/min. The normal brain tissue partial pressure of oxygen is 35 to 40 mmHg. Brain tissue oxygen levels below 30 mmHg may cause brain tissue injury, and at 20 mmHg, the risk of brain damage becomes exponentially elevated. The threshold for brain infarction is 10-12 ml/100g/min of blood supply with neuronal injury and death beginning in 60 to 180 seconds.

Being a post-mitotic organ, the human brain does not have any reasonable capacity to regenerate itself. This means that when the human brain suffers any type of irreversible injury, that injury is permanent and cannot be reversed or cured by the brain or by medical therapy. There are so many types of brain injuries. Hypoxic-ischemic brain injury due to hypo-perfusion or non-perfusion of the brain gunshot wounds is only one type of brain injury. For the human brain to suffer irreversible hypoxic-ischemic brain injury, there has to be an impaired supply of oxygen and blood to the brain. The established and generally accepted median or mean reference threshold time for irreversible hypoxic-ischemic brain damage to occur is 3 to 5 minutes in cumulative time. This means that irreversible brain damage can occur in less than 3 minutes or in more than 5 minutes, but with a mean or median time of close to 3 to 5 minutes.

Pain is a basic, vegetative and primitive human reflex with a primary objective of alerting the person to remove himself from imminent danger. Given that pain is a primitive reflex, patients who are alive but are suffering a disorder of consciousness still experience pain and suffering. There is no rigid demarcation between consciousness and unconsciousness. It is a continuum or spectrum of physiological functioning, however, there are broad varying degrees of disorders of consciousness with broad varying degrees of pain and suffering physiology and biochemistry[13-16]. We cannot reasonably differentiate or quantitate the degree of pain and suffering; rather it is a



qualitative question of whether a person experiences pain or not. Therefore, pain and suffering are present in all persons with disorders of consciousness and should be adequately treated[14,17-20]. In the non-communicative, unconscious patient, the most relevant aspects of response to pain are physiologic (i.e., modification in the vital parameters such as heart rate and respiration) and behavioral (i.e., modification in the facial expression, motor and visual response)[21-23].

**Jermaine Petit's conscious pain and suffering**
Jermaine Petit was shot at around 07:20 p.m. on July 18, 2022. Police officers had accosted him at about this time, parking their cars around him, pulling their guns and pointing the guns at him while yelling out orders at him. At this time, Jermaine Petit was conscious and aware of his surroundings. He was not suffering from any known neurological disease or drug intoxication that may have precluded his capacity to process noxious stimuli and experience pain and suffering. Pain and suffering moreover are primitive autonomic reflexes of humankind. Patients who suffer neurological diseases like delirium, neurosis, psychosis and dementia and all forms of cognitive impairment, congenital and acquired intellectual disabilities and autism spectrum disorders still possess the autonomic capacity for primitive reflexes like pain and suffering, thirst and hunger and fear.

His reticular activating center was completely intact and functional. As a 39-year-old adult African-American male he had the mental capacity and learned behavior to identify and classify the presence of the police officers, their guns and weapons, the noises of the police vehicles and sirens, the visual effects of the police lights, the firing and explosive noises of the gun(s), and the bullets hitting him as imminent dangers and threats to his life.

At this time, the brainstem nuclei, the frontal cortex, pre-frontal cortex, basal forebrain, and limbic cortex of Jermaine Petit's brain initiated, within 10,000th of a second, action potentials, which initiated within milliseconds, the primitive human reflexes of fright, flight and fight. This mental awareness of imminent danger initiated the nor-adrenergic and adrenergic biochemical neural responses of fear, fright, and flight, when the locus ceruleus of the brainstem released large amounts of noradrenalin to the cerebral hemispheres. This fear, fright and flight adrenergic response caused high levels of mental pain and suffering. His heart started pumping faster [chronotropic effect] and stronger [ionotropic effect] due to the nor-adrenergic/adrenergic response. His respiratory rate and general muscle tonicity increased as well due to the nor-adrenergic/adrenergic response. His gastrointestinal system increased bowel peristalsis and acid secretion in the stomach. All these patho-physiologic processes culminated in high levels of conscious mental pain and suffering, which resulted in attendant somatic and biochemical pain and suffering as a result of the body's pathophysiological and biochemical responses to mental pain and suffering. The fear, fright and flight autonomic response prompted him to flee and run from the police, who initiated pursuit and shot him. Firing the gun generated loud blast noises in close range which instigated mechanical ossicular noxious stimuli and pain from transmission of such loud noises.

