**RODNEY S. DIGGS, Esq. (SBN 274459)**
Email: rdiggs@imwlaw.com
**IVIE McNEILL WYATT PURCELL & DIGGS**
444 South Flower Street, 32nd Floor
Los Angeles, California 90071
Telephone:   (213) 489-0028
Facsimile:   (213) 489-0552

Attorneys for Plaintiff, JERMAINE PETIT

DALE K. GALIPO, Esq. (SBN 144074)
Email: dalegalipo@yahoo.com
RENEE V. MASONGSONG, Esq. (SBN 281819)
Email: rvalentine@galipolaw.com
**THE LAW OFFICE OF DALE K. GALIPO**
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367
Telephone:   (818) 374-3333
Facsimile:   (818) 347-4118
Attorneys for Plaintiff, JERMAINE PETIT

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASHLYN PETIT, as Successor-in-Interest to JERMAINE PETIT, deceased, <br><br> Plaintiff, <br><br> vs. <br><br> CITY OF LOS ANGELES, a municipal entity; OFFICER DARYL GLOVER, JR.; SERGEANT BRETT HAYHOE; and DOES 1 through 10, inclusive, <br><br> Defendants. | CASE NO.: 2:23−cv−00789 ODW(PVCx) <br><br> **DECLARATION OF RODNEY S. DIGGS IN SUPPORT OF PLAINTIFF'S MOTION IN LIMINE NO. 1 THROUGH 4** <br><br> <u>Motion in Limine Hearing</u> <br> Date: 2/2/2026 <br> Time: 1:30 p.m. <br><br> <u>Trial</u> <br> Date: 2/17/2026 <br> Time: 9:00 a.m. |

## <u>DECLARATION OF RODNEY S. DIGGS</u>

I, Rodney S. Diggs, declare and state as follows:

1. I am an attorney at law, duly licensed to practice before this Court and all of the courts of the State of California. I am a partner at Ivie McNeill Wyatt Purcell & Diggs, attorneys of record for Plaintiff Ashlyn Petit in the above-captioned matter. If called to testify, I could and would competently testify to the following facts, as the same are personally known to me, except as to those matters that may be stated upon information and belief, and as to those matters, I believe the same to be true.

2. Attached hereto as **Exhibit A** are true and correct copies of unsealed excerpts from the Deposition of Daryl Glove, taken on July 30, 2025.

3. Attached hereto as **Exhibit B** are true and correct copies of unsealed excerpts from the Deposition of Brett Hayhoe, taken on August 28, 2025.

4. Attached hereto as **Exhibit C** is a true and correct copy of Mr. Petit's autopsy report, dated August 8, 2024.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct and that this Declaration was executed this 14th day of January, 2026, at Los Angeles, California.

/s/ Rodney S. Diggs
Rodney S. Diggs, Declarant

EXHIBIT

A

Page 1

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    --oOo--

4

5  ASHLYN PETIT, as successor-in
   interest to JERMAINE PETIT, deceased,
6
7         Plaintiff,

8  v.                         Case No.
                              2:23-cv-00789-CJC (PVCx)
9  CITY OF LOS ANGELES, a municipal
   entity; OFFICER DARYL GLOVER, JR.;
10 SERGEANT BRETT HAYHOE;
   and DOES 1 through 10, inclusive,
11
        Defendants.
12 _____/

13

14

15       STENOGRAPHIC REPORTER'S TRANSCRIPT OF

16    REMOTE VIDEO DEPOSITION OF DARYL GLOVER, JR.

17         WEDNESDAY, JULY 30, 2025

18         **UNSEALED PORTION**

19 Reported Stenographically by:

20 KIMBERLY D'URSO, CSR 11372, RPR

21 Job No.  18705

22

23

24

25

Page 2

1       APPEARANCES (Remote)

2  FOR THE PLAINTIFFS:

3       LAW OFFICES OF DALE K. GALIPO
        BY:  DALE K. GALIPO, ESQ.
4             RENEE MASONGSONG, ESQ.
        21800 Burbank Boulevard, Suite 310
5       Woodland Hills, California 91367
        818.347.3333
6       dalekgalipo@yahoo.com
        rvalentine@galipolaw.com
7
        IVIE MCNEILL WYATT PURCELL & DIGGS
8       BY:  RODNEY S. DIGGS, ESQ.
        444 S. Flower Street, Suite 3200
9       Los Angeles, CA 90071
        213.489.0028
10      rdiggs@imwlaw.com

11 FOR THE DEFENDANTS BRETT HAYHOE and DARYL GLOVER, JR.

12
        CARPENTER ROTHANS & DUMONT, LLP
13      BY:  KIMBERLY SARMIENTO, ESQ.
        500 S. Grand Avenue, 19th Floor
14      Los Angeles, CA 90071
        213.228.0400
15      ksarmiento@crdlaw.com

16 FOR THE DEFENDANT CITY OF LOS ANGELES:

17      OFFICE OF THE CITY ATTORNEY OF LOS ANGELES
        BY:  CHRISTIAN R. BOJORQUEZ, ESQ.
18      200 N. Main Street, 6th Floor, City Hall East
        Los Angeles, CA 90012
19      christian.bojorquez@lacity.org

20 ALSO PRESENT:  Dennis Saelee, Videographer

21         Danie Williams, paralegal

22         Olivia Burnett, law clerk

23         --oOo--

24

25

Page 3

1       INDEX OF EXAMINATION

2  WITNESS:  DARYL GLOVER, JR.

3  EXAMINATION BY                      PAGE

4       MR. GALIPO...........................5

5       MR. BOJORQUEZ.......................90

6

7       EXHIBITS FOR REFERENCE

8  EXHIBIT      DESCRIPTION           PAGE

   1 - Body-worn camera footage of Officer Glover...65

9  2 - Body-worn camera footage of Officer Martinez.82

10 3 - Body-worn camera footage of Sergeant Hayhoe..85

11         --oOo--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1         --oOo--

2         BE IT REMEMBERED, that set on Wednesday, the

3  30th day of July, 2025, commencing at the hour of

4  1:42 p.m., thereof, DARYL GLOVER, JR. appeared remotely

5  in Los Angeles, California, before me, Kimberly E.

6  D'Urso, an RPR and Certified Shorthand Reporter of the

7  State of California, the following deposition was

8  stenographically reported by me:

9         (Whereby the Certified Shorthand Reporter

10        introduced herself on the record and

11        administered the oath to the deponent.)

12

13        THE VIDEOGRAPHER:  Good afternoon.  We are now

14 on the record.  The time is 1:42 p.m.  Today's date is

15 July 30th, 2025.  This is the recorded remote video

16 deposition Officer Daryl Glover, Junior, in the matter of

17 Petit versus City of Los Angeles.

18        This deposition is being held via web

19 conference.  My name Dennis Saelee.  I'm the videographer

20 with Focus Litigation Solutions.  The court reporter is

21 Kimberly D'Urso.

22        Counsel, please introduce yourselves and state

23 whom you represent, after which the court reporter will

24 swear in the witness.

25        MR. GALIPO:  Dale Galipo with Renee Masongsong,

Page 9

1     Q.    And were you able to look at the body-worn
2  camera footage of your partner from that day?
3     A.    Yes, sir.
4     Q.    Was that also last week?
5     A.    Yes, sir.
6     Q.    Who was your partner on the date of the
7  shooting?
8     A.    Officer Martinez.
9     Q.    And there was a sergeant who also was present
10 on scene when the shooting occurred?
11    A.    Yes, sir.
12    Q.    And what was the name of the sergeant?
13    A.    Sergeant Hayhoe.
14    Q.    Is that "H-A-Y-H-O-E"?
15    A.    Yes, sir.
16    Q.    And did you review any of his body-worn camera
17 footage?
18    A.    Yes, sir.
19    Q.    Anything else that you reviewed that you can
20 think of -- and I'll throw out a few things -- like a
21 CAD printout?  Radio dispatch?
22    A.    Radio dispatch.  I'm unsure about the CAD
23 printout, but I don't believe so.
24    Q.    Have you looked at any use of force policies or
25 anything like that?

