UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE OTIS D. WRIGHT, U.S. DISTRICT JUDGE


JERMAINE PETIT, et al.,          )
                                 )
          PLAINTIFFS,            )     CASE NO.
                                 )
          vs.                    )     CV 23-00789-ODW
                                 )
CITY OF LOS ANGELES,             )
et al.,                          )     VOLUME 2
                                 )     PAGES 112 TO 349
          DEFENDANTS.            )
_____)


REPORTER'S TRANSCRIPT OF
JURY TRIAL DAY 2
WEDNESDAY, FEBRUARY 18, 2026
8:58 A.M.
LOS ANGELES, CALIFORNIA


_____

MIRANDA ALGORRI, CSR 12743, RPR, CRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, SUITE 4455
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

**EXHIBIT C, PAGE 1 OF 15**

120

six months before the shooting, six months before -- and these records are from Cedars-Sinai.  These are the records where he was taken after the shooting.  These are their records.

THE COURT:  Okay.

MR. ROTHANS:  But this is dated six months before the shooting.  It says, "39-year-old male with history of psychotic disorder and substance abuse -- meth, cocaine, ETOH -- who presents for psychiatric evaluation in the context of a court-ordered admission to the domiciliary.  He was high on methamphetamine and saw police officers.  He ran away, was chased, not thinking rationally.  Currently in veterans' court and is told to engage in substance use treatment.

"The patient has a long history of psychosis" -- please understand six months before the shooting.  "Patient has long history of psychosis since his mid 20s in the context of active crystal meth use.  He believes this is substance induced.  Describes that he gets into an alternate reality, but it's hard to nail him down with the actual psychotic symptoms."

It also goes on, and I'm not going to read pages and pages, but a couple more sentences.  Six months before the shooting.

"Crystal methamphetamine is his drug of choice but has been using drugs since he was 13 years old.  After coming home from the military, he started using cocaine, then crack and then he found methamphetamine cheaper and felt better

**EXHIBIT  C,  PAGE 2 OF 15**

not talking about --

MR. GALIPO:  And we dropped, as you recall, negligence.  So it couldn't come in under the theory of comparative negligence, and what was he doing and why is irrelevant now.

And, third, we're only claiming physical pain and suffering.  So for them to say that he used drugs a year later after he was shot and somehow that affected his pain and suffering while he was in the hospital, clearly not on drugs, other than the medications they're giving him, is unfair and inaccurate and should be excluded under 403.

THE COURT:  Well, my primary consideration was that we don't -- well, there's two of them now, actually.  The jury selection, it could very well be that if and when this information about his drug use from the time he was a kid comes out, that that may affect the attitudes of some of the people who are now sitting on the jury and maybe -- maybe, I don't know, one-by-one we may need to talk to each one of these jurors.

And, yes, I was worried about -- I was worried about the defense basically saying that the reason that he was shot was because he realized that he was guilty of having committed some crime and he was trying to avoid arrest and blah, blah, blah.  And that probably is completely wrong, that there is another explanation for that.

**EXHIBIT  C,  PAGE 3 OF 15**

And I'm really troubled by the fact that -- I say "we." I have been proceeding along this path with, I'll say, incomplete information that I think had I known about what was going on with him six months before the shooting, I may have looked at a lot of these things differently.

So I know what I should do. I know I should declare a mistrial.

MR. GALIPO: From the plaintiff's perspective, we think the Court's ruling is correct, and we think the Court should only revisit it if, during the course of the trial, the Court feels the door has been opened or is somehow now relevant and the Court is satisfied that under 403 the unfair prejudice outweighs the probative value.

THE COURT: Yes, Mr. Rothans.

MR. ROTHANS: Thank you, Your Honor.

First of all, I'm looking at document 154 from the Court's docket, which is the minute order following the final pretrial conference.

As to plaintiff's Motion in Limine 3, the Court noted granted as to historic drug use, denied without prejudice. As to drug use at the time of the shooting, there was no ruling.

So when counsel says, well, we agree with the Court's ruling, there was no ruling, number one, on post-discharge drug use because it wasn't in the motion. At

least that's what the Court concluded.

So to say that it's already been ruled on and let's not revisit it, there was no ruling.  Look at Document 154 of the docket.

Number two, counsel suggests it's hearsay.  I think we all know that under FRE Rule 803(3), then existing mental, emotional or physical condition records are an exception to the hearsay rule, not to mention business records exception.  So they certainly fall within two exceptions to the hearsay rule.

And then counsel suggests that they're only claiming physical pain and suffering.  Well, that's not what their expert Dr. Omalu said.  He says under oath and in his report that schizophrenia and PTSD were exacerbated by this shooting.  And the Court needs to know Dr. Omalu was not given any of the prior records prior to Cedars-Sinai prior to the shooting.

And even more importantly, Judge, Dr. Omalu, their forensic pathologist, wasn't even given records post-shooting.  He's talking about exacerbation.  He's talking about behavior after discharge from Cedars.  He didn't even have the records.  He wasn't given those records.

