UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE OTIS D. WRIGHT, U.S. DISTRICT JUDGE


JERMAINE PETIT, et al.,        )
                               )
          PLAINTIFFS,          )     CASE NO.
                               )
            vs.                )     CV 23-00789-ODW
                               )
CITY OF LOS ANGELES,           )
et al.,                        )     VOLUME 3
                               )     PAGES 350 TO 594
          DEFENDANTS.          )
_____)


REPORTER'S TRANSCRIPT OF
JURY TRIAL DAY 3
THURSDAY, FEBRUARY 19, 2026
8:04 A.M.
LOS ANGELES, CALIFORNIA


_____

MIRANDA ALGORRI, CSR 12743, RPR, CRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, SUITE 4455
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

**EXHIBIT C, PAGE 1 OF 10**

379

Did you hear that?

A       Yes.

Q       Did your training teach you that you can shoot someone based on the color of their skin?

A       Absolutely not.

Q       Have you ever trained any young recruit that they may shoot someone simply based on the color of their skin?

A       Absolutely not.

Q       What if their clothing is unkempt?  What if there's holes in their --

MR. GALIPO:  Your Honor, I'm going to object under 403.  I think we all agree you can't shoot someone if their clothing looks unkempt.

THE COURT:  I think the point is all of this information -- well, this information was broadcast to the responding units.  And the import of this information on the responding units I think is relevant.

So go ahead.

Q       BY MR. ROTHANS:  With respect to the ADW transmission, did you hear the suspect was suspected -- the subject was suspected of being involved in assault with a deadly weapon?

A       Yes.

Q       Is that significant to you in some way?

A       Absolutely.

**EXHIBIT  C,  PAGE 2 OF 10**

Q    Why?

A    Because, in my mind, prior to going to that call, I'm concerned that this is possibly a dangerous subject that we're about to encounter.  So it raises my concerns.  It raises my cautionary level.  And we have to proceed accordingly based on, you know, the information that's given to us at the time. So it raises our suspicion level and our danger level a little bit more than just the simple family disputes or business dispute.

Q    Okay.  And it raises your suspicion level of what activity?

A    Well, it's a dangerous activity.  An assault with a deadly weapon is a serious call.  It's a call that would raise the suspicion of any officer that's responding to that because you have the potential of dealing with a dangerous subject that's already committed a dangerous -- a potentially dangerous offense.

Q    Okay.  Are you trained, Sergeant, that you may shoot someone simply because they're suspected of being involved in assault with a deadly weapon?

A    No.  Absolutely not.

Q    Is that why you shot Mr. Petit that day, because he was suspected of being involved with a deadly weapon?

A    Not at all.

Q    As you followed Mr. Petit in your patrol

Q        In your training as a police officer, when you hear reports about a gun or an assault with a deadly weapon, are you thinking about watching or looking at the hands of a subject?

A        Of course.

Q        Why?

A        Because they teach us in training from day one in the academy at LAPD, as would -- Your Honor would agree from the sheriff's academy, these credible -- you know, these credible agencies are going to train you from the beginning. The one thing that can kill you are somebody's hands.  That gives them the present ability and capability of doing so if they have the intent to do so.  The hands are what are going to kill you.  Not their feet.  Not their elbows.  Their hands.

Q        Did you see where Mr. Petit's hands were in the seconds before the shots were fired?

A        Yes.  They were around his waistband and midsection.  And to me, that alerts me, if I can't see somebody's hands clearly and they're manipulating or moving around in this midsection or anywhere close to the waistband, that raises my suspicion even further that they're armed, because in my experience of the tons and tons of foot pursuits I've been in with suspects that indeed had handguns, they were retrieved from the area of the midsection or the waistband area.

539

A       Yes, he was.

Q       And you would agree that Mr. Petit's failure to cooperate, failure to stop when told, or drop it when told would subject him to arrest for Penal Code 148, resisting, delaying, and obstructing a peace officer in the discharge of his or her duties.  Isn't that true?

A       Yes.

Q       Is it unlawful, sir, to -- for any individual to brandish a replica or imitation firearm on a public street?

A       Yes.

Q       Is it unlawful, sir, to light something on fire in a public place?

A       Yes.

