# EXHIBIT 4

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE OTIS D. WRIGHT, U.S. DISTRICT JUDGE


JERMAINE PETIT, et al.,      )
                             )
          PLAINTIFFS,        )    CASE NO.
                             )
             vs.             )    CV 23-00789-ODW
                             )
CITY OF LOS ANGELES,         )
et al.,                      )    VOLUME 2
                             )    PAGES 112 TO 349
          DEFENDANTS.        )
_____)


REPORTER'S TRANSCRIPT OF
JURY TRIAL DAY 2
WEDNESDAY, FEBRUARY 18, 2026
8:58 A.M.
LOS ANGELES, CALIFORNIA


_____

MIRANDA ALGORRI, CSR 12743, RPR, CRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, SUITE 4455
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

we need to take up before we bring the jury out?

MR. ROTHANS:  Yes, Your Honor.

THE COURT:  Okay.

MR. ROTHANS:  Before we present our opening statements, I just want to clarify an issue as to drug use post-shooting and post-discharge from the hospital because I don't want to step on something that I shouldn't be.

THE COURT:  I don't remember us dealing with post-discharge from the hospital.  In other words, drugs that he may have been on and administered to him while he was in the hospital?

MR. ROTHANS:  No, sir.  Post-discharge.

We had plaintiff's Motion in Limine No. 1 that was argued on February 10, 2026, at the final pretrial.  And the Court indicated there was no motion on post-shooting or post-discharge drugs, so you weren't going to rule on the issue.

And yesterday you made a comment about no drugs. I don't want drugs.  And I understand that to be the day of the incident but not beyond that because of pain management issues, if you recall, we talked about.  And if the Court's going to preclude that, I'd like to make a record.

THE COURT:  Okay.  I think it makes sense that he may have been on some pain management post-discharge from the hospital, but I think what you had alerted us to yesterday was

that that opens up another whole can of worms in terms of drug use, tolerance to, et cetera, et cetera, stuff that we're -- drugs was going to just become a tangential issue that was going to consume an awful lot of time.  And I think the classic 352 --

MR. ROTHANS:  May I be heard on the issue for the record, Your Honor?

THE COURT:  Yeah, absolutely.

MR. ROTHANS:  Okay.  Unlike drugs on the date of the incident, which we talked about yesterday -- and the defense does not have a physician to say that that level of drugs found in his urine at Cedars-Sinai meant that he was under the influence.

THE COURT:  Okay.

MR. ROTHANS:  And as the Court ruled yesterday -- and I'm not revisiting that ruling -- drugs onboard on the day of the shooting, off limits.  I respect that.  We're not going to talk about it in opening.

However, to give you some context, the plaintiff has two physician experts:  Dr. Omalu, who the Court may be aware of, who is a forensic pathologist he has indicated in his Rule 26 report -- he has testified at deposition -- that the post-traumatic stress disorder and the schizophrenia that Mr. Jermaine Petit had suffered prior to the shooting was exacerbated or worsened by the shooting.  And, therefore, there

were additional mental health issues post-shooting for which, of course, he deserves compensation.  That's Dr. Omalu.

They also have a Dr. Amy Magnusson, M-a-g-n-u-s-s-o-n, and she's going to talk about the care that he received and the pain and suffering he likely or most likely would have experienced following the shooting after his discharge from the hospital.

I just want to give the Court some context so you understand what we're talking about.  We have three experts. We have Dr. Hedge, who is a board certified physiatrist in physical medicine and rehab, who is going to say that the injuries did not require or result in the type of pain that Dr. Magnusson is suggesting for the year post-shooting.

We have a Dr. Cohen, who is a board certified psychiatrist, who will say that the alleged exacerbation of PTSD and schizophrenia is not related in any way to the shooting itself and his discharge from the hospital.

And then we also have a Dr. Vilke who's going to talk about the injuries and pain and suffering as well.  All of those three from the defense are rebuttal experts because the plaintiff is putting on experts to say his troubles and problems, once he was discharged, are all related to our shooting and nothing that predated.

With that, I want to give you some context, Judge, if you don't mind.  January 13, 2022, January 13, 2022,

six months before the shooting, six months before -- and these records are from Cedars-Sinai. These are the records where he was taken after the shooting. These are their records.

THE COURT: Okay.

MR. ROTHANS: But this is dated six months before the shooting. It says, "39-year-old male with history of psychotic disorder and substance abuse -- meth, cocaine, ETOH -- who presents for psychiatric evaluation in the context of a court-ordered admission to the domiciliary. He was high on methamphetamine and saw police officers. He ran away, was chased, not thinking rationally. Currently in veterans' court and is told to engage in substance use treatment.

"The patient has a long history of psychosis" -- please understand six months before the shooting. "Patient has long history of psychosis since his mid 20s in the context of active crystal meth use. He believes this is substance induced. Describes that he gets into an alternate reality, but it's hard to nail him down with the actual psychotic symptoms."

It also goes on, and I'm not going to read pages and pages, but a couple more sentences. Six months before the shooting.

"Crystal methamphetamine is his drug of choice but has been using drugs since he was 13 years old. After coming home from the military, he started using cocaine, then crack and then he found methamphetamine cheaper and felt better

for the past.  He has been in residential treatment 10 to 11 times, generally coming from jail.  He will stay sober in treatment and then gets out and goes back to substance abuse."

I just want to provide the Court with this context so you understand they're going to be asking the jury to award damages, if liability is found, based on about a 12- to 15-month period after he was discharged from Cedars before his remains were found, and attribute an increase in PTSD solely to the shooting, an increase in symptoms from his schizophrenia solely from the shooting, and that the pain and suffering, of course, continued for the entire length of time he was alive.

As a defense, we have to be able to demonstrate that's not an accurate -- those aren't accurate opinions.  And what we're -- I was suggesting is -- I'm not trying to revisit the prior history of drug use.  I wanted the Court to be aware of it.  But I'm suggesting we need to be able to cross-examine, and not to mention our defense experts, what are they going to talk about if they're prohibited from talking about drug use with, by the way, similar symptoms to schizophrenia, similar symptoms to PTSD.  And according to the patient himself, it was all induced by the drug use, methamphetamine, drug of choice.

So I want to make the record.  I want the Court to be aware of the context.  Because to rule that drugs on the day of the incident are inadmissible, understand, we've got a

And I'm really troubled by the fact that -- I say "we." I have been proceeding along this path with, I'll say, incomplete information that I think had I known about what was going on with him six months before the shooting, I may have looked at a lot of these things differently.

So I know what I should do. I know I should declare a mistrial.

MR. GALIPO: From the plaintiff's perspective, we think the Court's ruling is correct, and we think the Court should only revisit it if, during the course of the trial, the Court feels the door has been opened or is somehow now relevant and the Court is satisfied that under 403 the unfair prejudice outweighs the probative value.

THE COURT: Yes, Mr. Rothans.

MR. ROTHANS: Thank you, Your Honor.

First of all, I'm looking at document 154 from the Court's docket, which is the minute order following the final pretrial conference.

As to plaintiff's Motion in Limine 3, the Court noted granted as to historic drug use, denied without prejudice. As to drug use at the time of the shooting, there was no ruling.

So when counsel says, well, we agree with the Court's ruling, there was no ruling, number one, on post-discharge drug use because it wasn't in the motion. At

least that's what the Court concluded.

So to say that it's already been ruled on and let's not revisit it, there was no ruling.  Look at Document 154 of the docket.

Number two, counsel suggests it's hearsay.  I think we all know that under FRE Rule 803(3), then existing mental, emotional or physical condition records are an exception to the hearsay rule, not to mention business records exception.  So they certainly fall within two exceptions to the hearsay rule.

And then counsel suggests that they're only claiming physical pain and suffering.  Well, that's not what their expert Dr. Omalu said.  He says under oath and in his report that schizophrenia and PTSD were exacerbated by this shooting.  And the Court needs to know Dr. Omalu was not given any of the prior records prior to Cedars-Sinai prior to the shooting.

And even more importantly, Judge, Dr. Omalu, their forensic pathologist, wasn't even given records post-shooting.  He's talking about exacerbation.  He's talking about behavior after discharge from Cedars.  He didn't even have the records.  He wasn't given those records.

THE COURT:  What do you think of the suggestion of simply declaring a mistrial and beginning with a whole new jury?

MR. ROTHANS:   I guess I would ask -- I have to think about that.   But I think the most important thing is what's the Court's ruling going to be?   If the Court's sticking with the previous ruling, apparently, then I don't know that we need a mistrial.   If the Court's going to open up the prior use history going back to at least, let's say, 15, 20 years, anyway.

THE COURT:   Right.

MR. ROTHANS:   He was 39 when this incident happened.

THE COURT:   Right.

