# EXHIBIT 5

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

**HONORABLE OTIS D. WRIGHT, U.S. DISTRICT JUDGE**

| | | |
|---|---|---|
| JERMAINE PETIT, et al., | ) | |
| | ) | |
| PLAINTIFFS, | ) | CASE NO. |
| | ) | |
| vs. | ) | CV 23-00789-ODW |
| | ) | |
| CITY OF LOS ANGELES, | ) | |
| et al., | ) | VOLUME 3 |
| | ) | PAGES 350 TO 594 |
| DEFENDANTS. | ) | |
| | ) | |

**REPORTER'S TRANSCRIPT OF**
**JURY TRIAL DAY 3**
**THURSDAY, FEBRUARY 19, 2026**
**8:04 A.M.**
**LOS ANGELES, CALIFORNIA**

_____

**MIRANDA ALGORRI, CSR 12743, RPR, CRR**
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, SUITE 4455
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

Q        Just so I'm clear, in all this one or two minutes that you were observing Mr. Petit up until he got to Bronson, you're saying you never saw any objects in either his left hand or right hand.

Am I understanding that correctly?

A        Until he approached Bronson, that's -- that's correct.

Q        Okay.  So you didn't see the water bottle in his left hand at any time; correct?

A        Correct.  I don't recall that.

Q        You saw no object in his right hand before he got to Bronson.

A        Correct.

Q        And this object that you saw, you saw, as you said, for a second or a fraction of a second.  It was instantaneous.

A        Yes, sir.

Q        Now, you said you reviewed your deposition; right?

A        Yes, sir.

Q        Do you still have a copy with you?

A        I do, sir.

Q        Okay.  Do you recall when I asked you in your deposition what hand he had this item in, you said you didn't know whether it was his left hand or right hand?

A        I remember -- I remember the comment, sir.  That was from the perspective at the time that this incident occurred.  But after body-worn video, I was able to see that it was in his right hand.

Q        Okay.  Well, let me break this down.

You would agree that you understood, when I took your deposition, you were under oath to tell the truth.

A        Yeah.  Absolutely, sir.

Q        And there was a court reporter involved taking down all the words just like we have in court now.

A        Yes.

Q        And you would agree, when you told me that you saw this item for, you know, a second or a fraction of a second before you shot, I asked you what hand was it in.

You recall that?

A        Yes.

Q        And you told me you don't know what hand it was in.

Would you agree with that, in your deposition?

A        I said I could not recall, yes.

Q        Now, you -- we had a discussion with counsel and the Court about blading.

Do you remember that?

A        Yes.

Q        You actually faced the jury with your front to

414

them with this object in your right hand, even though you didn't recall which hand it was in in your deposition, and pointed it in their direction.

Do you remember doing that?

A        Yes.

Q        Well, sir, would you agree that in looking at the body-worn camera footage, Mr. Petit is on the black asphalt street when the shots happened?

Do you agree with that?

A        I'd have to see it again to know exactly when the shot was fired, but --

Q        Well, you can hear it on some of the body-worn cameras, can't you?  Because the -- at least Officer Glover and Martinez turned theirs on so we have audio; right?

A        There will be some of that, sir, yes.

Q        And so we can hear and see -- and you reviewed these body-worn cameras; right?

A        Yes, sir.

Q        That Mr. Petit is facing straight west when the shots happened, not turned towards you at all.  Isn't that true?

A        Well, there's more to it than that, sir.  It's a continuous movement.  There's not one permanent position.

Q        Would you agree, sir, in looking at the video, Mr. Petit is facing west, not turned towards you at the time we

hear the shots?

A    I'd have to see it again.  But the item was facing me, sir, when I fired the weapon.

Q    And according to your testimony, you have your gun pointed out your open window for 9 seconds and 90 feet as you're paralleling Mr. Petit.

A    Yes, sir.  That sounds accurate.

Q    And during none of that time, according to you, do you see an object or does he point an object at you; is that right?

A    Correct.  But I believe he's attempting to arm himself.

Q    Attempting to arm himself.

Well, I'm a little confused.  Because you just said now I think it might have been in his right hand because I saw video footage where you see he had something in his right hand; right?

A    I couldn't see either of his hands, sir.

Q    No.

But you just said a short while ago that even though when you took your deposition and I asked you what hand it was in, you said I don't know, you're saying now you think it was his right hand.

MR. ROTHANS:  Your Honor, this has been asked and answered.  It's becoming argumentative.

impeachment.  Can we have a page and line and reference?

MR. GALIPO:  Sure.

Q    BY MR. GALIPO:  Do you have your deposition still with you?

A    I have it with me, sir.

Q    Okay.

THE COURT:  Just tell counsel and the Court page and line.

MR. GALIPO:  Yes.

THE COURT:  Give us a second.

MR. GALIPO:  Page 51, lines 3 through 8.

MR. ROTHANS:  No objection, Your Honor.

MR. GALIPO:  I can actually read for completeness 3 through 13.

THE WITNESS:  Yes, sir.  I see that where it says "dark in color."

Q    BY MR. GALIPO:  All right.  Would you agree in looking at that it refreshes your recollection you weren't sure if it was -- you said it was dark but you weren't sure if it was black or brown?

A    I said -- not that I wasn't sure.  I think I said that it was -- let me read on here past 3 and 4.  I did say I would say it's a dark colored -- darker colored -- I couldn't recall exactly if it was dark or brown or black.  It was dark in color.

Q       Right.

A       Dark-colored barrel is what I said.

Q       Then I asked you in lines 12, 13 following up, "You're not sure which hand it was in."  And you said, "Correct."

A       Yes, sir.

Q       So this life-threatening last resort that you're trying to describe to this jury and doing a demonstration, you didn't even know which hand this object was in.  Is that true?

A       Either hand can kill you, sir.  It doesn't matter if it's right or left.

Q       You're doing a demonstration to this jury on what you say you saw in a split second.  And you admit in your deposition you don't know what hand it's in, yet you're facing them pointing this object at them.  Is that true?

A       I saw the position of where his hand was and the position that his arm was in.

Q       And you were asked about information on the call about a transient and things of that nature, but it was also said in the call that it was unknown whether the person had a gun.  Isn't that true?

A       There were parts of the call, sir, that mentioned that, yes.

Q       You said you tend to believe the callers.

Do you remember that?

A       Yes.

Q       You didn't speak to any of the callers, did you?

A       No, sir.  No.

Q       I mean, you don't hear the 911 calls, do you?

A       No, sir.  Not until after the fact.

Q       Would you tend to believe the words of a fellow officer?

A       Yes.

Q       You would agree that information you get over the police radio from people calling in sometimes is accurate and sometimes is inaccurate?

A       Yes.  Until we determine otherwise, sir, yes.

Q       And are you saying -- you talked about skipping and shuffling, I'm not exactly sure all the words, before Mr. Petit got to Bronson.  Are you saying you never saw any object in his hand during that time frame?

A       Correct.

Q       And regarding this assault with a deadly weapon, you didn't know if that had occurred or not.  True?

A       Not at that time, sir.

Q       And to have an assault with a deadly weapon, you at least need a deadly weapon.  Would you agree with that?

A       Yes.

Q       Are you trying to suggest that you saw Mr. Petit pull something out of his waistband right before you shot him?

A        I don't recall, sir, if it would have been from his clothing or his waistband area.  I couldn't -- I could not tell where it came from.

Q        And do I understand you correctly that nowhere on the video can we see Mr. Petit pointing an object at you? Would you agree with that at least?

A        Yes.   You're not going to be able to see that. His back is turned in the video that we see.   But he's also skipping sideways, evident in the video.

Q        Are you saying he was skipping sideways at the time he was shot?

A        No.   I'm not saying that, sir.   I'm saying that I could not see anything in his hands the entire time until the last second.   So that's what I'm trying to say.

Q        And then, as soon as you saw something in his hands, because your gun was already pointed out the window for 9 seconds, you pressed the trigger twice?

A        When I deemed that my life was in jeopardy, I did, sir, to save my life, yes.

Q        And I'm not going to go through all of it, but you had training with respect to when you can and cannot use deadly force; right?

A        That's correct, sir.  Of course.

MR. GALIPO:  Thank you.  That's all I have at this time, Your Honor.

MR. ROTHANS:  No further questions, Your Honor.

THE COURT:  Okay.

MR. BOJORQUEZ:  Just one question, Your Honor.

**RECROSS-EXAMINATION**

**BY MR. BOJORQUEZ:**

Q       Sergeant Hayhoe, when was that deposition taken?

A       The deposition with counsel was taken August 28th of 2025.

Q       How many years after the incident?

A       That would have been three years after, a little over three years after the incident.

Q       Did the video help you recall and refresh your recollection as to certain things?

A       Yes.

MR. BOJORQUEZ:  I have no further questions. Thank you.

MR. GALIPO:  Nothing further, Your Honor.

THE COURT:  Mr. Galipo touched on this, and I thought I was going to be able to avoid asking you myself.  But you did indicate -- you stated that you tend to believe people who call the police.  Remember that?

THE WITNESS:  Yes, sir.

THE COURT:  Is it your experience -- are you aware -- have you ever heard that sometimes people who call the police to report an incident will say "and he has a gun" in

order to hasten the police's arrival?  Are you familiar with that?

THE WITNESS:  Yes.

THE COURT:  Okay.  Let's take a break.

MR. GALIPO:  Thank you, Your Honor.

THE CLERK:  All rise.

(A recess was taken at 9:37 a.m.)

(The following proceedings were held in open court outside the presence of the jury:)

THE COURT:  Someone wanted to talk about something?  No?  Good.

MR. BOJORQUEZ:  Yes, Your Honor.

So, Your Honor, we needed the Court to -- under Exhibit Nuber 229, which is a Ring camera video of the underlying incident --

THE COURT:  What kind of camera?

MR. BOJORQUEZ:  It's a security Ring camera.

THE COURT:  Oh, Ring.  Residential?

MR. BOJORQUEZ:  Correct.  Yes, it was a residential, Your Honor.  And it essentially captured the incident from across the street.  Looking from -- it would be to the south of the incident location, and it was -- captured the incident in a -- essentially it would be a northwest depiction of the underlying incident, Your Honor.

THE COURT:  Okay.  I'm just thinking.  You guys

**NELSON MARTINEZ,**

**CALLED BY THE PLAINTIFF, WAS SWORN.**

**DIRECT EXAMINATION**

**BY MR. GALIPO:**

Q       Good morning, Officer Martinez.

A       Good morning, sir.

Q       You -- is it your understanding you've been designated the representative for the City of Los Angeles for purposes of this trial?

A       Yes, sir.

Q       And you just happened to be one of the officers that was involved in the incident?

A       A witness officer.

Q       You're the one at some point that said "It's not a gun, bro"; is that correct?

A       Correct, sir.  I did say that.

Q       So how long have you been an LAPD officer?

A       Are we talking about right now or at the time of the incident?

Q       As of right now.

A       As of right now, I have 7-and-a-half years.

Q       And at the time of the incident, it was about 4 years.

A       Approximately 4.

Q       And you had gone to a police academy; correct?

earlier.  Basically just papers showing us what policies and training are.  But I did receive that.

Q      Okay.  And part of the training was you have to have the ability, opportunity and apparent intent to immediately cause death or serious bodily injury?

A      That was part of the training, yes.

Q      Give a warning when feasible; correct?

A      Yes, sir.  Sorry.  Yes, sir.

Q      Basically it should be a last resort when there are no other reasonable options?

A      As far as a last resort, it's just they train us -- it's on the reactions that we have to make on what the suspect is doing at the moment.

Q      Right.  You obviously had a firearm at the time; correct?

A      I'm sorry.  Can you repeat that?

Q      You had a firearm on you at the time of the incident?

A      Yes, I did have a firearm.

Q      Did you fire any shots, sir?

A      During this incident, I did not fire any shots.

Q      You had some familiarity with guns and firearms as a police officer at that time.  True?

A      Yes, sir.  At the time I've completed and made multiple arrests for firearms.

A       Yes, I did.

Q       At some point, did you ever see Mr. Petit pointing an object at you?

A       My initial contact getting out of the car, he never pointed anything to me.  I had more of his back during that first contact, which is why my contact or communication towards him was "come here."

Q       Here's what I want to know.  At some point Mr. Petit started walking away from you and Officer Glover westbound on the sidewalk; is that correct?

A       Yes.

Q       Before he walked away from you, did he ever point an object at you?

A       Before he started walking away, the pointing went more towards my partner.  And then he pointed it at me.

Q       Okay.  And this object at some point you determined was not a firearm; correct?

A       At that point in time and due to the positioning that I was in, I had a better -- well, I had the first official initial contact.  It wasn't pointed at me first, I had enough opportunity to see what it was that he had in his hand.  And at that time I believed it wasn't a gun.

Q       You believed it was not a gun; is that correct?

A       Correct.

Q       And what did you notice about it that made you

believe it was not a gun, given your experience with firearms?

A          I think at the time, if I recall correctly, I saw the face plate -- I don't know what it was, the flat part on the left side.  That for me was the huge indicator that possibly it's not a firearm.  And I also described the silver kind of tip at the end from, you know, the quick reaction that he made.  I was able to see that.

Q          Okay.  So you yourself, at least in your mind, were able to determine it was not a gun, in part, based on the side view and, in part, based on the silver tip.

A          Correct.  And my location from where I was to Mr. Petit.

Q          And obviously as a law enforcement officer, you -- there's occasions where you need to try to distinguish a firearm from another object.

Is that generally a fair statement?

A          I mean, it's circumstantial.  Depending where you are, if everything is rendered safe and you can verify the -- whatever weapon it is and whatever is in someone's hands, then you can figure out what you have.  But in a fluid kind of incident, you don't really have time to do that.

Q          Well, in this incident, you, yourself in the few seconds that you had contact with Mr. Petit, determined it was not a firearm; correct?  You, yourself.

A          Well, me, myself, in that first moment when he

know.  Like I said, every incident's different.

Q        You've never done that in the hundred times?

A        No.  I've never had to yell out "gun."

Q        Okay.  But based on your training, the benefit of that would be to let a fellow officer know what you're seeing in case they don't see it.

A        Yes.  That's correct.  You could describe what you see to your partner officer or other officers.

Q        Okay.  And obviously in this case you did not yell out "gun."

Is that a fair statement?

A        In this incident I did not yell that out.

Q        What you said is, "It's not a gun, bro."

Is that -- we can hear that on your body-worn camera; correct?

A        Yeah.  That's what I said.

Q        And I'm assuming, prior to saying that, in your mind, you made the realization it's not a gun.

A        At the moment in time during that first turn and interaction when he actually faced us, yes, I had it in my mind that that possibly was not a firearm.

Q        Well, you said "It's not a gun, bro," is what you said; correct?

A        That is what I said.

Q        I mean, obviously if it was pointing at you and

you thought it was a firearm, you might have shot.

A     Well, like I said, it's circumstantial.  If it happened at that time and everything was different, it could have been different actions, but I can only speak on what happened this time.

Q     You obviously didn't shoot when this object was pointed at you and your partner; is that correct?

A     Yes.  I didn't shoot.

Q     And your partner didn't shoot at that time either, did he?

A     At that first moment in time, no, he didn't shoot.

Q     When you first saw the object -- you said you noticed the silver tip; right?

A     Yes.  That's what I said.

Q     And did you initially, the first time you saw, see the back of it?

A     I'm sorry.  The back of what part?

Q     Of the object.

A     I think during the time the way he was manipulating it, I was only able to see the front I want to say 2, 3 inches of it, but from the left side.

Q     You saw the front 2 or 3 inches.  You're talking the part by this silver tip?

A     Well, from the silver tip, the 2 or 3 inches that

MR. GALIPO:  We stopped at 19:35:42.

Q        BY MR. GALIPO:  A couple more questions.

The part of the call that related to the ADW, would you agree that you didn't know whether there was actually a victim of that ADW?

A        Well, to that I can't really answer.  The investigation, from what we know, wasn't completed at the moment.  Like you said earlier, we were the backing unit, which is the secondary unit, and we were canvassing.  So whether there is a victim or not, someone called, someone believed someone, you know, was threatened with a firearm.  Initially that already makes somebody a victim of a crime.  But whether they made contact with that person, I'm not sure.  We were just canvassing the area due to the severity.  And because of his actions, putting the rest of the public, you know, in a sense of fear.

Q        I see.

Can you turn to page 25 of your statement, please.  Do you have that in front of you?

A        Yes, I do.

Q        Can you look at the question and answer on line 6 through 8, please, on 25.

A        Yes, I see it.

Q        You see the question, "Did you know or do you know there was a victim of an actual ADW?"

And you said "No."

A      That's correct.  I see that.

Q      And would you agree, sir, that your experience as a law enforcement officer is sometimes information that's transmitted to you from the dispatcher from 911 callers sometimes ends up being inaccurate?

A      At the end of the day, it's our responsibility to find out, but it could happen.

Q      I mean, that's the point.  It's your responsibility to find out what's actually going on; right?

A      Yes, it is.

Q      Just because someone says they think someone has a gun, you can't necessarily just assume that's true.  You have to go out and determine its yourself.

Is that a fair statement?

A      Yes.  And that falls with either if the danger is still happening, rendering the scene safe, taking any person into custody, as far as a detention, completing an investigation.  Then we find out whether a crime occurred, whether we have a victim.  But we have to render the scene safe.  That is ultimately the goal.

Q      So in this case are you saying you rendered the scene safe after Mr. Petit was shot?

A      I believe the scene was stabilized and he was taken into custody.

503

Q        Did you review the depositions of the involved officers?

A        Yes, I did.

Q        Were you given -- did you review the body-worn cameras involved in this incident?

A        Yes.

Q        And do you have an understanding of the radio dispatch information that the officers in the field had related to this call?

A        Yes.

Q        And after reviewing all the documents, at some point did you write a report stating your opinions?

A        Yes, I did.

Q        Do you happen to have a copy of your report handy with you today?

A        Yes.

Q        I want to first talk about the information the officers had.  And the jury has heard a lot of this, pretty much all of it.  You understand there was a call regarding assault with a deadly weapon, someone being possibly armed with a handgun, some information about unknown if there was a gun involved, and then a stick and things of that nature.

A        Yes.

Q        So what is the responsibility of the officers, generally speaking, upon hearing this type of information in

A    Yes.

Q    At this point in the encounter, based on your review, how would you characterize Mr. Petit's actions?

A    Well, he's clearly displaying the objects that were in his hands.

Q    Okay.  Do you have an understanding that he was asked to do so?

A    Yes.

Q    And would that at least be some form of cooperation?

A    Yes, it would.

Q    At this point do you view him as a deadly threat?

A    No.

Q    Why not?

A    Because he wasn't exhibiting any aggressive behavior.  He at this point was complying with the request, or at least a portion of the request, to display what he had in his hands.

Q    Now, you have heard in the body-worn camera audio from Officer Martinez the phrase, "It's not a gun, bro."

A    Yes.

Q    Was that important to you in your review of this case as a police practice expert?

A    Yes.

Q    Can you tell the jury why that was important to

you when you heard the statement from Officer Martinez, "It's not a gun, bro."

A       Well, it establishes that it wasn't a gun.   If there was any confusion about it, he was aware through his vision and his analysis that it wasn't a firearm.

Q       And do you think it was good that he voiced that out so that his partner Officer Glover could hear it?

A       Absolutely.   That would be an expected response from an officer in that situation that they were in.

Q       Would you expect an officer who observed something like that and had his partner nearby to, rather than communicate that to his fellow officer, just talk to himself about it?

A       No.   He absolutely would be expected to share that information with his fellow officer for his safety as well and his understanding of the circumstances.

Q       Mr. Bryce, you have seen, in both video and photographs, this object, this car part that Mr. Petit was holding; correct?

A       Yes, I have.

Q       Do you have an opinion as to whether it looks like an actual firearm?

A       No, it didn't.

Q       And do you have an opinion as to a reasonably -- as to whether a reasonably trained officer would be able to

determine that is not an actual firearm?

A          Yes.

Q          What's your opinion?

A          That after seeing that, that they would determine that it wasn't.  In fact, that's what Officer Ramirez did.

Q          Officer Martinez.

A          Or, I'm sorry.  Officer Martinez did, was he analyzed it and realized it wasn't a firearm.  And he conveyed that information to his partner Officer Glover.

Q          Okay.  Now, are officers trained, if they see a firearm or what they believe to be a firearm, one thing they can do is to yell out "gun, gun," to let their fellow officers know what they're seeing?

A          Yes.  They're trained and expected to do that in that circumstance.

Q          Okay.  Based on your review of the materials in this case, did either Officer Martinez or Glover yell out "gun" at any time?

A          No, they didn't.

Q          Did they communicate over the police radio that they thought he had a gun?

A          No.

Q          Now, if hypothetically officers believe someone has a firearm, is there a concept of cover that they are trained on?

508

A        Yes.

Q        Can you explain to the jury what cover is?

A        Cover would be concealing yourself or your body in a position to where you wouldn't be vulnerable to fire from a suspect.

Q        In this instance, after Officer Martinez and Officer Glover had initial contact with Mr. Petit and Officer Martinez said "It's not a gun, bro," did you note whether the officers took cover or not?

A        Yes.

Q        What did you note in that regard?

A        They didn't attempt in any way to take cover. They followed him directly up the sidewalk.

Q        And in your opinion, is that consistent with them not believing he had an actual firearm?

MR. BOJORQUEZ:   Objection.   Lack of foundation. Calls for speculation.

THE COURT:   Overruled.

THE WITNESS:   That would be inconsistent with the training they receive about taking cover and protecting themselves.   And, no, it wasn't -- it wasn't the appropriate action to take.

Q        BY MR. GALIPO:   So if, for example -- why would it be important for someone to take cover if they actually believed a suspect had a firearm?

509

A        To protect their own life and safety.

Q        And is there any training on having cover and distance and giving yourself time to properly assess something?

A        Yes.   They're often, in training and basic training and on-the-job training, instructed how to gain cover using their vehicles, their patrol vehicles or other objects, fences, concrete fences, anything like that to take cover behind in order to protect themselves.

MR. GALIPO:  All right.  Can we see Exhibit 4-2, please.

Q        BY MR. GALIPO:  You're aware this is also a still taken from, I believe, Officer Glover's body-worn camera?

A        Yes.

Q        And this is as Mr. Petit is walking westbound on the sidewalk approaching Bronson.

A        Yes.

Q        Do you have an opinion as to whether it would be appropriate to shoot him at this point?

A        It would have been absolutely inappropriate.

Q        What's the standard, generally, as to the training and standard as to when an officer can use deadly force against someone?

A        When they're faced with an imminent danger of serious bodily injury or death.

Q        And imminent, does it -- what's -- how -- what's

510

the current training on that in terms of the ability, opportunity, and apparent intent?  Is that what the standards are?

A       Yes.  Imminent means immediate, that they're -- there's virtually no time frame between the potential danger and the situation that they're faced with.  They have to take immediate action in order to overcome that imminent or immediate danger.

Q       Is part of the analysis the tactics the officers deploy beforehand?

A       Yes.

Q       Is part of the analysis whether they have other reasonable actions?

A       Yes.

Q       Is part of the analysis whether they give a verbal warning before using deadly force?

A       They're required whenever possible to give a warning that they're about to use deadly force.

MR. GALIPO:  Can we look at 4-3.

Q       BY MR. GALIPO:  And by the way, if someone had an actual gun in their hand that was identified as a gun, is that enough in and of itself, based on the training, to shoot someone?

A       No, it's not adequate.

Q       So here, 4-3, we see Mr. Petit getting closer to

Q        BY MR. GALIPO:  From your review of the materials, given this -- the body position here, what the officers observed, do you have an opinion as to whether it would have been appropriate for Officer Martinez or Officer Glover to shoot Mr. Petit at this point?

A        Yes, I do.

Q        What's your opinion?

A        That it would have been inappropriate.

Q        And can you tell the jury why?

A        Because he didn't pose an imminent threat to them or anyone else at that point.

Q        And the imminent threat, does it have to rise to an immediate deadly threat?

A        That's correct.

Q        Well, what if someone says, well, he was walking away from us, not complying with our commands, is that enough to shoot him?

A        No, it's not.

Q        What if someone said he had something in his hands.  I thought it possibly could be a gun.

Is that enough to shoot him?

A        No, it's not.

Q        Why not?

A        Because it isn't an imminent threat to death or serious bodily injury.  That has to be the circumstance before

514

the use of deadly force is justified.

Q     Okay.  And I'm going to show you Exhibit 4-6, please.  You see here Mr. Petit stepping into the asphalt of Bronson.

A     Yes.

Q     Does he appear to you at this point to be turned in the direction of the patrol vehicle?

A     No.

Q     And I'd like to show you the next image 4-7.

Does Mr. Petit appear to you to be starting to go down?

A     Yes, it does.

Q     4-8, appear he's continuing to go down?

A     Yes.

Q     4-9, getting close to the ground?

A     Yes.

Q     4-10, on the ground?

A     Yes.

Q     Did you see anything in this image that was important to you?

A     Yes.

Q     What?

A     The fact that Officer Glover had just fired his weapon at him.

Q     How do you know he just fired?

A   You can see the casing coming out of the -- out of his pistol.

Q   Do you have an opinion as to whether or not it was appropriate to shoot Mr. Petit in this case while he was on the ground?

A   I have an opinion, yes.

Q   What is it?

A   That it was inappropriate because he didn't pose an imminent threat of serious bodily injury or death to anyone at that point.

Q   And did you review in the documents that Officer Glover believed that Mr. Petit had been struck by a gunshot before going to the ground?

A   Yes.

Q   I want to ask you some -- I want to focus for a minute on Sergeant Hayhoe.

Did you understand he had been a patrol sergeant for about 6 or 7 months before this incident?

A   That's what my understanding is.

Q   And are patrol sergeants normally there to supervise the patrol officers?

A   Yes.

Q   So in this case, are you aware that Sergeant Hayhoe decided to pull forward and parallel Mr. Petit for about 90 feet or 9 seconds with his gun pointing out his

open window at Mr. Petit?

A   Yes.

Q   Do you think that was good tactics under -- in this situation?

A   No.  And it was in violation of his own department's policy.

Q   The policy regarding shooting at -- shooting from moving vehicles?

A   Yes.

Q   And how about this concept of cover you've been talking about?  If Sergeant Hayhoe reasonably believed that Mr. Petit had a firearm, in your opinion, would that be good tactics, pulling your car alongside of him for 90 feet or 9 seconds, pointing your gun out the window at him?

A   No.  With his window down, absolutely it wasn't a good tactic.

Q   Explain to the jury why.

A   Because he exposed himself.  If he -- if that actually had been the case, that the individual had a firearm, he was driving alongside of him with his window down and exposing himself when he didn't need to do that.  He could have positioned himself in a different angle and location and used the protection of his own vehicle.

Q   And are officers trained that they -- if they get themselves in bad tactical positions without cover, they could

517

be more prone to overreact?

A    Yes.

Q    Including overreacting and using deadly force?

A    Yes.

Q    So is it your opinion that Sergeant Hayhoe shouldn't have been where he was in the first place?

A    Yes.

Q    Let's go with Sergeant Hayhoe's version of this. Sergeant Hayhoe says that -- I'll proffer to you, said he didn't see any object in either one of Mr. Petit's hands before he started approaching.

Are you with me so far?

A    Yes.

Q    In fact, he says that's one of the reasons he did approach, because he didn't see any object in either one of his hands.

You read that in his statement?

A    Yes, I did.

Q    And further assume that Sergeant Hayhoe parallels Mr. Petit for 90 feet and 9 seconds before they get to Bronson.

Are you with me so far?

A    Yes.

Q    And according to Sergeant Hayhoe, during this 90 feet or approximate 9 seconds, he sees no object in either one of Mr. Petit's hands.

Are you with me?

A     That's what he said.

Q     And then he said he yelled a couple times to drop it and says, when he said that, he was just saying drop it but he didn't see anything in his hands.

Do you recall that?

A     Yes.

Q     And then, according to Sergeant Hayhoe, as he gets close to the intersection or in the intersection, he looks and for the first time he sees what he believes to be a firearm, 2 or 3 inches of it pointed in his direction and, therefore, he thought he was about to be shot and fired two shots.

Are you with me?

A     Yes.

Q     Under the facts of this case, do you have an opinion, even assuming Sergeant Hayhoe's story was accurate, whether that would be appropriate or not?

A     Yes.

Q     What's your opinion?

A     That it was inappropriate because he put himself into that position when he shouldn't have.  He should have taken a more tactically appropriate position to try to de-escalate the situation and gain control of officer Petit {sic}.

Q        Did you see anything in the video footage that you looked at where Mr. Petit was facing towards Officer Hayhoe pointing this object at him?

A        I'm sorry.   Could you repeat that?

Q        Sure.

Did you see anything in the video footage you looked at where Mr. Petit was facing towards the patrol video, towards Sergeant Hayhoe, pointing an object at him?

A        None of the videos that I observed revealed that.

Q        And at the time of the shooting, based on the videos you observed, was Mr. Petit generally facing westbound?

A        Yes.   Essentially towards that white vehicle in front of -- in front of where you can see him lying on the pavement.

Q        Now, with respect to Officer Glover's shot, do you have an opinion regarding whether it was potentially a reactionary or contagious shot?

A        Yes.

Q        Can you explain, first of all, what that means, reactionary or contagious, to the jury?

A        Well, unfortunately, that happens in -- all too frequently where an officer that's involved in a shooting situation, if you will, a second officer hears another officer fire his weapon at an individual and he just reacts based on hearing the other officer shoot.

Q        And that's why it's called a reactionary shot?

A        Yes.

Q        Your understanding is there were two shots from Sergeant Hayhoe from the patrol vehicle.

A        Yes.

Q        And then after that and after Mr. Petit went down, one shot, as we see here on the screen, from Officer Glover.

A        Yes.

Q        How about subjective fear or fear of future harm? What if an officer said, I was in fear of my life?  I thought I was going to get shot?

Does that end the analysis?

A        Yes.

Q        How does that play in?  Is that enough for an officer to say I was in fear of my life subjectively?

A        No.  That is not sufficient for the justification of the use of deadly force.

Q        Why not?

A        Because it isn't an imminent threat.  It isn't something that the officer's faced with that can't be dealt with in any other way.

Q        In terms of the tactics in this situation, do you think the tactics should have been different or better?

A        Yes.

amount of force necessary or the force at all is necessary to overcome and control a situation.

Q    And in a situation where officers encounter someone, like in this case, that they think could be a transient and they hear the person mumbling but it's difficult to make out what they're saying, does de-escalation become important in a situation like that?

A    Yes.

Q    And can you explain to the jury why?

A    Well, oftentimes in dealing with people with mental issues, it takes a little more time and a little more effort to deal with them.  And you have to move your tactics in a -- in an appropriate manner to overcome that.  Sometimes you can't talk an individual that's mentally deranged, if you will, into doing what you want them to do.  So you have to kind of work hopefully as slowly as possible but will use the minimum amount of force and to try to calm them down.

Q    So in conclusion, Mr. Bryce, your opinion, that the tactics could have been better than they were and should have been.

A    Oh, yes.

Q    And the use of deadly force by both officers you feel was inappropriate under the circumstances here.

A    Yeah.  In my opinion, yes, it was.

Q    And why is it important for an officer to be able

to distinguish just ordinary objects in people's hands from firearms?

A    Well, officers are trained that -- about the sanctity of life and the importance of protecting life.  That's an officer's goal is to protect life and property of individuals.  So you need to make reasonable decisions to do that.  And the use of deadly force to use tactics that are going to eliminate that individual have to be under extreme circumstances where, again, it's an imminent threat.  You don't have any other choice.

In this case, they had other options that they could have used, and the use of deadly force wasn't necessary. He didn't present an imminent threat of serious bodily injury or death to these officers, and they could have used less lethal tactics to subdue him.

MR. GALIPO:  Thank you.  Thank you very much.

That's all I have, Your Honor.

MR. ROTHANS:  May I proceed, Your Honor?

THE COURT:  Please.

**CROSS-EXAMINATION**

**BY MR. ROTHANS:**

Q    Good afternoon, sir.

A    Good afternoon.

Q    You retired from the Ventura County Sheriff's Department in August of 1999; correct?

Q    You were asked if you knew where we got the object.  Do you think you needed to know that in order to give an opinion?

A    No.

Q    You did look at photos of the object.

A    Yes.

Q    And you saw it on the video.

A    Yes.

Q    By the way, you were asked by counsel, did you hear Sergeant Hayhoe asking after the shooting, you know, where's the gun?  Does anyone see a gun?  Or words to that effect.

Do you recall that?

A    Yes, I do.

Q    Was that important to you in some regards in this case?

A    Yes, it was.

Q    Can you explain to the jury why?

A    I think it helps substantiate the situation that they didn't know -- or he didn't know what the gun looked like, or what the object that he thought was a gun looked like, because it was lying right there on the pavement in front of him, in front of the victim and he didn't recognize it.

Q    So the very object in question was lying right next to Mr. Petit when Sergeant Hayhoe was asking anyone if

they see any gun.

A        Yes.

Q        You were asked whether or not the officers ever threatened to harm Mr. Petit.

Do you recall that?

A        Yes.

Q        Based on your review, did Mr. Petit ever threaten to harm the officers?

A        No.

Q        Did he ever use profanity?

A        Not that I heard.

Q        You were asked about the commands, drop it and stop and saying, well, he didn't completely comply with those.

Do you recall that?

A        Yes.

Q        Does that justify shooting someone?

A        No.  It was a misdemeanor.

Q        You were asked whether he could have been arrested I think for a 148(a)(1).  That's a misdemeanor; right?

A        That's correct.

Q        If you can possibly arrest someone for a misdemeanor, does that mean it's okay to shoot them?

A        No.

Q        You were asked about whether or not you reviewed any LAPD policy, and you referenced to page 8 of your report

where you did.

A        Yes.

Q        And that's the policy basically discouraging shooting at or from moving vehicles.

A        That's correct.

Q        You were asked whether or not you were critical of the approach.  I think you said you weren't critical of the approach, but the timing.

A        Yes.

Q        You were asked whether you were critical of them calling the paramedics.  I take it you're not critical that they asked for the paramedics but the timing.

A        That is correct.

Q        Do you have an opinion as to whether they should have asked for the paramedics immediately after he was shot?

A        Yes.  That's usually standard procedure after a shooting, to immediately request medical assistance.

Q        As opposed to waiting four minutes after he's handcuffed.

A        That's correct.

Q        In your career, Mr. Bryce, have you seen suspects with guns, knives and other weapons in their hands?

A        Yes, I have.

Q        Have you shot any of them?

A        No.

A        I learned from my mother, who learned from my Uncle Mark, who is an L.A. County sheriff.

Q        Okay.   And when you say your Uncle Mark, is that your mom's brother or dad's brother?

MR. BOJORQUEZ:   Objection.   Relevancy, Your Honor, at this point.

THE COURT:   Just background.   Overruled.

THE WITNESS:   It's my dad's brother.

Q        BY MR. DIGGS:   All right.   Now, did you come and see your father any time after you found out he had been shot?

A        Yes.   I came about a month after he was shot.

Q        Okay.   In August of 2022?

A        Yes.

Q        All right.   And where did you see your father?

A        I saw him at my grandmother's house.

Q        And your grandmother lives in Los Angeles?

A        Yes.

Q        All right.   Now, looking at this exhibit that's up, Ms. Petit, 15-4, did your father -- when you saw him in August of 2022, did he look the same as we see in this photograph?

A        No, he did not.

Q        Can you please tell the ladies and gentlemen of the jury the physical differences that you noticed in your father when you saw him.   Take your time.

A        He was a lot skinnier.  He looked more weak.  I can see looking at this photo seeing his eyes when I saw him that he was -- like he looked sad.  And that he had metal pieces in his mouth.  And he just looked like he was suffering.

Q        Did you notice or observe --

MR. BOJORQUEZ:  Objection, Your Honor.  Motion to strike as to as of his suffering.

THE COURT:  Overruled.

Q        BY MR. DIGGS:  Ms. Petit, did you observe any sort of injuries to your father's face?

A        Yes.

Q        What did you observe?

A        He had a shattered jawbone and he had --

MR. BOJORQUEZ:  Objection, Your Honor.  Lacks foundation.  Calls for speculation as far as medical expert testimony.

THE COURT:  Overruled.

THE WITNESS:  He had a shattered jawbone as well as metal pieces in his mouth that restricted him from being able to open his mouth fully and communicate with me fully to be able to speak with him.

Q        BY MR. DIGGS:  All right.  You briefly mentioned that during the times that you, you know, spoke with your father in person in 2019 and then during the times that you talked to him on the telephone, when you came to visit your

father in August of 2022, did he sound the same as he previously did those years?

A       No, he didn't.

Q       Did you observe your father walk when you visited him in August of 2022?

A       He was able to walk but with difficulty.

Q       All right.  And when you say "with difficulty," what do you mean?

A       He was slow when he was moving.  He had a hard time sitting up and down.  And while I visited him, there was multiple times that he had to leave the room to go lay down.

Q       From your perception, Ms. Petit, did it seem as though your father was in physical pain?

A       Yes.

Q       Did your father need assistance walking when you saw him in August of 2022?

A       If he needed help sitting up, I'd give a lending hand.  But he was able to walk but with difficulty.

Q       All right.  And, Ms. Petit, was that the last time that you saw your father?

A       Yes.  It was the last time.

Q       Okay.  That was your -- you were 17.  That was your senior year of high school?

A       I was in the summer of entering my senior year of high school.

572

Q        Okay.  All right.  And you went back to Minnesota?

A        I did.

Q        All right.  After that visit with your father, did you speak with him on the phone?

A        Yes, I did.

Q        All right.  And when you first spoke with your father on the phone when you went back to Minnesota, was it hard to understand him?

A        Yes.  It was still hard to understand him.

Q        All right.  And you talked to him many times thereafter over the telephone; correct?

A        Yes.

Q        All right.  And did you have the same difficulty speaking or understanding your father during those conversations?

A        Yes.

Q        All right.  Now, Ms. Petit, we've heard this throughout the trial and you've -- you know, you've been sitting here.  And, you know, we've heard terms of whether or not your father was a transient or unhoused.

Was your father unhoused?

A        No, he was not unhoused.

Q        Okay.  Did your father own a home?

A        He did.  He owned a home in Lancaster,

questions and a lot of the questions that the Court asked, he could have done so.  He didn't.  So at that point, you know, the Court is a neutral party here and it is supposed to basically advance the interest of justice, which is basically treating each side fairly.

THE COURT:  Hurry up because I'm going to tell you about how I'm really just bursting at the seams and I'm really restraining myself because I sat here and listened to several hours of perjury and I didn't say a word.

MR. BOJORQUEZ:  I think that's intimated in the sense the way that the judge has been conducting himself in a sense towards counsel and the witnesses.

THE COURT:  No.  No.  Because that would have just --

MR. BOJORQUEZ:  That appears that that's your opinion.  I think it's the jury ultimately has to make the determination.

THE COURT:  Okay.

MR. BOJORQUEZ:  But we're entitled to a fair and impartial determination of that matter.  That's all I have to say.

THE COURT:  Okay.  Good.  Sit down.

MR. BOJORQUEZ:  I have a good relationship with you.  I don't want to -- I just have to, for the record, do what I do for my client.  So I appreciate it.

THE COURT:  Yes.  And I think you've done a good job for your client.

MR. BOJORQUEZ:  Thank you, Your Honor.

THE COURT:  Anybody else have a bone to pick?  Now is a good time.

Okay.  Let's do scheduling.

MR. GALIPO:  So I think we'll be done with Dr. Omalu -- I don't know what the cross will be -- by 10:00 or 10:30.  So I really think we need to have the -- I'm assuming we're going to get all the evidence finished tomorrow.  So I just need to know the order and the estimates.  That's all I need to know for the defense.

MR. BOJORQUEZ:  So we'll have Dr. Vilke, who will be coming and will be the next witness after Dr. Omalu.  Because we weren't exactly sure where we would be, we have Dr. Hedge and Dr. Cohen.  So they're just going to have to come one after the other.  I do not -- I cannot represent right now where they will be second or third.

THE COURT:  These are your witnesses?

MR. BOJORQUEZ:  They're the defense witnesses.  Correct, Your Honor.

THE COURT:  All right.  You're not going to be here -- who is going to be examining these people?

MR. BOJORQUEZ:  Well, I mean, they were shared witnesses obviously, but I'm going to be taking those

594

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  19TH  DAY OF FEBRUARY, 2026.


_____
MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER