# EXHIBIT 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE OTIS D. WRIGHT, U.S. DISTRICT JUDGE

JERMAINE PETIT, et al.,        )
                               )
          PLAINTIFFS,          )      CASE NO.
                               )
             vs.               )      CV 23-00789-ODW
                               )
CITY OF LOS ANGELES,           )
et al.,                        )      VOLUME 4
                               )      PAGES 595 TO 716
          DEFENDANTS.          )
_____)

REPORTER'S TRANSCRIPT OF
JURY TRIAL DAY 4
FRIDAY, FEBRUARY 20, 2026
7:56 A.M.
LOS ANGELES, CALIFORNIA

_____

MIRANDA ALGORRI, CSR 12743, RPR, CRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, SUITE 4455
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

case-in-chief.  Your next witness, sir.

MR. GALIPO:  Thank you, Your Honor.  The plaintiff would like to call Dr. Bennet Omalu.

THE CLERK:  Stand here and raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Thank you.  Please be seated.  Please state your full name and spell your last for the record.

THE WITNESS:  My name is Bennet Omalu. B-e-n-n-e-t.  Omalu, O-m-a-l-u.

THE COURT:  One second.  Just one second.

MR. GALIPO:  Thank you, Your Honor.

**BENNET OMALU, M.D.,**

**CALLED BY THE PLAINTIFF, WAS SWORN.**

**DIRECT EXAMINATION**

BY MR. GALIPO:

Q    Good morning, Dr. Omalu.

A    Good morning, sir.

Q    Are you a medical doctor?

A    Yes, sir.

Q    Are you board certified?

A    Yes, sir.

601

Q        In how many different areas and medical specialty are you board certified?

A        I'm board certified in five subspecialties, sir.

Q        And can you tell the jury what those five subspecialties are.

A        I'm board certified in anatomic pathology, clinical pathology, forensic pathology, neuropathology and medical management.

Q        Just basically what are those different subspecialties?  For example, you talked about anatomic pathology, clinical pathology and forensic pathology.

A        Well, each specialty is a subspecialty of medicine.  Anatomic pathology deals with the study and diagnosis of disease based on structure of disease.

          Clinical pathology is the study of disease and the diagnosis of disease based on the presence or absence of chemicals and proteins in the human body.

          Forensic pathology is a subspecialty of medicine that studies and makes diagnosis of disease, trauma and death after the fact.  Forensic pathologies work backwards to study disease and trauma and the relationship between disease and trauma and death.

          Neuropathology is a subspecialty of medicine that studies and makes diagnosis for diseases of the brain, spinal cord, nerve fibers and muscles and studies the trauma and

602

manifestations of trauma and the behaviors of human beings in response to disease and trauma.

Q       Okay.

A       Medical management deals with the management of every aspect of health care and patient care management.  But to become board certified in medical management, you must have a master's in business administration, which I have, and also a master's in public health in epidemiology, which I also have.

Q       Okay.  I'm going to get on to this case, but what is epidemiology?

A       Epidemiology is a specialty of medicine and science that studies the cause, the presentations, manifestations of diseases across populations of groups of individuals.  So based on the behavior of disease in populations, you can then apply it to the individual patient.  That is the study of epidemiology.

Q       Forensic pathologists, one of your areas of specialties, do they perform autopsies?

A       Yes, sir.

Q       And do they perform autopsies on victims of gunshot wounds?

A       Yes, sir.

Q       And as part of your work as a forensic pathologist performing autopsies on victims of gunshot wounds, do you determine trajectory within the body?

603

A        Yes, sir.

Q        Are you often called upon, assuming you know the position of the shooter, to determine the relative position of the shooter and the person shot at the time they're shot?

A        Yes, sir.

Q        Can you briefly tell the jury about your educational background and how you became a doctor.

A        Well, it's quite lengthy, but I'll try my best to make it brief.

So I went to medical school in Nigeria.  It's a seven-year medical school curriculum fashioned after the British.  Six years of medical school training, one mandatory year of clinical internship whereby you work as a physician but under supervision.

I became a fully certified physician in Nigeria, which is the most populated country in Africa.  Then I applied to the World Health Organization to get a scholarship to enable me to come to the United States.

While I was applying to the World Health Organization, I sat for my United States medical license and examinations, which is the same examinations medical graduates in America take.

I passed that which enabled me to come to the United States in 1994.  I went to the University of Washington in Seattle, Washington.  I spent one month in Washington as a

604

research scholar.

I completed that and went to Columbia University in New York City at Harlem Hospital Center to do a five-year residency training program in anatomic pathology and clinical pathology.  I completed that and went to the University of Pittsburgh, Pittsburgh, Pennsylvania, to do a one-year fellowship training in forensic pathology.  I completed that and went back again to the University of Pittsburgh, Pittsburgh, Pennsylvania to do a two-year fellowship training in neuropathology.

I completed that and then went to the School of Public Health University of Pittsburgh to do a three-year master's in public health program in epidemiology.  I completed that and then went to Carnegie Mellon University in Pittsburgh, Pennsylvania to do a three-year master's in business administration, which I completed.  I got a master's in public health and a master's in business administration.

Then I sat for my five board certification examinations, which I passed.  But since then I've been very academically active.  I'm currently a full professor of pathology.  And I've published extensively in the medical literature.

Q    Okay.  And I want to talk to you a little bit about this case, Dr. Omalu.

Was one of the things my office asked you to do

in this case was to look at the gunshot wounds and determine the trajectory of the wounds?

A       Yes, sir.

Q       And did you have some materials that you reviewed that my office sent you?

A       Yes, sir.

Q       Did that include body-worn camera videos of the incident and the scene following the shooting?

A       Yes, sir.

Q       Were you able to look at some still photos related to the body-worn camera footage?

A       Yes, sir.

Q       And did you have available to you the medical records for the three weeks that Mr. Petit was at Cedars-Sinai Medical Center?

A       Yes, sir.

Q       I want to start off by asking you, Doctor, if you can tell the jury where -- how many gunshot wounds, first of all, did Mr. Petit sustain?

A       He sustained two gunshot wounds, sir.

Q       And where were the gunshot wounds on his body?

A       The first gunshot wound was to his face.  It entered to the left side of his face in his jaw.  The second gunshot wound was in his back.  It entered his back up above the main scapular region.  The scapula is the wing bone

directly in your back.  There's one on the left.  There's one on the side.

So it entered from the back and went into the chest cavity and hit the spine, the upper spine, and settled by the upper spine.

Q    Okay.  Just generally, the trajectory in the body of the gunshot wound to the left jaw, can you explain that, please.

A    So the gunshot wounds, one of them exhibited very inclined pathways in the body.  The gunshot wound to the left jaw traveled left to right, front to back and top to bottom.  So rightward, backward and downward.

Q    And what, if any, damage did that bullet cause after entering the body?

A    The bullet unfortunately caused extensive injuries to his face and jaw.  It entered the left side of the face, impacted the jawbone called the mandible, extensively fractured the mandible, causing the most extensive types of fractures you would encounter called comminuted, c-o-m-m-i-n-u-t-e-d, comminuted fractures of the mandible.  Continued, contused and lacerated the structures of the mouth, the tongue, the structures of the throat.  It also fractured the nasal bone and the maxilla, the bone of the cheek.

It continued downward, unfortunately, lacerated two medium-sized blood vessels on the right called the external

607

carotid -- and the external carotid, c-a-r-o-t-i-d -- and the external jugular, j-u-g-u-l-a-r.

It continued downwards.  There is a space in your upper neck/jaw area called the submandibular.  That's potential space underneath your jaw.  So the bullet settled in the submandibular space.  It caused extensive damages.  It began to bleed a lot, swallowing his blood.  And he bled extensively in the right face upper jaw with contusions of his tongue and extensive lacerations of his throat and mouth.

Q        Based on your review of the medical records, Dr. Omalu, did they try at the hospital to surgically repair the damage that was done by that bullet?

A        Well, they gave him blood because he bled extensively.  But given the sensitivity of the regions involved, a lot of that causing more damage.  The surgeons chose to leave the bullet inside because it was lodged in his face.  That was better left alone by itself.

So they gave him supportive care to let the wounds heal.  The fractures healed.  For wounds of the face and neck, you need to be extremely careful because they're very sensitive structures, which when you go in to manipulate surgically, you could cause more trauma.  So they give him blood and give him conservative therapy to sustain him to let his body heal.  But the bullet was left lodged permanently in his jaw.

Q        Given the -- and I don't know if -- I'm hoping the jury can all see Dr. Omalu from their position, hopefully they can, but --

A        Do I stand up?

Q        If that would help you or the jury?   I'm getting some nods.

MR. GALIPO:   Is it okay if he stands up, Your Honor?

THE COURT:   It's okay if the jury -- if any members of the jury wish to reposition themselves.

JUROR NUMBER 6:   Can we sit back here?

THE COURT:   You can do -- yes, absolutely.   The answer to that is yes.

I apologize, Doctor.   The elevator for the witness seat is out of order.   I don't want anyone to hurt themselves, so -- but this is the best we can do under the circumstances.

Okay.   Go ahead.

Q        BY MR. GALIPO:   Okay --

A        Do you want me to stand up, sir?

Q        Yeah, one moment.   I'm thinking of -- if there's anything I might want you to do again if before the jurors couldn't see you.

Can you -- with the Court's permission, could you just show -- stand up and show the trajectory again of the shot

609

to the face.

THE WITNESS:  Do I stand up, Your Honor?

So the bullet to the face entered from the side, it entered the face through the jaw.  Once it entered, it contused and lacerated the skin and soft tissues of the jaw. And then encountered the mandible, which is the jawbone.  It penetrated the mandible and caused very extensive fractures of the mandible.  The most extensive types of fractures you could encounter, they are called comminuted fractures of the jaw.

So it continued, entered the mouth, lacerated and contused the base of the tongue, the throat.  Continued downward and backward.  There is a space underneath your jaw called the retromandibular space or submandibular space.  It got in there.

Unfortunately, because of the density of structures on your face and neck, there are very vital blood vessels and nerves.  So one of those blood vessels, or two, one is called the external carotid.  And the other one adjacent the external carotid is the external jugular vein.  So it lacerated these blood vessels.  He began bleeding massively that it formed a very large hematoma with pressure on the right side.

Fortunately/unfortunately the bullet settled in the submandibular space.  But he was already bleeding massively and was swallowing his blood.

The surgeons made the clinical decision, which

happened because of the sensitivity of the face and neck, if you suffer a bullet, a gunshot wound, sometimes it is just safer to leave it as it is.  Because when you go in to search out the bullet, you cause more damage.  So the doctors left the bullet permanently embedded in his jaw, piece of metal, and gave him blood to replace the blood he lost and managed him conservatively to give him time to heal to the best of his ability.

Q       BY MR. GALIPO:  Okay.  If you can remain standing for a moment.

Based on the trajectory of the bullet to the face, as you just described to the jury, could Mr. Petit have been directly facing towards the shooter when he was shot?

MR. BOJORQUEZ:  Objection.  I think it lacks foundation.  Calls for speculation.  Beyond this witness's knowledge and expertise.

THE COURT:  Overruled.

THE WITNESS:  So the science of forensic pathology over the centuries have established some scientific truths.  There are some positions a human being will be in and sustains a gunshot wound and we can reasonably scientifically determine the position of the body when he was shot.

So given the location of the gunshot wound of entrance, the pathway of the bullet inside the body, the trajectory of the bullet and the point of recovery of the

611

bullet when Mr. Petit -- Petit, right?

Q        BY MR. GALIPO:   Petit.

A        Petit.   When Mr. Petit was shot, he was not facing the shooter.   It is not anatomically feasible that when he was shot he was facing the shooter, because the bullet -- bullets travel in a linear trajectory.   Bullets don't run around under gravity.   And bullets travel at 1,200 to 1,300 feet per second, faster than any human reaction.

So if somebody fires a gun at you and you're looking at him, the bullet would enter through the front and will travel in a diametric back-to-front fashion.

So given the totality of the anatomy of the wounds he suffered, we can reasonably determine scientifically that he was not facing the shooter when he was shot.

Q        Okay.

MR. GALIPO:   And I want to show -- can we show Exhibit 4-6, please, that's already in evidence.

Q        BY MR. GALIPO:   Are you able to see this exhibit on your screen, Dr. Omalu?

A        Yes, sir.

Q        And you have -- I think you've already explained that you've looked at the videos and still frames regarding this case?

A        Yes, sir.

Q        I want you to assume hypothetically, Dr. Omalu,

that Sergeant Hayhoe was driving this patrol vehicle that we see in this exhibit and that he had his passenger window down and was pointing his .45 caliber semiautomatic weapon out the window at Mr. Petit in this position that we see in this exhibit.

Are you with me so far?

A    Yes, sir.

Q    Is the position of the car and my described position of Sergeant Hayhoe and the position we see of Mr. Petit in this image consistent with the trajectory that you explained to the jury of the shot to the face?

A    Yes, sir.  This picture is consistent with the trajectory and the anatomy of the wound documented in Mr. Petit.

Q    And why is this photo consistent with the trajectory to the face?

MR. BOJORQUEZ:  Objection.  Lacks foundation. Calls for speculation.  Beyond this witness's knowledge and expertise.  He's not a ballistic evidence expert.

THE COURT:  Overruled.

THE WITNESS:  So if you've instructed me to believe that the shooter was in the car, if you notice, Mr. Petit was running away.  When human beings run away, it's called a primitive reflex.  You don't have to think.  You lean forwards.  You don't stand erect when you're running from

613

some -- something you're afraid of.

So you could see the car is located slightly to his front.

MR. BOJORQUEZ:  Motion to strike as to "something he's afraid of."  Lacks foundation.  Calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  So the car is slightly to his front.  The shooter is in an SUV, not in a sedan, and he's leaning forwards.  So this picture is consistent with the anatomic configurations of the wounds as documented in Mr. Petit.  And this is based on scientific truths established over the centuries.  Not just my opinion.

Q   BY MR. GALIPO:  Okay.  So with regards to this photo and the trajectory you described, are you saying that the trajectory of the shot to the face is consistent with Mr. Petit not turning towards the shooter or facing the shooter at the time he was shot?

A   Yes, sir.  This picture does not show him facing the car.  And it will be consistent with somebody fleeing in one direction and shot from the side.

Q   Okay.  Thank you.

Just remain standing for just a few more questions, if you could.

The shot to the back, what was the trajectory -- where did that shot enter -- maybe you can show on your own

614

back to the jury where that entered and what the trajectory was.

THE WITNESS:    Your Honor, do you mind if I remove my jacket?

THE COURT:    Make yourself comfortable.

THE WITNESS:    Thank you, sir.

So if I remove my jacket, which I have just done now, and I'm wearing a white shirt and a tie.  I'm showing my back to the jury.

So the bullet entered in the upper part of the back at the level of the scapula.  If you could see, I'm flexing my arm and you can see the bone sticking out.  It entered in the upper back at the lower level of the scapula slightly to the outside of the back, to the left of the back. And then it traveled in a very inclined utmost like around 45 degrees, about 30 degrees and was recovered at the T1-T2, which is the topmost part of the back.  The T1 is the upper tip of the back.

So it entered here and got recovered right around the midline of the T1-T2 vertebra.  Entering the chest and packed into T1-T2 and fracturing T1-T2 vertebra.  Fractured the second rib from the back and contused the left lung.

And he bled into his left chest cavity with air in the left chest cavity, which is medically important.

Q    BY MR. GALIPO:  Why is that important medically?

615

A       For you to be able to breathe, if you notice, is a passive motion.  Atmospheric pressure is at 760 millimeter mercury.  The pressure inside your chest is minus 4 to 6 millimeter mercury.  So it's a negative pressure, so it gives you the very passive in-and-out motion.

Whenever you have a bullet that breaches the integrity of the chest cavity, there is a one-way valve mechanism where air moves from a higher pressure into the lower pressure of your chest and compresses your lungs.  So in addition to the bleeding, you could suffer what we called pneumothorax, air in the chest, which by itself alone can kill you.

Q       Okay.  I would like to look at Exhibit 4-11, which is in evidence.

A       Can I put back on my jacket?

Q       Yes, I think so.

A       You think so?

Q       Whatever you -- well, why don't you just wait one more minute and then I'll let you put your jacket back on.

Okay.  This exhibit has already been admitted. Are you able to see this on your screen?

A       Yes, sir.

Q       And can you see in this image Mr. Petit laying on the asphalt?

A       Yes, sir.

616

Q       And can you see what appears to be a firearm?

A       Yes, sir.  Some -- hands holding a firearm, yes, sir.

Q       You also see the casing right to the right?

A       Yes, sir.

Q       Is this position, Dr. Omalu, in your opinion, the relative position of Mr. Petit consistent with the entry wound and the upper trajectory that you described to the jury of the shot to the back?

A       Yes.  So the gunshot wound enters on Mr. Petit was in the upper back.  It traveled in an upward, forward, rightward trajectory.  When you see such a configuration, tells you that the gun that fired the bullet was at the higher level than a human being.  And the human being was, more likely than not, lying flat on the ground or close to the ground.

So this picture, as depicted here, it's scientifically consistent with the anatomic configurations of the wounds by Mr. Petit.

Q       Thank you.  You can put your jacket back on now.  Thank you so much, Dr. Omalu.

And just a few more questions.

You mentioned there was blood loss or bleeding.

A       Yes, sir.

Q       Was that -- obviously was caused by the damage of the gunshot wounds?

617

A        Yes, sir.

Q        Was there anything done at the hospital based on your review of the records to help with the blood loss?

A        Yes, sir.  Considering the dangers of losing blood in the human body, it damages the human brain.  So the doctors made an aggressive attempt to replace the blood he lost by transfusing him with blood.

Q        Can you just very briefly explain how blood loss damages the human brain.

A        So the human brain sits on top of your head. There is less than 30 percent of your body weight.  It gets about 20 to 30 percent of the blood volume every second, every minute.  There are over 200 billion brain cells that control everything about you as a human being.

Unfortunately, the human brain is what we call a postmitotic organ.  It does not have any ability to regenerate itself.  And it can only survive on glucose and oxygen.  Unlike other cells in the body that can survive on fatty acids, that can survive on glucagon, but the brain cells only oxygen and glucose.  They don't have any ability to store oxygen and glucose.

The only way to get oxygen and glucose is the blood that comes in from the heart.  Because it's a very sensitive organ, it cannot regenerate itself.  They have a reserve of about 60 seconds before they start suffering damage.

So when you're losing blood, your blood pressure is going down. The brain cells begin to die. Unfortunately, there are some specific cells in the human brain, once you suffer any significant loss, they begin to die.

There are about three centers in the brain. Unfortunately, this is the part of your brain that handles your mood and your memory. So whenever you have suffered such severe bodily injury, losing massive amounts of blood, you're in this hypermetabolic state, there is an inherent risk of suffering brain damage. So that is why you must begin resuscitation immediately.

Every minute you waste there's a risk of suffering brain damage that increases by 10 percent. Every second or minute you provide resuscitation, you increase the risk of saving the brain by 200 to 300 percent. So losing massive amounts of blood is very dangerous and is a critical and serious bodily injury.

Q    Thank you very much.

MR. GALIPO:  That's all I have, Your Honor.

THE COURT:  Cross.

**CROSS-EXAMINATION**

BY MR. ROTHANS:

Q    Good morning, Dr. Omalu.

A    Good morning, sir.

Q    I just want to get some clarity on the number of

of Cedars-Sinai, at Mr. Petit's discharge?

A    So I don't memorize medical records.  All I know is at discharge he had passed through the acute phase.  He wasn't yet fully healed, so -- let me finish.  His injuries were permanent and serious bodily injuries.  He had two bullets lodged in his body.

So in acute care, once you've been --

MR. BOJORQUEZ:  Motion to strike as nonresponsive and motion to admonish the jury to disregard his testimony.

THE COURT:  I wish you'd stop interrupting him and let him give an answer to the question.

MR. BOJORQUEZ:  Your Honor, I don't believe he is answering the question.

THE COURT:  The request is denied.

Q    BY MR. ROTHANS:  I think you may continue, Doctor, is the ruling.

A    I lost my train of thought.

Q    Well, let me get back to my previous question, sir, and that is the pain assessment chart.  Are you as a pathologist familiar with the pain assessment chart?

A    Yes.  I'm familiar with the pain assessment chart.  But to ask me this pain assessment chart for each specific patient is an undue burden and unreasonable.  We don't memorize that.

MR. BOJORQUEZ:  Objection.  Motion to strike.

Nonresponsive, Your Honor.  I'd like to --

THE COURT:  He's answering the question.  You may not like it, but no.  It's denied.

MR. BOJORQUEZ:  It is a yes or no.

Q    BY MR. ROTHANS:  I'm not asking you about every single patient.  I'm talking about Mr. Petit.

And what I'm asking you is, you're familiar with the pain assessment chart, which is the frown on the one end and the big smiley face on the other end.

You're familiar with that; right?

A    Yes.  I'm familiar with that.  It is the assessment of the cognitive aspects of pain.

Q    I'm asking you, sir, about the pain assessment chart, not the cognitive assets of pain.

The pain assessment chart, you are familiar with that?

A    Yes, I'm familiar with it.

Q    So tell us, then, tell this jury what was Mr. Petit's pain level on the pain assessment chart as denoted in the discharge records at the time Cedars-Sinai released him?

MR. GALIPO:  I'm going to object, Your Honor, as beyond the scope of my examination and his opinions in my examination regarding trajectory.

MR. ROTHANS:  The observation and testimony, Your Honor, is that these injuries were permanent and he

624

sustained substantial injuries.  I just want to know when they let him go was he a mess when they let him go or had he made some recovery with diminished pain.

THE COURT:  Objection sustained.

MR. BOJORQUEZ:  May we approach sidebar, Your Honor?

THE COURT:  No.  This goes beyond the scope of the direct exam.

MR. BOJORQUEZ:  Your Honor, this is his cross-examination the first time.  It can't go beyond the scope.  He's entitled to challenge the credibility of the witness.

THE COURT:  Do you want to resume your seat?

MR. BOJORQUEZ:  I'm sorry, Your Honor?

THE COURT:  I've made my ruling.

Q    BY MR. ROTHANS:  Doctor, you are board certified in a number of different fields of pathology; correct?

A    Yes.

Q    Okay.  And as a pathologist, you don't treat living patients -- you're not a treating physician.  Is that true?

A    I don't present myself as a treating physician, no.

Q    And you have testified to that under oath a number of times, I don't treat patients.  I don't treat

625

patients and I don't offer myself as a treating physician.

All those are true statements, aren't they?

A      Yes.   But like I said in my earlier -- my license is a license to practice as a physician and surgeon.   It doesn't limit -- my license doesn't limit me from treating patients.   But I don't offer or present myself as a treating physician.

Q      How many autopsies have you performed?

A      In my career?

Q      Yes, sir.

A      Over 15,000.   15, one-five.

Q      And you've not treated a patient who sustained a gunshot wound in an emergency room setting; is that correct?

A      That is not true, sir.   Remember, I was an emergency room physician in Nigeria for about five years.   So I performed the full spectrum of emergency care while I was in Nigeria, yes, sir.

Q      Okay.   In the United States?

A      No.   Not in the United States, no, sir.

Q      In the United States you've never treated a gunshot wound patient as a treating physician; correct?

A      No, sir.

Q      That's not correct or that's accurate?

A      I meant, no, I've not treated.

Q      Okay.   And you never performed surgery as a

surgeon in the United States on a patient suffering a gunshot wound.  Is that true, sir?

A        No, sir, I have not.

Q        You being a pathologist did not perform any autopsy on Mr. Petit's remains.  Is that true?

A        I did not perform an autopsy myself, but I reviewed and examined the autopsy report on pictures in this case.  Yes, sir.

Q        Understood.

Did you reach out, by the way, to the medical examiner who did do the autopsy in this case?

A        I did not reach out.  It was beyond my scope in this case.  I had an assigned scope.  I don't have the leisure to do whatever I need to do on a case.  It was outside my scope in this case.

Q        Understood.

You testified that the injuries, at least some of them, were permanent in nature.  Did you request, at any time, to see the medical records of Mr. Petit in the weeks and months after the shooting and after he was discharged?

A        Remember in a case like this, I have a scope.  I have a defined assignment.  The defined assignment was limited to what I was provided.  So I wasn't expected to do that.

Q        Okay.  So you didn't request the records, they weren't provided to you, and you have no knowledge of the pain

627

levels as documented by any physician after he was discharged from Cedars.  Is that fair?

MR. GALIPO:  Your Honor, I apologize.  I'm going to object as beyond the scope of the direct exam.

THE COURT:  He can answer the question.

THE WITNESS:  Can you repeat the question again, sir?

Q    BY MR. ROTHANS:  Certainly.

I had asked you whether you requested any medical records after Mr. Petit was discharged from Cedars-Sinai and you said no.  So I just want to confirm you didn't request the records.  The records were not provided to you.  And you have no knowledge of the treatment or pain levels documented in the weeks or months after he was discharged from Cedars.

Is that a fair statement?

A    That is not a fair statement.  If I may explain.

Q    Please.

A    So as a physician we have what is called standards of practice.  We have to adhere to certain standards.  So in a case like this, my scope wasn't to review the post-discharge materials.  My scope was to establish the injuries suffered.

So the acute care establishes that he suffered serious bodily injury.  He had two bullets retained permanently by his spine and in his face.  So that information is

sufficient for me to establish that he has serious bodily injury.  His injuries is permanent.

And when you have serious bodily injury and permanent injury, you will experience consequences of that injury until death.  And one of the consequences of injuries is mental, somatic and biochemical pain, period.

Q        I appreciate that.  But can we get back to my question, sir?

And that is did you review and do you have any personal knowledge of his complaints of pain, Mr. Petit's, after he was released from Cedars-Sinai until the time of his death?

MR. GALIPO:  Objection, Your Honor.  Beyond the scope of his testimony regarding the trajectories.

THE COURT:  It is, but can be answered yes or no.

Go ahead and answer the question.

THE WITNESS:  The answer is yes.  A human being with serious bodily injury shall experience pain and suffering until death.  But what happens is that people always confuse cognitive aspects of pain to pain and suffering.

THE COURT:  Doctor, thank you.  You've answered.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  You answered the question.

Q        BY MR. ROTHANS:  Have you seen any documentation to support the continuing pain and suffering till death after

Q     And that happened in the position he's in in 4-11?

A     The picture is consistent with the position he was in when he was shot.

MR. ROTHANS:   Nothing further.   Thank you.

MR. GALIPO:   Nothing further.   Thank you, Your Honor.

THE CLERK:   Everyone, let's take a break. 10 minutes.   All rise.

(The following proceedings were held in open court outside the presence of the jury:)

MR. GALIPO:   If I could just make one comment. We're prepared to rest our case.   And I believe the three medical experts that the defense wants to call are rebuttal experts.   And as I told the Court this morning, I limited very much my direct exam.   So if they're going to be going beyond that, since they're rebuttal experts to Dr. Omalu, I'm going to object on that basis.

THE COURT:   So that we don't cause someone needless inconvenience, why don't we find out now, because I hate to have anyone travel all the way down here to testify just to find out they won't be permitted to testify.

So having in mind what Mr. Galipo just said, does that affect anyone's decision with respect to witnesses that they had intended to call?

650

MR. BOJORQUEZ:   It may affect with respect to Dr. Cohen that we have, Your Honor, because I didn't hear any of the psychological, psychiatric type of testimony.   So I think --

THE COURT:   Better call him off.

MR. BOJORQUEZ:   -- Dr. Cohen is here.   So we had them all here, just because we wanted to be efficient, Your Honor.

THE COURT:   Okay.   That's fine.

MR. BOJORQUEZ:   If I could have some moment of time.

I think the other two doctors, one of them will be talking consistently with respect to what Dr. Omalu testified.

THE COURT:   Okay.

MR. BOJORQUEZ:   And the other one will be talking about the pain management, pain and suffering.   So I think those two would be relevant, Your Honor.

THE COURT:   All right.   You can dismiss -- yes?

MR. GALIPO:   That's why I want the proffer.   Because Dr. Omalu didn't talk about the ongoing pain and suffering after hospitalization.

THE COURT:   Right.

MR. GALIPO:   And so they want to have someone talk about that.   That's -- I'm going to object to it.

651

THE COURT:  Right.

MR. GALIPO:  And then the other one I'd like a proffer.  Because he said he's going to talk about what Dr. Omalu talked about.  I want to know what the subject matter is, because their reports have everything but that.

MR. BOJORQUEZ:  Well, Your Honor, he --

THE COURT:  Bullet trajectory I assume.

MR. GALIPO:  Okay.

MR. BOJORQUEZ:  Your Honor, I mean, I think --

THE COURT:  Yes.

MR. BOJORQUEZ:  -- the important thing is, is Dr. Omalu testified about the idea that these injuries and the pain was permanent.  That's what he testified to when he was going off -- he went beyond the questions asked by both counsel and created and opened the door for the issue regarding the issue of damages.

So, again, we're not getting into drugs.  We're not getting into the psychiatric issues.  We just asking him -- we're going to be asking the doctors post being discharged from the hospital, tell us a little bit about whether or not there was any, you know, complaints of pain directly related to the injuries he sustained, and any and all medication that may have been prescribed to control any of the pain and suffering he experienced, so --

THE COURT:  None of that was part of what

654

he does his cases.   It's happening in this court case.

So essentially what's happening is we are now having to sit there and be guided by whatever Mr. Dale Galipo has decided he wants the case and how he wants it to proceed.

THE COURT:   Are we in the defendants' case-in-chief yet?

MR. BOJORQUEZ:   We are not yet, Your Honor.

THE COURT:   Are we still in the plaintiff's case-in-chief?

MR. BOJORQUEZ:   I wouldn't know.

THE COURT:   You don't know if we're in the -- okay.

Now, at this point it is my understanding it is your intention to bring in witnesses who will impeach the plaintiff's witnesses.

MR. BOJORQUEZ:   That is correct, Your Honor.   So I want to give -- I am prepared right now to give the Court the parameters of what I would be intending to seek.

THE COURT:   Because Mr. Galipo has carefully circumscribed the parameters of his witness's testimony.

MR. BOJORQUEZ:   Well --

THE COURT:   And it doesn't deal with all of the things that you just said that your witness is going to talk about.

MR. BOJORQUEZ:   Well, I disagree.

698

Q        Obviously that bullet traveled from back to front?

A        That's -- the entrance is on the back there, that's where it landed, that would be a back-to-front direction, yes.

Q        Okay.  And so obviously after the shots, Mr. Petit was on the ground for some period of time; correct?

A        He was, yes.

Q        You noticed in some photos or videos a certain amount of bleeding?

A        I did notice blood there, yes.

Q        At some point he would have been transported to the hospital Cedars-Sinai?

A        He was, yes.

Q        And then you talked about blood transfusions. Would you agree he needed those?

A        I agree that they were appropriate, yes.  That was part of the care.

Q        If you don't get blood transfusions and you have low blood, then there could be serious medical consequences?

A        That can happen, sure.

Q        And how many blood transfusions did he get?

A        I believe the total is he ended up over the time, because a couple of days it dropped down, he I think ended up with seven units of packed cells, two units of fresh frozen

plasma and two units of platelets.

Q    And why did he need so much blood?

A    In part because he lost some blood at the scene. He lost a bit of blood at the scene.  And then he's also bleeding into his lung over the days.  So sometimes we can autotransfuse some of your blood back to you.  Meaning if you have a chest tube in there and we're pulling the blood out to try to raise that lung, we can use some of that blood to give back to you.  And that's part of the transfusion.  So we're giving it back.

THE REPORTER:  Excuse me.  Can you please slow down.

THE WITNESS:  Oh, I'm sorry.  I apologize.  I'm excited.

We're giving it back to you.  And so we take that blood, we pack it up, and we give it back to you.  So that's a transfusion.  So it's an autotransfusion.  So it's sort of giving you blood because you're sort of leaking.  We give it back.  We leak it.  We give it back at some level.

And as the wound heals, as the lung heals, you're not oozing as much, you're not bleeding as much, and we're not needing as many transfusions.  So he needed blood when he first got to the ER and they gave him a number of units then.  And then over the days he had a few extra autotransfusions.

Q    BY MR. GALIPO:  Okay.  You mentioned in your

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  21ST  DAY OF FEBRUARY, 2026.


_____
MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER