# EXHIBIT 7

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE OTIS D. WRIGHT, U.S. DISTRICT JUDGE

JERMAINE PETIT, et al.,      )
                             )
            PLAINTIFFS,      )      CASE NO.
                             )
               vs.           )      CV 23-00789-ODW
                             )
CITY OF LOS ANGELES,         )
et al.,                      )      VOLUME 5
                             )      PAGES 717 TO 936
            DEFENDANTS.       )
_____)

REPORTER'S TRANSCRIPT OF
JURY TRIAL DAY 5
TUESDAY, FEBRUARY 24, 2026
9:00 A.M.
LOS ANGELES, CALIFORNIA

_____

MIRANDA ALGORRI, CSR 12743, RPR, CRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, SUITE 4455
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

LOS ANGELES, CALIFORNIA; TUESDAY, FEBRUARY 24, 2026

9:00 A.M.

---

(The following proceedings were held in

open court outside the presence of the jury:)

THE CLERK:  Calling item 1, CV 23-789,

Jermaine Petit versus City of Los Angeles, et al.

Counsel, may I have your appearances, please.

MR. GALIPO:  Good morning, Your Honor.

Dale Galipo with Renee Masongsong on behalf of the plaintiff

who is present.

MR. DIGGS:  Good morning, Your Honor.

Rodney Diggs on behalf of Ms. Ashlyn Petit, plaintiff in this

matter.

THE COURT:  Good morning to you all.

MR. ROTHANS:  Good morning, Your Honor.

Steve Rothans on behalf of defendants Hayhoe and Glover, along

with Aria Beizae from my office.

THE COURT:  Good morning.

MR. BOJORQUEZ:  Good morning, Your Honor.

Christian Bojorquez on behalf of the defendant City in this

matter.

THE COURT:  Good morning.

I noticed everyone has spent some quality time

with my law clerk in an effort to finalize these jury instructions, and it appears that you have done so.

All right.  Counselor, I suppose where we go from here, as opposed to just simply indicating what the Court's position is, is to give you all an opportunity to articulate your objections to the Court's position.  So let's start with that, starting with the plaintiff.

MR. GALIPO:  Thank you, Your Honor.  I'm not -- it's my understanding that by the end of our conversation with the law clerk, we were down to five disputed instructions.  And so I don't know what the Court ultimately decided.  But I can briefly state that we believe the vicarious liability instruction should be given for obvious reasons.

There was a disagreement on the wording of the denial of medical care instruction and the Bane Act instruction.  And there was an issue as to whether certain language in the battery instruction should be included.  And I think I was not in agreement that the fleeing felon scenario that is bracketed in the battery instruction should be given for the reasons -- although I am aware there was some information about an ADW, there was no information about serious injury or death.

And all the officers and all the experts agree you couldn't shoot him for fleeing or walking away.  So I think that might be confusing for the jury.

There might have been one other instruction, but that's what I can think of off the top of my head.

THE COURT: All right. I have to admit that I agree with your summary. I don't know how we do not instruct on the vicarious liability. I don't see how that's really a close call. Definitely ought to do that.

Matter of fact, let me start at least in some sort of numerical order if this is the way we're going to do that.

This is the opportunity for counsel to put on the record their views with respect to the position that is being adopted by the Court. And no one necessarily has to go along with that position, and you are entitled to state your position on the record. And this is your opportunity to do so.

So I've got a list of things here. Instruction to indicate that there is no duty to retreat. I don't even understand why that would even be within the conversation. Retreat from what? Retreat from this guy running away? Anyway, I don't see giving that.

Excessive force in response to threat of death or serious bodily injury. Really? How does that apply here? Okay. It doesn't. Fine. Good.

We're not going to give an instruction that uses the phrase "mental health." All right. We can't indicate that it applies to -- in one instance and doesn't apply in the

other.  We can't use the phrase "mental health" with respect to the decedent here.  That was part of an agreement.

Now, with respect to the title of this instruction about denial of medical care, I have a bit of a problem with the word "denial."  Delay, yes.  Denial, I don't think that's appropriate.

Duty to cooperate, I don't think so.

The battery on a peace officer instruction, what is that, 7 and 8?  Special instruction, yes.  Where is the defendants' instruction on battery?

All right.  So I know that we discussed that -- of the competing instructions that the defendants' version Instruction No. 8 was preferable.  The one problem I have -- let's just back up.

"Deadly force can be used to apprehend a fleeing person, fleeing felon when all of the following conditions are present:

"One, the felony threatened or resulted in death or serious bodily injury to another.  Sergeant Hayhoe and Officer Glover reasonably believed that the person fleeing would cause death or serious bodily injury to another unless immediately apprehended."

That is a stretch.

"And Sergeant Hayhoe and Officer Glover made reasonable efforts to identify themselves as peace officers."

I don't think that can be seriously within dispute.

"And to warn that deadly force may be used unless the officers had objectively reasonable grounds to believe that the person is aware of those facts."

The officers did not need to identify themselves as police.  They were in uniforms and driving marked police vehicles.  But was there a warning that deadly force might be used?  I don't think so.  Therefore, I question whether or not this instruction can be given.

MR. GALIPO:  May I be heard just briefly?

THE COURT:  Yes.

MR. GALIPO:  First of all, as the Court noted, it's bracketed.  So it's up to the Court to decide if it applies to the facts of this case.  And obviously, if you look at the first two prongs that they had information that he committed some felony involving serious injury or death and had to be -- they had to use deadly force, because if not immediately apprehended, he was about to commit serious injury or death on someone else, it's simply not here.

And I would note from our record all the officers agreed you couldn't shoot him for walking away or even running away.  And both police practice experts agree under these facts you couldn't shoot him for walking or running away.

So to include that language I think is

unsupported by the evidence and is going to confuse the jury.

THE COURT:   I'm inclined to agree with you.

Anything from either of the defense attorneys?

MR. ROTHANS:   Your Honor, I'm not sure this is a classic case of *Tennessee v. Garner* or not.   But with respect to defendants' Instruction No. 8 -- and I realize the numbering is haywire, but it's the battery by peace officer, deadly force, essential factual elements, Mr. Galipo misquoted.   It's the felony threatened or resulted in death.

And clearly the broadcast from dispatch to the field was that there was an ADW in which a subject was threatened.   Again, that goes to the weight --

THE COURT:   Say that again?   There was a report of an ADW and no target was identified; right?   And I'm assuming that this -- that this occurred wherever Mr. Petit was seen coming from.   So he's going away from I guess the presumed target?

MR. ROTHANS:   Yes, sir.

THE COURT:   Then where is the imminent threat?

MR. ROTHANS:   Well, if he pointed an object that the calling party, the reporting party believed to be a firearm at him, that's the ADW.

THE COURT:   Okay.   I got that.   But he's left that location and he is --

MR. ROTHANS:   But the crime had been committed.

The pointing of the --

THE COURT:  Well, that's in reference to dealing with a fleeing felon.  Now we're talking about use of deadly force at this point in time.  What life are we concerned about?  What life being saved?  What life was in imminent danger?

MR. ROTHANS:  Well, first and foremost, Sergeant Hayhoe.

THE COURT:  Excuse me?  Seriously?

MR. ROTHANS:  Yes.

THE COURT:  He is in an automobile driving down the street and his life was in danger?  He's having to pursue this man.  This man is running away.

MR. ROTHANS:  I guess we have a different perception, Your Honor, on the threats to the officers when they're confronted with what they believe or perceived to be a deadly weapon.  Yes, in a car, out of a car, when the weapon is pointed at them, that's a threat and they can act in self-defense.

THE COURT:  Okay.  You're right.  We don't agree.  And we decided that the defendants had the better proposal.  Okay.  I'm going to reconsider this.  All right.

4 and 5, medical attention.  I believe the Court's position is that we probably should not give this instruction at all about denial.  Now, wait a minute.  That's 4.

All right.  So the numbers are all off now.

MR. GALIPO:   Plaintiff is okay with the delay and just keeping it with the delay, Your Honor, as you suggested.

THE COURT:   I think that's the only thing that's appropriate.  Denial is not factually accurate.

MR. GALIPO:  I agree.  I think delay is what's appropriate.

THE COURT:  All right.  All right.  I'm going to give plaintiff's recommended Instruction No. 5 under, we're going to call it delay of medical care.  All right.

I see no need to give instruction on a suspect's duty to cooperate.

All right.  So the Court is leaning towards giving the defendants' proposed instruction on battery by a peace officer.

Okay.  With respect to the Bane instruction, we're going to give the defendants' proposed Instruction No. 11, but I think we need to include -- we need to include the language that "the reckless disregard for a person's constitutional rights as evidence of specific intent to deprive that person of those rights."  So with that addition, we will go with the defendants' proposal.

Causation, I don't think we need to give an instruction on causation.

MR. GALIPO:   We're withdrawing that instruction,

Your Honor.   Is that the one with -- multiple causes?

THE COURT:   Yes.

MR. GALIPO:   We've agreed to withdraw it in light of the fact that we withdrew the negligence claim.

THE COURT:   Right.   I think we're going to give plaintiff's proposed instruction on vicarious liability.   Oh, that's Number 12.   I don't know how we're going to untangle this.   We'll work it out.

We're not going to give speculative damages and arguments of counsel are not evidence of damages.   And jurors are not to consider attorney's fees and costs, et cetera.

Okay.   Now, you all can voice your objections.

MR. GALIPO:   Very briefly, Your Honor.   As I stated previously, I'm fine with the modification of the instruction for medical care to say delay, because I think that's what we have here.

The battery instruction, I've already voiced my objection, but I think I can handle it in argument.

I don't think this is a fleeing felon case, but I understand the Court.

The Bane Act, we're appreciative of the Court including the language about reckless disregard, which is 9th Circuit case law.

And for obvious reasons the vicarious liability instruction should be given.

730

That's all the comments I have.

THE COURT:  Thank you, sir.

Anyone else?

MR. ROTHANS:  Your Honor, we just want to go on record as objecting to the use of the delay previously identified as denial of medical care.  We believe the analysis is more appropriate under the 14th Amendment than the 4th Amendment.  We'll submit on that.

Our special Instruction No. 4, the duty to cooperate with police and submit to detention, we'll withdraw that instruction.

With respect to 9th Circuit Model Instruction 9.27, did the Court indicate it's giving the plaintiff's or the defense?  Particular rights 4th Amendment unreasonable search of person, excessive force.

THE COURT:  Okay.  You have this as Number 6. Hang on.

Okay.  What is your question?

MR. ROTHANS:  I don't recall hearing which one of the 9.27 the Court's going to give, the plaintiff's or the defendants'.  That's the particular rights, 4th Amendment, unreasonable seizure of person.

THE COURT:  Plaintiff's.

MR. ROTHANS:  Your Honor, subject to that, I want to lodge our objections.

First and foremost, in the factors that are to be given in plaintiff's proposed instruction on 9.27, 9th Circuit model, they have included whether it should have been apparent to Daryl Glover and/or Brett Hayhoe that Mr. Petit was emotionally disturbed.

The Court did say that mental health references are not coming in. I just want to confirm that emotionally disturbed is not coming in.

THE COURT: Right.

MR. ROTHANS: Okay. Very well.

And then the second part we object to with the plaintiff's 9.27 is they left off the last two items from the Model Instruction. One of the factors, whether there was probable cause for a reasonable officer to believe that the suspect had committed a crime involving the infliction or threatened infliction of serious physical harm.

And they also left off the last paragraph where probable cause exists when, under all of the circumstances known to the officers at the time, an objectively reasonable police officer would conclude there is a fair probability that Jermaine Petit has committed or was committing a crime. And we would object to the use of the plaintiff's if those provisions are not included.

I will then turn to the instruction battery by a peace officer. I believe the Court said they're going to give

the defendants'.  I just want to make sure that it's clear any reference to mental health or intellectual disability will not be included.

My position on vicarious liability, Your Honor, is pretty simple.  That's what I call the deep pockets instruction.  The parties have stipulated to course and scope.  The parties have stipulated to vicarious liability.  The jury doesn't need to know what that means.  We've stipulated to it.  That means there is an understanding that if there's a verdict adverse to the officers the City is responsible for it.  But telling them that just highlights the fact that this is deep pockets.

Subject to that, we'll submit.

THE COURT:  Anyone else?

MR. BOJORQUEZ:  Good morning, Your Honor.  Just briefly, I think, you know, the City would also identify, with respect to the Bane Act, we just believe that the Bane Act instruction as provided from the CACI instruction should be used without being modified.  We believe, if you look at the cases cited by, I think it's the *Tatum* case or maybe -- no, that's not from the *Tatum* case -- but the cases cited by plaintiff's counsel, I think those are cases that, you know, if the state, the CACI instructions needed to be somehow adjusted or modified, that that would have been done, and it's never been done yet.  So we would object to it being modified.  We

think the Bane Act should be given just as it reads.

I agree with counsel's perception on the vicarious liability so I won't argue that issue.

I think just on the 9.27, Your Honor, with respect to the instructions, I do believe, I think with respect to Number 6 and Number 5, which is the old numbers -- so plaintiff's instruction is Number 5 and the defendants is Number 6, I would just like the Court to reconsider providing defendants' Instruction No. 6, because I think it's the most fair and accurate of the 9th Circuit Model Jury Instructions. Essentially they're on par.

So plaintiff's Number 5 and defendants' Number 6 track each other, with the exception of Number 12 in Number 5, which is the plaintiff's instruction, which obviously has the "emotionally disturbed" that the Court has identified would be removed. But then they go and do remove those last two areas of Number 13 that we have in the defendants' Number 6, and then also the probable cause definition, which I think is necessary.

So I think the defendants' Number 6 most correctly tracks not only the 9th Circuit Model Jury Instruction 9.27, but I also think it tracks the removal of what the Court had stated needed to be removed, which was factor Number 12.

I think our Number 12 obviously -- I notice here, it says, "Whether a reasonable office would have or shave

accurately."  I think it obviously should have been "whether a reasonably officer would have" -- let's see.  I think it should have been whether it was a -- "whether a reasonable officer would have or should have accurately perceived a mistaken fact."

So making that adjustment in defendants' Number 12, I think defendants -- I mean defendants' factor Number 12 -- my apologies, Your Honor -- I think that the Court -- I would ask the Court to reconsider and give the defendants' Instruction No. 6 with that correction at factor Number 13 or factor Number 12.

Thank you, Your Honor.

THE COURT:  Thank you.

Anyone else?

MR. ROTHANS:  No, Your Honor.

MR. GALIPO:  No, thank you, Your Honor.

THE COURT:  All right.  Who is our next witness?

MR. ROTHANS:  Chief Phil Sanchez, defense expert, Your Honor.

THE COURT:  And is he here in the courtroom? Then let's get the jury out here.

(The following proceedings were held in
open court in the presence of the jury:)

THE COURT:  All right.  We are still in the defendants' case-in-chief.

decided to take his gun out, he decided to point it out his open window -- not out the window, but in that direction -- for 90 feet and 9 seconds.

Are you aware of that?

A       Yes.  My understanding is that Sergeant Hayhoe's testimony was that he was trying to triangulate or eliminate a path of travel for Mr. Petit.

Q       In fact, you brought previously a water bottle up to the stand; correct?

A       Yes.

Q       A pretty large water bottle.

A       Yes.

Q       And from looking at some of the evidence in this case, you are aware that Mr. Petit had a large water bottle; correct?

A       In his left hand.

Q       Right.

A       Right hand or correct?

Q       Correct.

A       Thank you.

Q       Did Sergeant Hayhoe ever see this water bottle according to his testimony in Mr. Petit's left hand?

A       Not that I recall.

Q       Did any of the officers say they saw a water bottle in his left hand when they were looking at his hands so

781

But in any event, he had the water bottle in his left hand at that point; correct?

A        Yes, sir.

Q        And he had this car part, what we now know to be a car part, in his right hand?

A        Yes.

Q        And we can see the car part laying on the ground here in this exhibit; correct?

A        Yes.

Q        In fact, that car part was laying on the ground next to him after the shooting before the officers approached. Would you agree?

A        Yes.

Q        And not one officer said, hey, there it is, there's the gun, I see it right there.  In fact, what was said is, does anyone see a gun?  Anybody see a gun?

And this object is laying on the ground right there.  Would you agree?

A        In part I would agree.  I think that Sergeant Hayhoe said where's the gun rhetorically, in my opinion, with respect to Mr. Petit and the object that was directly adjacent to Mr. Petit.

I would add that the officers are unsure at that point and are -- well, I shouldn't say unsure.  They're reinforcing those observations by direct orders they are giving

Do you remember that?

A        Yes.

Q        And bleeding.

A        Yes.

Q        And are you aware that the first time any medical was called was after he was handcuffed?

A        That's my understanding.

Q        Based on your review, did Sergeant Hayhoe, the supervisor on scene, the one who fired two shots, ever call for medical for Mr. Petit after he shot him?

A        I don't know that Sergeant Hayhoe made that broadcast, although officers at the scene familiar with the event made the broadcast.

Q        Are you aware there was approximately four minutes between the shooting and the time the paramedics were called?

A        I think there was testimony suggesting it was between one and a half and four minutes.

Q        Have you ever timed it to see that it's actually four minutes?

A        No, sir.  I just went on the testimony at deposition, which both officers were examined extensively.

Q        Let's assume it's true that it was four minutes for purposes of my question.  Okay?

Aren't officers trained that when someone is

792

responsible for their tactical decisions.  True?

A       Yes.

Q       And one of the importance of tactics is for safety.

A       Yes.  Safety of the officers, safety of the public, safety of the individual they're trying to contact.

Q       Right.  The safety of the individual is a factor to consider.  True?

A       Yes.

Q       And the goal is, when possible, to take someone into custody or make contact with no force, if possible; correct?

A       Yes.

Q       Or the minimal amount of force if feasible?

A       The minimal amount of objectively reasonable force based on the totality of the circumstances.

Q       In this case, did the officers have any information that anyone was injured?

A       No.

Q       Any information that shots had been fired?

A       No.

Q       Okay.  And, in fact, when Sergeant Hayhoe first saw Mr. Petit, he was not on Martin Luther King yet.

        Is that your understanding?

A       Correct.  He was on -- the street is Deg- --

in his left hand.  True?

A     Yes.

Q     And we have -- he has what we now know to be a car part in his right hand; correct?

A     Yes.

Q     And did either officer yell out "gun," "gun," "he's got a gun"?

A     No.  They ordered Mr. Petit to drop the objects and he did not comply.

Q     Well, we're going to listen -- or the jury will listen to see if those commands you're saying existed actually happened.  But you would agree, instead of either officer yelling out "gun," Officer Martinez said, "It's not a gun, bro."

A     Officer Martinez did make that statement.

Q     And based on your review of Officer Glover's statement in deposition, he heard that statement; correct?

A     Yes.  In fact, what Officer Glover testifies to is that he --

Q     I just want to know if you heard it.

A     Yes.

Q     Okay.  And officers are generally trained that -- to rely on other officers' statements generally; correct?

A     Generally, not always.  Based on the totality of the circumstances.

Q       But generally you're trained to trust your partner.  Is that fair?

A       Well, trust of course is not extended to necessarily the perception of a firearm in a rapidly evolving event.

Q       Okay.  Officer Martinez says, "It's not a gun, bro."  And I asked you at your deposition whether that was inappropriate, you said, no, that was appropriate.

Do you recall that?

A       Yes.

Q       Because you said that's a good thing to do to avoid the use of unnecessary deadly force.

Do you recall that?

A       That is still my opinion.

Q       Okay.  As a matter of fact, it's your opinion that on that sidewalk, before they got to Bronson, it would have been inappropriate for Officer Martinez or Officer Glover to shoot Mr. Petit.  Isn't that true?

A       Yes.  And I believe they testified as much.

Q       Okay.  And you agree with that; correct?

A       Yes.

Q       And during part of that time on the sidewalk, you would agree Mr. Petit was turned towards them with this object in his hand, this car part; correct?

A       Yes.

Q       And you, being the expert for the defense, are agreeing before this jury it would be inappropriate to shoot him at that time.   True?

A       Yes.

Q       Now, I want to ask you a little bit about some of the principles that apply to the use of deadly force.  You would agree the expectation, if you shoot someone center mass, it's going to cause serious injury or death.

Is that the training?

A       Yes.

Q       You know in this case Mr. Petit was shot in the face and the back; correct?

A       Face and the left upper shoulder, yes.

Q       Well, it's technically his back, isn't it, below the scapula?

A       I believe it was the scapula that the round impacted.

Q       Do you think the round struck him in the back?

A       Well, as I testified earlier, I believe that one of the rounds struck Mr. Petit in the upper left torso.

Q       I'm asking you if it was -- I understand you're retained on behalf of the defense here and they're paying you.

Would you agree he was shot in the back?  That's all I'm asking.

MR. ROTHANS:  Your Honor, that's argumentative.

THE COURT:  Sustained.  Don't do that.

Q      BY MR. GALIPO:  Let's talk about the deadly force principles.

You have to have an immediate or imminent threat of death or serious bodily injury to use deadly force.  Would you agree?

A      Yes.

Q      And would you agree if there's not an immediate or imminent threat of death or serious bodily injury, deadly force should not be used.

A      Yes.

Q      In fact, the P.O.S.T. learning domain and California law, as you understand it, says you have to have the ability, the opportunity, and the apparent intent to immediately cause death or serious bodily injury to use deadly force.  True?

A      Yes.  All of which I believe that Mr. Petit possessed.

Q      Well, you understand the jury is going to make that decision.

A      Yes.

Q      And it goes on to say a fear of future harm, no matter how great the fear or how likely the harm, is insufficient.  Would you agree?

A      Yes.

A        Yes.  That if it's in his possession or her position, it's not generally speaking --

Q        In fact, you would agree under the facts of this case, given commands, arguably not complying with them, walking away westbound on the sidewalk, you would agree it would not be appropriate to shoot Mr. Petit for walking away on the sidewalk unless there was an immediate or imminent threat of death or serious bodily injury.

Would you agree with that?

A        Yes.

Q        Even if he ran away, you would agree you couldn't shoot him unless there was an immediate threat of death or serious bodily injury.

Would you agree with that as well?

A        Yes.

Q        Officers are trained to give a verbal warning when feasible before using deadly force.  True?

A        When feasible and safe to do so, yes.

Q        And officers are trained to consider their backdrop when using deadly force?

A        To the best of their ability, yes.

Q        Are you aware of what was in Sergeant Hayhoe's backdrop when he fired?

A        Yes.

Q        It was the car in the driveway; right?

A        Yes.

Q        And you saw the Ring video; correct?

A        Yes.

Q        You saw some of those children playing on the sidewalk on their bicycles?

A        The opposite side of the street, yes.

Q        By the way, you were asked if you reviewed policies.  Is it true that the LAPD has a policy generally prohibiting shooting out of a moving vehicle?

A        Yes.

Q        In fact, in terms of training, you would agree that officers are trained that suspects have the right to be free from excessive force under the 4th Amendment.

A        Yes.

Q        Would you also agree that hypothetically, if Sergeant Hayhoe had seen a dark object in Mr. Petit's hands before he pulled up, my hypothetical, you would agree that would be tactically not a wise thing to do if he had seen a dark object in his hand?

MR. ROTHANS:  Incomplete hypothetical. Vague, Your Honor.

THE COURT:  Do you understand the question?

THE WITNESS:  Yes, sir.

THE COURT:  You may answer it.

THE WITNESS:  Thank you, Your Honor.

Yes, it would have been inappropriate for Sergeant Hayhoe to pull forward and pass Mr. Petit if he had seen a dark object initially in his hands.

Q        BY MR. GALIPO:    In fact, it is your opinion that had Sergeant Hayhoe looked and saw a dark object in Mr. Petit's hands, it would have been better tactically to stay back, keep his distance, communicate with the other officers, maybe even provide cover for them with his vehicle.

A        That would be an option.    There would be other options that would come to my mind as well.

Q        In fact, when Sergeant Hayhoe decided to move forward, he actually passed both officers, didn't he?

A        Yes.

Q        Was there any attempt to communicate with the officers so that Martinez maybe could have told Hayhoe it's not a gun?

A        There was no communication between the three officers at that point.

Q        So from Officer Glover's perspective, you already told us that in your opinion it would be inappropriate for him to have shot Mr. Petit while Mr. Petit was on the sidewalk; correct?

A        At which point on the sidewalk?

Q        Before he got to Bronson.

A        Yes.

correct?

A        I think my testimony was that would be one option for Sergeant Hayhoe.

Q        In fact, we know from reviewing the body-worn camera footage that Mr. Petit had a water bottle in his left hand; correct?

A        Yes.

Q        And had this car part in his right hand; correct?

A        Yes.

Q        The car part.  I'm sorry.  I'll speak into the microphone.

But according to Sergeant Hayhoe, he's looking at Mr. Petit continuously and doesn't see anything in his hands and that's why he decides to pull forward.

Do you recall that statement?

A        I recall that he was pulling forward so that he could triangulate or eliminate a path of travel for Mr. Petit.

Q        But do you recall him saying the reason he pulled forward, in addition to triangulating, he felt safe to do so because he didn't see anything in Mr. Petit's hands?

A        Yes.

Q        Okay.  And then according to Sergeant Hayhoe, for 90 feet, almost twice the distance of this courtroom, and 9 seconds, as he's looking out his window at Mr. Petit, pointing his gun at him, he sees no object in either one of his

Did you see that?

A      Yes.

Q      And according to his testimony in deposition, he wasn't sure what color it was.

Did you see that?

A      Yes.

Q      And according to his deposition testimony, he only saw a couple inches of it.

Did you see that?

A      Including the part that he described as the barrel, yes.

Q      Yes.

And according to that testimony, he didn't see any silver or chrome on the barrel.  True?

A      That's true.  I think the object was described as a dark object, dark-colored object.

Q      But you know from looking at pictures of it and seeing it in person on the barrel portion of it it does have chrome or silver; correct?

A      Yes.

Q      And then this very same object is laying on the ground next to Mr. Petit after the shooting.

A      Yes.

Q      Would you at least agree with me that if hypothetically Mr. Petit did not raise and point this object

828

the issue we're looking at is the mental and emotional pre-death pain and suffering. I think the problem we have is that -- I think the concern that we have is obviously when it talks about the mental and emotional pre-death pain and suffering, those were some of the issues that we had medical doctors, like Dr. Cohen and other doctors who would have addressed those issues, but because of the circumstances and limitation on mental issues and drug issues, we stayed away from that information.

So I think -- I think, you know, again, it looks up on the first portion it says, "Physical injuries, disfigurement and physical pre-death pain and suffering," yes. But I don't really think that -- I guess the best, if we -- we would object to the entirety of the emotional issue, because I don't think there's any issue of it at -- post incident, but obviously I think we would say -- we would ask that mental and emotional be struck, and it just write -- or it should read, "Pre-death pain and suffering, distress, grief, humiliation, inconvenience."

I don't believe there's any evidence of loss of enjoyment of life at all that came in. And I do believe that, again, that goes -- stems to some of those medical records that we limited ourselves to highlight. But, you know, there was no evidence of any loss of enjoyment of life.

MR. GALIPO: Obviously there was, because his

879

mentioned that.  Disability, disfigurement, physical impairment, pre-death pain and suffering, loss of enjoyment of life, and the mental and emotional pre-death pain and suffering, humiliation, grief, anxiety, and inconvenience, et cetera.

So let me just talk for a few moments about this and then I'm done.

First of all -- and I asked you this question in jury selection.  Would you be able to fairly consider pre-death pain and suffering and damages for someone who has passed away?  And I think for all of you that I asked you said yes.

And do you understand that the daughter is stepping into the shoes, if you will, of her father under the law, having the right to collect that, as any child would have the right to collect that for the parent?  And everyone seemed to generally understand that.

And we also know that Mr. Petit passed away.  I am not standing before you to say specifically he passed away because of this.  I want to talk about these damages.

But I will say this, and Dr. Omalu said it well. Anyone that has these injuries is going to have problems, pain, suffering and otherwise, for the rest of their life.  They might get a lot better or somewhat better, but they're going to have problems.

So not only during his hospitalization, but

after, when Ashlyn saw him, he had physical, mental and emotional pain and suffering.  And if you think about it, it would be a difficult thing for anybody to recover from, physically or emotionally.  Walking down the street without a weapon, getting shot in the face and shot in the back.  Having multiple broken bones, plates, screws, you name it, teeth missing, tongue cut out, part of your tongue is missing, that's terrible.

And that is why, before an officer shoots someone, understanding it's likely to cause serious injury or death, you have to make sure it's justified.  You can't just go on, well, we thought it might be a gun.

So getting back to the verdict form.  And this number is coming from me, not from Ashlyn.  Because given everything you heard in this case, I would submit there needs to be full compensation and accountability for Mr. Petit.  And you can divide it up however you think it's fit, but I would request 8 to $10 million for what Mr. Petit went through.  And I'll tell you this.  I would be making the same request for whoever it was that went through the same thing.

Now, the damages are totally up to you.  I will respect whatever you decide and come up with.  This is a range that I'm giving for you to consider.  All of his damages from the moment this happened going forward.

I thank you all for listening to me.  I know the

900

Did plaintiffs give you -- those who bear the burden of proof, did they give you the medical records to show the discharge information?  Did they give Omalu the discharge information?  Of course not.  So there's no doubt, there's no question that the injuries were significant to Mr. Petit.  No question about it.  But how did he do in the three weeks at Cedars-Sinai?  What was his condition upon discharge?  No medical records on that.

Now, Ms. Petit, again, saw her father within a week or two after that, August of 2024, but one day only.  She was here for a week.  We have nothing after that.

Where is this uncle?  Where is the brother of Mr. Petit who is an L.A. County sheriff's deputy?  Why didn't he testify as to the observations he had of his brother over that time period that he lived?  Where are family, other family members?  Friends?  Colleagues?  Co-workers?  Not a single person came in here except Ms. Petit who saw him one day in August of 2024.

Ask yourselves why aren't there medical records from the Veterans Administration hospital in West L.A. that documents the pain?  You heard questioning about the pain assessment tool.  Nurses and doctors document pain when a patient comes in to an urgent care facility, to a hospital, to a doctor's office.  Where are you hurting and rate it for me.  Describe it for me.

Pain scale. Not a single record offered. Why do you think that is? Maybe it's because, like Dr. Hedge testified, maybe it's like the other physician that was here testified, Dr. Vilke, there's not a single reference to continuing jaw problems or pain. There's not a single reference to left shoulder or left back area pain. Not a single reference. Thousands of documents, thousands of pages of medical records, not one.

What we don't know, you won't know what those records show because they weren't admitted. But they want you to throw a lot of money at them, to award a lot of money at them, when you don't have a clue when he died, how long he survived, how long he survived the shooting after he was released from Cedars, and the level and degree of pain.

What about his activities of daily living? What did he do day-to-day? We know that on July 18, 2022 what he was doing. We know that he had a home up in the Palmdale area. What was he doing in the months that followed until his remains were found in August of 2024?

I'm not going to put up the verdict form. Mr. Galipo did rather quickly. We believe that a lot of the questions require an answer appropriately of "no."

First question, did Brett Hayhoe and/or Daryl Glover use excessive force against Jermaine Petit?

We believe the proper answer is "no."

It goes on.  Did Brett Hayhoe and/or Daryl Glover delay, deny or obstruct the provision of medical care to Jermaine Petit?

We believe the answer is "no."

On the damage portion of the special verdict, there's two categories.  One is the physical injuries, disfigurement and physical pre-death pain and suffering. Again, I suspect you don't have enough information to come up with some numbers on that.

And there's also a mental and emotional pre-death pain and suffering, distress, grief, on and on.  What do you know about his emotional state following this incident? Anything?  What do we know about the months that followed his release from Cedars-Sinai in early August of 2024?  Anything? Excuse me.  2022.  Anything?

And why not?  If they want millions of dollars from you, if they want you to give millions of dollars in this case as compensation, fair and reasonable and just compensation, why haven't they brought in a single doctor from the Veterans Administration, a single doctor from an urgent care facility?

Now, Mr. Galipo might say, well, Rothans and defense team could have done that.  We're not asking for money damages.  We don't have the burden of proof.  He wants millions of dollars from you folks, but not a single doctor, not a

single nurse, not a single health care provider in the time that followed his departure from Cedars. Why?

What Mr. Galipo is suggesting, along with his team, is there is one theme for damages, folks, one theme from their side of the table. It's justice equals money. That's what he's telling you. Justice equals money, dollar signs.

And he's suggesting, by the way, I think he said 8 to 10 million. I could barely write it on my pad, the more money, the more justice.

It's funny. That's not what Judge Wright told you. That's not what the jury instructions tell you. But they want to suggest to you, for a time period that we're -- that is undefined, how long did he live post discharge from Cedars? Nobody knows here. Nobody knows. The evidence was not presented. But he wants 8 to $10 million.

Again, I don't have that crystal ball. I don't know what you folks are thinking. I hope that you conclude, as a reasonable police officer would, that these officers acted appropriately under the circumstances they were presented with. But if, in fact, eight of you, eight of you determine that they're entitled to money -- and, again, we pray that it doesn't happen -- I have some numbers I want to throw at you, some numbers to consider that I believe are much more fair, reasonable and just than the lottery ticket that Mr. Galipo proposed.

First one is, consider awarding to the plaintiff for the pain and suffering experienced by Mr. Petit $50,000 for each of the two months from the shooting until mid September. There is no question he experienced pain and suffering. There is no question he was shot in the jaw or the left scapula area and that he suffered significant injuries. So $50,000 a month for those injuries. That obviously totals 100-.

And then consider the -- for the time following that, $10,000 a month for a year. Let's give them the benefit of the doubt. Even though there's no evidence, even though there's nothing to support it, $10,000 a month for ongoing pain past mid September for a year, because we don't know when he died. There's no evidence of it. There's no evidence of it. So 10,000 a month for the pain and suffering for that year period for which there is no documentation. That's 120,000, the total being obviously $220,000.

We think this money is life-changing. And if the eight of you decide that the officers used excessive force, we hope you'll consider a better evaluation of the damages for the less than two-year period he was alive as compensation.

Folks, this is my only opportunity to speak with you before Mr. Bojorquez and then Mr. Galipo get back up. And I'm just going to remind you that the plaintiff bears the burden of proof here.

Let me conclude by saying that 99 percent of the

938

CERTIFICATE OF OFFICIAL REPORTER

         I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

THE UNITED STATES.

              DATED THIS  25TH  DAY OF FEBRUARY, 2026.



              _____
              MIRANDA ALGORRI, CSR NO. 12743, CRR
              FEDERAL OFFICIAL COURT REPORTER