The various domains of his brain and cerebral functioning were intact and identified the imminent danger within 1000$^{ths}$ of a second. His limbic system instigated high levels of primitive adrenergic fright-flight-fight response, which caused high levels of mental, somatic and biochemical pain and suffering.

When Jermaine Petit was shot, the cranial and spinal nerve reflexes propelled him downwards to the ground violently impacting the ground. He suffered additional multiple blunt force impacts



Jermaine Clodor Petit, Deceased
Medico-Legal Report

Page 15 of 18

and trauma of his body. After he was shot and lying on the ground bleeding, he was left unattended for about 10 to 15 minutes before he received emergency medical assistance. He laid on the ground bleeding and progressed into traumatic and hypovolemic shock.

Jermaine Petit suffered multiple gunshot wounds and blunt force impacts. Each gunshot wound, and each impact initiated multimodal transfer of kinetic energy to his body. At this time, Jermaine Petit experienced physical and mechanical somatic pain caused by the constellation of gunshot wounds and blunt force impacts. Numerous nerve endings in his skin and tissues were activated, and elicited millions of pain action potentials, which were transmitted to the spinal cord and brain to cause conscious somatic pain, which caused conscious somatic suffering, which in turn elicited novel mental and biochemical pain and suffering, which synergized with the previously existing mental, somatic and biochemical pain and suffering. The biochemical cycles and systems in his body expressed acute reactant proteins and peptides in response, which sustained biochemical pain and suffering, and further accentuated his global conscious mental, somatic and biochemical pain, and suffering.

Following the gunshots, the bullets traveled through air, hit, and perforated Jermaine Petit's body. When the bullets perforated Jermaine Petit's skin, soft tissues, organs, and skeleton they transferred high levels of kinetic energy[2] and thermal energy to the tissues causing mechanical tissue damages and destruction, which activated thousands to millions of nerve endings and action potentials. He experienced more somatic pain and suffering with the attendant and accompanying mental and biochemical pain and suffering within 100 milliseconds of sustenance of his gunshot wounds.

As he was left lying on the ground bleeding, he progressed into traumatic shock slowly through the pathophysiological mechanisms of hypoxic-ischemic brain injury, which have been described above. He was conscious and was aware of the imminent threat and danger he was facing. He knew he had been shot, and as an adult male he knew he may die from his injuries. In response his body expressed the acute reactant peptides, proteins and enzymes, and many noxious biochemical cycles and cascades were initiated by his traumatic shock. And as he laid on the ground he continued to suffer highly intense and composite mental, somatic and biochemical pain from his direct physical injuries and from the secondary pathophysiological responses to his injuries as he progressed into traumatic shock without any definitive or reasonable timely emergency medical or surgical intervention. As the pool of his own blood expanded around him on the ground helpless, as he continued to bleed out, the acute traumatic shock and lack of medical and surgical intervention combined, activated millions of nerve endings and action potentials, and exponentially potentiated Mr. Petit's mental, somatic and biochemical pain and suffering.

During this time, his traumatic and hypovolemic shock progressed and began to cause hypoxic-ischemic brain injury. The attendant pathophysiological and biochemical responses of the body including but not limited to systemic inflammatory response, enzymatic, proteomic, and biochemical cyclic responses and expression in addition generated more and novel biochemical pain, which added to and accentuated the global mental, somatic and biochemical pain Jermaine Petit was experiencing.

Jermaine Petit was eventually transferred to the hospital where he received medical and surgical treatment for his critical wounds. He suffered direct/ primary and indirect/ secondary injuries to the blood vessels of the neck and face that in part supply the brain. The brain suffered significant

---

[2] A bullet traveling at a linear velocity of over 1200 feet per second possesses large amounts of kinetic energy.



degrees of hypoxic-ischemic injury [like neuronal injury of the pyramidal neurons of the Sommer's sector of the hippocampus], which were permanent and persistent and added to Mr. Petit's global neuropathological disease burden. This cumulative exposure to brain damage permanently aggravated and accentuated Mr. Petit's pre-existing neurological diseases and syndromes because of the cumulative disease concept of the brain, which has been described above.

The medical and surgical interventions and treatments he received generated independent mental, somatic and biochemical pain and suffering in response to the side effects of his therapies. His injuries were serious bodily injuries that left permanent sequelae, impairment and scars on his body, especially the global neurological injury exposure. He continued to experience composite direct or indirect mental, somatic and biochemical pain and suffering in response to his serious bodily injuries. The pain and suffering decreased in intensity as time went by but remained present especially the pain and suffering from the neurological sequelae of his injuries.

In summary, therefore Jermaine Petit experienced conscious pain and suffering as a result of the serious and permanent bodily injuries[3] and gunshot wounds he suffered in July 2022. He continued to experience pain and suffering from his serious bodily injuries until his death in July/August 2024 for a mean, median and mode duration of less than 2 years beginning from the time he was shot at about 07:20 p.m. on July 18, 2022[4,5].

I have provided all my opinions and conclusions with a reasonable degree of medical certainty.

---

[3] Direct and indirect serious, bodily injuries, damages, impairments and scars, including functional, somatic, physiological, biochemical, anatomic, neurological and psychological injuries and impairments.

[4] Medicine is not an absolute science, and these estimated ranges should not be interpreted as absolute quantitative estimations of time. Quantitative ranges of any measurable index are common practice and are the standard of practice in pathology and medicine, in part based on the principles of the central limit theorem.

[5] Human events like loss of consciousness and death involve a continuum of pathophysiological events on the cellular and gross functional levels without any identifiable rigid transitions or demarcations. Therefore, the determination of the time of occurrence of these events are guided by the time the events have been reproducibly and quantifiably confirmed. For example, the time of death of any individual is determined by the time the individual was pronounced dead by a designated medical professional who has clinically assessed the patient and confirmed the patient to be dead based on prevailing, reproducible and quantifiable clinical evidence that the patient was dead.



I reserve the right to amend, supplement, revise and/or modify my opinions and report, up and to the time of trial, should additional information become available.

Thank you.

Very truly yours,



Bennet I. Omalu, MD, MBA, MPH, CPE, DABP-AP,CP,FP,NP
Clinical Pathologist, Anatomic Pathologist, Forensic Pathologist, Neuropathologist, Epidemiologist
President and Medical Director, Bennet Omalu Pathology

END-NOTE REFERENCES

1. Hill AB. The Environment and Disease: Association or Causation? Proc R Soc Med. May 1965;58(5):295–300.
2. Burke DC. Pain in paraplegia. Paraplegia. Feb 1973;10(4):297–313. doi:10.1038/sc.1973.54
3. de Oliveira RC, de Freitas LB, Gomes RR, Cliquet A. Orthopedic Related Comorbidities in Spinal Cord-Injured Individuals. Acta Ortop Bras. Jul–Aug 2020;28(4):199–203. doi:10.1590/1413-785220202804224403
4. Cragg JJ, Haefeli J, Jutzeler CR, et al. Effects of Pain and Pain Management on Motor Recovery of Spinal Cord-Injured Patients: A Longitudinal Study. Neurorehabil Neural Repair. Sep 2016;30(8):753–61. doi:10.1177/1545968315624777
5. D'Angelo R, Morreale A, Donadio V, et al. Neuropathic pain following spinal cord injury: what we know about mechanisms, assessment and management. Eur Rev Med Pharmacol Sci. Dec 2013;17(23):3257–61.
6. Finnerup NB, Baastrup C. Spinal cord injury pain: mechanisms and management. Curr Pain Headache Rep. Jun 2012;16(3):207–16. doi:10.1007/s11916-012-0259-x
7. Hagen EM. Acute complications of spinal cord injuries. World J Orthop. Jan 18 2015;6(1):17–23. doi:10.5312/wjo.v6.i1.17
8. Masri R, Keller A. Chronic pain following spinal cord injury. Adv Exp Med Biol. 2012;760:74–88. doi:10.1007/978-1-4614-4090-1_5
9. Yasko JR, Mains RE. Chronic pain following spinal cord injury: Current approaches to cellular and molecular mechanisms. Trends Cell Mol Biol. 2018;13:67–84.
10. Rosner J, Negraeff M, Belanger LM, et al. Characterization of Hyperacute Neuropathic Pain after Spinal Cord Injury: A Prospective Study. J Pain. Jan 2022;23(1):89–97. doi:10.1016/j.jpain.2021.06.013
11. Vierck C. Mechanisms of Below-Level Pain Following Spinal Cord Injury (SCI). J Pain. Mar–Apr 2020;21(3-4):262–280. doi:10.1016/j.jpain.2019.08.007
12. Waring WP, Maynard FM. Shoulder pain in acute traumatic quadriplegia. Paraplegia. Jan 1991;29(1):37–42. doi:10.1038/sc.1991.5
13. Zasler ND, Formisano R, Aloisi M. Pain in Persons with Disorders of Consciousness. Brain Sci. Feb 23 2022;12(3)doi:10.3390/brainsci12030300