Page 10

1     A.    Throughout my regular workmanship, yes.
2     Q.    Have we covered the items that you have
3  reviewed in preparation for the deposition?
4     A.    Yes.
5     Q.    So before we get into the date of the incident,
6  I want to learn a little bit about your background.
7           I'm assuming you graduated from high school?
8     A.    Yes, sir.
9     Q.    What year did you do that in?
10    A.    2008.
11    Q.    Did you go to any college after high school?
12 And I don't need to know the names, just whether you
13 went or not.
14    A.    Yes, sir.
15    Q.    Did you study anything in particular?
16    A.    Yes, sir.
17    Q.    What did you study?
18    A.    Health and sport science.
19    Q.    Did you play sports in high school?
20    A.    Yes, sir.
21    Q.    What sports did you play?
22    A.    Basketball and football.
23    Q.    What positions did you play in football?
24    A.    Cornerback and receiver.
25    Q.    And what years did you go to college?

Page 11

1     A.    2009 -- well, 2000 -- so the following
2  season -- so I graduated high school in 2008, and then I
3  went directly to college.  So 2008 -- summer of 2008
4  until 2013, is when I graduated.
5     Q.    And did you end up getting a degree?
6     A.    Yes, sir.
7     Q.    How old are you now?
8     A.    35.
9     Q.    How tall are you?
10    A.    6 foot.
11    Q.    How much do you currently weigh?
12    A.    205.
13    Q.    Was that about your weight at the time of the
14 shooting incident?
15    A.    Give or -- no.  I was approximately 195.
16    Q.    So you think you gained a little weight since
17 the shooting incident?
18    A.    Yes, sir.
19    Q.    I have the same issue.
20          When did you go to the police academy?
21    A.    May of 2015.
22    Q.    What type of work did you generally do before
23 you went to the academy?
24    A.    I was a community safety officer for USC.
25    Q.    What time frame did you do that?

Page 12

1     A.    2014 to 2015, for a year.
2     Q.    Where did you go to the academy?
3     A.    The LAPD Academy in Inglewood.
4     Q.    Did you have to study Learning Domains when you
5  were at the academy?
6     A.    Yes, sir.
7     Q.    I'm assuming you had some instruction on
8  tactics and use of force.
9     A.    Yes.
10    Q.    When did you graduate from the academy,
11 approximately?
12    A.    Approximately, October of 2020 -- I'm sorry --
13 2015.
14    Q.    Where were you first assigned after graduating?
15    A.    West L.A. Division.
16    Q.    Were you assigned to Patrol, initially?
17    A.    Yes.
18    Q.    Did you go through a period of field training?
19    A.    Yes, sir.
20    Q.    How long was that for, approximately?
21    A.    Approximately, six months.
22    Q.    After you completed field training, where were
23 you assigned?
24    A.    77th division.
25    Q.    What time period were you there?

Page 17

1    Q.    Just holding it.

2    A.    No.

3    Q.    The 20 to 25 individuals you saw with guns in

4    their hand, did you shoot any of those individuals?

5    A.    No.

6    Q.    Have you seen suspects with other weapons in

7    their hands, like knives and other objects?

8    A.    Yes.

9    Q.    And has that been on multiple occasions?

10    A.    Yes.

11    Q.    Is one of the commands that you're trained to

12    give if you see a weapon in someone's hand, to "Drop

13    it," if you have time to give that command?

14    A.    Yes.

15    Q.    Other than your firearm, did you have any less

16    lethal tools with you that day, such as a Taser, pepper

17    spray, or a police baton?

18    A.    Yes, sir.

19    Q.    What did you have with you, other than your

20    firearm?

21    A.    A baton, a Taser, and pepper spray.

22    Q.    Do you know what type of baton?  Was it

23    expandable?

24    A.    No, I had the -- the side-handle baton.

25    Q.    Do you know what type of Taser you had?  Was it

Page 18

1    an X2 or something else?

2    A.    I don't recall, sir.

3    Q.    Do you recall if it had two cartridges in it?

4    A.    Yes, sir.  I believe it did.

5    Q.    And was it essentially OC spray that you had?

6    A.    Yes, sir.

7    Q.    Prior to the date of the shooting incident, had

8    you ever used your Taser in the field?

9    A.    Yes, sir.

10    Q.    On how many occasions, approximate?

11    A.    Once.

12    Q.    Was that in the probe mode?

13    A.    Yes, sir.

14    Q.    Or the -- and how about your OC spray?  Had you

15    ever used that in the field before?

16    A.    No.

17    Q.    And how about your baton as an impact weapon;

18    had you ever used that before?

19    A.    No, simply for crowd control.

20    Q.    You told me earlier you were partnered up with

21    Officer Martinez on the date of the incident; is that

22    correct?

23    A.    Yes, sir.

24    Q.    Were you assigned to the same patrol vehicle?

25    A.    Yes, sir.

Page 19

1    Q.    Do you recall who was driving that shift?

2    A.    Yes, sir.

3    Q.    Who was?

4    A.    I was.

5    Q.    Do you recall your shift hours at the time?

6    A.    Yes, sir.

7    Q.    What were they?

8    A.    1845 hours to 0645 hours.

9    Q.    Do you have an estimate as to approximately

10    what time the shooting occurred?

11    A.    Approximately, 7:40.

12    Q.    Was it still light outside?

13    A.    Yes, sir.

14    Q.    And where did the shooting occur?

15    A.    On King and Bronson.

16    Q.    Do you know, generally, which way King Street

17    runs?

18    A.    Yes, sir.

19    Q.    Which way?

20    A.    East and west.

21    Q.    And Bronson's a north-south street?

22    A.    Yes, sir.

23    Q.    I want to ask you about the information you had

24    regarding the call that ended up relating to the

25    shooting.

Page 20

1    Do you recall, generally, what information you

2    had, initially?

3    A.    Yes, sir.

4    Q.    Can you please tell me?

5    A.    Yes, sir.  The information originally was that

6    it was a man with a firearm.  And then we -- we had

7    another call of a man with a stick, possibly lighting

8    something on fire.

9    In regards to the man with the call -- I'm

10    sorry -- the man with the gun, I believe it was

11    brandishing, like he pointed it at someone, or used it

12    in a threatening manner, from my recollection.

13    Q.    Okay.  Was this information you received over

14    the police radio?

15    A.    Yes, sir.

16    Q.    And you said you listened to the dispatch tape

17    recently?

18    A.    I believe last week I did.  Yes, sir.

19    Q.    And when you listened to the dispatch tape, did

20    you hear them saying he had pointed a gun at someone?

21    A.    I don't know if that was from the dispatch tape

22    or if that was from the transcript of the dispatch --

23    like the calls that go into the dispatcher.  I could be

24    getting the two mixed up, but I know that that was

25    something I believed I -- I heard.

Page 21

1    Q.    Okay.  I'm trying my best to focus on
2  information you had at the time.  So your information
3  source would have been primarily the police radio?
4    A.    Yes, sir.
5    Q.    And are you saying you're not sure if they said
6  he was pointing it or not at someone on the police
7  radio, or are you saying they did say that?
8    A.    At this time, I don't recall.
9    Q.    And then regarding the person with a stick, did
10 you have the impression from listening to the police
11 radio, whether that was the same person or two different
12 people?
13   A.    The same person.
14   Q.    Okay.  And there was some description of
15 clothing and hairstyle?
16   A.    Yes, sir.
17   Q.    What do you recall about the clothing
18 information you had?
19   A.    I recall them mentioning either a hoodie or a
20 long sweater, and I recall the dreads.  Like a male,
21 Black, dreads, and a long hoodie or sweater.
22   Q.    Did you have any height or weight information?
23   A.    I don't recall.
24   Q.    Do you recall if you had any age information?
25   A.    I don't recall.

Page 22

1    Q.    Any other information you recall having related
2  to the call, before seeing the potential suspect?
3    A.    That's all I recall right now, sir.
4    Q.    Did you have any information, for example, on
5  the name of the person?
6    A.    No, sir.
7    Q.    Did you know whether or not the person had a
8  criminal history?
9    A.    No, sir.
10   Q.    Did you have any information as to whether the
11 person was under the influence of drugs or alcohol?
12   A.    No, sir.
13   Q.    Did you have any information that the person
14 specifically, had injured anyone?
15   A.    No, sir.
16   Q.    As a law enforcement officer, is part of your
17 job, as you understand it, to respond to calls and
18 information and do some type of assessment or
19 investigation when you can?
20   A.    Yes, sir, when I can.
21   Q.    Sometimes, has it been your experience that
22 information that comes in from callers is accurate, and
23 sometimes it may be inaccurate?
24   A.    Yes, sir.
25   Q.    Where was the individual that ended up getting

Page 23

1  shot when you first saw him?
2    A.    When I first saw him, he was walking westbound
3  on King, on the north side of the street, approximately
4  one block east of Bronson.
5    Q.    And where were you when you first saw him?
6    A.    When I first seen him, I was approximately -- I
7  was on King, approximately one block west of Westside
8  Avenue.
9    Q.    How far was he from you when you first saw him?
10   A.    Approximately, 25 yards.
11   Q.    Did you pull closer to him after first seeing
12 him?
13   A.    Yeah.  We -- I pulled behind him when I first
14 seen him.
15   Q.    And you were driving; correct?
16   A.    Yes, sir.
17   Q.    Was there any discussion you recall with your
18 partner, Officer Martinez, after seeing him, but before
19 Martinez getting out of the car?
20   A.    The conversations that we had was prior to
21 our -- like, on our startup watch, when we first get the
22 car gassed up and everything:  Who's going to be
23 contact, who's going to be cover.
24         So once we observed the suspect, we pretty much
25 just went into, you know, our normal police duties at

Page 24

1  that time.
2    Q.    Who did you understand was going to be the
3  contact officer and who was going to be the cover
4  officer?
5    A.    Originally, Martinez was going to be the
6  contact.
7    Q.    Did that change at some point?
8    A.    Yes, sir.
9    Q.    When did it change?
10   A.    When I noticed there was no compliance.
11   Q.    Then you assumed the role of the contact?
12   A.    I'm sorry, sir.  Can you repeat it?
13   Q.    Sure.  Then did you assume the role of the
14 contact officer?
15   A.    Yes, sir.
16   Q.    And then Martinez would have taken the role of
17 the cover officer?
18   A.    Yes, sir.
19   Q.    And it's my understanding that at some point,
20 you slightly repositioned your vehicle?
21   A.    Yes, sir.
22   Q.    Did you get out initially before repositioning
23 it, if you remember?
24   A.    I recall opening the door, but once I noticed
25 the suspect had been -- like, was walking away from

Page 25

1  Martinez, I then repositioned to try to get us in a
2  position of advantage, and hopefully block his path so
3  that he would go against the fence.
4     Q.   Okay.  Was the individual walking on the
5  sidewalk?
6     A.   Yes, sir.
7     Q.   And your patrol vehicle, obviously, would be in
8  the street?
9     A.   Yes.
10    Q.   Did Martinez get out of your vehicle first?
11    A.   Yes, he did.
12    Q.   And before Martinez got out of your vehicle,
13 what's the closest you think you got to the suspect?
14    A.   The closest that I got to the suspect once
15 Martinez was out of the vehicle.
16    Q.   Yes.  In other words, up to the time Martinez
17 got out of the vehicle.  So at any time before he gets
18 out or at the time he gets out, I'm trying to figure out
19 how close you got to the suspect.
20    A.   Approximately, 15 to 20 feet.
21    Q.   And before Martinez got out of the vehicle, did
22 you see anything in the suspect's hands, either the left
23 hand or the right hand?
24    A.   At that time, no.
25    Q.   And you then saw the suspect continuing

Page 26

1  westbound on King, so that's when you repositioned your
2  vehicle to try to have some tactical advantage?
3     A.   Yes, sir.
4     Q.   Were you watching the suspect prior to getting
5  out of your car, after repositioning?
6     A.   Yes, sir.
7     Q.   And during the time you were repositioning the
8  vehicle, would you have been looking at the suspect
9  through your front windshield or passenger window, or
10 both?
11    A.   Both.
12    Q.   Did you see -- did you see anything in the
13 suspect's hands at that point?
14    A.   No, sir.  Based off of the fact that I was
15 still, essentially, behind him.
16    Q.   At some point, you stop your vehicle?
17    A.   Yes, sir.
18    Q.   And when you stop your vehicle, is the suspect
19 west of you, or how would you describe his position?
20    A.   Northwest of me.  Yes, sir.
21    Q.   Did you hear the suspect say anything before
22 you got out of your vehicle?
23    A.   Yes, sir.
24    Q.   What did you hear the suspect say?
25    A.   I couldn't make it out.  I -- I couldn't

Page 27

1  understand what he was saying.
2     Q.   Did you say anything to the suspect before you
3  got out of your vehicle?
4     A.   Before I got out of my vehicle, no.
5     Q.   Did you hear Martinez say anything to the
6  suspect before you got out of the vehicle?
7     A.   Yes, sir.
8     Q.   What did you hear Martinez say?
9     A.   "Get along the wall and drop whatever you have
10 in your hands."
11    Q.   Okay.  And after you heard Martinez say that,
12 did you look to the hands, to see what he had?
13    A.   As I was -- yes, I did.
14    Q.   And when you looked at his hands for the first
15 time, were you just getting out of your vehicle or had
16 just gotten out?
17    A.   When I -- I'm sorry, sir.  Can you rephrase the
18 question or repeat it?
19    Q.   Sure.  Did you see an object at some point in
20 either one of the individual's hands?
21    A.   At the time of --
22    Q.   At any time.
23    A.   Oh.
24    Q.   At any time.
25    A.   I then seen something in his hands.  Yes, sir.

Page 28

1     Q.   I guess what I'm trying to ask is where you
2  were when you first saw something in his hands?
3     A.   Okay.  When I first seen an object in his
4  hands, I was away from my police vehicle and attempting
5  to get the suspect to go against the wall.
6     Q.   And you had a body-worn camera on your person?
7     A.   Yes, sir.
8     Q.   Did you activate it at some point?
9     A.   Yes, sir.
10    Q.   Do you know when you activated it?  Before you
11 got out of your car or after?
12    A.   I believe it was as I was getting out of my
13 vehicle.
14    Q.   And where was the individual when you told him
15 to get against the wall or words to that effect?
16    A.   He was on the sidewalk.
17    Q.   And where were you?
18    A.   Out of my vehicle.
19    Q.   Were you still on the street?
20    A.   I don't recall.
21    Q.   How far would you say the individual was from
22 you when you told him to get against the wall?
23    A.   Approximately, 10 to 15 feet.
24    Q.   And did you see anything in his hands at that
25 point?

Page 29

1    A.    Yes.

2    Q.    Let's start with the left hand.  Did he have

3  anything in his left hand?

4    A.    I don't recall if it was the left or the right.

5    Q.    Did you ever see a water bottle in either one

6  of his hands?

7    A.    I don't recall a water bottle.

8    Q.    Okay.  The object that you did see that you're

9  not sure which hand it was in, what did the object --

10  what color was it?

11    A.    It was black.

12    Q.    Was it -- was it solid black, from your

13  perspective?

14    A.    Yes, sir.

15    Q.    Were you -- strike that.

16        How far, approximately, was the individual from

17  Bronson, when you saw this object in his hand?

18    A.    Approximately, 20 yards.

19    Q.    And did the person ever turn towards you when

20  he had this object in the his hand?

21    A.    Yes, sir.

22    Q.    And where was Martinez, if you know, when the

23  person -- the suspect turned towards you with this

24  object in his hand?

25    A.    I believe Martinez was directly behind him.

Page 30

1    Q.    Were you trained that if you see what you

2  believe to be a gun in a suspect's hand, one thing you

3  can do is yell out "Gun" to alert your partner.

4        MS. SARMIENTO:  Incomplete hypothetical.

5        You can answer.

6        THE WITNESS:  That is something that we

7  normally do.  Yes, sir.

8  BY MR. GALIPO:

9    Q.    And what's the purpose of that, based on your

10  training?  Just to let your partner know what you're

11  observing?

12        MS. SARMIENTO:  May call for speculation.

13        Go ahead.

14        THE WITNESS:  The purpose -- I'm sorry, sir.

15  Can you repeat it?

16  BY MR. GALIPO:

17    Q.    Not -- not a problem.  Based on your training,

18  what's your understanding of why you should yell out

19  "Gun" if you see a gun in a suspect's hand or on their

20  person?

21    A.    For officer safety.

22    Q.    And did you in this case ever yell out "Gun"

23  when you saw this object in his hand?

24    A.    I -- I told my partner, I was like, "Oh" --

25  like, "Oh, crap.  Do you see that?"

Page 31

1    Q.    Okay.  I'm just wondering if you yelled out

2  "Gun"?  That was my question right now.

3    A.    No, I did not yell out "Gun."  No.

4    Q.    Okay.  You said something like, "Oh, did you

5  see that?", or words to that effect?

6    A.    Yes.

7    Q.    And did your partner say anything in response?

8    A.    Yes.

9    Q.    What did your partner say?

10    A.    My partner said, "It's not a gun" or "I don't

11  think it's a gun."

12    Q.    Okay.  How far was your partner from the

13  suspect when you heard your partner say, "It's not a

14  gun," or words to that effect?

15    A.    My partner was still directly behind him, but

16  approximately 7 feet -- 5, 7 feet.

17    Q.    And if you know, had your partner been out of

18  the car with the suspect for a few seconds before you

19  got out of the car?

20    A.    Yes.

21    Q.    When your partner said, "It's not a gun," did

22  you respond or say anything back to your partner?

23    A.    Yes.

24    Q.    What did you say?

25    A.    "What do you mean it's not at gun?  What is

Page 32

1  it?"

2        I was under the impression that that was a --

3  that it was a firearm.  But when he made that statement,

4  it kind of took me back a little bit.

5    Q.    Generally, do you trust everything that your

6  partner says when you're out working with your partner?

7        MS. SARMIENTO:  Vague.  Incomplete

8  hypothetical.

9        Go ahead.

10        THE WITNESS:  That was my first -- generally,

11  yes.  But that was my first day ever working with Officer

12  Martinez, and Officer Martinez had just finished his

13  probation not too long prior to this incident.

14  BY MR. GALIPO:

15    Q.    And at least from your perspective, you

16  would -- you would not say, "It's not a gun," unless you

17  were sure.  Is that a fair statement?

18    A.    Absolutely.  Yes, sir.

19    Q.    In your training, were you trained that

20  sometimes you have to rely on what your partner says?

21        MS. SARMIENTO:  Vague.  Incomplete

22  hypothetical.

23        Go ahead.

24        THE WITNESS:  Can you repeat it one more time,

25  sir?

Page 41

1    Q.    Okay.
2    A.    Because the last thing I ever want to do is
3 shoot someone that's not armed.
4    Q.    Correct.
5    A.    So based on what he stated, I reassessed the
6 situation.
7    Q.    Right.  Because your partner's telling you it's
8 not a gun, basically?
9    A.    Yes.  But I also know that my partner did not
10 modify the weapon that was in his hand or have any
11 previous contact with him prior to even make a statement
12 like that.  So that kind of threw me when he --
13    Q.    Okay.  But it sounds like you took that
14 statement into consideration, at least in not firing,
15 initially?
16    A.    Yes, sir.
17    Q.    And then when the person was walking away from
18 you, did you think it was appropriate to shoot him at
19 that point?
20    A.    I did not think it was appropriate to shoot him
21 until I seen him blade that weapon towards the officer's
22 vehicle and fire, what I believed to be at that moment,
23 a round at the police vehicle, which, in fact, allowed
24 me to know that it was, in fact, a firearm.
25    Q.    Okay.  I take it if you would have known it was

Page 42

1 not at firearm, you wouldn't have shot; is that fair?
2    A.    Absolutely.
3    Q.    I mean, obviously, you don't want to shoot
4 someone who's unarmed.  Is that generally a fair
5 statement?
6    A.    Yes, sir.
7    Q.    Did you see any muzzle flash coming from that
8 item -- object he had?
9    A.    No, sir.
10    Q.    And you heard two shots; correct?
11    A.    Yes, sir.
12    Q.    And your impression was one of the shots came
13 from the police vehicle?
14    A.    Yes, sir.
15    Q.    What gave you that impression?
16    A.    It was I guess what his body did after the
17 second shot.  After I heard the second shot, his body
18 appeared to be like going down.  It was all so quick.
19         But the way I processed it during that
20 encounter was -- was that the second round had struck
21 him.  And then I -- then, like I said, believed that he
22 was shot.
23    Q.    Okay.  So you believe he was shot and going
24 down before you fired your shot?
25         MS. SARMIENTO:  May misstate the witness's

Page 43

1 testimony.
2         Go ahead.
3         THE WITNESS:  No, sir.  I believe -- I'm sorry.
4 Can you repeat it?
5 BY MR. GALIPO:
6    Q.    Sure.  You told me that you believed the second
7 shot had struck him and he was going down.  Did I
8 understand you correctly?
9    A.    No.
10         MS. SARMIENTO:  Same objections.
11         Go ahead.
12         THE WITNESS:  I believed that the second round
13 hit him, not that he was going down and out of the fight.
14 BY MR. GALIPO:
15    Q.    Okay.
16    A.    I just believed that the second round hit him.
17    Q.    Okay.  So you believed the second shot hit him,
18 just based on his body's response?
19    A.    Yes.
20    Q.    But he did not go down.  You're saying he was
21 still upright?
22    A.    Yes, sir.
23    Q.    And then when you fired your shot, he was still
24 upright?
25    A.    Yes.  And then at that point, he fell.

Page 44

1    Q.    And then after you fired your shot is when he
2 went down?
3    A.    After I fired, I reassessed.  Yes, sir.
4    Q.    And the reason you didn't continue to fire is
5 because he was down to the ground, and, in your opinion,
6 no longer an immediate threat of death?
7    A.    Yes, sir.
8         MR. GALIPO:  Okay.  I think this is a good time
9 that we could take a ten-minute break, if it's good for
10 everyone?
11         THE VIDEOGRAPHER:  All right.  We are off the
12 record.  The time is 2:38 p.m.
13         (Break taken.)
14         THE VIDEOGRAPHER:  We are back on the record.
15 The time is 2:52 p.m.
16 BY MR. GALIPO:
17    Q.    Okay.  So I want to take you back to the time
18 frame when you're just getting out of your vehicle and
19 looking at Mr. Petit.  You know that is his name, at
20 least now?
21    A.    Yes, sir.
22    Q.    To your knowledge, had you ever seen him
23 before?
24    A.    No, sir.
25    Q.    And I think based on what you told me earlier,

Page 45

you had no information about his past; is that fair?

2    A.    No, sir.

3    Q.    Is that correct?

4    A.    Yes, sir.  That's correct.

5    Q.    And are you saying it was difficult to make out

6  what he was saying at times?

7    A.    Yes, sir.

8    Q.    Almost like he was mumbling?

9    A.    Yes, sir.

10    Q.    Did you think that it was possible he had some

11  type of mental health issue?

12    A.    I --

13    MR. BOJORQUEZ:  Objection.  Lacks foundation.

14  Calls for speculation.  Beyond this witness's knowledge

15  and expertise.

16    (Reporter clarification.)

17    MS. SARMIENTO:  And I'll join that objection.

18  BY MR. GALIPO:

19    Q.    I'm just asking your impression, what you were

20  thinking?

21    A.    At the time that --

22    MR. BOJORQUEZ:  Objection.  I'm sorry.

23  Objection.  I think it assumes facts not in evidence.

24    MS. SARMIENTO:  Join.

25  BY MR. GALIPO:

Page 46

1    Q.    You may answer.

2    A.    So you're asking me what I was thinking about,

3  like, his mental status in regards to the --

4    Q.    Yeah.  I'm wondering whether that ever crossed

5  your mind when you saw him, based on his appearance and

6  the fact that he was mumbling, whether you thought maybe

7  this person has some mental health issue?

8    MR. BOJORQUEZ:  Again, objection.  I think --

9    (Simultaneous speakers.)

10    MR. BOJORQUEZ:  I'm sorry.  Again, objection.

11  I think it's vague and ambiguous as to time.  Again, I'll

12  reiterate it lacks foundation.  Calls for speculation.  I

13  believe it's beyond this witness's knowledge and

14  expertise.

15    MS. SARMIENTO:  I'll join the objection.

16  BY MR. GALIPO:

17    Q.    You may answer.

18    A.    At the time of the incident, I didn't think or

19  know anything about his mental status or if he was

20  possibly mentally ill.  I didn't -- I didn't think

21  anything of it at that moment.

22    Q.    Okay.  When he was mumbling, what did you think

23  when he was mumbling?

24    MR. BOJORQUEZ:  So objection.  The question is

25  vague and ambiguous as to, "What did you think."

Page 47

1    MR. GALIPO:  You may answer.

2    MS. SARMIENTO:  Go ahead.

3    THE WITNESS:  I thought he was kind of mocking

4  or -- and being -- not going with the program.

5  BY MR. GALIPO:

6    Q.    Okay.  Did he appear to you to be a transient?

7    A.    Possibly.

8    Q.    What did you see about him that made you think

9  he was possibly a transient?

10    A.    His clothes's weren't the cleanest, and he

11  just -- he kind of had that appearance of someone that

12  could have been a transient.

13    Q.    Do you recall if he was wearing a backpack?

14    A.    Yes, sir.

15    Q.    Was he?

16    A.    Yes, sir.  He was.

17    Q.    Do you recall what type of pants he had on?

18    A.    I don't recall.

19    Q.    Do you recall what type of upper garment he had

20  on?

21    A.    I don't recall.

22    Q.    What would you estimate his age to be?

23    A.    Approximately, 39, 40.

24    Q.    How about his height and weight?

25    A.    Approximately 6 foot, 175.

Page 48

1    Q.    And so when you first got out of your patrol

2  vehicle, are you saying there was a time when he was

3  turned towards you in the street?

4    A.    Yes.  There was a time where -- yes.

5    Q.    And is that when you saw the object in his

6  hand?

7    A.    Yes.

8    Q.    And how long after seeing the object did you

9  hear your partner say, "It's not a gun, bro"?

10    A.    Almost simultaneously.

11    Q.    How far was your partner from you,

12  approximately, when he said, "It's not a gun, bro"?

13    A.    From me?

14    Q.    Yes, from you.

15    A.    3 feet, maybe.  3 to 5 feet.

16    Q.    Obviously, that's something you could hear?

17    A.    Yes, sir.

18    Q.    And for how long a period of time was the

19  person -- Mr. Petit facing in your direction towards the

20  street during that time frame?

21    A.    Approximately, two seconds.

22    Q.    And while he was facing towards you, you could

23  see this object in his hand?

24    A.    Yes, sir.

25    Q.    Did you ever with 100 percent certainty,

```
                                                    Page 69
1                  ERRATA SHEET
2  PAGE/LINE         CHANGE              REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____
```

```
                                                    Page 70
1          DECLARATION OF DEPONENT
2
3          I, _____, say I have read the
4  foregoing deposition and declare under penalty of perjury
5  under the laws of the State of California and all federal
6  laws that my answers as indicated are true and correct.
7
8          Dated this _____ day of _____, 2025, at
9  _____, California.
10
11                    _____
12                    DARYL GLOVER, JR.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

EXHIBIT

B

1          UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                    --oOo--

4

5    ASHLYN PETIT, as successor-in
     interest to JERMAINE PETIT, deceased,
6
              Plaintiff,
7
     v.                            Case No.
8                                  2:23-cv-00789-CJC (PVCx)

9    CITY OF LOS ANGELES, a municipal
     entity; OFFICER DARYL GLOVER, JR.;
10   SERGEANT BRETT HAYHOE;
     and DOES 1 through 10, inclusive,
11
              Defendants.
12   _____/

13

14

                STENOGRAPHIC REPORTER'S TRANSCRIPT OF
15
            REMOTE VIDEO DEPOSITION OF BRETT HAYHOE
16
                   THURSDAY, AUGUST 28, 2025
17
                    **UNSEALED PORTION**
18

19   Reported Stenographically by:

20   KIMBERLY D'URSO, CSR 11372, RPR

21   Job No.  19685

22

23

24

25

1    approximately one to two seconds.

2        Q.    At the time that you gave your interview or

3    statement, were you aware that there had been another

4    shooter?

5        A.    Yes.

6        Q.    And did you know who the shooter was at the

7    time you gave your statement?

8        A.    Yes.

9        Q.    What was your understanding?

10       A.    My understanding was that the other -- the

11   other involved officer was Officer Glover at the time.

12       Q.    So let's start a little bit at the beginning.

13             You had certain information related to this

14   call?

15       A.    That's correct.

16       Q.    Can you generally tell me what information you

17   had?

18       A.    The information that I had was based on radio

19   call comments of -- that described an ADW suspect that

20   was armed with a black semi-automatic handgun.  And the

21   individual, the suspect, was described as a male, Black,

22   with dreadlock style hair, and olive green long-sleeve

23   shirt, black pants.

24             And I think additional comments were --

25   described the suspect as also lighting miscellaneous

Petit v. City of Los Angeles, et al.
Focus Litigation Solutions

Page: 14

1    things on fire and carrying a stick.

2        Q.    Any other information you recall having, other

3    than what you've told me so far?

4        A.    That the individual threatened the PR with a --

5    with a handgun, and then the general description of the

6    last seen location of where the suspect was.

7        Q.    Did you have the individual's name?

8        A.    No.

9        Q.    Any information of any prior criminal history

10   before that day?

11       A.    No.   No, sir.

12       Q.    Any information that the individual had

13   physically injured anyone?

14       A.    No, sir.

15       Q.    Where was the individual when you first saw the

16   individual?

17       A.    When I first saw the individual, I was driving

18   in my black-and-white vehicle, as I saw him walking on

19   foot as I was driving eastbound, on Martin Luther King

20   Boulevard, passing the residential street that he was

21   walking on.

22            And he was walking southbound on the east

23   sidewalk of Dayton and -- I belive it's Degnan Avenue,

24   and it's spelled D-E-G-N-A-N.   And he was walking south

25   on the east sidewalk, and I was travel eastbound on

1    A.   I would say it would not have been more than

2  ten seconds.

3    Q.   Okay.  So I want to talk to you about this time

4  period, this approximate 30 yards from when you first

5  started paralleling him, and this is before he got to

6  Bronson.

7        Do you have that in mind?

8    A.   Yes, sir.  Yep.

9    Q.   Then we're going to talk about the shooting,

10 and, you know, what you observed immediately before.

11    A.   Okay.

12    Q.   It sounds like before you started paralleling

13 him, you, yourself, did not see an object in either one

14 of his hands.  Is that fair?

15    A.   That's fair.

16    Q.   And then once you started paralleling him, as

17 you're going 2 to 3 miles an hour, and he's walking on

18 the sidewalk, did you see anything in his hands at that

19 point?

20    A.   Well, just to correct the -- the record,

21 when -- when I started paralleling him, he was now -- he

22 began to start jogging, and moving at a quicker pace,

23 and not walking.

24    Q.   Okay.  So you had to increase your speed to

25 keep up with him?

Petit v. City of Los Angeles, et al.
Focus Litigation Solutions

Page: 33

1       A.    I just had to continue moving.

2       Q.    Okay.

3       A.    I was not stationary.  I could not remain

4   stationary because of his movements.

5       Q.    I get that.  You were trying to track him the

6   best you could?

7       A.    That is correct.  Yes.

8       Q.    So this last 90 feet that you were paralleling

9   him before Bronson, did you see any object in the either

10  one of his hands?

11      A.    At one point, yes.

12      Q.    This is before he got to Bronson?

13      A.    Yes.

14      Q.    How far was he from Bronson when you saw an

15  object in his hands?

16      A.    Just a -- just a few feet.  It was very quick.

17      Q.    So prior to seeing this object in his hands a

18  few feet from Bronson, that prior 80 feet or so, did you

19  see anything in his hands prior to that?

20      A.    No, sir.

21      Q.    Were you able to see his hands as you were

22  viewing him?

23      A.    I could see his hands, but I could not

24  determine if there was an object in his hands.

25      Q.    Did you, in your mind, think that he had

1    and the two officers, prior to encountering this

2    individual?

3    BY MR. GALIPO:

4         Q.   Yes, that is the question.

5         A.   Okay.  So the question would be no, I did not

6    have a -- I did not tell the officers how to deploy or

7    how to exit the vehicle, or I did not tell them what to

8    do.  These are conversations.  These are trained

9    officers in the academy.

10             They -- they already have or are expected to

11    already have had a conversation on who's contact and

12    who's cover.  That's not my role to tell a trained

13    officer on how to safely or tactically deploy.

14             That is something that is expected of them

15    prior to encountering any individual that they come

16    across.  So I did not tell them how to exit their

17    vehicle or deploy on the suspect.

18        Q.   And did you tell them that you were going to

19    pull forward, ahead of their location?

20        A.   I did not tell them that, no.

21        Q.   What was your thinking as -- why did you pull

22    forward to the intersection in the manner you did?

23        A.   So my initial mindset, as a supervisor there,

24    and a one-man vehicle, as opposed to a two-man car that

25    is initially expected to encounter a potentially armed

Petit v. City of Los Angeles, et al.
Focus Litigation Solutions

Page: 39

1    suspect, was to remain back in a supportive role, which

2    means that I would put out pertinent information on the

3    radio, if necessary; request additional resources, if

4    necessary.

5           But my initial plan with myself was not to

6    engage unless it was necessary, whether I believed it

7    was necessary to engage in the incident.  That's

8    expected of me as a supervisor, and to only -- and only

9    interject if necessary.

10           So the reason why I pulled forward was, it

11   appeared to me that the officers were attempting to gain

12   voluntary compliance from the individual that was the

13   suspect at this -- in this incident.  And it appeared to

14   me, based on hundreds of pedestrian stops that I've --

15   that I've engaged in over the years -- and -- and -- and

16   it becomes fairly clear fairly quickly whether an

17   individual is attempting to elude officers.

18           So once I determined or it appeared this

19   individual was -- was attempting to evaded the officers

20   and the situation was beginning to escalate, in my

21   opinion, that is when I made the determination to

22   interject myself.  I know the area very well.

23           There's not only a danger to the officers that

24   were outside of cover, there -- there -- there are other

25   dangers in the area.  In terms of public safety, it's a

Petit v. City of Los Angeles, et al.
Focus Litigation Solutions

Page: 40

1    residential neighborhood to the north.  It's a busy

2    street.  Martin Luther King Boulevard is a very busy

3    street.  And there's also a school that's on the

4    opposite side of the street, within feet of where

5    incident took place.  And there's a mall, Crenshaw Mall,

6    which is only two blocks away.

7            So not only did I engage the -- did I interject

8    myself into the situation because of the officers'

9    personal safety, I did so in -- in regards to public

10   safety, as well.

11       Q.   Okay.  Let me just ask you a few more questions

12   and then we can take our first break.

13       A.   Okay.

14       Q.   You had your gun pointed out the window for

15   some period of time before you shot; is that correct?

16       A.   Yes, sir.

17       Q.   For how long, approximately, did you have your

18   gun pointed out the window of your car before you shot?

19       A.   So I would have had my -- my -- I unholstered

20   my gun and trained my weapon on the individual

21   immediately upon encountering him at the mid-block area

22   where we discussed, where I was 25 to 30 feet away.

23       Q.   So would you have had your gun pointed out your

24   window for approximately nine seconds?

25       A.   Yes, sir -- or less than ten seconds.  In -- in

Petit v. City of Los Angeles, et al.
Focus Litigation Solutions

Page: 41

```
 1  that range.  However long it took from me not seeing his
 2  hands, from the point to where I recognized the item I
 3  believed to be a firearm.
 4       Q.   And this object that you saw, which hand was it
 5  in, of his?
 6       A.   I don't recall.
 7       Q.   How much time passed from you seeing the object
 8  to you firing your first shot?
 9       A.   I'm sorry.  Repeat one more time?
10       Q.   How much time passed from you seeing the object
11  in his hand to you firing the first shot?
12       A.   It just happened so quickly, simultaneously.
13  Probably, one to two seconds.  No more than that, once I
14  recognized the item, what I believed to be a handgun
15  pointed in my direction, so...
16       Q.   Was the upper body of Mr. Petit facing
17  westbound when you fired your first shot?
18       A.   I don't recall whether he was bladed or facing
19  west.
20       Q.   How about the second shot?  Do you recall if it
21  was bladed or facing due west?
22       A.   Yeah, I don't recall the exact second or half a
23  millisecond.  I don't recall.
24       Q.   Did you give any verbal warning you were going
25  to shoot?
```

1    in the street at that point.

2         Q.   Did you make any -- did you give him any

3    commands after you saw a few inches of the object, but

4    before the shooting?

5         A.   No.

6         Q.   It sounds like the commands you gave were

7    before you saw the object.  Is that correct?

8         A.   Yes.

9         Q.   Did you have any information that the

10   individual in this case, Mr. Petit, had seriously

11   injured or killed anyone before you saw him?

12        A.   No, sir.

13        Q.   Did you recognize him from any prior contacts?

14        A.   No, sir.

15        Q.   Did you have an impression as to whether he was

16   possibly homeless or transient?

17        A.   I'm sorry.  Did I have any information that he

18   had --

19        Q.   Impression -- just either information or

20   impression, from observing him?

21        A.   I did have an initial -- my initial observation

22   when I passed him, my first observation upon seeing him,

23   which was very, very quick, a second, a couple seconds'

24   worth of observation was that he was possibly a

25   transient.

1              DECLARATION OF DEPONENT

2

3         I, _____, say I have read the

4    foregoing deposition and declare under penalty of perjury

5    under the laws of the State of California and all federal

6    laws that my answers as indicated are true and correct.

7

8         Dated this _____ day of _____, 2025, at

9    _____, California.

10

11                    _____

12                    BRETT HAYHOE

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT

C



# COUNTY OF LOS ANGELES
# DEPARTMENT OF MEDICAL EXAMINER

1104 N. MISSION RD, LOS ANGELES, CALIFORNIA 90033



Odey C. Ukpo, M.D., M.S.
Chief Medical Examiner

## DEATH INVESTIGATION SUMMARY

**Medical Examiner Case Number:** 2024-12394
**Decedent Name:** PETIT, JERMAINE CLODOR

**Pronounced date/time:** 08/04/2024 1:50:00 PM
**Date of examination:** 08/06/2024
**Deputy Medical Examiner:** Dr. Young, Kevin
**Forensic Technician:** Morris, Ted

---

**CAUSE OF DEATH A:** UNDETERMINED (SKELETONIZED REMAINS)
**OTHER SIGNIFICANT CONDITIONS:** HISTORY OF SUBSTANCE USE DISORDER, ALCOHOL USE, POST-TRAUMATIC STRESS DISORDER, SCHIZOPHRENIA
**MANNER OF DEATH:** UNDETERMINED
**HOW INJURY OCCURRED:** UNKNOWN. NO EVIDENCE OF FOUL PLAY.

---

Dr. Young, Kevin
Deputy Medical Examiner
Completed On: 08/07/2024 11:15 PM

Please call (323) 343-0518 should you have any questions after reviewing this material.

**Case Num:** 2024-12394          **Decedent Name:** PETIT, JERMAINE CLODOR          **Age:** 41 y

## Medical Report Summary

1. Full examination of skeletonized human remains.
   a. Appears complete and intact in about 5 layers of clothes
   b. No soft tissue/organs present
   c. No antemortem trauma seen
2. Metal hardware plate on left mandible
3. Old mushroomed large caliber bullet with thick green crusty corrosion partially protruding from the inner surface of the left posterior 1st rib, submitted to evidence.

## Summary and Opinion Narrative

Cause and manner of death are undetermined due to skeletonization.
No evidence of foul play.

THE DECEDENT HAS A presumed HX OF SCHIZOPHRENIA, PTSD, AND SUBSTANCE ABUSE. HE WAS SHOT IN JULY 2022 IN AN OFFICER INVOLVED SHOOTING, ON HIS SHOULDER, (POSS THE LEFT) AND RECEIVED TREATMENT AT CEDARS SINAI MC. HIS USUAL DOCTOR IS AT THE VA. HE'S AN AIRFORCE VETERAN. THE DECEDENT WAS LAST KNOWN ALIVE IN OCTOBER/NOVEMBER 2023. HE WAS FOUND INSIDE HIS OWN RESIDENCE. THE HOME HAD NO FURNITURE. THE DECEDENT WAS SEEN LYING SUPINE IN ONE OF THE BEDROOMS. THERE WERE EMPTY WINE BOTTLES EVERYWHERE AS WELL AS BUTANE LIGHTERS. THE DECEDENT IS SKELETONIZED AND FULLY DRESSED IN MULTIPLE LAYERS OF CLOTHING.

## Decedent Identification

- Two unique patient identifiers reviewed
  - Same As Decedent Name
    - Decedent Name: PETIT, JERMAINE CLODOR
  - Case Num: 2024-12394

**Phenotypic Sex**
  - Male

**Type of examination**
  - Partial
    - Other

**Form Sections**
  - Decedent Identification
  - Prior Postmortem Procedures
  - External Examination
  - Evidence Of Traumatic Injury
  - Internal Examination
  - Male Reproductive Tract
  - Musculoskeletal System
  - Examination Procedures And Ancillary Testing

- **Exam Start:** 08/06/2024 12:15

## Prior Postmortem Procedures

- Radiology Reviewed: Yes
  - X-ray
  Interpretation: Shows deformed bullet.

- Organ/Tissue Donation: No

- Mortuary Preparation: No

## External Examination

**General**
  Other: Skeletonized

**Race**
  Other: Skeletonized

**Phenotypic Sex**
  - Male

**Body Weight and Height**
  - Weight: 34 lb
  - Height: 72 in
  - BMI: 4.6 lb/in2

**Extremities**
  Other Extremities: Skeletonized

**Skin**
  Other Skin Findings: Skeletonized
  - Scars
  Other Scars Description: Skeletonized

**Tattoos**
  Other tattoos findings: Skeletonized

**Hair**
  - Long

**Facial hair**
  - Beard

**Hair color**
  - Brown

**Eye Color**
  - Other
    Description: Skeletonized

**Sclerae**
  - Other
    Description: Skeletonized

**Conjunctival Petechiae**
- Other
  Description: Skeletonized

**Facial petechiae (i.e. non-conjunctival)**
  Other: Skeletonized

**Ears**
  Other: Skeletonized

**Nose**
- Other
  Description: Skeletonized

**Oral cavity**
- Dentition: Good Dentition
- Frenulae and Mucosae: Other
  Description: Skeletonized

**Neck**
- Normal
  Other: Skeletonized

**Chest**
- Normal
  Other: Skeletonized

**Abdomen**
- Normal
  Other: Skeletonized

**Back**
- Unremarkable
  Other: Skeletonized

**External genitalia**
- Male

**Evidence of medical intervention/therapy at examination**
- None

**Postmortem Changes**
- Livor mortis: Indiscernible
- Rigor mortis: Absent

  **External decomposition changes**
  Other External Decomp Changes: Skeletonized

  **Internal Organs and Tissue**
  Other Internal Organs and Tissue: Skeletonized

---

## Evidence of traumatic injury

**None**

## Internal Examination

**Body Cavities**
Other: Skeletonized

## Male Reproductive Tract

**Prostate**
Other: Skeletonized

**Testes**
Other: scrotum present

**Breast Tissue**
Other: Skeletonized

## Musculoskeletal System

**Bony Framework**
- Normal

**Vertebral column and Ribs**
- Normal Curvature

**Ribs**
- Absent of Abnormalities

**Vertebral Bodies**
- No Fractures

## Examination Procedures and Ancillary Testing

**Photography Taken**
- Yes
  - Photos taken prior to the examination

**Special Dissection**
- None

**Clothing Reviewed by DME**
- Yes
  Description: about 5 layers of clothing

**Tissue retention**
Other: Skeletonized

**Histology Key**
- Not Applicable

**Additional Samples Taken**

- Hair

**Ancillary testing**

- Radiology

*Please see Prior Postmortem Procedures Radiology section for details.*

*℥*

Dr. Young, Kevin
Deputy Medical Examiner
Completed On: 08/07/2024 11:15 PM

COUNTY OF LOS ANGELES

DEPARTMENT OF MEDICAL EXAMINER

**27**

Decedent: PETIT, JERMAINE CLODOR

Case Number: 2024-12394

Skeletonized male



Dreddlocks

Beard
- old bullet
recovered

24-12394

-12394

Doe, und 357



Date: 08/06/2024 12:15:00 PM

8/7/24

Dr. Young, Kevin
Medical Examiner

(REV. 9/23)



# COUNTY OF LOS ANGELES
# DEPARTMENT OF MEDICAL EXAMINER

1104 N. MISSION RD., LOS ANGELES, CALIFORNIA 90033

"Enriching Lives"

Odey C. Ulpo, M.D., M.S.
Chief Medical Examiner



Case Number: 2024-12394 - Decedent's Name: PETIT, JERMAINE CLODOR

| COUNTY OF LOS ANGELES | | INVESTIGATIVE SUMMARY REPORT | | DEPARTMENT OF MEDICAL EXAMINER |
|---|---|---|---|---|

| 1 | APPARENT MODE | Undetermined | CASE NO 2024-12394 |
|---|---|---|---|
| | SPECIAL CIRCUMSTANCES None | | CRYPT G-380 |

| LAST, FIRST MIDDLE PETIT, JERMAINE CLODOR | | | | | AKA | | | # 2024-357 |
|---|---|---|---|---|---|---|---|---|

| ADDRESS 1726 Sierra View Avenue | | | | | | CITY Lancaster | | STATE California | ZIP 93535 |
|---|---|---|---|---|---|---|---|---|---|

| SEX Male | RACE APPEARS Black | DOB | AGE 41 y | HGT 72 in | WGT 34 lb | EYES unknown | HAIR Black | TEETH Natural | FACIAL HAIR No | ID VIEW No | CONDITION SKELETONIZED |
|---|---|---|---|---|---|---|---|---|---|---|---|

| MARK TYPE | MARK LOCATION | MARK DESCRIPTION |
|---|---|---|
| | | |

| RELATIONSHIP Daughter | | | PENDING BY | DATE 8/7/2024 | TIME 15:20:00 |
|---|---|---|---|---|---|

| ID METHOD Body X-rays | | | | | |
|---|---|---|---|---|---|

| L.A. # | MAIN # | CII # | FBI # | MILITARY # | POB |
|---|---|---|---|---|---|

| IDENTIFIED BY NAME(PRINT) Desantis, Mark | RELATIONSHIP | PHONE | DATE 8/7/2024 | TIME 12:45:00 |
|---|---|---|---|---|

| PLACE OF DEATH/PLACE FOUND Residence | ADDRESS OR LOCATION 1726 Sierra View Avenue | CITY Lancaster | ZIP 93535 |
|---|---|---|---|

| PLACE OF INJURY | AT WORK No | DATE | TIME | LOCATION OR ADDRESS | ZIP |
|---|---|---|---|---|---|

| DOD 8/4/2024 | TIME 13:50:00 | FOUND OR PRONOUNCED BY LACFD ENG 117, DIAZ, |
|---|---|---|

| OTHER AGENCY INV OFFICER LASD LANCASTER | PHONE 661-948-8466 | REPORT No 024-12132-1135-491 |
|---|---|---|

| TRANSPORTED BY Miranda, Dustin | DATE 8/4/2024 | TIME 20:04:00 |
|---|---|---|

| FINGERPRINTS? No | CLOTHING Yes | PA RPT No | MORTUARY |
|---|---|---|---|

| MED EV No | INVEST PHOTOS# 59 | SEAL TYPE | HOSP RPT No |
|---|---|---|---|

| PHYS EV Yes | | PROPERTY? Yes | HOSP CHART No |
|---|---|---|---|

| SUICIDE NOTE No | | | PF NO |
|---|---|---|---|

SYNOPSIS
THE DECEDENT IS BELIEVED TO BE: JERMAINE CLODOR PETIT, 08/20/1982, WHO RESIDES ALONE AT THIS RESIDENCE. HE HAS A HISTORY OF SCHIZOPHRENIA, POST TRAUMATIC STRESS DISORDER, AND SUBSTANCE ABUSE. HE WAS SHOT IN JULY 2022 IN AN OFFICER INVOLVED SHOOTING, ON HIS SHOULDER, (POSS THE LEFT) AND RECEIVED TREATMENT AT CEDARS SINAI MEDICAL CENTER. HIS USUAL DOCTOR IS AT THE VA. HE'S AN AIRFORCE VETERAN. THE DECEDENT WAS LAST KNOWN ALIVE IN OCTOBER/NOVEMBER 2023. HE WAS FOUND INSIDE HIS OWN RESIDENCE. THE HOME HAD NO FURNITURE. THERE WERE SPIDERWEBS AND SPIDERS EVERYWHERE THROUGHOUT THE RESIDENCE. THE DECEDENT WAS SEEN LYING SUPINE IN ONE OF THE BEDROOMS. THERE WERE EMPTY WINE BOTTLES AND BUTANE LIGHTERS SEEN THROUGHOUT THE HOME. THE DECEDENT IS SKELETONIZED AND FULLY DRESSED IN MULTIPLE LAYERS OF CLOTHING. HE WAS WEARING A BEANIE. EYE COLOR IS UNABLE TO BE DETERMINED DUE TO SKELETALIZATION. HE HAD DREADLOCKS. NO OBVIOUS TRAUMA WAS SEEN.



# COUNTY OF LOS ANGELES
# DEPARTMENT OF MEDICAL EXAMINER

1104 N. MISSION RD, LOS ANGELES, CALIFORNIA  90033

Case Number: **2024-12394** - Decedent's Name: **PETIT, JERMAINE CLODOR**



Odey C. Ukpo, M.D., M.S.
Chief Medical Examiner

"Enriching Lives"



# COUNTY OF LOS ANGELES
# DEPARTMENT OF MEDICAL EXAMINER

1104 N. MISSION RD, LOS ANGELES, CALIFORNIA 90033

Case Number: 2024-12394 - Decedent's Name: PETIT, JERMAINE CLODOR



Odey C. Ukpo, M.D., M.S.
Chief Medical Examiner

| COUNTY OF LOS ANGELES | **Investigator's Narrative** | DEPARTMENT OF MEDICAL EXAMINER |

## Information Sources:

Deputy Torres #679947: Los Angeles County Sheriff's Department Lancaster, 661-948-8466

████████ Cousin, ████████

On scene investigation

## Investigation:

This death was reported to our office on 08/04/2024 at 1442 hours.
I was assigned the call at 1502 hours by Investigator Benavidez-Parraz.
I arrived to the scene at 1652 hours and cleared the call at 1805 hours.
The decedent was transported to the Forensic Science Center by Forensic Attendant Miranda.
Criminalist callout criteria was reviewed and not met for this case.
The decedent is believed to be: Jermaine Clodor Petit, date of birth: 08/20/1982, sole resident of this residence.

## Location:

Location of Death: 1726 Sierra View Avenue, Lancaster, California 93535    County Los Angeles

## Informant/Witness Statements:

Deputy Torres gave me the following information: The decedent is believed to be Jermaine Clodor Petit, ████████ California identification number:████████ Mr. Petit is the owner of this home and is believed to live alone. He is an Air Force veteran. Mr. Petit had not been seen or heard from since October 2023. Today, 08/04, Mr. Petit's cousin and mother decided to come check on him. They entered the residence via the unlocked front door and found him dead in one of the bedrooms. 911 was called; deputies from the Los Angeles County Sheriff's Department Lancaster station as well as paramedics from the Los Angeles County Fire Department Engine 117 were dispatched to the scene. Death was determined at 1350 hours. Mr. Petit had a history of alcoholism and substance abuse.

████████ gave me the following information: Mr. Petit has a history of Post Traumatic Stress Disorder, schizophrenia, and substance abuse. He often would disappear for periods of time and then reappear when he was ready. This residence is his; he lives alone. Mr. Petit was shot by the police in July 2022. He was reportedly shot in the back and hospitalized. The decedent recovered, was in jail, and then released to a program at the VA. He was last known alive in October 2023. His phone went dead in November 2023. ████████ and the decedent's mother decided to come check on him today. They had reportedly requested welfare checks, but Mr. Petit was never found.

## Scene Description:

The residence was in poor condition. There was no furniture in any of the rooms. There was trash littered throughout the home including numerous wine bottles, lighters, food, and clothing. The walls were written on. There were spiderwebs and spiders found throughout the home. The floors were grimy.

The decedent was found in the only bedroom downstairs. He was lying supine near the back of the door. He was close to the back of the door, but far enough that it was able to be opened to allow for entry. His head was pointing in an easterly direction and his feet were pointing west. His arms were bent at the elbows and his hands were resting on his chest. His legs were extended straight.

The residence was locked and secured at the completion of this field investigation.

## Body Examination:

The decedent is skeletonized. He had black dreadlocks. There was no tissue present. He was wearing multiple layers of clothing: four t-shirts, one sweatshirt, two socks, two shoes, four pairs of pants, one hat, and two belts. No obvious evidence of trauma was seen.

## Identification:

The decedent was initially unidentifiable and was issued Undetermined Doe #357. He was later positively identified by X-ray comparison analysis as Jermaine Clodor Petit, ████████

Generated by: Benavidez-Parraz, Ryan at 8/30/2024 1:09:26 AM



# COUNTY OF LOS ANGELES
# DEPARTMENT OF MEDICAL EXAMINER



1104 N. MISSION RD, LOS ANGELES, CALIFORNIA 90033

"Enriching Lives"

Odey C. Ukpo, M.D., M.S.
Chief Medical Examiner

Case Number: 2024-12394 - Decedent's Name: PETIT, JERMAINE CLODOR

**Next of Kin Notification:**

The decedent's daughter, ▮▮▮▮▮▮ was formerly notified of the death once he was positively identified.

**Tissue Donation:**

The decedent is not a viable candidate due to the time lapsed since death.

**Autopsy Notification:**

No autopsy requests.

**Evidence:**

Projectile collected on 2024-08-07, at approximately 12:55:00 hours - Deputy Medical Examiner - Dr. Young, Kevin

Investigator: Navarro, Marleen
Inv. Report Date/Time: 8/28/2024 at 14:23:00

Reviewed By: Benavidez-Parraz, Ryan
Reviewed Date/Time: 8/30/2024 at 01:09:00