THE COURT:  What do you think of the suggestion of simply declaring a mistrial and beginning with a whole new jury?

**EXHIBIT  C,  PAGE 5 OF 15**

hospital.

THE COURT:  On the pain and suffering issue.

MR. GALIPO:  Right.  On pain and suffering only.

And I'm saying I still think it should be excluded.  However, let's see how our evidence is presented.

THE COURT:  Okay.  And revisit this.

MR. GALIPO:  And then you could say, okay, now I think it's fair for them to get into that or, no, I still don't because of the way the case has been presented.  They didn't talk about these issues you were concerned about, Mr. Rothans, therefore, I don't agree that it's relevant.  The door has not been opened, in my opinion.

THE COURT:  All right.

MR. GALIPO:  So that's how I would request we proceed.

THE COURT:  The offer has been made to both of you, you know, to go the mistrial route, and neither one of you apparently want to do that.

So we have an alternative way to proceed, and we can do that.  You know, let's see how the evidence unfolds, and we can revisit this issue down the road.

MR. GALIPO:  Yes.  Correct, Your Honor.

THE COURT:  Okay.  That's fine.

Yes, sir.

MR. BOJORQUEZ:  Thank you, Your Honor.

**EXHIBIT  C,  PAGE 6 OF 15**

Just one other alternative I think is possible. I think what the Court -- I don't know how we're going to avoid and how he's going -- how plaintiff is going to prove the damages if they're just going to talk about from July 18th until August 8th when he was released, because anything beyond that is going to obviously initiate these issues regarding the drug abuse and the drug history.  And the drug history is naturally going to have to come in because it sets a basis or a foundation as to how do you evaluate him after the incident versus prior to the incident.  So those --

THE COURT:   How do you evaluate him?

MR. BOJORQUEZ:   How you evaluate, meaning Mr. Petit and his whatever tried allegations of damages that he's suffered as a result of the shooting, how do you really excise the prior experience and exposure of his drugs with then how he's post-shooting.

Essentially the way that the defense at least is looking at it is that, you know, the -- especially since the early on, six months earlier in January, there's a consistency in the sense of his troubles that he's dealt with, his problems that he's acknowledging and talking to medical providers after the shooting are very consistent with what you had back in January, for example, of 2022.

So I think the Court had stated it would allow all the information in which I think is the correct process.  I

**EXHIBIT  C,  PAGE 7 OF 15**

think the concern about a mistrial, I think what the Court had suggested and I think what at least the City's perspective would be, is that the jurors that we have now, rather than declaring a mistrial, because we have come as far as we have, would the Court be willing to entertain questioning the jurors to see whether or not any of these people, the issues that Mr. Galipo feels are concerning to him, let's figure out if these are going to be an issue that's going to change the dynamics of their perspective and put them into a position where they no longer could be fair and impartial. Because I think we don't know that yet. I don't think -- it's not going to take too much time to do that.

But that's an appropriate manner of trying to resolve the issue and seeing if we can avoid ultimately a mistrial, Your Honor. So that would be the defense --

THE COURT: There's a couple of ways of looking at it. Yes, that would absolutely address my concerns that cause me to mention the word "mistrial." But both sides apparently are not anxious to go that way anyway. So it looks like both sides are waiving their right to explore -- not explore, but actually implement that particular remedy. No one wants a mistrial if I'm understanding.

MR. BOJORQUEZ: Correct.

MR. GALIPO: That's correct, Your Honor.

THE COURT: Okay.

**EXHIBIT C, PAGE 8 OF 15**

had all these problems for that time.

THE COURT:  You know what, I'd like to have them all sitting here.  I wish they had been sitting here throughout the entire trial.  I do.  And I would ask them which one of them can offer an opinion on whether or not -- that I have been experiencing excruciating pain since we've started.

They wouldn't be able to offer an opinion on that.  While it's true, while I have to have my people help me put my robe on and off, I'm just -- the concept of pain is just too ephemeral to bring in someone who's got a lot of degrees, which I respect, and have them offer an opinion on the pain levels experienced by someone they have never even examined.

But, anyway, here.  Let me see what you do.  Okay?  Let me see what you do.

There will be an objection raised undoubtedly when you begin down a path, and then we can discuss it.  I said -- I said that his historical drug use, you know, did not belong in this case.  It may have been wrong.  It may have been wrong.  It could very well be that with respect to this gentleman.  Drug use was a part of his life.  And it may have been his method for coping with some of the psychological issues.  I don't know.  I really don't know.  And no need of me pretending to know.

So this is -- I'll admit it.  This is difficult for me in an effort to try to get this right.  And what I fear

six months before the shooting in this case?  Do we know?

MR. GALIPO:  I don't know.  I'm assuming he was admitted for some reason and they did a work-up or report.

THE COURT:  The reason I ask is that I'm not always clear when we start talking about post-discharge from the hospital.  I don't know -- he's obviously been in the hospital on a number of occasions.  He's got --

MR. GALIPO:  Right.  I'm talking about his discharge from his treatment for his physical injuries related to the gunshot wounds.

THE COURT:  Okay.  All right.  Good.

MR. GALIPO:  So they -- what they want to do is talk about after his discharge from the hospital for his physical injuries related to the gunshot wounds, that he used some drugs after that.

THE COURT:  Okay.

MR. GALIPO:  That's what they want to talk about.

THE COURT:  Why would they do that?

MR. GALIPO:  Well, that's the point I'm trying to make.  So what I'm saying is that they think somehow it rebuts our medical expert's opinion, but I don't think, when you hear the narrow scope of our medical expert's opinion, you're going to conclude it doesn't go there.  So, therefore, the door hasn't been opened.  Therefore, that's not relevant.

So a very simple thing is we proceed, he doesn't

mention it in his opening, and then the Court sees how the evidence plays out. And by the time we're done presenting our evidence, if the Court thinks now this has become relevant and not prejudicial, then the Court can allow it.

But to start off, I think we should start off without it included.

THE COURT: I just don't -- I don't see anyone going down that road to basically raise the inference or the possibility that the gentleman was self-medicating to ameliorate the effects of the gunshot wound.

MR. GALIPO: I'm not going to go there.

THE COURT: Well, I don't think they're going to go there either.

MR. GALIPO: But that's what they want to do apparently. They just want to get drugs in any way they can, quite frankly. And so I think the Court has to be the gatekeeper, as you have been. I understand the initial thing is, oh, especially given this Court's background in dealing with people with problems with drugs, the Court's initial reaction might be, oh, that might explain a lot.

But when the Court takes a step back and realizes that's not part of the 4th Amendment analysis for purposes of this case, then the Court could say that's not relevant and it's unduly prejudicial.

So if the only issue is they want to get in drugs

after he's discharged from the hospital for his gunshot wounds and I'm going to present the case in a way that it doesn't even become important or relevant, then I think we don't talk about it now.  We let the case proceed and revisit it if they think the door has been opened.

MR. ROTHANS:  Can I add to that, Your Honor?

THE COURT:  Yes, sir.

MR. ROTHANS:  First of all, Mr. Galipo keeps referring to the 4th Amendment and the 4th Amendment claims.  We're talking about damages.  This is an issue that I asked the Court to address before opening, and it deals with damages.  Not liability.  Not whether the officers used unreasonable or excessive force, but damages, number one.

Number two, the reason we were bringing it up and the reason we have rebuttal experts is because, if an individual is having hallucinations, if an individual is talking to himself, if an individual is rambling, saying things that are incoherent, and if an individual is so mind-altered that he's not of his right mind, what Dr. Omalu, their expert, says, that's an example and that is causally related to the shooting.

And we're saying, wait a second.  He's had mind-altering drugs, methamphetamine being drug of choice, since he was 13.  How could you blame it all on us?  But of course he doesn't have the prior records, and he doesn't have

THE COURT:  That's not the question before me. You're right.

I like Mr. Galipo's suggestion.

MR. BOJORQUEZ:  Your Honor, the only problem with Mr. Galipo's is that he's presented, at least for the premise that the defense has no interest in documents prior to the underlying incident, which would be untrue.  That's not what -- the argument the defense is making is that his history is related to where is he post-shooting.

So when the Court had mentioned, you know, pain, suffering, things of that nature, getting ready for the day, if you went to a hospital, were treated by doctors and they asked you what you're experiencing and you explain to them my back has been injured, my arm, I don't have a good range of motion, somebody had punched me and I have this numbness that hasn't gone away, those would be things that an expert doctor would be utilized to talk about, claims that you're making now if, let's say, you bumped one of us in court and then we were getting sued because there's an injury to your shoulder and there's some medical records that show you had some injury to that shoulder predating our incident.

So all of that stuff is completely relevant because from an historical perspective and the fact that experts are entitled to rely upon hearsay, they're entitled to look.  And the credibility and determination of why we value

**EXHIBIT C, PAGE 13 OF 15**

discharged from the hospital, he has nothing past that, nor did he have any documents prior to.

But yet he is trying to talk about how the injury he sustained here would cause him such significant pain and suffering which he would be entitled to obviously -- I'm sure they're going to be asking for lots of money in that.

So there's the problem that I think we find ourselves in. But I think counsel for plaintiff is completely trying to tie us and place to the Court a representation that's not what the defense is attempting to have this Court consider.

(A pause in the proceedings.)

THE COURT: I'm going to go with your proposal, sir.

MR. GALIPO: Thank you, Your Honor.

THE COURT: Not because it's your proposal but because it seems workable. And we'll see what happens. We'll see what happens. Because lord knows -- you all know that what you decide to do, what you decide not to do, the question you decide to ask of this witness or not ask is made a nanosecond before you do it. So let's wait and see what happens.

MR. GALIPO: Thank you, Your Honor.

THE COURT: All right.

MR. GALIPO: I believe we're ready to proceed.

THE COURT: All right.

///

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  19TH  DAY OF FEBRUARY, 2026.


_____
MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER

**EXHIBIT  C,  PAGE 15 OF 15**