Q       You would agree that the officers under these circumstances were justified in placing Mr. Petit under arrest if the shooting had not occurred.

A       Yes.

Q       In fact, sir, you were not given any LAPD policies by Mr. Diggs' or Mr. Galipo's offices for your work in this case, were you, sir?

A       The policy about firing from a moving vehicle.

Q       Can you show me where that is in your report.

A       I'm sorry.  What?

Q       Can you show me where that policy is identified in your report.

**EXHIBIT  C,  PAGE 5 OF 10**

A       I'll give it a try.

Q       I say that, sir, while you're searching, because your report, dated September 18, 2025, does not identify any LAPD policy in terms of the materials that you were provided.

A       I referred to it on page 8 and quoted a portion of it.

Q       Where specifically, sir?

A       Page 8, paragraph 2.

Q       You quoted the policy.  But in terms of identifying the policy as one of the items you were provided to review, it's not in your list of documents, is it?

A       Apparently not.

Q       Okay.  So you could have quoted it from something that was told to you by the lawyers in the case?

A       No.  I read that and quoted it.

Q       Any other policies of the LAPD that were not identified that you reviewed in your work?

A       Not that I know of.

Q       With respect to de-escalation, you would agree that tactical de-escalation does not require that an officer compromise his or her safety; correct?

A       That's correct.

Q       And you can also agree that de-escalation techniques should only be used when it is safe and prudent to do so.

A       Yes.

Q       Would you agree, sir, that some situations require an immediate response from an officer and de-escalation techniques are neither viable nor effective options?

A       Yes.

Q       Are you generally familiar with the concept of perception reaction or lag time?

A       Yes.

Q       Tell the jury what that means to you.

A       Well, lag time is the time between when an officer decides to fire or has thought about firing and when he fires.

Q       Speaking of that, at what speed does a bullet leave the barrel of a police handgun such as that of Officer Glover?

A       It would depend on the caliber of the round that they're shooting.

Q       Do you know what caliber Officer Glover had?

A       9mm is my understanding.

Q       And the speed at which a bullet or a round from the barrel would be coming out of that gun would be how fast?

A       I don't know what the speed of a 9mm is.  It's substantial, but I don't know what it is.

Q       It would actually be faster than 1,000 feet per second, wouldn't it, sir?

**EXHIBIT  C,  PAGE 7 OF 10**

took them to do it.

Q        Okay.

MR. ROTHANS:  May I read, Your Honor, from the witness's deposition, page 127, lines 22 through 25?

THE COURT:  Go ahead and read it.

MR. ROTHANS:  "QUESTION:  I don't see any criticism of that in your report.  So would it be fair to say you're not critical of how the officers approached the subject after the shooting?

"ANSWER:  No."

Q        BY MR. ROTHANS:  In fact, you're not critical of the officers summoning the paramedics when they did.  Is that also correct?

A        I don't recall being asked that question.

Q        I'll represent to you I did.  But put aside whether I asked you the question.

You're not critical of the officers summoning paramedics, are you, sir?

A        Of them calling for the paramedics?

Q        Yes.

A        No.  I think absolutely they needed to call them.

Q        Since you've identified learning domains in your report of September 18, 2022, you also included P.O.S.T. learning domain Number 20, use of force; is that correct?

A        Yes.

where you did.

A       Yes.

Q       And that's the policy basically discouraging shooting at or from moving vehicles.

A       That's correct.

Q       You were asked whether or not you were critical of the approach.  I think you said you weren't critical of the approach, but the timing.

A       Yes.

Q       You were asked whether you were critical of them calling the paramedics.  I take it you're not critical that they asked for the paramedics but the timing.

A       That is correct.

Q       Do you have an opinion as to whether they should have asked for the paramedics immediately after he was shot?

A       Yes.  That's usually standard procedure after a shooting, to immediately request medical assistance.

Q       As opposed to waiting four minutes after he's handcuffed.

A       That's correct.

Q       In your career, Mr. Bryce, have you seen suspects with guns, knives and other weapons in their hands?

A       Yes, I have.

Q       Have you shot any of them?

A       No.

**EXHIBIT  C,  PAGE 9 OF 10**

594

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  19TH  DAY OF FEBRUARY, 2026.


_____
MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER

**EXHIBIT  C,  PAGE 10 OF 10**