MR. ROTHANS:   And allow the post-discharge evidence, he was in and out of rehab, he was in and out of the VA.   There's all kinds of records of his continued abuse of both meth and cocaine.   Then maybe we have to consider a mistrial.

But, you know, I'm only asking the Court to look at now and clarify the issue of post-discharge drug use. Because I didn't believe that the ruling says you ruled on that issue in the motions in limine, but it was unclear from your comments yesterday about no drugs.

THE COURT:   Yeah.   But that was -- see, that was -- that's in isolation.   But then I get this report of him and his drug use, a report that was prepared six months before anything giving rise to this lawsuit occurred.   And now we're

starting to get a much more detailed -- I'm not going to say accurate, but a much more detailed picture of this man --

MR. ROTHANS:   Understood.

THE COURT:   -- and what he was going through and the things that may have affected him psychologically and mentally and certainly contributed to his abhorrent -- well, I don't know if it's abhorrent behavior -- but some of this behavior is mystifying when you're basically surrounded by police that are telling you to stop.

Hard to understand.  Well, not anymore it's not hard to understand.  So now all of this stuff becomes relevant.

Yes, sir.

MR. GALIPO:   Yes, Your Honor.

So, first of all, whatever the reasons that Mr. Petit did what he did really is not relevant for purposes of the 4th Amendment analysis as to whether it was objectively reasonable to shoot him based on what the officers saw and knew.  And we have videos of what happened.

THE COURT:   Uh-huh.

MR. GALIPO:   Okay.  So -- and it sounds like counsel, although he read that paragraph six months earlier with all that negative information, is not saying he wants that in evidence.  He's also understanding that Your Honor ruled that on the day of the incident the officers didn't know whether he was on drugs or not.  So that doesn't come in.

What he's asking for, if I'm understanding him correctly, is after he was discharged from the hospital but some point before he died, there's evidence of drug use.

THE COURT:   Uh-huh.

MR. GALIPO:   And that's what he thinks should be permitted.

And I would say to that it might depend on how the plaintiff presents their case and what their experts testify to because he, Mr. Rothans, stood up here and said we have rebuttal experts to Omalu and Magnusson and, therefore, we think this could be relevant.  Well, Magnusson is not going to testify.  So any rebuttal to her is out.  And I'm going to limit Omalu's testimony hopefully to not open the door to this issue.  You'll have to make that decision later.  And if it comes in, it would have to come in on a limited basis.

My preference would be not to declare a mistrial, to go forward with the jury we have.  I think the Court's ruling about what happened six months -- well, whatever happened earlier I think is irrelevant and excluded under 403, even though it might explain some of his behavior, but not under the objective analysis.

THE COURT:   Well, no, it does -- okay.  I understand what you're saying.  It has no direct bearing upon why we're here.  Okay.  You don't shoot someone for what was apparent to the officers at the time.

Just one other alternative I think is possible. I think what the Court -- I don't know how we're going to avoid and how he's going -- how plaintiff is going to prove the damages if they're just going to talk about from July 18th until August 8th when he was released, because anything beyond that is going to obviously initiate these issues regarding the drug abuse and the drug history. And the drug history is naturally going to have to come in because it sets a basis or a foundation as to how do you evaluate him after the incident versus prior to the incident. So those --

THE COURT: How do you evaluate him?

MR. BOJORQUEZ: How you evaluate, meaning Mr. Petit and his whatever tried allegations of damages that he's suffered as a result of the shooting, how do you really excise the prior experience and exposure of his drugs with then how he's post-shooting.

Essentially the way that the defense at least is looking at it is that, you know, the -- especially since the early on, six months earlier in January, there's a consistency in the sense of his troubles that he's dealt with, his problems that he's acknowledging and talking to medical providers after the shooting are very consistent with what you had back in January, for example, of 2022.

So I think the Court had stated it would allow all the information in which I think is the correct process. I

think the concern about a mistrial, I think what the Court had suggested and I think what at least the City's perspective would be, is that the jurors that we have now, rather than declaring a mistrial, because we have come as far as we have, would the Court be willing to entertain questioning the jurors to see whether or not any of these people, the issues that Mr. Galipo feels are concerning to him, let's figure out if these are going to be an issue that's going to change the dynamics of their perspective and put them into a position where they no longer could be fair and impartial.  Because I think we don't know that yet.  I don't think -- it's not going to take too much time to do that.

But that's an appropriate manner of trying to resolve the issue and seeing if we can avoid ultimately a mistrial, Your Honor.  So that would be the defense --

THE COURT:  There's a couple of ways of looking at it.  Yes, that would absolutely address my concerns that cause me to mention the word "mistrial."  But both sides apparently are not anxious to go that way anyway.  So it looks like both sides are waiving their right to explore -- not explore, but actually implement that particular remedy.  No one wants a mistrial if I'm understanding.

MR. BOJORQUEZ:  Correct.

MR. GALIPO:  That's correct, Your Honor.

THE COURT:  Okay.

THE COURT:  Okay.

MR. ROTHANS:  I just want to address one thing, because I'm still not clear on what I'm permitted to deliver during opening.  And that is Mr. Galipo, for whom I have a lot of respect, keeps talking about the physical pain and suffering.

But nonetheless, as we talked at the final pretrial, there's pain management issues.  There's quality of life issues.  There's activities of daily living issues.  And this gentleman, who had an addiction problem, we have a right to explore that because it does affect his quality of life in that time period.  It does affect his mental state, his altered state.  And it affects everything to do with his life after the shooting until his passing.

THE COURT:  I don't know how you're going to explore that.  If he were here, you could ask him how his daily life is affected by his drug use.

MR. ROTHANS:  Well, what I'm suggesting is that if the plaintiff's experts, including Dr. Omalu, was given all the medical records, the records show time and time again --

THE COURT:  Well, he can guess -- you know, he can guess what life was like.

MR. ROTHANS:  There's no reference to pain in the shoulder area, and there's no reference to pain in the jaw. But they're going to have Omalu come in and say he should have

had all these problems for that time.

THE COURT:  You know what, I'd like to have them all sitting here.  I wish they had been sitting here throughout the entire trial.  I do.  And I would ask them which one of them can offer an opinion on whether or not -- that I have been experiencing excruciating pain since we've started.

They wouldn't be able to offer an opinion on that.  While it's true, while I have to have my people help me put my robe on and off, I'm just -- the concept of pain is just too ephemeral to bring in someone who's got a lot of degrees, which I respect, and have them offer an opinion on the pain levels experienced by someone they have never even examined.

But, anyway, here.  Let me see what you do.  Okay?  Let me see what you do.

There will be an objection raised undoubtedly when you begin down a path, and then we can discuss it.  I said -- I said that his historical drug use, you know, did not belong in this case.  It may have been wrong.  It may have been wrong.  It could very well be that with respect to this gentleman.  Drug use was a part of his life.  And it may have been his method for coping with some of the psychological issues.  I don't know.  I really don't know.  And no need of me pretending to know.

So this is -- I'll admit it.  This is difficult for me in an effort to try to get this right.  And what I fear

But here's the deal.  Here's the deal.  I think that when these issues are brought up and I'm called upon to make a decision, I will do that.  But, ultimately, I think this case belongs to you all, the lawyers and the parties.  The case belongs to you all, and you can make the decision.  You're the ones who are going to be most directly affected by it.

Yes, sir.

MR. GALIPO:  Yeah.  It sounds like neither myself or Mr. Rothans wants a mistrial.

THE COURT:  No.  Nobody wants a mistrial.

MR. GALIPO:  I don't think one would be appropriate.  And I think what would be appropriate is for Mr. Rothans not to mention it in his opening and the Court will reserve the right to consider allowing that evidence depending on how the plaintiffs present their case and whether the Court thinks it's now more probative than prejudicial.  And I think that's how we should proceed.

THE COURT:  Do we all understand what is meant by "it"?

MR. GALIPO:  Yeah.  Well, what they're asking for, just so we're clear, because the only thing they're asking for is his drug use post-discharge from the hospital, post-shooting.  That's all they're asking for.

THE COURT:  So there will be no mention of -- oh, by the way, why was he -- why was this medical report prepared

after he's discharged from the hospital for his gunshot wounds and I'm going to present the case in a way that it doesn't even become important or relevant, then I think we don't talk about it now.  We let the case proceed and revisit it if they think the door has been opened.

MR. ROTHANS:  Can I add to that, Your Honor?

THE COURT:  Yes, sir.

MR. ROTHANS:  First of all, Mr. Galipo keeps referring to the 4th Amendment and the 4th Amendment claims.  We're talking about damages.  This is an issue that I asked the Court to address before opening, and it deals with damages.  Not liability.  Not whether the officers used unreasonable or excessive force, but damages, number one.

Number two, the reason we were bringing it up and the reason we have rebuttal experts is because, if an individual is having hallucinations, if an individual is talking to himself, if an individual is rambling, saying things that are incoherent, and if an individual is so mind-altered that he's not of his right mind, what Dr. Omalu, their expert, says, that's an example and that is causally related to the shooting.

And we're saying, wait a second.  He's had mind-altering drugs, methamphetamine being drug of choice, since he was 13.  How could you blame it all on us?  But of course he doesn't have the prior records, and he doesn't have

the subsequent records.  Only the records of the care at Cedars-Sinai.  And he's saying PTSD exacerbated, schizophrenia exacerbated.

So why would we bring it up?  Well, not to suggest he was self-treating because of our injuries but to show that -- the psychosis he was experiencing.  And by the way, he went to the Veterans facility more than a dozen times after he was discharged from Cedars until his passing were incidents of psychosis, were incidents of drug-induced psychosis from methamphetamine and/or cocaine.

So it's a damages issue, Your Honor, not a liability issue.  And I will submit on that.

THE COURT:  Okay.  We're going to have experts testifying who are not familiar with the entire record of this gentleman, medical records?

MR. ROTHANS:  It's their experts --

THE COURT:  That's yes or no.  We're going to have experts testifying who are not fully versed in his medical records.

Is that true?

MR. ROTHANS:  From the plaintiff's perspective, yes.

THE COURT:  And I'm supposed to say, oh, yeah, go ahead and offer an opinion?

MR. ROTHANS:  I would have to defer to --

THE COURT:  That's not the question before me. You're right.

I like Mr. Galipo's suggestion.

MR. BOJORQUEZ:  Your Honor, the only problem with Mr. Galipo's is that he's presented, at least for the premise that the defense has no interest in documents prior to the underlying incident, which would be untrue.  That's not what -- the argument the defense is making is that his history is related to where is he post-shooting.

So when the Court had mentioned, you know, pain, suffering, things of that nature, getting ready for the day, if you went to a hospital, were treated by doctors and they asked you what you're experiencing and you explain to them my back has been injured, my arm, I don't have a good range of motion, somebody had punched me and I have this numbness that hasn't gone away, those would be things that an expert doctor would be utilized to talk about, claims that you're making now if, let's say, you bumped one of us in court and then we were getting sued because there's an injury to your shoulder and there's some medical records that show you had some injury to that shoulder predating our incident.

So all of that stuff is completely relevant because from an historical perspective and the fact that experts are entitled to rely upon hearsay, they're entitled to look.  And the credibility and determination of why we value

discharged from the hospital, he has nothing past that, nor did he have any documents prior to.

But yet he is trying to talk about how the injury he sustained here would cause him such significant pain and suffering which he would be entitled to obviously -- I'm sure they're going to be asking for lots of money in that.

So there's the problem that I think we find ourselves in.  But I think counsel for plaintiff is completely trying to tie us and place to the Court a representation that's not what the defense is attempting to have this Court consider.

(A pause in the proceedings.)

THE COURT:  I'm going to go with your proposal, sir.

MR. GALIPO:  Thank you, Your Honor.

THE COURT:  Not because it's your proposal but because it seems workable.  And we'll see what happens.  We'll see what happens.  Because lord knows -- you all know that what you decide to do, what you decide not to do, the question you decide to ask of this witness or not ask is made a nanosecond before you do it.  So let's wait and see what happens.

MR. GALIPO:  Thank you, Your Honor.

THE COURT:  All right.

MR. GALIPO:  I believe we're ready to proceed.

THE COURT:  All right.

///

152

soldiers. He graduated as a squad leader, and in December of 2005 he was discharged honorably.

After proudly serving his country, Mr. Petit struggled. On July 18, 2022, at approximate 7:20 p.m. -- and you'll see video, it's summertime, so it's still light outside -- officers received radio calls generally describing a possible suspect, a black male with dreadlocks, possibly with a gun, possibly with a stick, possibly lighting fires in trash cans. Possibly.

Now, Officer Glover and Officer Martinez were driving in a vehicle together. They arrived near Martin Luther King Jr. Boulevard and Bronson Avenue. They saw who they now know as Mr. Petit walking on the sidewalk. They were conducting an investigation to determine whether he was involved in those radio calls and whether a crime had been committed.

Now, based on their training, they looked at his hands, and they saw no weapons. Officer Martinez exited the vehicle first and approached Mr. Petit on foot with his gun drawn. Officer Glover then parked his vehicle and approached Mr. Petit with his gun drawn.

When Officer Glover got closer, he noticed that Mr. Petit was mumbling. And Officer Glover will tell you that he believed that Mr. Petit appeared disoriented, his clothes were not clean, he wore a backpack. He looked disheveled.

we're headed and what the lawyers perceive the evidence is going to be. Certainly what I say and what Mr. Diggs says is not evidence. You will see and hear the evidence from the witness stand. What we say is not evidence, but it's our projection of what we think is going to happen during this trial.

Sergeant Hayhoe had, at the time of this incident, more than 22 years of experience in law enforcement with the LAPD. Officer Glover had more than 7 years' experience with the LAPD.

Your role, if I may, is to look at all the evidence, listen to all the evidence, and then collaborate or deliberate and decide whether or not under the totality of circumstances you believe these officers acted as any reasonable officer would when confronted with these circumstances.

The lawsuit has been brought by Ms. Petit who is Mr. Petit's daughter. She currently resides in Minneapolis. But understand, folks, this is not a wrongful death case. There will be no testimony that Mr. Petit died, passed away, as a result of this incident. That is not the case.

According to Ms. Petit, her father had various health issues prior to this incident. He had been living for a period of time, according to Mr. Petit's mother, on the streets of Los Angeles. This incident happened at approximately

be -- and Mr. Diggs talked about de-escalation. If they are armed, that comes first. Officer safety and safety of the public comes first. They have to control the scene, and they have to make sure that the person puts down the weapon or weapons. You don't sit around and chitchat while the person's got a gun.

The officers have also been trained that the signs and symptoms of being under the influence are very similar to the signs and symptoms of mental illness. So they don't know what they're dealing with. All they know is this gentleman is not listening to their commands. This gentleman has something in one or both hands, won't listen, won't stop, and is fleeing the area and is reported to have assaulted someone with a deadly weapon.

These officers were trained that what constitutes an imitation firearm -- now, you will see that object. You saw it on one of the photos that Mr. Diggs showed you, we're going to bring the actual object itself in here and let you see that object in person.

An imitation firearm is a BB device, a toy gun, a replica or other device that is so substantially similar in coloration and overall appearance to an existing firearm as to lead a reasonable person to perceive that the device is, in fact, a firearm. That's their training. They didn't know what this guy had. They didn't know what he had done as an assault

court.

A       Yes.

Q       So I want to talk to you a little bit about the information you had or maybe didn't have related to this call.

I take it you, yourself, did not hear the 911 calls.

Is that fair?

A       Yes, sir.

Q       You would hear whatever was dispatched from the dispatcher over your police radio.

A       Yes.

Q       And there were several calls that came out regarding this incident.

Would that be accurate?

A       Yes.

Q       And, initially, you were unable to locate who the suspect was.

A       Yes, sir.

Q       Did you have any information that anyone had specifically been injured?

A       No, I didn't.

Q       Did you have any information that shots had been fired?

A       No, sir.

Q       And you as a law enforcement officer understand

A        I'm here.

Q        Okay.  Great.  And if you could look at lines 13 and 14 and read them to yourself and see if that refreshes your memory that you indicated that there was another call that came out that the suspect possibly does not have a firearm.

A        I see that, sir, that statement.

Q        Did you have a chance to read it?

A        Yes, sir, I did.

Q        Does it refresh your recollection that you said that in your initial statement?

A        Yes, sir.

Q        Okay.  And you would have been driving the vehicle; is that correct?

A        Yes, sir, I was.

Q        And Officer Martinez was your -- would have been in the front passenger's seat.

A        Yes.

Q        Okay.  You didn't have any information as to the name of the person, did you?

A        No, I didn't.

Q        Any information this person had any criminal history?

A        No.

Q        Any information that this person was under the influence of drugs or alcohol?

A       No.

Q       And I think you already told me you had no information that the person had injured anyone; is that correct?

A       Yes.

Q       And you were trying to locate this person for some period of time.

A       Yes.

Q       And initially you saw the person and you told your partner, that's not him.

Do you remember that?

A       I don't recall that part, sir.

Q       Okay.  Can you look at the next page of your statement, which would be page 9 of your statement.

A       (Witness reviewing document.)

Yes, sir.

Q       Okay.  Did you see there's a reference to -- on lines 6 and 7 to you telling your partner, that's not him?

Do you see that?

A       Yes.  My reference was not to the -- Mr. Petit, though.  It was --

Q       It was someone else?

A       It was to another individual.

Q       Okay.  And then when you do see who we now know to be Mr. Petit, you thought in your mind that's possibly the

the radio calls?

Q        Yeah.  Just looking at him --

A        Okay.

Q        -- did he appear to be committing a crime when you saw him walking down the sidewalk?

A        No.

Q        And you kind of repositioned your car a little bit so that as he continued to walk after Officer Martinez got out, you moved your car up a bit; is that right?

A        Yes, sir.

Q        Okay.  Now, I have a few photos.

MR. GALIPO:  May I approach counsel, Your Honor?

THE COURT:  Please.

MR. GALIPO:  Your Honor, by agreement we have some exhibits.  We're going to take it little by little, and I can read them slowly for your court clerk, if that's okay.

By agreement, Exhibit 9-3 and 9-1.  And I would move to admit based on our agreement.

MR. ROTHANS:  No objection, Your Honor.

THE CLERK:  There's multiple photos in that one exhibit.

MR. GALIPO:  Right.  We're just going to admit the specific items at this time.

THE COURT:  I'm not following.  9-1, 9-3, each of those are collections of photos?

walking on.

A       Yes.

Q       And is the front of your vehicle, although I know it's at an angle, generally directed toward Bronson, the next cross street?

A       Yes.

Q       Okay.  And then by agreement I'd like to show you Exhibit 9-1, please.

Okay.  Are you able to see 9-1 on your screen?

A       Yes, sir.

Q       Okay.  And would this be a photo of where your vehicle was positioned before you got out taken from the other direction?

A       Yes, sir.

Q       Okay.  And obviously it looks a little dark in this photo.  But when you encountered Mr. Petit, it was still light outside.

A       Yes.

Q       Okay.  It was July 18, 2022.  Do I have the date correct?

A       Yes, sir.

Q       And about 7:20 p.m.?

A       Yes.

Q       But in the middle of the summer, it's still light outside.

A      Yes.

Q      Okay.  And you yourself were in uniform; correct?

A      Yes, sir.

MR. GALIPO:  And 11-1 and 11-3 I think by agreement, Your Honor.

MR. ROTHANS:  No objection, Your Honor.

THE COURT:  Received.

MR. GALIPO:  11-1 and 11-3.

(Marked for identification and received into evidence Exhibit No. 11-1 and 11-3.)

MR. GALIPO:  Thank you.

May I publish once it's received?

THE COURT:  Yes.

MR. GALIPO:  Thank you.

Can we show 11-1, please.

Q      BY MR. GALIPO:  I take it this would be a photo taken of yourself at some point after the shooting?

A      Yes, sir.

Q      Are you right-handed or left-handed?

A      Right-handed.

Q      Okay.  So you would have had your firearm posted on your right side?

A      Yes, sir.

Q      And was it a 9mm semiautomatic weapon you had?

A      Yes, sir.

ever yell out "gun"?

A    He did not.

Q    He actually said the opposite.  He said, "It's not a gun, bro."

A    Yes.

Q    And officers in part are trained to rely on the statements of their fellow officers, generally speaking.  Would you agree?

A    To a certain extent, yes.

Q    If Martinez said he saw a gun, that's something that would be important to you.

A    That would be important, yes.

Q    And in this case, Martinez said, "It's not a gun, bro."

Correct?

A    Yes, sir.  But he also had no way to validate that statement because he never manipulated it.  And I know that he never -- yeah, like I say, I know he never manipulated that weapon or the object.

Q    Who never manipulated it?

A    Officer Martinez never manipulated it.

Q    Well, to your knowledge, Officer Martinez had been a police officer for four years at that time; correct?

A    That -- yes.  But that was also my first time working with Officer Martinez, and I was unsure of obviously

knew what a firearm looked like.

A      Yes, sir.

Q      So you mentioned some prior arrest with a cell phone gun.

Is that what you said?

A      Yes, sir.

Q      Did you see a cell phone in Mr. Petit's hands at any point?

A      I used that as a reference because not all guns look alike.  And that object appeared to be a firearm to me.

Q      I see.

So once your partner said, "It's not a gun, bro," you knew he was talking to you; correct?

A      Yes, sir.

Q      You at least took that into account.

A      I did.

Q      And after he said that, Mr. Petit turned and started walking away.

A      Yes, sir.

MR. GALIPO:  And I'd like to show Exhibit 4-2, please.

Q      BY MR. GALIPO:  Again, is this from your body-worn camera, a still?

A      Yes, sir, it is.

Q      And are these your hands and your 9mm gun we're

seeing?

A     Yes, sir.

Q     And is this Mr. Petit walking westbound on the sidewalk towards Bronson?

A     Yes, sir, it is.

Q     And we can barely see in the left side of this image a patrol vehicle approaching.

Do you see that?

A     Yes, sir.

Q     Is that who you now know to be Sergeant Hayhoe's vehicle?

A     Yes, sir.

Q     Did you know at the time that Sergeant Hayhoe was going to approach?

A     I knew he was in the area.  I did not know he was going to approach at that moment.

Q     Okay.  Did you think at this point in time, after being told by your partner, "It's not a gun, bro," and Mr. Petit was walking away from you, did you think it would be appropriate to shoot him at this point in time?

A     At this point in time, no.

Q     Can you shoot someone, based on your training, for walking away from you?

A     I would need to know more.  Were they walking away from me holding a firearm or -- and then we have multiple

radio calls of assault with a deadly weapon?  Or just the simple aspect of them walking away, no.

Q     All right.  But let's be fair with this assault with a deadly weapon reference.  You've already told us you had no information that he had injured anyone; correct?

A     For assault with a deadly weapon, you don't necessarily have to injure someone.

Q     Right.  That's the whole point.

A     Oh, okay.  Yes, sir.

Q     You didn't even know if it was true and accurate, and you had no information he injured anyone.  Would you agree?

A     Yes, sir.

Q     That's why you went to investigate; correct?

A     Yes, sir.

MR. GALIPO:  Okay.  So if we could look at 4-3, please.

Q     BY MR. GALIPO:  Do you see in this image that Mr. Petit is continuing to walk away from you?

A     Yes, sir.  And it appears like his body is bladed towards the patrol vehicle.

Q     Okay.  He hasn't got many -- meaning Mr. Petit hasn't got to Bronson yet; correct?

A     Yes, sir.  He hasn't.

Q     And we can see a little bit more of the patrol vehicle in this image; correct?

Q        And how far would you estimate you were from Mr. Petit at this time?

A        Maybe 10 yards.

Q        Okay.  Did you ever see Mr. Petit start going to the ground before you heard any shots?

A        No.

MR. GALIPO:  4-8, please.

Q        BY MR. GALIPO:  Are you able to see that on your screen?

A        Yes, sir.

Q        It looks like Mr. Petit is continuing to go to the ground?

A        Yes, sir.

MR. GALIPO:  4-9.

Q        BY MR. GALIPO:  It looks like Mr. Petit is further going to the ground.

Would you agree?

A        Yes, sir.

MR. GALIPO:  And 4-10.

Q        BY MR. GALIPO:  Are you able to see that on your screen?

A        Yes, sir, I am.

Q        And would you at least agree in this image Mr. Petit appears to be on the ground?

A        Yes, sir.

Q       Now, can you see in this image your casing?

A       Yes, sir, I can.

Q       And I want to ask you a few questions about your casing.  And it's slightly above your gun that we could see; correct?

A       Yes, sir.

Q       Your weapon, you told us before, is a semiautomatic weapon; correct?

A       Yes, sir.

Q       And the ejection for casings is on the right side.

A       Yes, sir.

Q       So with each bullet you fire, the casing ejects from the weapon on the right side; is that correct?

A       Yes, sir.

Q       And this is your ejected casing, which tells us this is very close in time to the time you shot.

        Is that fair?

A       Yes, sir.  I would say I shot a little bit before that, but that's the still image of the casing coming out. Once the gun has been put down and I reassessed.

        MR. GALIPO:  Let's look at 4-11, please.

Q       BY MR. GALIPO:  We can actually see the casing ejected just to the right of your weapon there; correct?

A       Yes, sir.

Q        And would you at least agree with me, Officer Glover, when we look at this image and we see the casing ejecting from the right side of your weapon, Mr. Petit is laying on the ground?   Would you at least agree with that in this image?

A        Yes, sir.

MR. GALIPO:   4-12, please.

Q        BY MR. GALIPO:   This would be -- you had already fired your shot now; correct?

A        Yes, sir.

Q        And we see, again, Officer Martinez to the right, and we see your gun no longer directed at Mr. Petit.

Would you generally agree?

A        Yes, sir.

Q        And then looking lastly at 4-13, this is where Mr. Petit ended up after all the shots in the street; is that right?

A        Yes, sir.

Q        And if you know, did the sergeant's vehicle come to a stop at about that location we see in this image?

A        Yes, sir.

Q        Mr. Petit was eventually handcuffed; is that right?

A        Yes, sir.

Q        And do you know how much time passed between the

221

shots being fired and officers approaching him?

A        Approximately a minute and a half.

Q        And he would have been handcuffed at that point?

A        Yes, sir.

MR. GALIPO:  Okay.  We can take that down.  Thank you.

Q        BY MR. GALIPO:  So did you, yourself, give Mr. Petit a verbal warning you were going to use deadly force?

A        It wasn't feasible.

Q        So the answer is no, and you're saying it wasn't feasible.

A        Yes, sir.

Q        Okay.  And did you say anything to Mr. Petit from the time he was on the sidewalk to the time you fired your shot?

A        Yes, sir.

Q        What did you say?

A        I told him to get against the wall.  I told him to drop what was in his hand.  I asked him what was in his hand.

Q        Anything else you can remember?

A        From my recollection, that's -- that's all.

Q        And you indicated that as a police officer you would not want to shoot someone who is unarmed; is that accurate?

A        Absolutely.

Q        And that's why you're saying as a police officer you would want to be 100 percent sure it's a firearm before shooting.

A        Absolutely.

Q        In fact, I think you explained at some point to me, perhaps at the time of your deposition, that you're not going to make a life-altering decision unless you are sure.

Remember saying that?

A        Yes, sir.

Q        And when you say "life altering," you understand that using deadly force, by your training, is likely to cause permanent injury or death; correct?

A        Yes.

Q        And do you remember telling me at the time of your deposition you were not expecting the sergeant's patrol vehicle to pull forward at that moment?

A        Yeah.  I just -- I didn't -- I didn't know what to expect.  But that wasn't something that I could have foreseen.

Q        And you also weren't expecting the shots you heard; correct?

A        Yeah.  It's the same thing.  I didn't --

Q        You weren't expecting it?

A        I didn't expect it.

Q       Okay.  So you're agreeing you never saw the object and never saw it pointed at the patrol vehicle; correct? You're agreeing with that?

A       I'm agreeing that I seen the object originally. I know that he never dropped the object.  And that I'm assuming at this point that the object is still in the position that it was when I originally seen it, due to the fact that he never dropped that right arm for me to see the object again.

Q       Here's I guess what I'm getting at.  You're behind Mr. Petit.

A       Yes, sir.

Q       He's kind of west of you, due west; is that right?

A       Yes.

Q       I'm wondering from your -- and the sergeant's vehicle would have been to the left of both of you.

A       Yes.

Q       I'm wondering whether you ever saw Mr. Petit point his arm out --

A       Oh, no, I never seen that.

Q       No?

A       No.

Q       Could you even see his hand at all?

A       No, I couldn't see his hand at all.

Q       Could you see the object at all when you heard

the shots?

A    No.

Q    You're saying that as Mr. Petit was walking away and getting onto Bronson Street, the object was not visible?

A    The object was not visible, yes, sir.

Q    Let me ask you about these two shots.

You're saying, based on your statement and deposition, that you believe one of the shots came from the patrol vehicle.

A    Yes, sir, I did.

Q    And so you didn't know who was in the patrol vehicle at the time; correct?

A    Yes, sir.

Q    And I take it at least something from your perspective made you believe that one of the shots came from the patrol vehicle.  True?

A    Yes, sir.

Q    Now, officers to some extent in certain situations are trained to fire two shots and reassess.

Is that fair?

A    No.

Q    No.

The two shots you heard, how far apart do you think they were?

A    Within a -- maybe a half a second.  Maybe.

226

Q      Okay.  And you're aware that the firearms the LAPD carries, the semiautomatic weapons, could fire two or three shots in a second.

Is that fair?

A      Yes, sir.

Q      And you heard two shots very close in time together.

A      Yes, sir.

Q      And from your perspective, you're saying at least one of the shots came from the patrol vehicle; correct?

A      I assumed that, yes, sir.

Q      And you also assumed that one of the shots came from Mr. Petit.

A      Yes, sir, I did.

Q      That's why you're saying you shot; right?

A      Yes, sir.  I'm saying that based off of the fact that -- I had asked my partner obviously if -- what he meant by it's not a gun.  Is it a gun?  Is it a gun?  And he never responded.  I then heard, drop it.

It was very fast.  I then heard two shots.  And at that point I was under the impression that the vehicle, the police vehicle that he had bladed towards and made, like, eye contact with, he shot at.  And then they returned fire, and then I returned fire to intervene.

Q      Okay.  And you told us before about wanting to be

100 percent sure; correct?

A    Yes, sir.

Q    And you don't obviously want to speculate before you shoot someone; right?

A    Yes.

Q    I'm just trying to go over this.

You saw this object.   You described it as funky looking.   Remember that?

A    Yes, sir.

Q    In fact, you said something to the effect it's not what we ordinarily have a firearm looking like.   Remember saying that?

A    Yes, sir.

Q    In fact, you described it as having silver and chrome in it; right?

A    Yes, sir.

Q    And you weren't sure what it was obviously. That's why you didn't fire at Mr. Petit initially.

MR. ROTHANS:  Vague as to time, Your Honor.

MR. GALIPO:  Initially.

THE COURT:  Initially.

Q    BY MR. GALIPO:  Correct?

A    I told you that I originally didn't fire based off of my partner's statements.

Q    Right.  And so you didn't fire even before your

hypothetical.

THE COURT:  Overruled.

THE WITNESS:  It depends what they're doing with it, sir.

Q       BY MR. GALIPO:  Do you recall telling me at your deposition that a gun in the hand is not enough?  It has to be more?

A       Yes, sir.  It all depends what they're doing with it.  It has to be a little more than just having it on your person.

Q       Right.  Like, for example, when someone is pointing it at someone, for example.

A       I'm sorry.  What's the question, sir?

Q       Like if they were pointing it at someone, that would be different.

A       Yes.

Q       And you're trained that in order to use deadly force, there has to be an immediate or imminent threat of death or serious bodily injury.

Is that fair?

A       Yes.  But also in our training it states that you don't -- the gun does not have to be pointed at you at the time to use deadly force.

Q       Okay.  And part of your training is that the person has to have the ability, opportunity, and apparent

intent to immediately cause death or serious bodily injury to use deadly force.

True?

A      Yes, sir.

Q      And your training is there has to be all three, ability, opportunity, and apparent intent; correct?

A      Yes, sir.

Q      So here obviously the ability would be you'd have to have a firearm.

MR. ROTHANS:   Argumentative.   Lacks foundation. It's argumentative.

THE COURT:   Overruled.

Q      BY MR. GALIPO:   Correct?

A      Yes, sir.   Yes.

Q      Okay.   But even if he had a firearm, he'd still have to have the apparent intent to use it; correct?

A      Yes.

Q      And you are trained essentially that deadly force should be a last resort.

A      Yes.

Q      And that there should be no other reasonable options.

A      Yes, sir.

Q      And you're trained to give a verbal warning when feasible.

A       When feasible, yes, sir.

Q       And you are trained that resistive behavior, like not complying with the commands or walking away, is insufficient to use deadly force.

Is that fair?

A       Yes, sir.

Q       And subjective fear or fear of future harm you're trained is also insufficient to use deadly force; correct?

A       Yes, sir.

Q       Have you been trained on the concept of contagious fire?

A       Yes, sir.

Q       And that's basically don't just respond to hearing other shots?

A       Yes, sir.

MR. GALIPO:  May I have a moment to look at my notes, Your Honor?

THE COURT:  Certainly.

Q       BY MR. GALIPO:  You did use some profanity with Mr. Petit; is that right?

A       Yes, sir, I did.

Q       Did you have the impression or form an impression as to whether he understood you or not?

A       I believed he understood me.

Q       You had heard him --

A        Well --

Q        Go ahead.  I'm sorry.

A        I just -- I expected him to understand what I was saying.

Q        You heard him mumbling.  You couldn't really make out what he was saying?

A        Right.  Yes, sir.

Q        Some part of the item that you saw looked like it was welded together; is that right?

A        Yes, sir.

Q        So what part of Mr. Petit's body were you aiming at when you fired?

A        Due to how he was bladed towards the police vehicle, it was like his left upper back area.  So the left side of his upper back or like midpoint.

Q        Isn't it true, sir -- and I can put the exhibits up again.

Isn't it true that you fired your shot after Mr. Petit already went to the ground?

A        No, sir.  I don't think you're taking in consideration lag time for someone to observe obviously the threat or for it to register for us to react.  And all of that was within one second.  And I believe the timestamps are going to be -- show what I'm referring to.

MR. GALIPO:  Okay.  Can we put 4-11 back up,

please.

THE WITNESS:  The lag time, the perception, the reaction.

Q    BY MR. GALIPO:  How much time do you think passed between you hearing the second shots and you firing?

A    Less than a second.

Q    So -- and your impression was the second shot that you heard struck Mr. Petit; correct?

A    I'm unsure.  I couldn't see where it went.  I just knew that he no longer posed a threat at that moment.  So I no longer fired.

Q    Well, do you recall telling me at deposition that you believed the second shot struck him?

A    What I -- from my belief -- I'm saying a shot.  I don't know if he -- it was the first one -- at that moment I didn't know if he shot first or second.  I'm going off of beliefs.  But I believe that he was struck by one of the rounds.

Q    And that would be before you fired.

A    Yes, sir.

Q    And looking again at Exhibit 4-11, we could see Mr. Petit on the ground; correct?

A    Yes, sir.

Q    We can see your hands and your gun; correct?

A    Yes, sir.

Q        And we can see the casing coming out of your weapon.  So we know that's the time frame you fired.

A        Yes, sir.

Q        So I'm only asking you -- I'm not asking about perception reaction time.  Would you agree when you actually pressed the trigger with the bullet coming out of the barrel and the casing being ejected on the right side, Mr. Petit was on the ground?

A        From this photo, yes.

Q        And you're trained -- as part of your training, you're responsible to justify every shot; is that true?

A        Yes, sir, we are.

Q        And after he was on the ground, you saw this object that he had end up somewhere on the ground; correct?

A        Yes, sir.

Q        And did you hear after the incident Sergeant Hayhoe asking if anyone could see a gun on the ground?

A        I don't recall that part.  I remember us saying get away from the gun, because at that moment I was still under the impression that that was a firearm.  I even told another officer after the scene was over with to stand by the firearm.

Q        You know it's a car part now; correct?

A        Well, now I do, yes, sir.

Q        Would you at least agree with me, based on your training, it would be inappropriate to shoot Mr. Petit after he

fact that he matched the description of those crimes that were alleged.

Q     Okay.  What commands do you recall specifically giving Mr. Petit, just you, nobody else, on the scene prior to the shooting?

A     I recall telling him to drop what's in his hands. I recall telling him to get against the wall and to come here.

Q     At any point in time, did Mr. Petit go against the wall?

A     No, sir.

Q     At any point in time, as he walked or proceeded along that sidewalk, did he drop any object that he had been holding onto?

A     No, sir.

Q     And did you hear commands of Officer Martinez directed at Mr. Petit at any time?

A     Yes.

Q     Again, what commands from Officer Martinez do you recall hearing?

A     Officer Martinez told him to get against the wall.  To come here, meaning to go back to his direction or come to his direction and to drop what was in his hands.

Q     At any time you were there on the scene prior to the shooting, did Mr. Petit comply with any of Officer Martinez's commands?

be 100 percent sure before I made any choice, like I mentioned, that's life altering.

Q        Right.

A        I don't have this job to -- I don't ever want to kill anyone or shoot anyone or hurt anyone ever.

Q        Right.  So counsel asked you if, when you fired, you were 100 percent sure.

Do you remember that question?

A        Yes, sir.  At that moment I was 100 percent sure.

Q        That's what I want to get to.

A        Yes, sir.

Q        You told me earlier that the reason you didn't yell out "gun," even before your partner said, "It's not a gun, bro," is because you were not 100 percent sure; correct?

A        Yes.

Q        So would you at least agree with me that you were not 100 percent sure it was a gun when he was on the sidewalk?

A        Yes.

Q        In fact, you had your partner -- and I think we're going to play, if we can, exhibit -- this is Exhibit 5, the body-worn camera of Officer Martinez.

MR. GALIPO:  We're going to play a short clip, Your Honor, by agreement.

(Marked for identification Exhibit No. 5.)

(The video commenced playing before the jury.)

case.  You realize the object in his hand is not a gun.

A      Okay.

Q      And he starts walking away from you.

Do you think it would have been appropriate to tase him?

MR. ROTHANS:  It's irrelevant, Your Honor.

THE COURT:  Sustained.

Q      BY MR. GALIPO:  You were also asked about de-escalation.

A      Yes, sir.

Q      The goal is to safely detain someone or take him into custody; correct?

A      Yes, sir.

Q      With hopefully no force used; correct?

A      Yes, sir.

Q      And if any force, hopefully the minimal amount of force; correct?

A      Yes, sir.

Q      And that's part of your de-escalation training; is that right?

A      Yes, sir.

Q      And you talked about cover.  So cover, you're trained to take cover if you believe someone has a firearm.

A      Yes, sir.

Q      To allow you some protection; correct?

A       Yes, sir.

Q       And one place you could take cover is a vehicle, including a police vehicle.

A       Yes, sir.

Q       And so after you got out of your car and after you made these observations of Mr. Petit, did you ever take cover?

A       At that moment I did not.  At that moment, also, I mentioned that I did not see anything in his hand.  So my original goal was to get him against the wall and us to just go hands on and put handcuffs on him while we do our investigation.

Q       But what I'm asking you, sir, is after you saw something in his right hand, did you take cover then?

A       It was -- we're on a busy street.  The vehicle was away from us.  The only thing -- I would have had to literally stand in the middle of the street to get cover behind a tree.  So it was horrible placement, like...

Q       When the counsel played your body-worn camera footage, did you see that?

A       Yes, sir.

Q       And I'm assuming that was started after you got the call and information related to this call.

A       Yes, sir, it was.

Q       Did you note when you looked at the body-worn

Q    And like the other officers, you didn't have any information as to the name of the person; correct?

A    Correct.

Q    Whether they had a criminal history, you had no information in that regard.

A    Correct.

Q    Whether they were under the influence of anything, no information in that -- of that regard.

A    Correct.

Q    You had no information he had physically injured anyone.  Would you agree?

A    Yes, sir.

Q    And you actually observed Mr. Petit at some point before he got on the north sidewalk walking westbound on Martin Luther King Boulevard; is that true?

A    Yes, sir.

Q    Did you initially see him walking south on the -- is the street pronounced Degnan or something?

A    Yes, sir.  D-e-g-n-a-n.

Q    Okay.  Thank you for that.

So you initially saw him walking south on Degnan, which is parallel to Bronson?

A    Yes, sir.  Yeah.

Q    And then so -- if I have my directions right, would he be going south on Degnan?

Q       All right.  And when you saw Mr. Petit, did you see what appeared to be any firearm in his hands?

A       Not at that time, sir.

Q       And did he appear to be committing a crime when you first saw him at that time?

A       At the moment that the officers contacted him?

Q       When you saw him walking down the sidewalk, coming from Degnan and turning down, did he appear to you to be committing a crime?

A       Not as he was making the turn, no, sir.

Q       Now, you at some point decide to pull your car forward; correct?

A       Correct.

Q       And you did that in part because you had the impression that Mr. Petit was starting to walk away from the officers.

A       In part, yes.  Yes, sir.

Q       And you thought maybe there could be a potential foot pursuit.

A       That's correct.

Q       So you were thinking to pull forward even to the next block, if you could, and I think you used the word to triangulate; right?

A       Correct.

Q       So if hypothetically Mr. Petit started to run

A        It appears so.

Q        And at some point -- okay.

So you at some point dispatch -- dispatch is where -- or maybe communicated over your police radio you were code 6?

A        Yes, sir.

Q        And I think you said you -- were you code 6 on a possible suspect?

A        Yes.  That sounds about accurate.

Q        And you never communicated over the police radio that you observed a gun in this person's hand, did you?

A        No, sir.

Q        Did you ever hear any of the officers yelling out "gun" or communicating that he had a gun?

A        No, sir.

Q        I take it, if they would have done that, you would not have pulled forward in the manner you did.

Is that a fair statement?

A        It's hard to say what I would have done in that situation, sir.  They were there away from cover.  So I was concerned about that.  That was one of the reasons why I pulled forward as well.

Q        You're saying one of the reasons you pulled forward is because your officers had -- did not -- were not using their vehicle as cover?

Q       And going to page 13 of your statement -- let me know when you're there.

A       I'm there, sir.

Q       Line 22, you reference, again, "but did not have anything in his hands at this point."

Do you see that?

A       Yes, sir.

Q       What point were you referring to that Mr. Petit didn't have anything in his hands?  That's before you started approaching.

A       I'd have to look through the previous page to see where exactly I decided to pull forward.

Q       Okay.  Let's go to the -- okay.  Let's go to the next page.

A       The next page.  Page 14, sir?

Q       Page 14, lines 23 and 24.  You could even start at line 22 when you reference, "He was trying to elude the officers, so at this point I did not see anything in his hands."

A       That's correct, sir.

Q       Wouldn't that be before you got close to him?  Or would that be after you got close to him?

A       Well, in reference to myself pulling forward, I decided to pull forward and interject myself when it appeared that Mr. Petit was obviously, in my opinion, attempting to

deliberately ignore the officers and elude them and get away. Basically walk away from their contact.

Q    If you can turn to page 15, please, lines 7 and 8, you reference, "I didn't see anything in his hands at this point.  I didn't believe that he was armed at this point."

Do you see that?

A    Yes.

Q    Is that after you approached him or before or both?

A    It appears that that was before I decided to pull forward.

Q    Okay.  Line 14 on that page, you again referenced this was the possible suspect; correct?

A    Correct.

Q    Because you didn't know for sure; correct?

A    Correct.

Q    And then going to page 16, lines 21 through 23, you're talking about you thought it was safe to proceed forward with the cover of your vehicle and not seeing anything in his hands.

Do you see that?

A    Yes, sir.

Q    And then you're talking about accelerating forward.

A    That's correct, sir.

Q      And then going to page 17, on line 21 you talk about being in the process of accelerating towards him?

A      Yes.

Q      And you're noting his hands were free; correct?

A      Yeah.   They appeared free at that moment, sir.

Q      Okay.   So now you're saying, as you're accelerating toward Mr. Petit after observing this for some time, his hands appeared free.

Is that your statement?

A      Yes, sir.

Q      You then say after that, another sentence, "He had nothing in his hands."

Do you see that?

A      Yes.

Q      You say, "He didn't have a stick.   He didn't have a gun.   He didn't have nothing in his hands."

Do you see those words?

A      Yes.

Q      And the reason you reference stick and gun is because part of the call said he might have a gun and another part of a call said he might have a stick; right?

A      Correct.

Q      But you didn't see either one up to that point in time.

A      No, sir.

Q    Am I correct, though, to say --

A    Yeah.  Yes, sir.  You're correct.

Q    I asked a double negative.  I'm sorry.

So then going to page 18, the next page, you're talking about after you accelerated towards him.  And on line 15 of page 18, you again say, "I couldn't see anything in his hands."

Do you see that?

A    Yes, sir.

Q    And then on lines 18 and 19 of the same page, you say, "I could not see what was in his hands."

Do you see that?

A    Yes, sir.

Q    So you approach him, and then you parallel him -- I think these are your words -- as he's walking westbound towards Bronson; is that right?

A    Yes.

Q    And by paralleling him -- your window is down on your passenger side; correct?

A    Correct.

Q    You're going about 2 or 3 miles an hour; correct?

A    When I got fairly close to him in that position, the parallel position, correct, I was going very slow.  Well, moving.

Q    You had to accelerate --

A       Yes.

Q       But once you got to him, you were kind of paralleling him, in other words, keeping the vehicle even with his moving along the sidewalk?

A       Correct.

Q       And you estimated your speed to be about 2 or 3 miles per hour approximately.

A       Correct, sir.

Q       And would you agree that you continued to parallel him for about 90 feet?

A       That's correct, sir.

Q       Just to give us an idea of 90 feet --

A       Estimate.

Q       -- from where you are to the back of this courtroom is about 50 feet; right?

A       I'd say that's about right.

Q       So almost twice that distance you were paralleling him going 2 or 3 miles an hour.

        Is that fair?

A       That's a fair estimation.

Q       And you're looking at him through your open window on your passenger side.

A       Yes.

Q       And for about 9 seconds before you fire your two shots, your .45 caliber weapon that we saw a photo of is

pointed out your open passenger window at Mr. Petit.

Is that fair?

A        Yes.

Q        And according to your testimony, during these 90 feet and 9 seconds that you're paralleling Mr. Petit pointing your weapon at him before he gets to Bronson, just so I'm clear, you don't see any object in either one of his hands.

Am I understanding your testimony correct?

A        At that point, no, sir.

Q        Is that correct what I'm saying?

A        Yes.

Q        So just to make sure I'm with you, in all the time you observe him before you accelerate towards him, you don't see an object in his hands; correct?

A        Correct.  I couldn't see his hands at all.

Q        And then as you're accelerating towards him, according to you, you don't see an object in his hands; correct?

A        Correct.

Q        And then as you're paralleling him for 90 feet, approximately 9 seconds, you don't see any object in his hands; am I correct?

A        I'm sorry.  Repeat the question.

Q        Sure.

During the 9 seconds or 90 feet you're

parralleling him, looking out your window at him, you're close to the curb, he's on the sidewalk, you don't see anything in his hands according to your testimony.

Is that also correct?

A    Well, until the conclusion of the 90 feet.

Q    I'm going to get to that in a moment.

So during all this time, this 90 feet before the conclusion, did you ever see an object in Mr. Petit's right hand before the conclusion?   Before we got to Bronson?

A    Not before that, sir, no.

Q    And did Mr. Petit ever point any object at you before he got to Bronson?

A    Just before Bronson.

Q    Now, according to your testimony, you told him to drop it a few times; correct?

A    Drop it.   Don't do it.   Drop it.   Something to that effect.

Q    Right.   I want to ask you about that because, according to your testimony, you told him to drop it when you didn't see anything in his hands; correct?

A    I believed he was attempting to retrieve something that I thought was going to be a weapon.

Q    Okay.   But what I'm getting at, when you told him to drop it a couple times, am I correct that you did not see anything in his hands at that point?

A       That's correct.

Q       So you're telling someone to drop it, but you didn't see anything in his hands yet.

Is that fair?

A       Correct.

THE COURT:  Counsel, is this a good point --

MR. GALIPO:  This is a good point.  Thank you so much.

THE CLERK:  Let's take ten minutes.  All rise.

(A recess was taken at 2:14 p.m.)

(The following proceedings were held in open court outside the presence of the jury:)

MR. GALIPO:  Your Honor, do you have an idea of how long you'd like to go until today?

THE COURT:  3:30.  How's that?

MR. GALIPO:  That would be great.

THE COURT:  Good.

MR. GALIPO:  Sold.

(The following proceedings were held in open court outside the presence of the jury:)

THE COURT:  The jury is present.  All counsel are present.  Sergeant Hayhoe has resumed his place on the witness stand.  Let's continue.

MR. GALIPO:  Thank you, your Honor.

Q       BY MR. GALIPO:  Would you agree, Sergeant Hayhoe,

A    That's what I'm trying to correct.  That's what I'm -- that's what I'm saying.

Q    Just so my question's clear, I'm asking you what you did after you saw the object.

Are you with me?

A    Yes.

Q    You're saying that the first time you saw this object, Mr. Petit was close to the cement and asphalt area.

Do I have that correct?

A    Yes, you do, sir.  Yes.

Q    I am wondering, after you saw this object, did you say drop it after you saw the object?

A    No.

Q    Did you give any warning you were going to shoot after you saw the object?

A    No.

Q    Did you immediately hit your brakes and let him proceed forward after you saw the object?

A    No.

Q    When Mr. Petit was having this interaction with the officers initially, Officer Glover and Officer Martinez, and walking down the sidewalk, did you, sir, ever see him point an object at either one of those officers?

A    Not from my vantage point, sir.

Q    And during the 90 feet that you were paralleling

him, did he ever point an object at you before he got to this area where the cement and asphalt meet?

A        No.

Q        Did you ever hear him verbally threaten to harm you?

A        No.

Q        Did you ever hear him use any profanity?

A        No.

Q        How long of a period -- strike that.

Am I correct that you already had your gun pointed at Mr. Petit through your open window before you saw the object?

A        Yes.  That's accurate, sir.

Q        How much time would you say passed from you seeing this object to you firing?

A        Within one second, sir.  It was simultaneous.  No more than a second.

Q        Okay.  So you're saying that you saw this object, if I have you correctly, before you fired for a split second.

Do I have that right?

A        That sounds accurate, sir.

Q        And according to you, you could only see maybe 2 or 3 inches of this object.

Is that also correct?

A        I don't recall giving that estimation of the size

Q       Okay.  Do you recall in your deposition telling me -- and if you don't, I'll show you the page -- that you could only see a few inches of this object before you fired?

A       Yeah, I don't recall.  But if you can remind me.

Q       Yeah.  Page 50, lines 23 through 25.  Read that to yourself and see if that refreshes your recollection in that regard.

A       I'm sorry, sir.  Page 50, lines 22 --

Q       23 to 25, please.

A       Okay.

Q       Read that to yourself.  Let me know when you've had a chance to do that.

A       (Witness reviewing document.)

Okay, sir.

Q       Would you agree that you told me at the time of your deposition you could just see a few inches of the object?

A       Yes, sir.  That sounds accurate.

Q       So it would be a few inches of the object for a split second before you fired.

Do I have that right?

A       Yes, sir.

Q       You had been watching Mr. Petit, how long would you estimate, from the time you first saw him to the time you fired?  First saw him walking southbound on Degnan, crossing that street, which is pretty wide, going all the way one block

from Degnan to Bronson and his interaction with the officers in between, how long in total do you think you observed him before you fired?

A      I was the initial officer that observed him in the first place.  So I would say at least -- at least a minute or two had passed before the conclusion.

Q      And I'm understanding your testimony correctly, you thought he was a possible suspect; correct?

A      Correct.

Q      And you're saying in that whole one or two minutes you saw an object in his hand for a split second before you fired.

A      Yes.

Q      And you only saw a few inches of this object.

A      Yes.  It was enough for me at the time, sir.

Q      If your thinking was I'm going to pull forward to triangulate in case he tries to run, why, sir, were you paralleling him for 90 feet?  Why did you decide to do that?

A      As opposed to what?

Q      As opposed to pulling forward maybe past Bronson so that if he continued to walk away or run, you would be in a tactical position to help?

A      Because, sir, the triangulation -- a triangulation tactic means that you do not present yourself in a position of crossfire with fellow officers.  So had I pulled

like 2 or 3 miles an hour when you fired out the window; correct?

A    Correct.

Q    And there's a policy with the LAPD that you're aware of discouraging officers from -- not firing at or from moving vehicles.   Would you agree?

A    Except in exigent circumstances, that's correct, sir.

Q    And this is a semiautomatic weapon; right?  So you have to press the trigger for each shot?

A    That's correct, sir.

Q    And you're saying, at least now, you believe you fired two shots?

A    That's correct.

Q    At the time of your statement, you thought you might have fired an extra shot or so?

A    Correct.

Q    And the two shots that you fired would have been fired within that split second; true?

A    Simultaneously one after the other, yes, sir.

Q    Right.

MR. GALIPO:  And thank you, Ms. Masongsong.

Q    BY MR. GALIPO:  So your first shot that you fired, you couldn't tell if that struck him or not.

Is that fair?

315

after you fired your second shot; correct?

A    Correct, sir.

Q    And then at some point you heard another shot.

A    Yes.

Q    Did you know when you were firing your two shots they were your shots?

A    I wasn't completely certain at that point, sir.

Q    Well, you knew you were pressing the trigger; right?

A    Correct, sir.  Yeah.

Q    Did you ever see his hands inside his waistband?

A    Just in the immediate area of his waistband, sir.

Q    Ever see his hands inside his pockets?

A    In the area of his pockets, sir.

Q    Do you recall telling me in your deposition you don't recall if he turned towards you?

A    I'm sorry, sir.  I said in the deposition that he never turned towards me at all?  If you can, show me that line because that's not my recollection of the incident.

Q    And you believed that he had already walked into the street on Bronson when you fired; correct?

A    I believe he was on the corner of Bronson and Martin Luther King, I believe.

MR. GALIPO:  I'd like to refer to the deposition, page 49, lines 17 through 21 I would offer to read.  Page 49,

lines 17 through 21.

THE COURT:   Don't ever use this court reporting service again.   Good lord.

MR. GALIPO:   Page 49, 17 through 21.

THE COURT:   Where are we with this?   You're asking whether or not looking at this refreshes his recollection?

MR. GALIPO:   I can do it that way.

THE COURT:   Or is this just impeachment and we'll move on?

MR. GALIPO:   Sure.   I was going to just read it, but if you want me to refresh his recollection, I'm happy to do it.

THE COURT:   I don't -- I've got no dog in this fight.   I just --

MR. GALIPO:   I was going to read it.   That's all.

THE COURT:   Okay.   Good.   Read it.

MR. GALIPO:   "QUESTION:   When you fired your first shot, was Mr. Petit on the sidewalk or had he already walked into the street?

"ANSWER:   I believe he had already walked into the street."

Q      BY MR. GALIPO:   After he went down to the ground, you heard him moaning and groaning; is that fair?

A      Yes, sir, that's fair.

Q        And when you saw him laying there, you didn't see anything in his hands.  Is that also correct?

A        Not at that moment, sir.

Q        And are you saying -- and on page 50, the next page, lines 8 through 10, can you take a look at that for a second and see if it refreshes your recollection about whether he turned his upper body towards you when he was in the street?

A        (Witness reviewing deposition.)

Yes.  I'm looking at line 8, sir.  Yep.

Q        Right.  You recall telling me at the deposition when I asked you if he turned his upper body towards you when he was in the street, you said "I don't recall"?

A        Yes.  I remember answering that.

Q        Now, in terms of your training on deadly force, you also had training that in order to use deadly force, there has to be an imminent threat of death or serious bodily injury.

Is that a fair statement?

A        Yes, sir.

Q        And your training also is that there had to be the ability, opportunity and apparent intent to immediately cause death or serious bodily injury.

Is that true?

A        Yes, sir.

Q        And you're generally trained that if there's not an imminent threat of death or serious bodily injury, you

should not use deadly force?

A        Yes.

Q        And generally trained it's a last resort?

A        Generally.

Q        And you know, based on your training, that if you shoot someone, it's likely to cause serious injury and possibly death.

A        Correct.

MR. GALIPO:  So we're going to play, with the Court's permission, the sergeant's body-worn camera that hasn't been shown yet.  I think it's Exhibit 1.  And I think this is by agreement.

(Marked for identification Exhibit No. 1.)

Q        BY MR. GALIPO:  You've seen your body-worn camera before; correct?

A        Yes.

Q        And I take it it doesn't show Mr. Petit from your perspective because your camera is on your chest and your chest is more facing the front of the car --

A        Correct.

Q        -- with your arm out the open window; is that right?

A        Yes, sir.

MR. GALIPO:  We're going to start it for the record 1 minute and 26 seconds into it.  And the timestamp on

A        Yes, sir.  The parked vehicle, yes.

Q        Yes.

         That was in a driveway.  Do I have that right?

A        Correct, sir.  Yeah.

Q        I'm assuming there was a home associated with that driveway?

A        Further east, that's correct.

Q        Do you know -- did you yourself ever dispatch that shots were fired after you fired your shots?

A        I did not.  I don't believe I'm the one that put it out that shots were fired because Officer Nelson already had done that.

Q        Did you ever, yourself, request for medical attention for Mr. Petit?

A        I did.  I directed an officer to render CPR.

Q        Okay.  I'm wondering whether you ever asked for like a rescue ambulance, for example.

A        I didn't have to.  Another officer did.

Q        Now, I stopped your body-worn camera at this point.  But do you know how much longer it took before any paramedics or medical professionals got to Mr. Petit?

A        I think it was probably a couple minutes after the request was made.

Q        When was the request made, if you know?

A        The request would have been made after we safely

took him into custody and had him under control.

Q       Let me ask you about that.

You know someone's been shot; correct?

A       Yes.

Q       In this case.

You knew he was shot.

A       Correct.

Q       And even from your position you could see blood on the asphalt next to him; correct?

A       Yes.

Q       Why not call for the paramedics then, have them stage halfway down the street so that as soon as it's safe, they can get him that timely care?  Why wait 3 or 4 minutes until he's handcuffed before calling?

A       Because we're in the middle of a tactical situation.  He -- we can't determine that he's a threat until he's in custody.  We didn't immediately -- we didn't immediately determine he was a non-threat until it was apparent that he wasn't moving any longer.  So that's why -- that's why the ambulance isn't -- wasn't requested right away.  We're in the middle of a tactical situation.

Q       Right.  But you don't want to wait till the person stops moving before calling an ambulance because they could end up dying; right?

A       Well, in an ideal situation, sir, yes.  An

ambulance 5 feet from the person would be perfect.  But that wasn't the case.

Q       Okay.  You may have answered it and I apologize, Sergeant.  I'm just wondering why you didn't call for the ambulance before he was handcuffed.

A       Because we were in the middle of a tactical situation approaching and he was not safe to approach at that point.

MR. GALIPO:  May I have one moment, Your Honor?

THE COURT:  Sure.

MR. GALIPO:  Thank you, Your Honor.  Nothing further at this time.

MR. ROTHANS:  Your Honor, may I inquire, are we still stopping at 3:30 regardless of where we are in the examination?

THE COURT:  No.  Because that sounds ridiculous. I don't want to drag him back tomorrow morning for 3 minutes.

MR. ROTHANS:  Okay.  You want to stay till we finish?

THE COURT:  I'd like to, yeah.

MR. ROTHANS:  Very well.  Thank you, sir.

**CROSS-EXAMINATION**

BY MR. ROTHANS:

Q       Sergeant, when did you first become a police officer?

351

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  19TH  DAY OF FEBRUARY, 2026.


_____
MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER